# EXHIBIT A

IN THE COURT OF COMMON PLEAS OF
CHESTER COUNTY, PENNSYLVANIA

MARC BRAGG, Esq., an individual,

               Plaintiff,

       v.

LINDEN RESEARCH, INC., a corporation,
and PHILIP ROSEDALE, an individual,

               Defendants.

CIVIL DIVISION

No.

**COMPLAINT IN CIVIL ACTION**

Code:

Filed on behalf of Plaintiff, MARC BRAGG,
Esq., an individual,

**NOTICE TO PLEAD**

TO:    Defendants

    You are hereby notified to file a
written response to the enclosed **Complaint**
within twenty (20) days from the date of
service hereof or a judgment may be entered
against you.

By: _____
    Attorney for Plaintiff

Counsel of record for this party:

Jason A. Archinaco, Esq.
P.A. I.D. #76691

WHITE AND WILLIAMS LLP
Firm #683
1001 Frick Building
Pittsburgh, PA  15219

(412) 566-3520

**JURY TRIAL DEMANDED**

IN THE COURT OF COMMON PLEAS OF
CHESTER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| MARC BRAGG, Esq., an individual, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | |
| | ) | |
| LINDEN RESEARCH, INC., a corporation, | ) | |
| and PHILIP ROSEDALE, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>NOTICE</u>

You have been sued in Court. If you wish to defend, you must enter a written appearance

personally or by attorney and file your defenses or objections in writing with this Court. You are

warned that if you fail to do so the case may proceed without you and a judgment may be entered

against you without further notice for the relief requested by the Plaintiff. You may lose money

or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO

NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.

THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE

TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THA TM AY OFFER

LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**Chester County Bar Association**
**15 West Gay Street, 2nd Floor**
**P.O. Box 3191**
**West Chester, PA 19380**
**610-692-1889**

## IN THE COURT OF COMMON PLEAS OF
## CHESTER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| MARC BRAGG, Esq., an individual, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | |
| | ) | |
| LINDEN RESEARCH, INC., a corporation, | ) | |
| and PHILIP ROSEDALE, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S COMPLAINT IN CIVIL ACTION

AND NOW COMES, the Plaintiff, Marc Bragg, Esq., by and through his attorneys, Jason

A. Archinaco, Esq. and the law firm of WHITE AND WILLIAMS, LLP, and avers as follows:

### THE PARTIES

1.      Plaintiff, Marc Bragg (hereinafter "Bragg"), is an adult individual resident of the

County of Chester, Commonwealth of Pennsylvania.

2.      Defendant Linden Research, Inc. (hereinafter "Linden"), is a Delaware

corporation, with a primary business address and at all relevant times, providing its services out

of the State of California at 1100 Sansome Street, San Francisco, CA.  Linden uses the name

"Linden Labs" on the internet to conduct business.

3.      Defendant, Phillip Rosedale, (hereinafter "Rosedale") is an adult individual and a

resident of the State of California with an address of 2717 Pacific Avenue, San Francisco, CA

94115-1129.

## FACTS

## BACKGROUND

4.      Linden operates a massively multiplayer role-playing game ("MMORPG") known as "Second Life" and hosted at http://secondlife.com.

5.      To participate in Second Life, a participant must download Linden's client software and install it on the user's computer. A participant may participate for free, or upgrade to a premium membership.

6.      In Second Life, participants from around the world interact together in a huge "virtual" world / environment.

7.      The virtual world / environment contains many of the real world goods and items from cars to homes to slot machines. Linden represents that it promotes the creation and trade of such goods and items by its participants and refers to such items as "virtual property."

8.      Defendants' computer code was designed and intended to act like real world property that requires the payment of U.S. Dollars to buy, own, and sell that property and to allow for the conveyance of title and ownership rights in that property separate and apart from the code itself, and as such, Plaintiff's rights in the virtual property should be regulated and protected like real world property.

9.      Participants in Second Life create characters called "avatars," develop their own unique reputation and/or buy and sell unique software, encoded and scripted "objects," design numerous creative and unique buildings, clothes, equipment, furnishings, etc., run businesses, and purchase uniquely located and described pieces of "virtual land" from the Defendants.

10.     Although referred to as a "game," Second Life is a business operated to generate a profit for Linden and, upon information and belief, Second Life generates a substantial profit for

-2-

Linden and Rosedale.  Rosedale has publicly stated that Second Life is not a game but rather is a "platform."

## VIRTUAL WORLDS

11.    Linden is not the only company that operates a virtual world for a profit and, indeed, the industry has become saturated with such games ranging from Blizzard's Worlds of Warcraft, to Sony's Everquest and Star Wars Galaxies.  However, unlike the industry leaders, Linden is the only MMORPG that represents that its participants retain / obtain ownership rights to the land they purchase from Linden and retain all intellectual property rights for any virtual items or content created by the participant and, indeed, Linden does not even restrict or disclaim such ownership interests in their "Terms of Service" agreement (hereinafter "TOS").

12.    A virtual world is a place one co-inhabits with hundreds of thousands of other people simultaneously. It is persistent and dynamic, in that the world exists independent of any participant's presence (much like the internet does), and in that a participant's actions can permanently shape the world. Even when one is not in the virtual world, the environment continues to exist and changes over time.

13.    Millions of people with Internet connections are now living large portions of their lives, forming friendships with others, building and acquiring virtual property, forming contracts, substantial business relationships and forming social organizations in these virtual worlds.

14.    These millions of individuals are paying substantial sums of money to exist in these virtual worlds; hundreds of millions of dollars flow into the coffers of Sony, Blizzard, and other companies like Linden that provide the servers upon which these virtual worlds reside. Worlds of Warcraft, for example, boasts a subscriber base in excess of 7 million and is believe to be generating revenues in excess of $1 billion a year annually.

-3-

15.    There are no courts, no halls of Congress, and no visible mechanisms for civic governance; however, it is foreseeable to the corporate companies that own these virtual worlds, including Linden, that where large amounts of real money flow, legal consequences must follow and, indeed, Linden enforces its legal rights to payments to which it is entitled, and to protecting its business through real world laws.

16.    In many respects, these virtual worlds exist similar to theme parks such as Disney World. Thus, although the park itself is an "attraction" in some respects, like Disney World, shops selling merchandise exist and a variety of transactions occur inside the virtual world just like such shops and transactions occur inside Disney World, and independent of entrance to the park itself. Unlike Disney World where Disney chooses to operate many of the shops and control many of the transactions inside of Disney World, nearly every sale of virtual goods and/or virtual "shops" are operated by the third party individual participants of Second Life, as opposed to Linden itself. Moreover, just like the transactions that occur inside Disney World are subject to the laws of the United States of America, so too are the transactions that occur inside and in connection with Second Life.

17.    Unlike Disney World, however, Linden has been in the business of selling the land inside the "theme park". Thus, Linden no longer owns the very world they created, instead choosing to sell the world / land to consumers. Rosedale has referred generally to Second Life as a "country."

18.    In other respects, Second Life itself is much like Microsoft's Internet Explorer in that it simply gives a participant access to a "world" (like the internet), where the "participant" can enter into a variety of transactions and visit various places. In many respects, Second Life is simply a three-dimensional version of Microsoft's Internet Explorer – and the places one can

-4-

visit using that graphical three-dimensional web browser are simply three dimensional graphical web sites. Rosedale has acknowledged that "Second Life is like the internet but it's 3-D . . . ."

19.    Unlike Microsoft's Internet Explorer, however, participants can "see" the other visitors to various "web sites" and locations and choose to interact with them by "chatting" with them.

20.    This similarity has lead some commentators to note that Second Life is, in actuality, an operating system like Microsoft Windows and is ultimately designed to compete with Microsoft's Windows. Rosedale has called Second Life a "platform."

## VIRTUAL ITEM AND PROPERTY OWNERSHIP

21.    Typically, in such virtual worlds, the operators of the worlds claim to not permit the participants to hold any rights to "virtual items" (houses, buildings, cars and other virtual objects) or "virtual land" that exist inside the game world. Both are referred to generally by participants in such worlds as "virtual property."

22.    Indeed, several of such companies who have not provided any rights to the participants have threatened lawsuits to prevent the trade and sale of virtual items, land, money and accounts and have attempted to prevent the sale and trade of virtual items, land, money, goods and even the accounts that contain such virtual items, lands, money and goods

23.    Generally speaking, most virtual worlds derive their revenue and profit, not from the sale of virtual items, land, money or goods, but rather from monthly subscription fees paid to the operator of the world.

24.    The industry standard has generally been to deny that the participant holds any rights in the virtual items, land, money and/or goods that the participant holds in his account. This denial is despite the growing body of legal work that sets forth that, irrespective of such

-5-

company's claims, that participants in such worlds can and do have rights to their virtual property and that any statements or claims to the contrary are unconscionable.

25.     Despite such denials of ownership by participants, the trade of virtual items, land, money and goods is believed, by some estimates, to have approached nearly $1 billion annually and is, in any event, a market and industry in excess of $100 million a year.

26.     Further, despite such a prospering "black market" for virtual items, land, money and goods, because such transactions have been branded as "illegitimate" by the operators of many (if not most) of the virtual worlds, many participants in such virtual worlds have refrained from buying or selling virtual items, land, money and goods despite their rights to do so.

27.     In many respects, a golden opportunity had existed for some time for any virtual world game company that would claim and represent to legitimize the buying and selling of virtual items, land, money and goods by the payment and exchange of U.S. Dollars and that would preserve and protect the participant's intellectual property and ownership rights in any items or goods created inside the game world by the participant.

## SECOND LIFE'S PLACE IN THE CROWDED MMORPG MARKET

28.     When Second Life was first "opened" by Linden in 2003, the competition in the industry for participants in virtual worlds was fierce and the industry was dominated by well-known players.

29.     Upon information and belief, Linden had difficulty differentiating itself from other, higher profile games and turning a profit for Linden.

30.     Initially, Linden chose the familiar route of refusing to recognize the participants' rights to the virtual property in-game.

-6-

DOCS_PIT 35184v.1

31.     Second Life, unlike other virtual worlds, was devoid of any name recognition, fancy graphics or exciting game-play.   As such, Second Life generally languished and trailed its peers in terms of participants.

32.     As such, desperate for a participant base to generate profits, Linden made a calculated business decision to depart from the industry standard of denying that participants had any rights to virtual items, land and/or goods.  Linden decided that it could maximize its own profits if it, instead, represented to the participants in its world that their rights to the virtual items, land and goods held in the participants' accounts would be preserved and recognized for the participant and that participants' intellectual property rights are preserved.

33.     Linden announced its new business model at the "State of Play" conference in or about November, 2003 and followed with a press release shortly thereafter.

34.     Linden and Rosedale made oral representations at the "State of Play," and then reduced those representations to writing.

35.     In the November 14, 2003 press release, Linden touted its modifications to Second Life's Terms of Service, stating that "the revised TOS allows subscribers to retain full intellectual property protection for the digital content they create."

36.     In the same press release, Linden, by and through Rosedale, stated: "Until now, any content created by users for persistent state worlds, such as EverQuest or Star Wars Galaxies, has essentially become the property of the company developing and hosting the world," said Rosedale. "We believe our new policy recognizes the fact that persistent world users are making significant contributions to building these worlds and should be able to both own the content they create and share in the value that is created. The preservation of users' property rights is a necessary step toward the emergence of genuinely real online worlds."

DOCS_PIT 35184v.1

37.    Linden's claims to allow Second Life participants to retain their intellectual property rights was even believed by well-known, Stanford University Professor of Law, and Founder of the Stanford Center for Internet and Society, Lawrence Lessig.

38.    Indeed, Lessig had such confidence and belief in the representations made by Linden and Rosedale that he permitted himself to be quoted in the November 14, 2003 press release and stated that: "Linden Lab has taken an important step toward recognizing the rights of content generators in Second Life . . . As history has continually proven, when people share in the value they create, greater value is derived for all. Linden Lab is poised for significant growth as a result of this decision."

39.    As set forth above, even the well known law professor believed the press release and statements of Linden and noted that Linden was "poised for significant growth" as a result of the decision.

40.    Following those representations that were widely regarded as revolutionary to the virtual world industry, Linden's participant base greatly expanded, as predicted by Lessig.

41.    Further, in December, 2003, Linden and Rosedale again decided to attempt to increase the participant base of Second Life by representing that participants could own "virtual land" inside of Second Life.

42.    The land owned by the participants was taxed by Linden.  Indeed, by June 3, 2004, as Rosedale acknowledged to the USA Today, the real estate tax revenue on land sold to the participants exceeded the amount the company was generating in subscriptions.

43.    Similarly, in 2004, Rosedale was quoted: "The idea of land ownership and the ease with which you can own land and do something with it...is intoxicating."  Rosedale fully

-8-

expressed his concept of land ownership by admitting that "land ownership feels important and tangible. It's a real piece of the future."

44.    Thus, by mid-2004, Linden and Rosedale's representations had caused significant dollars to not only be invested in Second Life, through the purchase of virtual land, but also a significant revenue stream generated from the taxation of that virtual land.

45.    Linden and Rosedale continued their publicity campaign regarding ownership rights in Second Life in an effort to continue increasing the participant base and the profits to both Linden and Rosedale.

46.    Defendants published their representations on the Second Life website, including a section called "Own Virtual Land" which discusses "owning land" in Second Life. Defendants also published on the Second Life website a section entitled "IP Rights" which stated that "Linden Lab's Terms of Service agreement recognizes Residents' right to retain full intellectual property protection for the digital content they create in Second Life . . . . This right is enforceable and applicable both in-world and offline . . . You create it, you own it – and it's yours to do with as you please."

47.    On or about June 14, 2005 an interview with Rosedale was published by Guardian Unlimited: Gamesblog. During the course of that interview, Rosedale represented to the world that participants that purchased land in Second Life owned the land.

48.    In response to a question about the integration of Western Capitalism into the Second Life world, Rosedale represented / stated: "We like to think of Second Life as ostensibly as real as a developing nation...The fundamental basis of a successful developing nation is property ownership...**We started selling land free and clear, and we sold the title, and we**

-9-

**made it extremely clear that we were not the owner of the virtual property.**" (emphasis added)

49.    As Linden and Rosedale's representations about ownership of land in Second Life continued and as Linden and Rosedale continued to represent that the participants in Second Life retained their intellectual property rights, the participant base for Second Life continued to grow – and generate more money for Linden and Rosedale.

50.    As of September 8, 2005 Defendants representations with regard to virtual land ownership have been so successful that Linden has eliminated subscription fees. In commenting on the elimination of subscription fees in an article posted at CNET news and in disclosing the profit motive of Defendants, Rosedale stated: "We're going to make more [money] because some people who wouldn't have otherwise signed up are going to buy land . . . ."

51.    As of March 28, 2006, the efforts at convincing consumers that they, in fact, would own the land they bought from Defendants, was so successful that a company press release touted that "Second Life has grown to over 165,000 residents with an economy worth over $60mm per year." Linden boasted that "Second Life has enjoyed month over month record growth in subscriber acquisition, its economy and the number of subscribers that are generating profits in US currency."

52.    Further, the March 28, 2006 press release continued Defendants' scheme of associating themselves with well-known and respected figures in an effort to further "legitimize" the representations they were making to consumers at large. Like the prior press release where Defendants associated themselves with Lawrence Lessig, the respected legal scholar, the March, 2006 press release announced that Linden had obtained $11mm in new financing from Globespan Capital Partners, with participation from Jeff Bezos, the founder of Amazon.com.

-10-

Linden also noted that other investors, including Mitch Kapor, the founder of Lotus

Development Corp., was also involved in their business as an investor. It is believed, and

therefore averred, that Defendants have not disclosed to Lessig, Bezos or Kapor that the

representations that they make to consumers about land ownership in Second Life are false.

53.    Defendants have aligned themselves in the media with their investors, including

Kapor, because as Rosedale states they are interested in the "social good" of technology.

54.    Even recently, Rosedale represented on April 13, 2006 in an interview with

PSFK.com, in response to question about whether there was any "gray area" with regard to

copyright and intellectual property rights in Second Life, that: "Things are pretty clear – as a

user, you own what you create in Second Life." Further, In discussing the importance of land

ownership and quoting the concepts set forth in Hernando de Soto's "The Mystery of Capital",

Rosedale stated: "[S]uccessful countries always start by making sure that people can freely own,

resell, and mortgage the real-estate on which they live. This is a Very Big Idea . . . This was one

of the key things that drove our ideas around land ownership and the introduction of IP rights."

55.    Thus, Rosedale continued the façade that Plaintiff and others actually owned the

virtual property they purchased from Defendants and, in explaining that Second Life was akin to

a country, added further "credibility" to the representations he and Linden were making to

consumers at large.

56.    As is more fully set forth at length herein, it was the following month, in May,

2006, that Defendants simply took Plaintiff's virtual land and other virtual items from him

without compensation.

57.    Despite Defendants acts that were inconsistent with their public announcements

with regard to virtual land ownership and IP right retention, Rosedale and Linden continued with

-11-

their public campaign to attract new participants with their promised "utopia" of virtual

ownership rights.  Approximately two months after stealing Plaintiff's virtual land and property,

Rosedale gave a "podcast" interview with After TV on or about July 20, 2006.  During that

interview, Rosedale continued to reinforce the representations being made.  In relevant part

Rosedale stated that "everything inside it [Second Life] is made by the people who are there and

in fact, the land itself and the space and everything is owned, controlled and built by the people

who are there. . . ."

58.    Further, when asked by the reporter about how one goes about "owning land" in

Second Life, Rosedale replied "You just buy it."  Further, he stated "You buy it generally from

other users.  You can participate in a land auction and buy it from us . . . ."

59.    Rosedale was also asked: "So your economic model is selling virtual land; do you

have an advertising model?"  In response, Rosedale stated, in relevant part: ". . . everyone owns

their own stuff, their own property – **there's no way we could just advertise on that property**

**without asking because it isn't ours you know.  It belongs to land owners.**" (emphasis

added).

60.    Rosedale also admitted in the After TV interview that "The majority of our

money is made in recurring fees—think of them being like property taxes that you pay when you

own land."

61.    By July, 2006, the representations of Defendants succeeded in growing the

participant base to over 300,000.

62.    As set forth previously, the course of representations by Linden and Rosedale

resulted in an increased participant base and more profit for each.

-12-

63.     It is believed, and therefore averred, that following each substantial press release / interview that the participant base of Second Life spiked and continued to grow.

64.     The announcements and representations of Linden and Rosedale have been very successful for Linden and Rosedale.  Indeed, Linden currently boasts it has over 500,000 participants (up from less than 200,000 approximately six months ago) and generates over $50,000,000.00 U.S. per year in real world dollar transactions.

## VIRTUAL PROPERTY IN SECOND LIFE

65.     As set forth above and herein, Linden represented that it recognized rights of in-game participants to their virtual items, land, money and goods.   Moreover, Linden represented that it recognized the intellectual property rights of the participants in their creations.

66.     The virtual items created by participants as well as the land owned by the participants is retained, preserved and stored by Linden on its servers.

67.     In other words, a participant's account and valuables of Second Life are stored as electromagnetic records on the Linden's servers.  Defendants are simply paid for that storage and to hold the land and objects in trust for the owners of the virtual items and property.

68.     The owner of the account is entitled to control the account and valuables' electromagnetic record and may freely sell or transfer it.  Although a participant's account and valuables are "virtual," they are valuable property in the real world. The participants can auction them, sell them, license them or transfer them online and through other third independent parties, like eBay.com, slexchange.com, and others.

69.     A participant can sell any code / virtual items they offer; may restrict the code so the purchaser cannot modify it, resell it or transfer it at all; alternatively, participants author code that allows the buyer to resell it that may require the buyer to pay the seller for each such sale.

-13-

70.    Simply put, the system of transferring the virtual items and objects created by a participant mirrors that of the real world in nearly every respect. As set forth previously, similar to a store that exists inside Disney World, participants list and sell their goods and virtual items for sale or trade.

71.    A participant's accounts and valuables are the same as the property in the real world.

72.    A participant's interests in these virtual items, objects and properties persist regardless of the system currently connected to it, separate from the intellectual property that exists in Defendants' underlying code, much similar to a document or book simply created with a program such as Microsoft Word. Indeed, some commentators have noted that Second Life is, in essence, simply an "operating system" similar to Microsoft Windows.

73.    A participant can invite people into his virtual property, hold meetings in it, invest in it, and sell it to other people who might want to do the same independent of and regardless of the intellectual property that exists in Defendants' code.

74.    Accordingly, Plaintiff's virtual property rights are divisible and severable from the rights of other participants in the game and the owner of the server upon which Defendants' code resides.

75.    These virtual properties, both the virtual land and the virtual objects, have value in real U.S. Dollars across the globe measuring in the billions of dollars and millions of participants.

76.    Defendants intended their code and their public statements regarding ownership and use rights of the land and objects to materially induce Plaintiff as well as thousands of other

-14-

participants to invest real U.S. Dollars in purchasing land, and buying and selling the objects described above and have actively encouraged participants to do so.

77.     Because of Defendants' transfer of title and ownership interests to Plaintiff in their virtual assets, and Defendant's creation of a market economy in which Plaintiff's property interests may be sold for real cash value, expectations that these virtual assets constitute property are entirely foreseeable, in addition to the representations made by Linden and Rosedale specifically providing for such property rights and the preservation of the same.

78.     Along with Defendants' promise of the transfer of title to Plaintiff of the title to their land and the ownership rights to their copyright and intellectual property creations, Defendants' virtual world possesses all of the real world features of exclusive ownership; persistence of rights, transfer under conditions of agreement and duress, free alienability of title, and a currency system to support trade in these property-based assets, including the buying and selling of these assets with U.S. currency. Private property is the default in Defendants' service, providing its customers with a bundle of rights, including the fundamental rights to use, exclude and transfer property interests.

## VIRTUAL PROPERTY IN SECOND LIFE – PROPERTY OWNERSHIP

79.     For a participant to purchase and own land in Second Life, the participant must upgrade to a premium membership and pay a monthly "tier," or tax which varies in amount depending on the amount of land the participant owns.

80.     A participant may then, in his unbridled discretion and control, split the land into varying sizes and parcels, resell it to other participants and convey title, retain it, build upon it, restrict what can be built upon it, change the shape of the land, i.e. "terraform" it, rent it, lease it, and / or exclude all participants, or just some participants from trespassing upon it.  While

-15-

DOCS_PIT 35184v.1

Linden continues to create "new" land, once land is created and/or sold to a participant, it continues to exist and is not "deleted" or otherwise destroyed. It is unique, just like real land.

81.    To obtain premier accounts, participants are required to provide Defendants with private and confidential information including a credit card number and associated information so it can be charged, or a PayPal account to debit. Defendants retain participants' personal information on their servers.

82.    Participants access their personal account information, purchase "lindens" (the in-game money), buy and sell lindens for U.S. currency, pay for land, and monitor their accounts via the Internet. A currency exchange is maintained that sets, just like any other currency exchange, the exchange rate between "lindens" and U.S. currency. Third parties also provide for additional currency exchanges between "lindens" and U.S. currency, including ebay.com.

83.    Defendants' website expressly states that a participant may cancel an account at any time and leads one to believe that upon canceling, their private account information, such as their credit card information or PayPal account information, will be destroyed and no longer used or retained or made available to the public.

## MARC BRAGG IS INDUCED INTO "PARTICIPATING" IN THE SECOND LIFE WORLD

84.    Plaintiff is an individual who signed up and paid Defendants to participate in Second Life in or about November / December 2005.

85.    Having had prior interest in developing real estate, Bragg was interested in developing the real estate in Second Life upon learning that Defendants had represented that title to the land and all associated ownership rights would pass to the buyer of that land and did so for primarily personal, family and/or household purposes.

-16-

86.    Plaintiff was induced into "investing" in and purchasing virtual property from Linden and Rosedale by the representations made by Linden and Rosedale in press releases, interviews and through the Second Life website.

87.    Plaintiff believed the representations made by Linden and Rosedale and justifiably relied upon them.  Indeed, there was nothing to make Plaintiff suspect that the representations being made by Linden and Rosedale were false.

88.    By promising Plaintiff that he would receive and retain all right, title, interest, copyright and intellectual property rights to the land, objects and virtual property Plaintiff purchased and/or created in Second Life, Defendants intended to and did in fact deceptively induce Plaintiff to invest thousands in U.S. Dollars via the wires and mails crossing state lines.

89.    Indeed, over the course of his participation in the game, Plaintiff acquired a significant amount of virtual property from Defendants, or others in-game, as set forth and more fully described in Exhibit "1" attached hereto.

90.    Further, Plaintiff acquired a number of virtual items from independent third parties.

## SECOND LIFE'S AUCTION OF LAND

91.    Defendants generally sell their lands via auctions hosted on Defendants' website.

92.    On their website, Defendants identify various ways to discover which pieces of virtual land, or "sims," are being auctioned; (1) by reviewing the list posted on the secondlife.com website to see land currently on the auction block; and (2) by looking in-game at the land that has been set as a blue square by Defendants.

93.    Defendants used the same color blue for their "sims" to identify three different states of that land:

-17-

a.    Land that was currently on the auction block;

b.    Land that was intended to be auctioned once a participant initiated the auction;

c.    Land that was not on the auction block and where the auction could not be initiated by a participant.

94.    Defendants' FAQ on auctions advised a participant that, in order to find land intended to be auctioned or on the auction block, to go in-game to the Map provided by Defendants showing the squares set in blue by Defendants to determine which "sims" are to be auctioned.

95.    Any participant that would go in-game to those blue squares could obtain data associated with that particular blue square via the tools provided by Defendants. That data included the land size, name of the "sim", and a unique auction ID (which is the number associated in the auctions for that particular "sim").

96.    If a participant wanted to bid on an auction, Defendants provided unique auction pages for each piece of land being auctioned which allowed the participant to enter the amount they intended to bid, confirm the bid, advising the participant that any bid won constituted a "legal and binding contract," and then once bid, posting the amount bid on that auction page for anyone to review and bid against.

97.    A participant was allowed to either go to the auctions listed by Defendants on their ongoing auction page and bid there, or to enter the unique auction ID number in the URL provided by Defendants for auctions, and by so doing, initiate an auction for only those blue squares set by Defendants allowing the initiation to occur.

-18-

98.     Moreover, a participant could go to Google.com and conduct a search by entering the query "second life auctions [sim name or id number]" and Google would return a link to the various auctions; both those that were ongoing having been initiated by Defendants and those where participants could initiate the auction.

99.     In all cases, the auction would then run for 48 or 72 hours at which time anyone else who was aware of the auction and wanted to bid on the land was free to do so.

100.    Once auctions were won, participants were charged for the purchase of the land at the final bid price via their credit cards and/or PayPal accounts, or by deducting the U.S. currency in their accounts then held in trust by Defendants for such purposes.

101.    Moreover, once the auction closed, the name of the "sim," winning participant's name, and final amount bid were displayed on the secondlife.com website.

102.    At no point prior to, during or following the sale of the virtual property via the auctions, did Defendants advise Plaintiff, or any participant for that matter, that their public representations that Plaintiff would own all right, title and interest in such land were false or otherwise misleading.  Indeed, Defendants continued with their ruse to cause Plaintiff to believe that the virtual land sold to Plaintiff by Defendants and all right, title and interest to such land had been transferred or otherwise provided to Plaintiff.

103.    Defendant's auctions, being held in California, are controlled by California Civil Code §1812.600 et seq., the statute relating to auctions held in California.

104.    Each and every virtual land purchase, independently, was a valid and enforceable contract for which Plaintiff paid valuable consideration either from Defendants or from third-parties in-game.

105.    Plaintiff deposited real world money with Linden to obtain the land.

-19-

106. After upgrading to a premium account, Plaintiff paid real world money as "tax" on that land.

107. Plaintiff trusted and believed that the money he deposited with Linden, as well as the money he invested in the virtual property, could not and would not be converted or stolen by the Defendants. Further, Plaintiff trusted and believed that Linden's representations that Plaintiff would retain all of his intellectual property rights were true and that Defendants would not interfere in the use and/or exercise of those rights.

### "[Y]OU CAN'T FOR EXAMPLE JUST TAKE SOMEONE ELSE'S PROPERTY IN SECOND LIFE", (PHILIP ROSEDALE, JULY 20, 2006), i.e. LINDEN STEALS BRAGG'S PROPERTY

108. In or about April, 2006, Bragg had significantly grown his real estate holdings as well as his own virtual goods, items and content that he had created and offered for sale. Indeed, not only had Bragg purchased numerous parcels of land from Defendants, but he had also created content such as "fireworks" that Plaintiff offered for sale and did sell to other participants. Plaintiff had also acquired numerous other virtual items from third-parties, independent of Defendants.

109. Bragg learned through other participants, messages posted by Defendants' agents in Defendants' forums on Defendants' website, and by Defendants' agents in forums hosted by Linden Labs that there was more than one way to purchase land from Defendants via Defendants' auctions.

110. Until April, 2006, Bragg had acquired all land he purchased via ongoing auction or other sellers within Second Life.

111. On or about April 30, 2006, Bragg bid on and subsequently won the bid on a piece of virtual land named "Taessot." Bragg paid Defendants $300.00 in U.S. currency for that land, which amount Defendants accepted per the terms of their "legally binding contract" and

-20-

transferred title to Bragg. The purchase of the land was memorialized on Defendants' closed

auction list reflecting the price paid.

112.    On or about May 2, 2006 or May 3, 2006, however, Bragg received an e-mail

from "Jack Linden," a Linden agent, employee and/or servant, advising Bragg that the Taessot

land had been purchased using an "exploit" in the system, and accordingly, the land had been

taken away from Bragg and further, that Bragg would receive his $300.00 U.S. currency

refunded to him.

113.    The statements of the Linden agent were a lie, however.  While Defendants did

remove Bragg's name from the title to the Taessot land, they failed and refused to return Bragg's

$300 to him that they had agreed to refund.

114.    Even worse and deceptive, Linden "froze" Bragg's account preventing him from

accessing the account to use, cancel or modify it.  In essence, Linden prevented Bragg from

access any of his items, land or goods to which he had all rights, title and interest.  Moreover,

despite preventing Bragg access to his items, land and goods, Linden continued to charge Bragg

a "tax" on the land he owned and, also, refused to release Bragg's credit card information.

115.    In the ultimate act of deception and fraud, Linden, without any right to do so or

any consent from Bragg, removed Bragg's name from all other land owned by Bragg as

described in Exhibit "1."  Moreover, Linden proceeded to convert the title and all associated

value away from Bragg without notice, process of any kind, reimbursement, or consideration of

any kind.

116.    Such actions were taken despite Rosedale's specific admission and statement on

July 20, 2006 that "**you can't for example just take someone else's property in Second Life.**"

(emphasis added).  Moreover, Rosedale's comment was made in the context of him referring to

such an act as a **crime**. Rosedale's statements are an admission against he and Linden that Defendants acts were improper and, in fact, a crime.

117.    The land that Bragg owned was taken from him but not "deleted" from the game world. Indeed, had Linden done so, it would have undermined their own plan to enrich themselves at the expense of Plaintiff. See, Exhibit "2," map of Second Life world, attached hereto.

118.    In so wrongfully taking Bragg's land, Defendants also removed, retained, and/or converted all other personal property and objects then owned by Bragg in-game, all of which Bragg had purchased with U.S. currency, and all of which, including the land, had real value and could have been sold to multiple ready, willing and able buyers. Bragg was never offered the opportunity to do so. Defendants also interfered and prevented Plaintiff from exploiting his rights to sell and/or otherwise trade his "fireworks" and other content created by him and, in which, he retained all intellectual property rights.

119.    Defendants took, retained and converted Bragg's virtual property, without just cause, excuse or notice of any kind, including his virtual land, buildings, businesses, code scripted objects, and linden dollars all of which had been purchased with real world U.S. dollars as a result of Defendants' fraudulent representations.

120.    Moreover, Bragg had a significant amount of U.S. currency in his account, approximately $2000. Linden simply took the money, along with all of Bragg's other possessions. Despite approximately 50 attempts to withdraw his money from the account, Linden blocked those transactions and prevented Bragg from transferring his money.

121.    With regard to the land owned by Bragg and wrongfully confiscated and taken by Linden, Defendants listed the property at auction and sold it to the highest bidder.

122.    In the ultimate act of fraudulent bravado, Defendants kept the proceeds of the auctions of Bragg's land for themselves and provided none of the money to Bragg.  In essence, Defendants had doubled their own profits by charging twice for the same land – and unjustly enriching themselves at the expense of an unsuspecting Bragg who had been defrauded.

123.    Thus, not only did Defendants "eject" Bragg from their "Disney World," but before doing so, they confiscated all the goods he had purchased at the stores, refused to refund his money for the purchases, re-listed the purchased goods for re-sale, resold the goods to third parties, did not provide the proceeds to Bragg (keeping it for themselves) and – to top it off – simply took his other possessions as well as his wallet (with all his U.S. currency in it) that Bragg had, evidently, made the serious mistake of bringing into the "park" with him.

124.    Defendants' conduct as described is part of a continuing and systematic plan and scheme using the national wires and mails intended to and in fact defrauding Plaintiff and other similarly situated consumers out of thousands of dollars by promising to preserve and/or otherwise provide rights that the Defendants do not provide and, indeed, lie about to potential participants.

125.    The utopia of Second Life and the promise by Defendants to potential participants that they will retain all rights, title and interest in the virtual land, property and goods was a lie.  Apparently, Defendants never intended to perform according to their promises and representations.

## SECOND LIFE'S ATTEMPTED FINE PRINT, AKA THE TERMS OF SERVICE AGREEMENT ("TOS")

126.    Defendants provide what is known as a Terms of Service Agreement ("TOS").  Although referred to as a TOS, the reality is that the "agreement" is nothing more than a contract

-23-

of adhesion. Like many participants, Bragg never read the TOS although he was forced to click the "accept" button to gain access to his virtual property, land and items.

127.    Defendants' TOS is very similar, in essence, to the fine print on the back of a ticket checking your automobile with a valet or, similarly, entrance to a theme park.

128.    Like the unconscionable terms contained with such contracts of adhesion that provide the potential participant with absolutely no negotiating leverage, the Linden TOS is similarly drafted in such an unconscionable, heavy handed way. Moreover, the TOS is consistently changed and, despite the fact a participant may "join" while one TOS is in "effect" and already "invested" thousands of dollars based on one TOS, the participant is forced to "accept" any revised TOS to gain access to his virtual property, land and items. Thus, Linden simply unilaterally imposes any contract terms on the participant without regard to whether the participant signed up under a different TOS and without consideration.

129.    Further, like such fine print on access to a theme park, the TOS is naturally limited and cannot possibly apply to any valid transaction that occurs within the theme park itself. Thus, similar to the fact shops operate inside of Disney World (selling all types of goods and items), many operated by Disney itself, and others operated by third parties, the laws of the United States of America do not cease to exist inside of a theme park like Disney World, irrespective of any fine print on the back of a ticket providing access to Disney World. Indeed, such fine print could not possibly operate to suspend the laws of the United States inside of Disney World, nor the transactions that occur inside its "walls." Equally, no fine print provided by Defendants could possibly operate to suspend the laws of the United States inside of Second Life.

-24-

130.    Indeed, any attempt to claim that the TOS effectively operates, in any way, to suspend the laws of the United States, is simply unconscionable and absurd.

131.    While Defendants provide a TOS, it did not state or provide any term or condition such that Defendants may retain and/or convert Bragg's money, or that Plaintiff ever waived the right to, retain and remove, Plaintiff's property interests or his U.S. currency on deposit held in trust with Defendants.    Moreover, the TOS does not address deleting land and, in fact, the land existing in Second Life is never deleted, instead persisting with a name, size and location, all the things that make "real property" unique.

132.    Indeed, any such terms would be utterly inconsistent with the repeated representations made by Defendants in the media and press.

133.    To the extent that Defendants seek to interpret their own TOS inconsistently with the representations made by them to the world in the media and press or that Defendants may withhold, retain, and/or convert Plaintiff's property interests or Plaintiff's U.S. currency on deposit in trust with Defendants in any way, shape or form, such terms and/or conditions are unconscionable and should otherwise be deemed void as against public policy and not enforceable.

134.    Further, Defendants' TOS provides no clear or reasonable notice to Plaintiff that Defendants may at any time, without notice, and/or without identifying a violation of Defendants' TOS, or in fact there being a violation of Defendants' TOS, withhold, retain, and/or convert all property interests and U.S. Currency belonging to the Plaintiff. Even if the TOS did contain any such terms, they would be unconscionable and unenforceable.

135.    The TOS provides, in relevant part, the following misleading assertions:

-25-

a.     "The Websites and Linden Software collectively constitute the "Service" as used in this Agreement"; however, the TOS does not claim that the software created by participants is controlled by the TOS (Section 1.1);

b.     in Section 1.2, that "Linden Lab is a service provider, which means…. that Linden Lab  does not control various aspects of the service" leading Plaintiff to believe that he, consistent with Defendants' public representations regarding ownership rights, instead controlled those aspects of his investments;

c.     in Section 1.3, that "Linden Lab and other parties have rights in their respective content, which you agree to respect" leading Plaintiff to believe that he had full ownership and title rights in his content, and that Defendants would respect and preserve same to the best of their ability;

d.     in Section 1.3, that "Linden Lab and other Content Providers [which includes Plaintiff] have rights in their respective Content under copyright and *other applicable laws* and treaty provisions, and that except as described in this Agreement, such rights are not licensed or otherwise transferred by mere use of the Service[]" leading Plaintiff to believe that by investing thousands of dollars in U.S. currency constitutes something substantially more than "mere use" of the Service and that investment was not subject to conversion, fraudulent or otherwise, by Defendants;

e.     in Section 1.4, establishing a "currency" (Linden Dollar) and granting a limited license to same, but not otherwise limiting or restricting Plaintiff's rights to withdraw U.S. currency in their respective accounts, and not clearly explaining that the limited license right could be revoked or modified as a single or group of users, instead suggesting that

-26-

Defendants' right to modify the limited license right it granted would be applied to all participants, and not selectively modified for one or more;

        f.    in Section 1.5, explaining that the use of the words "buy" and "sell" on their website is used to indicate the transfer of the limited license right described in Section 1.4, and stating that Defendants may deny any sell order individually "for any reason," which terms are unconscionable and contrary to, but not in any way suggesting that, the U.S. currency in Plaintiff's account was subject to the above arbitrary standard;

        g.    further, in Section 1.5, the arbitrary standard of "for any reason" being unconscionable, it should be deemed void and of no force or effect;

        h.    in Section 1.7, providing that participants agree to the posted pricing and billing policies on the Websites, which in relevant part under the common law reciprocal rights pursuant to contract law in California, requires Defendants then to abide by its posted pricing and billing policies, which would require Defendants to honor all auctions that were closed and paid for and all title transfers in connection with them;

        i.    in Section 2.5, providing that any participant may cancel an account at any time and in not stating or otherwise suggestion that any such cancellation would forfeit any and/or all U.S. currency placed and/or transferred into Plaintiff's account;

        j.    in Section 2.6, providing that Defendants may "suspend or terminate your account any time, without refund or obligation," but not otherwise providing that the assets and ownership interests conveyed by Defendants and/or third parties would be retained by Defendants, or otherwise unrecoverable.  Moreover, to the extent that Defendants attempt to interpret Section 2.6 inconsistently with their public statements and representations, they should be estopped from doing so and any interpretation inconsistent with their public representations is

-27-

unconscionable and/or any interpretation that Section 2.6 is tantamount to any "right" of

Defendants to convert the property and/or currency of Plaintiff, such an interpretation is

unconscionable and unenforceable as a matter of law;

k.    in Section 3.1, providing that participants have a nonexclusive, limited,

revocable license which is not subject to revocation for so long as the participant is in

compliance with the TOS;

l.    in Sections 3.2 and 3.3, granting Defendants the irrevocable rights to

delete all data stored on Defendants' servers, and granting ownership of the "account" only in

Defendants, but not otherwise granting Defendants the right to convert Plaintiff's U.S. currency

held in trust by Defendants, or the title to the virtual property conveyed to Plaintiff to the extent

the data representing that property has not been deleted or, further, the right to interfere with the

intellectual property rights of the participant.  Moreover, to the extent that Defendants attempt to

interpret Section 3.2 or 3.3 inconsistently with their public statements and representations, they

should be estopped from doing so and any interpretation inconsistent with their public

representations is unconscionable and/or any interpretation that Sections 3.2 and 3.3 is

tantamount to any "right" of Defendants to convert the property and/or currency of Plaintiff,

such an interpretation is unconscionable and unenforceable as a matter of law

m.    in Section 4.1, defining community standards, but not stating any standard

by which Plaintiff's actions while a participant could be reasonably deemed to have violated any

of the stated community standards;

n.    in Section 5, et seq., providing various releases in favor of Defendants,

many of which are unconscionable, and/or require mutuality, and none of which release

Defendants from any claim for conversion of the U.S. currency held in trust by Defendants in

favor of Plaintiff, or release Defendants for conversion of assets and data belonging to Plaintiff that have not been deleted (i.e., the land purchased by Plaintiff), or release Defendants for damages caused by interfering with prospective economic advantage or economic relations between participants, or release Defendants for intentionally destroying Plaintiff's data with an intent to harm and without any proper purpose;

          o.     in Section 5.4, acknowledging that certain limitations and terms stated in the TOS may not be enforceable in various jurisdictions.

136.   Defendants' representations regarding the transfer of full and alienable title to participants upon the purchase of land, and the transfer of ownership rights consequent to participants' copyright and trademark interests, and Plaintiff's consideration given in light of those statements, are material modifications to the TOS to the extent those statements by Defendants are contrary to the written terms of the TOS.

137.   Further, Defendants did not state in their TOS that they had the unfettered right to take back the title to any of the land they sold nor did Defendants provide any process for the recovery of title from their participants. Further, the TOS does not state that Defendants have the unfettered right to obstruct or otherwise impede a participants use of his intellectual property rights or that the TOS governs or acts to otherwise interfere with transactions between third parties.

138.   In essence, despite Defendants' public statements regarding land ownership and the retention of intellectual property rights, representations that they used and are using to build their participant base, Defendants simply depart from those public statements at their own whim and for their own profits.

## COUNT I: VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, et. seq.)

139.    Plaintiff hereby incorporates by reference Paragraphs 1 through 138, as more fully set forth above.

140.    Plaintiff acquired virtual land, property and items from Defendants primarily for personal, family and/or household purposes.

141.    Defendants knowingly and actively represented that title to land (and virtual items) purchased in Second Life and all associated ownership rights would pass to the buyer Plaintiff.

142.    Defendants also knowingly and actively represented that participants in Second Life would retain all of their intellectual property rights.

143.    The representations of Defendants were false as to the virtual land, property, items and intellectual property rights and violated, at a minimum, 73 P.S. § 201-2 (4): (v), (ix) and (xxi).

144.    Further, Defendants never explicitly stated that depositing U.S. currency with Defendants in an account was, in truth, a forfeiture of such real world money.  Indeed, every statement made by Defendants gave the appearance, impression and deceptively caused Plaintiff to believe that his real world U.S. currency was actually his own money, and not simply being taken, without his knowledge, by the Defendants for their own unlawful and unjust reasons.

145.    Defendants knowingly and actively concealed their misrepresentations and did not specifically state or otherwise disclose their misrepresentations in their TOS or otherwise as, to do so, would have destroyed the entire purpose of their scheme, unfair methods of competition and/or deceptive acts or practices.

-30-

146.    The misrepresentations made by Defendants were material to the transactions at issue and constitute unfair methods of competition and unfair or deceptive acts or practices in violation of 73 P.S. § 201-1, et. seq. and more specifically 73 P.S. § 201-2.

147.    At all times relevant hereto, it was the intent of Defendants to deceive, defraud and induce reliance upon the material misrepresentations.  Indeed, the primary purpose of the false statements was to increase the participant base for Second Life under the false pretense that participants in Second Life would acquire rights, title and interests to virtual land, property and items and retain their intellectual property rights, unlike other MMORPG that claim that the participants surrender or fail to possess such rights.

148.    Defendants' statements to the media purporting to give exclusive ownership rights to Plaintiff and other Second Life participants are evidence of their intent to deceive, defraud and/or induce reliance by the Plaintiff to purchase the land and otherwise invest valuable time and consideration in Second Life.

149.    Plaintiff justifiably relied upon the material misrepresentations made by Defendants and purchased the virtual land in question, using U.S. currency, under the belief that title was transferred to him by Defendants and that he would retain all his intellectual property rights.

150.    Had Plaintiff known that the Defendants were making completely false assertions of ownership rights and retention of intellectual property rights and simply a ruse to generate a larger participant base, he would never have purchased the virtual land, property or items or otherwise invested his real world time or U.S. currency in Second Life or with Defendants.

151.    Indeed, Defendants knew that no one would invest their time or money with them or in Second Life without the misrepresentations of ownership and retention of intellectual property rights, which is the precise reason they made such false representations.

152.    Further, had Plaintiff known that Defendants would, at their whim, repossess and subsequently resell the land in question and keep all the proceeds for themselves to enrich themselves, Plaintiff would never have purchased the land for real world U.S. currency.

153.    Had Plaintiff known that Defendants would, at their whim, simply take his real world U.S. currency and keep it for themselves, he would never have entrusted his real world U.S. currency with Defendants and placed such money in any account with Defendants.

154.    Defendants acts cause them to be liable pursuant to 73 P.S. § 201-9.2 and Plaintiff is entitled to actual damages or one hundred dollars ($100), whichever is greater, and may be provided such other relief as is deemed necessary and proper, including treble damages and attorneys fees.

155.    As a result of the fraudulent and deceptive conduct engaged in by the Defendants, Plaintiff sustained real world damages and was harmed in an amount to be determined at trial.

156.    Further, injunctive relief and/or specific performance should be ordered against Defendants as the virtual property owned by Plaintiff was and remains unique and no adequate remedy at law exists with regard to depriving Plaintiff of the use and benefit of his virtual land.

157.    Additionally, Defendants have admitted that they have sold title to the virtual land to third parties / participants.  As such, Defendants should be enjoined from preventing Plaintiff and/or any other customers from accessing virtual land that is not owned by Defendants that has, instead been sold by Defendants.

-32-

158.    The Court should further declare that, having sold the virtual land, Defendants no longer have any ownership interest in such land or in those portions of the Second Life world that Defendants sold to third parties, including Plaintiff, other than the express responsibility of Defendants to maintain and/or not take such other acts to preclude or prevent participants from enjoying and utilizing their own virtual land.

159.    The Court should also declare that Defendants have no rights to interfere with access to the virtual land owned by Plaintiff and, as such, should require access to such land and, to the extent that Defendants claim otherwise, create an easement to permit such access.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual, treble and punitive damages, for Defendants' violation in an amount that the Court determines is proper and just, including attorney's fees and costs. Further, Plaintiff requests that the Court issue such additional relief as it deems necessary or proper, including injunctive and declaratory relief that Plaintiff is the rightful owner of the virtual land, property and items that were in his account and has all rights to exploit, transfer and/or otherwise use his intellectual property rights as set forth herein and above.

**JURY TRIAL DEMANDED**

**COUNT II: VIOLATION OF THE CALIFORNIA UNFAIR AND DECEPTIVE PRACTICES ACT (Cal. Bus. & Prof. Code § 17200)**

160.    Plaintiff hereby incorporates by reference Paragraphs 1 through 159 as more fully set forth above.

161.    Defendants knowingly and actively misrepresented to Plaintiff and public as a whole that all right, title and interest to the virtual land and all associated ownership rights would pass to buyers and that Plaintiff would retain his intellectual property rights.

-33-

162.    These misrepresentations were material to the transaction as it involved the development of real estate in Second Life in which Defendants represented that all right, title and ownership rights were to be conferred to buyers and that all intellectual property rights were retained by the participants and/or otherwise preserved.

163.    At all times relevant hereto, it was the intent of Defendants to deceive, defraud and induce reliance of both Plaintiff and public as a whole upon the material misrepresentations.

164.    Such misrepresentations are violations of Cal Civ. Code § 1711 that provides: "One who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit."

165.    Plaintiff justifiably relied upon the material misrepresentations made by Defendants and purchased the virtual land in question under the belief that title was transferred to him by Defendants.

166.    Further, Plaintiff justifiably relied upon the material misrepresentations with regard to the preservation and retention of his intellectual property rights.

167.    Had Plaintiff known that Defendants misrepresented ownership rights in order to induce Plaintiff to purchase virtual land, Plaintiff would have never purchased the virtual land and/or otherwise invested his U.S. currency and/or time in Second Life and with Defendants.

168.    Moreover, had Plaintiff known that Defendants, after their misrepresentations, would repossess and subsequently resell the virtual land and interfere and/or destroy his intellectual property rights, Plaintiff would never have purchased the virtual land in the first place nor provided his U.S. currency to Defendants.

-34-

169.    The misrepresentations of Defendants as set forth above violated Cal. Civil Code § 1750, and 1770 (a) (7), (9), (16) and (19).

170.    As a result of the fraudulent and deceptive conduct engaged in by the Defendants, Plaintiff sustained damages and was harmed in an amount to be determined at trial.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual, treble and punitive damages, for Defendants' violation in an amount that the Court determines is proper and just, including attorney's fees and costs.

### JURY TRIAL DEMANDED

### COUNT III: VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, Ca. Civ. Code § 1750, et. seq.

171.    Plaintiff hereby incorporates by reference Paragraphs 1 through 170, as more fully set forth above.

172.    As set forth above and herein, the acts, statements and material omissions of Defendants constitute violations of the California Consumer Legal Remedies Act, codified at Ca. Civ. Code § 1750, et. seq.

173.    Plaintiff repeatedly placed Defendants upon notice of their violations of his rights that were, in fact, violations of Ca. Civ. Code § 1750, et. seq., including Cal. Civil Code § 1770 (a) (7), (9), (16) and (19).

174.    Plaintiff repeatedly demanded that Defendants correct their violation of Cal. Civil Code § 1770 (a) (7), (9), (16) and (19).

175.    Defendants refused to provide any remedy or correction of their violations.

176.    Accordingly, as a result of Defendants violation of such statute, Plaintiff is entitled to:

-35-

a.    Actual damages;

b.    An order enjoining such methods, acts, or practices;

c.    Restitution of property;

d.    Punitive damages; and

e.    Any other relief that the court deems proper.

177.    Plaintiff is further entitled to court costs and attorneys fees due to Defendants' violation of such statute.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual and punitive damages, for Defendants' violation in an amount that the Court determines is proper and just, including attorney's fees and costs. Further, Plaintiff requests that the Court issue such additional relief as it deems necessary or proper, including injunctive and declaratory relief that Plaintiff is the rightful owner of the virtual land, property and items that were in his account and has all rights to exploit, transfer and/or otherwise use his intellectual property rights.

## JURY TRIAL DEMANDED

## COUNT IV: FRAUD AND/OR FRAUD IN THE INDUCEMENT

178.    Plaintiff hereby incorporates by reference Paragraphs 1 through 177, as more fully set forth above.

179.    As set forth above and herein, Defendants made:

a.    False representations;

b.    Material to the transaction at hand;

c.    Made falsely and with knowledge of their falsity and/or recklessness as to whether the statements were true and/or false;

-36-

d.    With the intent of misleading Plaintiff into relying upon the

misrepresentations;

e.    That Plaintiff justifiably relied upon; and

f.    That caused and/or proximately caused Plaintiff damages and/or injuries.

180.    As a result of the fraudulent and deceptive conduct engaged in by the Defendants,

Plaintiff sustained damages and was harmed in an amount to be determined at trial.

181.    Plaintiff should be awarded punitive damages because of the egregiousness of the

false statements made by Defendants designed to unjustly enrich Defendants at the expense of

Plaintiff and others and to reap unjustifiable profits for the Defendants.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for

Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual and

punitive damages, for Defendants' fraud / fraud in the inducement in an amount that the Court

determines is proper and just, including attorney's fees and costs.

**<u>JURY TRIAL DEMANDED</u>**

**<u>COUNT V: VIOLATION OF CALIFORNIA CIVIL CODE § 1812.600, et. seq.</u>**

182.    Plaintiff hereby incorporates by reference Paragraphs 1 through 181, as more fully

set forth above.

183.    California Civil Code §1812.600, et. seq., governs auction transactions in or

originating from the State of California.

184.    The sale of the virtual land, as set forth more fully at length herein and above,

occurred via and qualifies as an auction pursuant to Cal. Civ. Code §1812.601(b).

185.    Defendant, Linden, is an "auction company" as that term is defined in Cal. Civ

Code §1812.601(c).

-37-

186. Further, Defendant, Linden, is an auctioneer as that term is defined in Cal. Civ. Code. §1812.601(d).

187. The virtual property sold by Defendant, Linden, qualifies as a good under Cal. Civ. Code §1812.601(g).

188. Cal. Civ. Code §1812.600, et. seq., cannot be waived and any attempts waive such code sections are contrary to public policy, void and unenforceable pursuant to Cal. Civ. Code §1812.609.

189. Upon information and belief, Plaintiff alleges that Defendants have not provided a bond to the California Secretary of State, did not post or distribute the terms, conditions, restrictions, and procedures for the goods sold at their auctions, and upon re-auctioning Plaintiff's land as described below, did not provide Plaintiff with either the information required to be provided and associated with those subsequent auction transactions, or the proceeds thereof, all in violation of various provisions of the above statute including Cal. Civ. Code §§ 1812.600(a)-(c), 1812.607(a), (c), (g), (i), (j), (k), (l), and (m); 1812.608(a), (c), (d), (f), (g), (i), (j) and (k).

190. Defendant, Linden, also violated Cal. Civ. Code § 1812.605 (c) and 1812.608 (c), (j), (g), (i) and (j) by failing to truthfully represent the goods to be auctioned, and indeed, lying about the goods that were being auctioned, their value and/or condition as more fully set forth at length herein and above.

191. Defendant Rosedale aided and abetted Defendant Linden in violating Cal. Civ. Code § 1812.600 et seq. by making numerous false statements in the media and to the press and, accordingly, is liable pursuant to Civ. Code § 1812.608 (b), (c), (i) and has, accordingly, committed a misdemeanor and is punishable pursuant to § 1812.604.

-38-

192.    By violating Cal. Civ. Code § 1812.600, et. seq., and pursuant to § 1812.604, Defendant Linden is guilty of a misdemeanor.

193.    Pursuant to Cal. Civ. Code § 1812.600 (l), Plaintiff is entitled to recover a civil penalty of $1000 for Defendants violation of the statute, an action for enforcement of those duties, and/or recovery and such penalties should be cumulative for every infraction.

194.    Pursuant to Cal. Civ. Code § 1812.600 (m), Plaintiff is entitled to a reasonable attorney fee and costs, in addition to the civil penalties provided for in Cal. Civ. Code § 1812.600 (l).

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for damages and penalties pursuant to Cal. Civ. Code § 1812.600, et seq., in addition to attorneys fees and costs.

### JURY TRIAL DEMANDED

### COUNT VI: CONVERSION

195.    Plaintiff hereby incorporates by reference Paragraphs 1 through 194, as more fully set forth above.

196.    Plaintiff held all title, interest and possessory rights to the virtual land, items and intellectual property herein described that was acquired from Defendants and/or third parties and/or created by Plaintiff and paid for using U.S. Currency.

197.    Plaintiff equally held all title, interest and possessory rights in his U.S. Currency that was held on deposit by Defendants.

198.    The virtual property and U.S. currency described above and herein are interests capable of precise definition, exclusive possession or control and, Plaintiff had a legitimate claim to exclusivity of such virtual property and U.S. currency.  As set forth above and herein, these

-39-

rights were secured to Plaintiff through various statements made by Defendants to and in the media, in addition to Plaintiff's exclusive possessory rights to the virtual property, items, intellectual property and U.S. Currency by and through his payment of U.S. Currency for such items.

199.    Defendants intentionally, without Plaintiff's consent and without lawful justification, interfered with and destroyed Plaintiffs right of property in, or use or possession of the goods and/or chattel as more fully set forth above and herein.

200.    The interference with and disposition of Plaintiff's rights were wrongful and caused Plaintiff damages.

201.    Defendants did not refund or otherwise return the consideration paid for the property.  Moreover, Defendants, re-auctioned Plaintiff's virtual property and retained all the benefit of such auctions of their own good and unjust enrichment.

202.    Plaintiff is entitled to money damages amounting to the full value of the chattel which has been wrongfully converted by the Defendants.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual damages, for Defendants' conversion in an amount that the Court determines is proper and just including costs.

### JURY TRIAL DEMANDED

### COUNT VII: INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONS / PROSPECTIVE ECONOMIC ADVANTAGE

203.    Plaintiff hereby incorporates by reference Paragraphs 1 through 202, as more fully set forth above.

204.   Plaintiff possessed all intellectual property rights in the virtual items he created in Second Life and had the exclusive rights to exploit such copyrights and/or intellectual property rights.

205.   Plaintiff also possessed all rights in the virtual property he bought in Second Life from Defendants and/or third parties.

206.   Plaintiff had previously and, at the time that Defendants stole his property, entered into contracts with third parties for the sale of virtual property and/or the virtual items he had created in Second Life.  Further, Plaintiff had the right and/or ability to sell the virtual items he had obtained from third parties to others.

207.   Prospective contractual relations existed between Plaintiff and third parties for the sale of his virtual property and/or items, including the intellectual property he had created and/or the transfer of such rights to a third party.

208.   Defendants had knowledge of Plaintiff's rights and/or virtual land and items he possessed and of Plaintiff's past sale of such virtual items and of such prospective sales of such items and land.

209.   Defendants intentionally, without any privilege and/or justification, interfered with Plaintiff's rights to such prospective contractual relations / economic advantage.

210.   Plaintiff has been caused damages by such acts by the Defendants.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual damages, for Defendants' interference in an amount that the Court determines is proper and just including costs.

**JURY TRIAL DEMANDED**

-41-

## COUNT VIII: BREACH OF CONTRACT

211.    Plaintiff hereby incorporates by reference Paragraphs 1 through 210, as more fully set forth above.

212.    Each of the virtual land transactions described herein and above by and between Plaintiff and Defendants was a valid and enforceable contract.

213.    Plaintiff paid valuable consideration for the virtual land bought from Defendants via auction.

214.    Defendants agreed to provide all right, title and interest to the virtual land as described above and herein.

215.    Contrary to such agreement, Defendants did not provide such right, title and interest to the virtual land and, as such, violated the contract between the parties.

216.    The agreements were written as they were executed through Defendants auction system.  Attached hereto collectively as Exhibit "3," are examples of the e-mail confirmations sent confirming such transactions that occurred through Defendants' auction system.

217.    Pursuant to Pa.R.C.P. 1019(i), although the claims of Plaintiff are based upon the written agreement of the parties, the writings are not all accessible to Plaintiff as Plaintiff did not retain each of the e-mail confirming the auction results.  Further, the auction contract / results, which contained the actual confirmation of the contract in writing, are no longer contained on Defendants' website and/or no longer accessible by Plaintiff.

218.    Instead, Defendants intentionally took acts to deprive Plaintiff of the benefit of the contract and/or frustrated his rights to receive the benefits of the agreement actually made.

219.    Plaintiff has been harmed and damaged by Defendants breach of contract.

220. Each of the pieces of virtual land purchased by Plaintiff from Defendants was unique.

221. There is no adequate remedy at law provided with regard to the purchase of the virtual land. As such, Plaintiff is entitled to equitable relief to protect his rights pursuant to the contract.

222. Accordingly, Defendants should be ordered to convey the virtual land back to Plaintiff and should be enjoined or otherwise prevented from precluding Plaintiff from accessing and enjoying his virtual land.

223. Defendants should also be ordered to provide access to Plaintiff such that he can exploit, enjoy and/or otherwise use his land without interruption and interference from Defendants.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual damages, for Defendants' breach of contract in an amount that the Court determines is proper and just including costs and equitable relief.

**JURY TRIAL DEMANDED**

**COUNT IX: UNJUST ENRICHMENT**

224. Plaintiff hereby incorporates by reference Paragraphs 1 through 223, as more fully set forth above.

225. Defendants not only took Plaintiff's virtual property from him, but also resold it to the highest bidder.

226. The re-sale of the property was not governed by any written contract.

227.    Defendant's sold the virtual property at auction to the highest bidder to unjustly enrich themselves at the expense of Plaintiff.

228.    At no time did Defendants remit the money they obtained in the re-auction to Plaintiff.

229.    Accordingly, Defendants are obligated to provide restitution to Plaintiff.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual damages in the form of restitution, for Defendants' unjust enrichment in an amount that the Court determines is proper and just including costs.

## JURY TRIAL DEMANDED

## COUNT X: TORTIOUS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (CALIFORNIA LAW)

230.    Plaintiff hereby incorporates by reference Paragraphs 1 through 229, as more fully set forth above.

231.    There is, implied in every contract, a covenant of good faith and fair dealing.

232.    In the contracts whereby Defendants sold virtual land to Plaintiff, there was impliedly covenanted that Defendants would, in good faith and in the exercise of fair dealing, deal with Plaintiff fairly and honestly and do nothing to impair, interfere with, hinder or potentially injure Plaintiff's rights.

233.    Plaintiff asserts this cause of action seeking contract damages for tortious breach of the implied covenant of good faith and fair dealing. Plaintiff alleges this cause of action for breach of the implied covenant of good faith and fair dealing as to that conduct of the Defendants which is determined not to be a breach of an express contractual provision but which nonetheless

-44-

is contrary to the contract's purpose and Plaintiff's legitimate expectations and thereby violates the implied covenant.

234.    As more fully set forth herein and above, Defendants breached the covenant, including but not limited to:

a.    Any and all of the Defendants' conduct as alleged above to the extent that such conduct is determined not to be a breach of any express consensual term of any contract;

b.    Asserting an interpretation of the virtual property contracts which is contrary to the express terms of such contracts alleged above and herein and pursuant to such interpretation, the Defendants have claimed that they are no longer required to fulfill its express promises and obligations and, indeed, have frustrated the very purpose of the contracts by involuntarily taking back such virtual property for their own unjust enrichment and defeating the very purpose of the contract selling such land in the first place;

c.    Evading the spirit of the bargain which Plaintiff made with the Defendants when they sold the virtual land to Plaintiff;

d.    Failing to deal with Plaintiff fairly and honestly and continually taking repeated action to impair, interfere with, hinder and injure Plaintiff's rights, such conduct being more fully set forth at length herein and above; and,

e.    Engaging in a pattern and practice of dishonesty as more fully set forth at length herein and above.

235.    Plaintiff performed under the contract as required by paying his U.S. currency for such virtual property.

236.    As a proximate result of the Defendants' acts as alleged herein, Plaintiff has been damaged in an amount according to proof at trial.

-45-

237.    Plaintiff should be awarded punitive damages for the conduct of Defendants.  The Defendants have specifically misrepresented the transfer of all right, title and interest to Plaintiff and the world at large in their overall scheme to defraud consumers into becoming participants of Second Life and so that Defendants can maximize their own profits.

238.    In September, 2005, Defendant Rosedale disclosed Defendants intent by announcing the policy that all membership to Second Life would become "free."  The "business" reason for making the membership "free" was set forth by Rosedale in an interview with CNET News on or about September 8, 2005, wherein he stated: "We're going to make more because some of the people who wouldn't have otherwise signed up are going to buy land . . . ."

239.    The virtual land ownership lie was and remains a cornerstone of Defendants' crooked business model.

WHEREFORE, Plaintiff Marc Bragg prays this Honorable Court enter judgment for Plaintiff and against Defendants Linden Research, Inc. and Philip Rosedale, for actual and punitive damages, for Defendants' breach in an amount that the Court determines is proper and just including costs.

**<u>JURY TRIAL DEMANDED</u>**

WHITE AND WILLIAMS, LLP

By: _____
Jason A. Archinaco, Esq.

Date:  10-3-06

DOCS_PIT 35184v.1

WHAT IS SECOND LIFE?   SHOWCASE   BUSINESS PARTNERS   DEVELOPERS   . . .   SUPPORT

**COMMUNITY**
Forums
C . . . .
Volunteer
Education
**CONNECTIONS**
Media
Blogs
Resident Sites
Newsletter
Mailing Lists
**COMMERCE**
Classifieds
Land Information
  L . . . Auctions
  . . . . Store
Lindex Currency Exchange
  . . . . .
  . . . us
  . . . . . . . .
  . . . action History
**MY SECOND LIFE**
  . . . count
Friends Online
Feature Voting
  . . . . . . .
  . . . . .
**SUPPORT**
Downloads
Police Blotter
Troubleshooting

# Your Account: Marc Woebegone: Land

## Land

### Owned Parcels

| Name | Location | Size |
|---|---|---|
| Maekju 001 (128,128) 2048 m2 Beatiiul penninusla rent or sale. | Maekju (160,112) | 4096 |
| Hodu 001 (128,128) 1024 m2 Mature Roadside One Sim to Ocean | Hodu (176,144) | 1024 |
| Hodu 001 (128,128) 512 m2 for development of any kind. | Hodu (80,248) | 512 |
| Cupideo Slingo. Where Luck Meets the Ocean and U Win! Danpoon | Danpoon (94,62) | 528 |
| Hodu 001 (128,128) 512 m2 for development of any kind. | Hodu (108,232) | 512 |
| Ho Su 001 (128,128) Mature 1024m2 Ocean Views and Hill Tops. | Ho Su (208,48) | 1024 |
| Maekju 001 (128,128) 1024 m2 Beatiiul penninusla rent or sale. | Maekju (208,208) | 1024 |
| Ho Su 001 (128,128) Mature 4096m2 Ocean Views and Hill Tops. | Ho Su (128,48) | 4096 |
| Maekju 001 (128,128) 4096 m2 Beautiful coast penninsusa prop. | Maekju (64,64) | 4096 |
| Atlas 001 (82,48) 1904 m2 | Atlas (106,72) | 1904 |
| Juree Mature 512 m2. Very buildable | Juree (176,152) | 512 |
| Ho Su 001 (128,128) Mature 1024m2 Ocean Views and Hill Tops. | Ho Su (16,240) | 1024 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,136) | 512 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,120) | 512 |
| Hodu 001 (128,128) 1152 m2 Mature Roadside One Sim to Ocean | Hodu (174,16) | 1152 |
| Hodu 001 (128,128) 1328 m2 Mature roadside | Hodu (170,208) | 1328 |
| Chamnamoo 001 (128,128) 1,024 m2 Mature | Chamnamoo (16,208) | 1024 |
| Hodu 001 (128,128) 528 m2 for development of any kind. | Hodu (80,234) | 528 |
| Hodu 001 (128,128) 256 m2 | Hodu (8,248) | 256 |
| Ho Su 001 (128,128) Mature 1024m2 Ocean Views and Hill Tops. | Ho Su (16,144) | 1024 |
| Maekju 001 (128,128) 4096 m2 Beatiiul penninusla rent or sale. | Maekju (240,16) | 1024 |

EXHIBIT

| | | |
|---|---|---|
| Maekju 001 (128,128) 1024 m2 Beatiiul penninusla rent or sale. | Maekju (208,240) | 1024 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,40) | 512 |
| Cristat (14,94) - 800 m2 | Cristat (14,114) | 800 |
| Maekju 001 (128,128) 1024 m2 Beautiful coast penninsusa prop. | Maekju (16,176) | 1024 |
| Jarang 512 m2 Mature Flat Land | Jarang (40,112) | 512 |
| Maekju 001 (128,128) 1024 m2 Beatiiul penninusla rent or sale. | Maekju (144,208) | 1024 |
| Cupideo Casino, Video n Dance Club - Areumdeuli | Areumdeuli (112,248) | 496 |
| Chamnamoo 001 (128,128) 1024 m2 Mature | Chamnamoo (240,112) | 1024 |
| Ribeata (158,228) - 896 m2 | Ribeata (138,238) | 112 |
| Hodu 001 (128,128) 27152 m2 for development of any kind. | Hodu (82,216) | 1584 |
| Hodu 001 (128,128) 256 m2 | Hodu (8,216) | 256 |
| Hodu 001 (128,128) 1024 m2 Top of the hill. Commanding view. | Hodu (208,48) | 1024 |
| Hodu 001 (128,128) 1152 m2 Mature Roadside One Sim to Ocean | Hodu (174,176) | 1152 |
| Maekju 001 (128,128) 1024 m2 Beautiful coast penninsusa prop. | Maekju (16,80) | 1024 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,56) | 512 |
| Hodu 001 (128,128) 256 m2 | Hodu (24,200) | 256 |
| Chamnamoo 001 (128,128) 1024 m2 Mature | Chamnamoo (240,80) | 1024 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,88) | 512 |
| Bembecia Mature Flat Land 640m2 Road side | Bembecia (124,114) | 640 |
| Danpoon Mature 3536 m2 Ocean View Property | Danpoon (142,214) | 2512 |
| Hodu 001 (128,128) 256 m2 | Hodu (24,248) | 256 |
| Hodu 001 (128,128) 512 m2 for development of any kind. | Hodu (76,232) | 512 |
| Cupideo Video n Rave Dance Club in Danpoon | Danpoon (178,190) | 560 |
| Chamnamoo 001 (128,128) 1024 m2 Mature | Chamnamoo (208,16) | 1024 |
| Ho Su 001 (128,128) Mature 1024m2 Ocean Views and Hill Tops. | Ho Su (16,176) | 1024 |
| Chamnamoo 001 (128,128) 1056 m2 Mature | Chamnamoo (234,214) | 1056 |
| Ho Su 001 (128,128) Mature 65536m | Ho Su (240,16) | 1024 |
| Maekju 001 (128,128) 4096 m2 Beatiiul penninusla rent or sale. | Maekju (160,16) | 4096 |
| Maekju 001 (128,128) 4096 m2 Beautiful coast penninsusa prop. | Maekju (64,128) | 4096 |
| Chamnamoo 001 (128,128) 1024 m2 Mature | Chamnamoo (240,48) | 1024 |
| Maekju 001 (128,128) 4096 m2 Beatiiul penninusla rent or sale. | Maekju (160,80) | 4096 |
| Hodu 001 (128,128) 27152 m2 for | Hodu (60,200) | 896 |

Second Life | Your Account: Marc Woebegone: Land                     Page 3 of 4

| | | |
|---|---|---|
| development of any kind. | | |
| Jarang 512 m2 Mature Flat Land | Jarang (80,168) | 512 |
| Songi - Mature Perfect Ocean View Property - Neg on sz n $ | Songi (14,186) | 336 |
| Maekju 001 (128,128) 32768 m2 Beatiiul penninusla rent or sale. | Maekju (176,208) | 1024 |
| Maekju 001 (128,128) 4096 m2 Beatiiul penninusla rent or sale. | Maekju (240,80) | 1024 |
| Cupideo Casino Vid n Dance Club in Saeneul | Saeneul (144,216) | 512 |
| Maekju 001 (128,128) 8192 m2 Beatiiul penninusla rent or sale. | Maekju (192,160) | 8192 |
| Chamnamoo 001 (128,128) 4512 m2 Mature | Chamnamoo (204,144) | 4528 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,168) | 512 |
| Ho Su 001 (128,128) Mature 1024m2 Ocean Views and Hill Tops. | Ho Su (16,208) | 1024 |
| Danpoon Mature Ocean Front Property 2,048 | Danpoon (228,134) | 2048 |
| Maekju 001 (128,128) 4096 m2 Beatiiul penninusla rent or sale. | Maekju (160,48) | 4096 |
| Maekju 001 (128,128) 1024 m2 Beautiful coast penninsusa prop. | Maekju (80,240) | 1024 |
| Maekju 001 (128,128) 1024 m2 Beatiiul penninusla rent or sale. | Maekju (240,240) | 1024 |
| Hodu 001 (128,128) 512 m2 for development of any kind. | Hodu (48,248) | 512 |
| Chamnamoo Prime Mature Flat Roadside Land 1,024) 1024m2 | Chamnamoo (106,118) | 3696 |
| Noonkkot First Land | Noonkkot (248,240) | 512 |
| Cupideo Art Walk in Danpoon at "he Breakers 6048 m2 | Danpoon (58,94) | 8928 |
| Atlas 001 (82,48) 9904 m2 | Atlas (134,54) | 16 |
| Cupideo Casino. SLingo, Condos, Casino and Dance in Danpoon | Danpoon (116,128) | 24704 |
| Hodu 001 (128,128) 4096 m2 Top of the hill. Commanding view. | Hodu (224,96) | 4096 |
| Wooson 1024m2 Mature Land near water | Wooson (250,200) | 192 |
| Maekju 001 (128,128) 2048 m2 Beautiful coast penninsusa prop. | Maekju (80,192) | 2048 |
| Hodu 001 (128,128) 4096 m2 Top of the hill. Commanding view | Hodu (224,224) | 4096 |
| Cupideo Video n Dance Club in Danpoon | Danpoon (184,222) | 896 |
| Wooson 1024m2 Mature Land near water | Wooson (240,208) | 832 |
| Hodu 001 (128,128) 256 m2 | Hodu (24,232) | 256 |
| Chamnamoo 001 (128,128) 59232 m2 | Chamnamoo (16,240) | 1024 |
| Hodu 001 (128,128) 61008 m2 | Hodu (154,186) | 48 |
| Linden Land | Agamok (194,162) | 16 |
| Maekju 001 (128,128) 4096 m2 Beatiiul penninusla rent or sale. | Maekju (240,48) | 1024 |
| Hodu 001 (128,128) 1024 m2 Mature | Hodu (176,112) | 1024 |

Roadside One Sim to Ocean

| | | |
|---|---|---|
| Chamnamoo 001 (128,128) 1024 m2 Mature | Chamnamoo (240,16) | 1024 |
| Maekju 001 (128,128) 4096 m2 Beatiiul penninusla rent or sale. | Maekju (112,192) | 4096 |
| Danpoon Mature 1024 m2 Ocean View Property | Danpoon (142,246) | 1024 |
| Hodu 001 (128,128) 256 m2 | Hodu (8,200) | 256 |
| Hodu 001 (128,128) 448 m2 for development of any kind. | Hodu (110,248) | 448 |
| Hodu 001 (128,128) 1024 m2 Top of the hill. Commanding view. | Hodu (208,16) | 1024 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,104) | 512 |
| Cupideo Casino at The Breakers in Danpoon | Danpoon (228,182) | 3776 |
| Hodu 001 (128,128) 1024 m2 Top of the hill. Commanding view. | Hodu (240,48) | 1024 |
| Cupideo Casino, Vid n Dance Club - Dotoorak | Dotoorak (216,48) | 432 |
| Cristat (148,124) - 544 m2 | Cristat (160,136) | 160 |
| Maekju 001 (128,128) 1024 m2 Beautiful coast penninusa prop. | Maekju (48,176) | 1024 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,152) | 512 |
| Hodu 001 (128,128) 512 m2 | Hodu (16,72) | 512 |
| Chamnamoo 001 (128,128) 3136 Roadside Mature | Chamnamoo (128,102) | 3136 |
| Maekju 001 (128,128) 2048 m2 Beatiiul penninusla rent or sale. | Maekju (240,112) | 1024 |
| Maekju 001 (128,128) 2048 m2 Beautiful coast penninusa prop. | Maekju (16,32) | 2048 |
| Hodu 001 (128,128) 1024 m2 Top of the hill. Commanding view. | Hodu (240,16) | 1024 |
| Hodu 001 (128,128) 1504 m2 mature roadside near ocean sim | Hodu (168,240) | 1504 |
| Maekju 001 (128,128) 2048 m2 Beautiful coast penninusa prop. | Maekju (16,128) | 2048 |

WHAT IS SECOND LIFE?    SHOWCASE    BUSINESS PARTNERS    DEVELOPERS    COMMUNITY    SUPPORT

**COMMUNITY**
Forums
Events
Volunteer
Education
**CONNECTIONS**
Radio
Blogs
Resident Sites
Newsletter
Mailing Lists
**COMMERCE**
Classifieds
Land Information
   • Land Auctions
   • Land Store
LindeX Currency Exchange
   • Buy L$
   • Sell L$
   • LindeX Market Data
   • Transaction History
Economic Statistics [NEW!]
**MY SECOND LIFE**
My Account
Friends Online
Feature Voting
Refer-A-Friend
Partners
**SUPPORT**
Downloads
Police Blotter
Troubleshooting

# Your Account: Marc Woebegone: Land

## Land

You do not own any parcels.

downloads | system requirements | privacy | community standards | terms of service | dmca | grid status | jobs





Page 1 of 1

**Main Identity**

From:      <land@secondlife.com>
To:        <msb@lawy-ers.com>
Sent:      Saturday, February 25, 2006 4:00 PM
Subject:   Second Life Auction: Item Won! Cristat (14,94) - 1792 m2

Congratulations Marc Woebegone!

You have agreed to purchase the following item from Second Life:

Auction ID: 0026198057
Item: Cristat (14,94) - 1792 m2
Winning Bid: L$9,010

Please go to the below link and pay for your auction:
http://secondlife.com/auctions/detail.php?id=0026198057

You will need to go in-world and claim the land within seven days. If you encounter a problem, email land@secondlife.com.

Please note: be sure to have enough land tier available before claiming your land, or you will be prompted to tier-up.

Linden Lab and the Second Life Team
http://www.secondlife.com



6/9/2006

## Main Identity

| | |
|---|---|
| **From:** | <land@secondlife.com> |
| **To:** | <msb@lawy-ers.com> |
| **Sent:** | Monday, February 27, 2006 3:55 PM |
| **Subject:** | Second Life Auction: Billing Failure |

Congratulations Marc Woebegone!

You have agreed to purchase the following item from Second Life:

Auction ID: 0026198076
Item: Songi - 001 - 65536 m2
Winning Bid: US$1605.00

Unfortunately we were unable to bill your account. In order to correct
this problem, please review your Membership and billing information to
ensure that everything is accurate and up to date. If the information you
have listed is accurate and correct, you may wish to contact your bank or
credit card issuer or paypal (depending on your payment method). Common
errors include mismatched addresses, expired credit cards and incorrect
expiration dates. Please contact land@secondlife.com within seven days if
you do not wish to forfeit this item.

To review or modify your account details, or to change or cancel your
Membership Plan, visit https://secondlife.com/account.

Linden Lab and the Second Life Team
http://www.secondlife.com

6/9/2006

## Main Identity

| | |
|---|---|
| **From:** | <land@secondlife.com> |
| **To:** | <msb@lawy-ers.com> |
| **Sent:** | Tuesday, February 28, 2006 11:02 PM |
| **Subject:** | Second Life Auction: Item Won! Ribeata (158,228) - 5104 m2 |

Congratulations Marc Woebegone!

You have agreed to purchase the following item from Second Life:

Auction ID: 0026198022
Item: Ribeata (158,228) - 5104 m2
Winning Bid: L$32,010

Please go to the below link and pay for your auction:
http://secondlife.com/auctions/detail.php?id=0026198022

You will need to go in-world and claim the land within seven days. If you encounter a problem, email land@secondlife.com.

Please note: be sure to have enough land tier available before claiming your land, or you will be prompted to tier-up.

Linden Lab and the Second Life Team
http://www.secondlife.com

6/9/2006

## Main Identity

| | |
|---|---|
| **From:** | <land@secondlife.com> |
| **To:** | <msb@lawy-ers.com> |
| **Sent:** | Thursday, April 13, 2006 7:11 AM |
| **Subject:** | Second Life Auction: Item Won! Ho Su 001 (128,128) Mature 65536m |

Congratulations Marc Woebegone!

You have agreed to purchase the following item from Second Life:

Auction ID: 0026198344
Item: Ho Su 001 (128,128) Mature 65536m
Winning Bid: US$1,501

Please go to the below link and pay for your auction:

http://secondlife.com/auctions/detail.php?id=0026198344

You will need to go in-world and claim the land within two days. If you encounter a problem, email land@secondlife.com.

Please note: be sure to have enough land tier available before claiming your land, or you will be prompted to tier-up.

Linden Lab and the Second Life Team
http://www.secondlife.com

6/9/2006