UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

MARC BRAGG,                      )        Civil Action 06-4925
                                )
                                )
              Plaintiff,         )
                                )
      vs.                       )
                                )
LINDEN RESEARCH, INC.,          )
et al,                          )
                                )        Philadelphia, PA
                                )        January 4, 2007
              Defendants.        )        3:13 p.m.


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:        JASON A. ARCHINACO, ESQUIRE
                           CHRISTOPHER ERIC BALLOD, ESQUIRE
                           WHITE & WILLIAMS, LLP
                           1800 One Liberty Place
                           1650 Market Street
                           Philadelphia, PA    19103


For the Defendants:        ANDREW J. SOVEN, ESQUIRE
                           REED, SMITH, LLP
                           2500 One Liberty Place
                           1650 Market Street
                           Philadelphia, PA   19106


Audio Operator:            JOSEPH MATKOWSKI

Dockets.Justia.com

Transcribed by:

DIANA DOMAN TRANSCRIBING
P.O. Box 129
Gibbsboro, New Jersey  08026-0129
Office:    (856) 435-7172
Fax:       (856) 435-7124
E-mail:    dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X

ARGUMENT:

PAGE NUMBER

By Mr. Archinaco                                    4, 46

By Mr. Soven                                          36

RULING:

PAGE NUMBER

By the Court                                          51

1          (The following took place in open court at 3:13

2     p.m.)

3               THE COURT:  Good afternoon.

4               MR. ARCHINACO:  Good afternoon, Your Honor.

5               MR. SOVEN:  Good afternoon, Your Honor.

6               THE COURT:  Please be seated.  The motion to -- to

7     remand the case to State Court in Chester County because the

8     amount in controversy does not exceed $75,000, including

9     costs.  So, plaintiff would like to -- to go -- to go back to

10    State Court, so why don't you proceed?

11              MR. ARCHINACO:  Your Honor, would you like -- this

12    is my first time before you, Your Honor.

13              THE COURT:  Yes.

14              MR. ARCHINACO:  I'm Jason Archinaco, on behalf of

15    the plaintiff.  Would you like me to argue from counsel table

16    or from the podium?

17              THE COURT:  Whatever is more comfortable for you.

18              MR. ARCHINACO:  Your Honor, I believe -- I don't

19    know what you would like in the way of background about the

20    case.

21              THE COURT:  Well, let me ask you a question

22    before --

23              MR. ARCHINACO:  Sure.

24              THE COURT:  -- before we get into that.  Is your

25    argument that you are not claiming more than $75,000 worth of

1    damages?

2         MR. ARCHINACO:  Well, I don't believe the face of

3    the complaint sets forth more than $75,000 in damages.

4         THE COURT:  Okay.  Well, that's a different

5    question, because --

6         MR. ARCHINACO:  Yes.

7         THE COURT:  -- we often have the issue where the

8    defendant will tender -- and, you know, your firm is involved

9    in these cases on the other side, generally -- somebody will

10   file a case in the Court of Common Pleas.  They will say, the

11   amount in controversy is less than $50,000.  The case comes

12   here, and the defendant says, okay.

13        And then the defendant says, well, if the plaintiff

14   agrees and stipulates that the damages in this case do not

15   exceed $75,000, and therefore, no judgment can be entered in

16   excess of that, I'll be happy -- I'll go back to State Court

17   to do that.

18        But, otherwise, you can't have it both ways.  You

19   cannot say, well, that's not what the complaint says, but I

20   can go over there and get $10 million.  And I don't know if

21   you want to candidly address that issue or not.

22        MR. ARCHINACO:  Absolutely, Your Honor.

23        THE COURT:  Okay.

24        MR. ARCHINACO:  Let me -- let me try to -- let me

25   try to address it this way.  The burden, I believe in these

1  cases --

2          THE COURT:  Yes.

3          MR. ARCHINACO:  -- is on the defendant to come

4  forward by a preponderance of the evidence as to what the

5  reasonably objective basis is for the removal.

6          THE COURT:  Yes.

7          MR. ARCHINACO:  Now, clearly, my client -- my belief

8  is my client is out of pocket approximately four to $5,000.

9  There is available to us a trebling statute.  There is also

10  available to us, under that statute, reasonable attorneys'

11  fees.  And there is also available under alternate causes of

12  action, punitive damages.

13          Now, that having been said, if you treble the amount

14  in controversy, you add on a reasonable attorney fee -- well,

15  let me go back for a second.  When you ask what the reasonable

16  attorney fee is -- an example -- what is the reasonable

17  attorney fee and what will the reasonable attorney fee be?  I

18  don't know the answer to that, as I stand here before you.  I

19  can't say to you that I should cap my fees at 70 -- that they

20  be less than $70,000, nor do I know what a Court would award

21  me --

22          THE COURT:  Well, sure --

23          MR. ARCHINACO:  -- in terms of a reasonable fee.

24          THE COURT:  -- and you don't know if you're going to

25  go to the Supreme Court of the United States or whether you

1    are going to resolve the case, you know, by summary judgment.

2            MR. ARCHINACO:  Correct, Your Honor.

3            THE COURT:  And, so, it could be 5,000; it could be

4    100,000.  But, under that -- under that view of the facts,

5    every case would belong in the Federal -- there would be no

6    point in having amounts in controversy, I mean --

7            MR. ARCHINACO:  Correct.

8            THE COURT:  -- effectively.  Now, you also have, in

9    punitive damages, the Gore line of cases that would, at the

10   very least -- I don't know whether it caps or it guides that

11   it be nine times.  So, this case would be, let's say, 5,000

12   times nine.  That would be $45,000 and then 5,000

13   -- I guess you would probably add the compensatory, as well.

14   So, 45 plus five.

15           MR. ARCHINACO:  Correct, Your Honor.

16           THE COURT:  That would be $50,000, even if you were

17   entitled to punitive damages, and then you would add

18   attorneys' fees to $50,000.

19           MR. ARCHINACO:  Well, what I would say -- one thing

20   I would like to point out to you with regard to punitive

21   damages, I agree in terms of a proposition of law, with

22   whether it be nine or ten times, that there is a limitation

23   placed by the law as to what is an appropriate amount.

24           The problem I have with what they filed with this

25   Court is, they cite a case, and I don't disagree with the

1    proposition that, under the appropriate circumstances, a nine

2    time multiple is fair.  What I do have a problem with is, is

3    that in order to determine a multiple, you have to present the

4    net worth of the defendants.

5         And, for example, if Linden's net worth is negative,

6    I don't foresee myself obtaining any punitive damage award

7    because the -- the element to obtain a punitive damage award

8    is, what is the net worth of the defendants.  So, when I

9    received their brief, I -- they say, obviously, the defendants

10   are not worth billions in assets.

11        THE COURT:  I thought, though, under Pennsylvania

12   law, and maybe -- correct me if I'm wrong -- actually the net

13   worth of the defendants is a defense to punitive damages, it's

14   not a component of punitive -- in other words, a defense can

15   come in and say, look, I'm very poor.

16        MR. ARCHINACO:  Correct.

17        THE COURT:  Therefore, you know, a dollar will do

18   it, but that the plaintiff doesn't have to show the net worth

19   of the -- he generally does because, you know, Aetna, you have

20   $21 billion, the number is real big, but he doesn't have to

21   do that.

22        MR. ARCHINACO:  Generally --

23        THE COURT:  Is that correct?

24        MR. ARCHINACO:  -- well, generally, what I have

25   seen, in my practice --

1          THE COURT:  Yes.

2          MR. ARCHINACO:  -- in defending cases is, the

3    plaintiff always presents the net worth of the --

4          THE COURT:  Well, to -- to agitate and --

5          MR. ARCHINACO:  Yes.

6          THE COURT:  -- the jury, but he doesn't have to.  In

7    other words, it's not a component of it.  It's viewed to have

8    the defendant have the -- in other words, if you are going to

9    punish somebody, and the person comes forth and says, hey,

10   look, I don't have any money -- you know, I'm worth a lot less

11   money.  I'm not -- I'm not Aetna.  In other words, he gives

12   the defendant an opportunity to mitigate punitive damages on

13   the strength that, you know, you don't have to give me a big

14   award to punish me.  I'm a little guy.

15         MR. ARCHINACO:  And, but -- and, Your Honor, but

16   what we have in terms of what's been presented to this Court,

17   is the defendants will not tell you their net worth.  I mean,

18   that's one of the components --

19         THE COURT:  Well, let's assume that it's billions of

20   dollars, so, you think that would make it more than -- can

21   Gore -- can you make it more than -- it doesn't matter, if

22   it's General Motors or Aetna Insurance -- isn't it nine times,

23   and that's it?

24         MR. ARCHINACO:  Correct, it would be a nine time

25   multiple.

Argument - Archinaco

1        THE COURT:  Yes.

2            MR. ARCHINACO:  And then the question would be a

3    reasonable attorney fee, and I can't tell you -- I mean,

4    obviously, I don't -- I do not believe that a defendant --

5            THE COURT:  Okay.  Well, let me ask you another

6    question.

7            MR. ARCHINACO:  Sure.

8            THE COURT:  What is it, in this case, on the face of

9    the complaint that suggests that this is nothing other than a

10   contract dispute, a breach of contract?  You paid them, and

11   they -- they have breached a contract to either give you

12   something or return you something, which you did not receive.

13   What is it here that -- that would suggest intentional tort,

14   fraud and all these various grievous conclusions?

15           MR. ARCHINACO:  If I can give you a little --

16           THE COURT:  Yes.

17           MR. ARCHINACO:  -- perspective on the industry.

18   There is -- there is -- they call them games, but in truth,

19   these aren't really games anymore.  They're enormous

20   businesses.  And there isn't -- a genre of the game industry

21   that has been referred to as the massively multiple online

22   roll playing genre -- MMORPG.

23           And the MMORPG industry, the industry standard has

24   been to deny players any rights in any virtual item or

25   property under all circumstances.  Sony has taken that line,

1    Blizzard, which is owned by Vivendi Universal.  Every company

2    has denied players ownership rights and interest in the

3    virtual items.  Now, that's not to say that players don't

4    believe that they actually own their accounts.

5         Many of these games people play for two or three

6    years.  They develop their characters for two or three years.

7    And over time, they acquire magical swords and helmets and

8    items that have real world value.  And, in fact, there is a

9    flourishing black market for these real world items, believed

10   to be a minimum of $100 million, and by certain reports, in

11   excess of a billion dollars a year.

12        And it's a black world market, because they are

13   traded -- you know, people sell virtual gold.  They sell

14   virtual items on Ebay.  They sell them on a web site called

15   PlayerAuctions.com.  There are a number of web sites.  But

16   it's all black market, because all of these companies have

17   said, you players do not own anything.

18        Mr. Rosedale comes along, Phil Rosedale, who is the

19   former CTO of Real Networks, and he establishes this Linden

20   Research, who creates Second Life.  And, initially, they are

21   just like any other massively multi-player online roll playing

22   game, but they were struggling to develop a player base.

23        People weren't going to their world, because they

24   didn't have any content.  They didn't have dragons, and they

25   didn't have dungeons, and they didn't have magical swords.

Argument - Archinaco

1  They had a platform, but they had nothing else.  So, he did,

2  in this industry, which is like telling someone they can vote,

3  he went out and made the statements, you come to our world,

4  and you will own virtual land.  You will retain your

5  intellectual property rights of anything you develop in this

6  world.

7      And that was a complete departure from the industry

8  standard.  What he did was, he created a fervor in the

9  industry, an absolute fervor, where players began, in some

10  numbers, to flock to Second Life, because this is, to them,

11  the promised land.  I can now own my virtual things.  All

12  these other companies are saying I don't own it, I can't own

13  it.

14      And so, Mr. Rosedale has repeatedly made the

15  statements to people, in numerous press releases and articles,

16  you own it.  And he's even gone so far to say, we transfer

17  title to the land to the people that own it, that the land is

18  so thoroughly owned by the player that we, the company, cannot

19  advertise on your land, because you own it when you buy it.

20      And my client was one of those people that came

21  along and invested approximately $8,000 --

22      THE COURT:  On the basis of the oral representations

23  that you would own it?

24      MR. ARCHINACO:  Yes.

25      THE COURT:  Well, was there a contract that he

1    signed when he -- when he began investing?

2          MR. ARCHINACO:   There -- well, that -- that, I

3    think, is going to be an issue that, at some point, will have

4    to be addressed, but what happens is, you go to the website.

5    It says the same thing Rosedale is saying in these interviews.

6          THE COURT:   Okay.

7          MR. ARCHINACO:   And on the website it says, own

8    virtual land.  You click various hyperlinks on the website,

9    and you go from subpage to subpage, and it continues to say

10   the same thing, buy, you own, you own, you own.  When you

11   finally register for an account with the game, you are caused

12   to check box, or at the time, you were caused to check box,

13   but not necessarily read, a terms of service agreement.

14         The terms of service agreement contains no language

15   in it that says, by the way -- there's no header that says,

16   virtual land, you don't really own it, you never owned it.

17   There's no header that addresses the virtual land issue, and

18   there's nothing in the terms of service that says, virtual

19   land contracts, here are the terms.

20         The way it would then work is, is after he had an

21   account established, they have what are called auctions, just

22   like an Ebay auction.  They have an independent site with all

23   of the land listed in individual auctions that you can bid on.

24   You bid on the land, and you are reminded, just like Ebay, if

25   you bid on this land, it's a binding contract, and you will

1    own, you know, this piece of land.

2         When you complete the auction, they send you an

3    email.  It says, confirmation, you have purchased this piece

4    of land.  The amount will be debited from your credit card or

5    your account, go log into the game and claim your land.  And

6    that's exactly what he did.

7         So, there is a terms of service agreement, although,

8    the terms of service agreement, if it were before the Court,

9    at this point, there does not appear to be a section that

10    says, by the way, when you enter into these auction contracts,

11    let's make it real clear to you that even though we were

12    telling you you own it, you don't own it anymore.

13         And, in fact, in the terms of service agreement,

14    there was actually, at one point in time, although they've

15    removed it now, there was a liquidation provision that said,

16    if we kick you out of the game, we will liquidate your assets.

17         THE COURT:  Let me ask you this.  If your client

18    owned the virtual real estate, I guess --

19         MR. ARCHINACO:  Yes.

20         THE COURT:  -- wouldn't that be worth more than four

21    or $5,000?

22         MR. ARCHINACO:  That is -- well, it depends.  It's

23    hard to say right now, Your Honor, because here's what's

24    happened.  He's out four to $5,000 with regard to out of

25    pocket.  The game itself, the world --

1          THE COURT:  Yes.

2          MR. ARCHINACO:  -- has expanded exponentially since

3   then.  I don't know, as we -- on some of it -- the company,

4   here's what they did to him, just to answer as directly as I

5   can.  When -- when they took his land from him, reclaimed it,

6   they put it out to auction again.  And when they put it out to

7   auction again, they sold it to the highest bidder and kept the

8   proceeds for themselves.  They did not return that money to

9   him.

10          In some instances, individual parcels of land sold

11  for more than he paid.  In some instances, they sold for less.

12  It's difficult for me, right now, to say, would -- what is the

13  actual value of that land, currently.  The game is

14  exponentially expanding, and more and more people --

15          THE COURT:  So, your theory would be that it's worth

16  considerably more or you don't even have -- or you don't even

17  know that?

18          MR. ARCHINACO:  I don't know that.  As I stand here,

19  I cannot assert to you.  What I can say is that we -- we have

20  requested specific performance.

21          THE COURT:  But if they gave you a -- if they --

22  your damages -- you paid, what, $300, is that it?  What was

23  the initial --

24          MR. ARCHINACO:  No, it was -- he invested

25  approximately $8,000 in virtual land --

1      THE COURT:  Okay.

2      MR. ARCHINACO:  -- and -- he's out of pocket,

3  approximately, four to $5,000.

4      THE COURT:  What is the difference between those two

5  numbers?

6      MR. ARCHINACO:  Because he was able to obtain some

7  of his cash back out of his account before they completely

8  locked him out, and made it unable --

9      THE COURT:  Okay.  Now, is it possible to try to

10 analogize this to what would happen in real life?

11     MR. ARCHINACO:  Yes.

12     THE COURT:  In other words, you -- you thought you

13 bought a piece of land, and you gave somebody $8,000.  And at

14 some point, there was, maybe, I don't know -- maybe he had

15 been -- if it had been misrepresented, I own the land, and --

16 and the person didn't own the land, so, you didn't get the

17 land, so you're owed, what, $8,000 or you're owed what that

18 land would have been worth if the person owned it?  I'm trying

19 to --

20     MR. ARCHINACO:  Sure.

21     THE COURT:  -- get my feet on something that is --

22 that is other than virtual to see how those principles apply

23 here.

24     MR. ARCHINACO:  Well, let's use the real --

25     THE COURT:  If that's possible.

1    MR. ARCHINACO:  Sure.  No, I'm going to -- I'll do

2    my best.

3        THE COURT:  Yes.

4        MR. ARCHINACO:  What, in essence, they sell you is a

5    piece of landlocked land, as an example --

6        THE COURT:  Okay.

7        MR. ARCHINACO:  -- because you still have to have

8    access to the game world to get --

9        THE COURT:  Okay.  Some easements into there.

10       MR. ARCHINACO:  Right.  So, it's almost like a

11   virtual easement.

12       THE COURT:  Okay.

13       MR. ARCHINACO:  The land, itself, to equate it to a

14   regular real world land, it operates just like real world

15   land, in that you can restrict other people from going on it,

16   you can put signs up --

17       THE COURT:  Right.

18       MR. ARCHINACO:  -- you can build casinos on it.  Mr.

19   Bragg had developed, you know, dance clubs and other things he

20   put on the land.

21       THE COURT:  Okay.

22       MR. ARCHINACO:  There is the prospect that that land

23   could become more valuable by virtue of the success of the

24   game.

25       THE COURT:  But, okay -- but, what happened there?

1   When it was sold, the seller owned it and conveyed it to Mr.

2   Bragg legitimately, so it's something that happened after the

3   sale was completed.  The wrong occurred some time thereafter.

4   So --

5           MR. ARCHINACO:  Right.

6           THE COURT:  -- what's happened is that the defendant

7   has foreclosed access to that -- to that land.  That would be

8   one -- one action.  And, number two, instead of giving him

9   back the money, I guess, there might have been some kind of

10  reservation.  Instead of giving him back, he has kept the

11  money, he has kept him out of the land.

12          MR. ARCHINACO:  Correct.  They did both.

13          THE COURT:  So, he has failed to, I guess, convey

14  the ownership of that land to -- to Mr. Bragg.

15          MR. ARCHINACO:  They told him that they conveyed him

16  the land through the representations and otherwise.

17          THE COURT:  But they didn't.

18          MR. ARCHINACO:  Well, apparently, they --

19          THE COURT:  They have failed to close on that deal.

20          MR. ARCHINACO:  Well, they did close on it.  He did

21  own it for a while.

22          THE COURT:  Okay.

23          MR. ARCHINACO:  He -- he entered into a series of

24  transactions over several months.

25          THE COURT:  Okay.

1    MR. ARCHINACO:  He would buy a piece of land, let's

2    say.  And he would buy another piece of land.

3            THE COURT:  But, so, his claim is that he is the

4    legal owner of this -- of this virtual property?

5            MR. ARCHINACO:  Yes.

6            THE COURT:  This virtual site?

7            MR. ARCHINACO:  Yes.

8            THE COURT:  Okay.  So, if he is the legal owner,

9    then he doesn't want back his money.  What he wants is --

10   doesn't he want some kind of action in equity --

11           MR. ARCHINACO:  Correct, Your Honor.

12           THE COURT:  -- to restore him to his rightful

13   position, land -- is virtual land irreplaceable, the same as

14   -- as real land, real property?

15           MR. ARCHINACO:  Yes.  Can I --

16           THE COURT:  I don't know if the word is

17   irreplaceable.

18           MR. ARCHINACO:  -- can I give you one qualification

19   on it?

20           THE COURT:  Yes.

21           MR. ARCHINACO:  You know, just like the Internet has

22   domain names --

23           THE COURT:  Yes.

24           MR. ARCHINACO:  -- the Second Life is sort of a

25   three dimensional version of the Internet, in that, specific

1    pieces of land never cease existing.  There's a game world
2    map.  So, just like the real world, the land exists, and it's
3    -- each piece is unique.
4            THE COURT:  Yes.
5            MR. ARCHINACO:  The difference -- the only
6    difference, in my view, with the real world is, is that Linden
7    can continue to make new land --
8            THE COURT:  Okay.
9            MR. ARCHINACO:  -- expand the borders of the world.
10           THE COURT:  But he wouldn't be satisfied if they
11   gave him a piece somewhere else in other words?
12           MR. ARCHINACO:  Correct.
13           THE COURT:  This is -- I think the word was unique.
14   Real estate in the real world being unique, what you want is
15   the real estate --
16           MR. ARCHINACO:  Correct, Your Honor.
17           THE COURT:  -- not someplace else or money, because
18   I think one of the factors is it may increase in value, et
19   cetera, so your interest in real estate is only satisfied if
20   you get the real estate.
21           MR. ARCHINACO:  Correct, Your Honor.
22           THE COURT:  So, I guess the amount in controversy
23   here may -- may be an estimate of what that is worth today,
24   but that -- that cannot be done?
25           MR. ARCHINACO:  Well, can it be done or has it been

1    done?  Can it be done?  Yes.  If the defendants would have or

2    did want to present evidence to you as to what they believe

3    the value of the land they took from Mr. Bragg is today,

4    because he did have property.  He got in very early in the

5    game world, and do I think it's appreciated?  Yes.  But we

6    don't have access to that information.

7          The defendants would have access to that

8    information.  The defendants would know exactly what the value

9    of that land is today and what the selling prices have been

10   for similar parcels of land.  But what the problem is is that

11   we filed a motion, and there is no evidence that has been

12   presented to you by the defendants saying, well, here is the

13   estimate of what we really think it is worth.

14         THE COURT:  Now, let me ask you another question.

15   And it may not have any legal significance, but why -- I can

16   see in a personal injury action or something like that,

17   although I'm not sure in Chester County, which is where you

18   want to return, that rationale would apply, but I can see that

19   a personal injury plaintiff in Philadelphia County would

20   rather be in Philadelphia County than in the Federal Court

21   because of the jury, et cetera.

22         But, why do you want to be in Chester County?

23   Either -- I can't imagine that there is any benefit or

24   advantage to it, and the two of you are just on the street.

25         MR. ARCHINACO:  Your Honor, actually, I mean, this

1       is -- this is the -- this is the -- you keep using the word

2       that I want to return.

3                   THE COURT:  Yes.

4                   MR. ARCHINACO:  I -- I --

5                   THE COURT:  Maybe Mr. Bragg --

6                   MR. ARCHINACO:  No.

7                   THE COURT:  -- wants to be in Chester County, but --

8                   MR. ARCHINACO:  Well, had I been able, had I

9       believed that I wasn't going to be confronted with a motion to

10      remand --

11                  THE COURT:  Yes.

12                  MR. ARCHINACO:  -- by filing in Federal Court, I

13      would have filed in Federal Court --

14                  THE COURT:  Yes.

15                  MR. ARCHINACO:  -- because I believe that there are

16      important issues in this case --

17                  THE COURT:  Yes.

18                  MR. ARCHINACO:  -- to be resolved.  And, quite

19      frankly, having the Federal Court preside over the matter, and

20      even this Court --

21                  THE COURT:  Yes.

22                  MR. ARCHINACO:  -- I'd be more than happy to.  The

23      -- the original complaint in this case was filed in Magistrate

24      Court.

25                  THE COURT:  Right.

1          MR. ARCHINACO:  And it was removed from there, in

2     part, because the Pennsylvania Rules of Civil Procedure, Rule

3     1301, which governs arbitrations, is an example, say that we

4     can't get equitable or specific performance relief from

5     arbitrators.  So, we couldn't even file it in arbitration, and

6     it ultimately went up to the GE level.

7          If I believed, sua sponte, that I could have filed

8     this Court in Federal Court, I would have done so.  But --

9          THE COURT:  Well, what -- well, I still don't --

10    don't understand all of that.  Say it again in --

11         MR. ARCHINACO:  Had I believed --

12         THE COURT:  Yes.

13         MR. ARCHINACO:  -- that I could have filed this

14    Court in Federal Court --

15         THE COURT:  You mean that you had --

16         MR. ARCHINACO:  -- that I had jurisdiction, I would

17    have filed it.

18         THE COURT:  -- 75,000.  You thought you'd be

19    confronted with, if you file in Federal Court, with a motion

20    to dismiss?

21         MR. ARCHINACO:  I thought I was going to be

22    confronted with a motion to remand the case --

23         THE COURT:  No, what --

24         MR. ARCHINACO:  -- if I filed in Federal Court.  I'm

25    actually somewhat surprised that it was removed.  That having

1    been said, we're now here, and the question is, is by a

2    preponderance of the evidence --

3            THE COURT:    I mean, initially, and this is maybe,

4    he wants this almost back from me.    I could see this case

5    actually -- yeah, well -- as I said, I don't -- you mean, you

6    didn't think that, in good faith, you could file a case in

7    Federal Court --

8            MR. ARCHINACO:    Correct, Your Honor.

9            THE COURT:    -- under Rule 11, that you would have

10   been bounced because you didn't have the amount in

11   controversy?

12           MR. ARCHINACO:    Had I filed in Federal Court, and I

13   had come before you and said --

14           THE COURT:    Yes.

15           MR. ARCHINACO:    -- here is the trebling of my $5,000

16   claim; here is the, you know, punitive damages, and I argued a

17   ten time multiple; here is my reasonable attorney fee, the

18   response from the defendants would have been, your reasonable

19   attorney fee can't be X.    You can't get over that $75,000

20   controversy.

21           THE COURT:    Well, you think that shifting of the

22   burden of proof makes it -- makes it -- you can now make those

23   arguments because the defendant has the burden, now, of

24   proving the negative, almost, or proving something that the

25   case is worth more than what the plaintiff says it's worth, in

Argument - Archinaco

25

1  a sense?

2          MR. ARCHINACO:  Well, I -- I think --

3          THE COURT:  It puts him in an awkward -- it puts

4  everybody in an awkward position --

5          MR. ARCHINACO:  Yes.

6          THE COURT:  -- to do that --

7          MR. ARCHINACO:  It does.

8          THE COURT:  -- to say, you know, my case isn't worth

9  a lot.  He says, it's worthless, but if it's worth something,

10  it's worth a lot.  Yes.

11          MR. ARCHINACO:  Your Honor, I think from -- I'll put

12  it to you this way, in terms of the litigants.

13          THE COURT:  Yes.

14          MR. ARCHINACO:  Mr. Bragg has practiced before this

15  Court.  Mr. Bragg has practiced in Chester County.  He's an

16  attorney.  Mr. Bragg, it does not matter to him which Court he

17  is before.  It does not matter to me which Court I am before.

18  I would actually prefer to be in Federal Court.

19          THE COURT:  Yes.

20          MR. ARCHINACO:  But I did believe that I was going

21  to be confronted with a motion to remand by the defendants,

22  had I filed, because, at the time I filed the complaint, the

23  amount in controversy was nowhere near $75,000.

24          THE COURT:  Okay.  But once the -- once the case was

25  removed, why -- why are we all here?

1          MR. ARCHINACO:  I think we're here because -- well,

2    the Court has jurisdiction at any moment to remand the case.

3    I mean, I don't -- I don't -- if you don't have jurisdiction,

4    you can bounce a case for lack of jurisdiction, so we could

5    have gotten halfway into the case, and you could have bounced

6    it for lack of jurisdiction.

7          I think why we're here is because I expect --

8          THE COURT:  Well, but is -- as of the time that the

9    filing occurred, not any time that there is less an amount.

10   In other words, I understand the principle to be as follows:

11   If there was no jurisdiction when the case came in, it doesn't

12   really matter, but you can -- it always happens.  Most cases

13   are less than the amount of jurisdiction by the time you

14   finish.  I don't know if it's most, but I mean, it's a very

15   common phenomenon.  You come in here.  You make your argument.

16   And the case is, you know, $50,000.  That doesn't mean that

17   the Court has no jurisdiction.

18         In other words, as I understand it, the moment -- in

19   other words, you're going to put the key in the door.  That's

20   the moment in which the Courts are going to -- to give you a

21   better example, if two people from Philadelphia sue each other

22   and it went all the way to the Supreme Court, the Supreme

23   Court could find, there is no diversity.  They're both in

24   Philadelphia.

25         But if one moved out to Nebraska six months into the

1    case, you still have jurisdiction at the time that you came

2    through the door.  So, the point is, as of the time you came

3    through the door, is there -- does the -- does the -- can the

4    defendant show, in this case, or could you have shown, if you

5    had filed a case here, under the -- under the standard, that

6    the amount in controversy exceeds $75,000?

7              MR. ARCHINACO:  It -- it -- I mean, Your Honor, the

8    way it would -- the way it would possibly exceed that amount

9    is if my attorneys' fees are caused to go through the roof,

10   through an aggressive litigation of the case.

11             THE COURT:  Yes.  Now, these two statutes, you have

12   Pennsylvania and California --

13             MR. ARCHINACO:  Yes.

14             THE COURT:  -- are they going to -- there's going to

15   be a choice of law or, in other words, is this in the

16   alternative or they violated both?

17             MR. ARCHINACO:  I believe they violated both, but

18   the truth is, I can only recover damages --

19             THE COURT:  One damages -- yes.

20             MR. ARCHINACO:  You don't -- there's some case law

21   cited by the defense counsel that you aggregate damages.

22             THE COURT:  Yes.

23             MR. ARCHINACO:  There's a single satisfaction rule.

24   A plaintiff can only be made whole once.

25             THE COURT:  Sure.

1          MR. ARCHINACO:  So --

2          THE COURT:  Same thing with fraud and deceptive

3    practices, et cetera.

4          MR. ARCHINACO:  Correct.

5          THE COURT:  If the fraud constituted a deceptive

6    practice, that's one amount.

7          MR. ARCHINACO:  I believe it's subsumed.

8          THE COURT:  Now, you may have -- I think that, for

9    example, the state statute would allow attorneys' fees and

10   maybe the common law fraud may not.

11         MR. ARCHINACO:  The state -- the state statute

12   permits attorneys' fees, at the Court's discretion.

13         THE COURT:  Yes.

14         MR. ARCHINACO:  It's not mandatory, although

15   California law is mandatory, but it is -- it is trebling, at

16   the Court's discretion, and attorneys' fees, at the Court's

17   discretion.  A fraud claim, on the other hand, would permit

18   only punitives.

19         So, I don't know that I've ever seen a case where

20   those two causes of action have been -- by a Court where they

21   have looked to say, what is the single satisfaction of the

22   plaintiff.  I don't know, although it's been the defendant's

23   position that I could conceivably obtain punitive damages on a

24   fraud claim, and then obtain the trebling and the attorneys'

25   fees under the statutory claim.

1    That's their position --

2    THE COURT:  Yes.

3    MR. ARCHINACO:  -- or at least -- well, they don't

4 say that's really their position --

5    THE COURT:  Yes.

6    MR. ARCHINACO:  -- but that's what they've asserted

7 in their papers.

8    THE COURT:  Right.

9    MR. ARCHINACO:  And I have not seen a case that has

10 reconciled those two causes of action as to whether or not

11 that is the case.

12    THE COURT:  Well, are -- are you -- would you be

13 prepared to stipulate that the amount in controversy exceeds

14 $75,000?

15    MR. ARCHINACO:  Exceeds it?

16    THE COURT:  Yes.

17    MR. ARCHINACO:  No, because, again, it's -- I -- I'm

18 not prepared to do either.  And the problem is, is the

19 attorneys' fee issue.

20    THE COURT:  Yes, but if it exceeds, it means you can

21 get it.  My question is, are you -- are you prepared to

22 stipulate that there is -- that the Court has jurisdiction to

23 hear this case?

24    In other words, are you prepared to say, not that

25 you don't have it, and then you go back.  The question is,

1    from what I understand it, you were reluctant to file the case

2    here, because --

3              MR. ARCHINACO:  Right.

4              THE COURT:  -- you weren't sure that you could stay

5    here.  But now, the defendant is -- is, in fact, urging you to

6    stay here.  So, the matter has changed posture.  And, so, the

7    question is, are you prepared to say, well, you're right, this

8    -- this -- the amount in controversy doesn't mean that's what

9    you are going to get, but the amount in controversy exceeds

10   $75,000.

11             MR. ARCHINACO:  Your Honor, two points --

12             THE COURT:  Yes.

13             MR. ARCHINACO:  -- I would make about that.  One is,

14   if the -- one is, if the defendant were to present evidence to

15   you, particularly as to the net worth of the individual

16   defendant and the defendant, Linden, you could, then,

17   properly, and I could properly assess, whether a nine or ten

18   multiple -- ten time multiple on punitive damages would be

19   appropriate.  That's the first point.  So, I would need to see

20   that evidence.

21             The second point is, is if the defendant is willing

22   to stipulate that there is absolutely no cap as to what would

23   be reasonable for my attorneys' fees in this case, then --

24             THE COURT:  Well, what does that have to -- I don't

25   understand what that has to do with it.

1          MR. ARCHINACO:  Because what's going to happen is is

2    that they are going to contest -- they will contest what a

3    reasonable attorney fee is for handling a $5,000 case.

4          THE COURT:  Right.

5          MR. ARCHINACO:  And I would, too.  If I was the

6    defense counsel, I'd say, it's unreasonable, Mr. Archinaco.  I

7    don't care -- you know, you're a partner at a big firm.  I

8    don't care.  It's unreasonable for you to have $70,000 in

9    fees.

10          THE COURT:  But it's not a $5,000 case.  If it was a

11   $5,000 case, if -- then, it would be unreasonable, but your

12   whole point is that it isn't a $5,000 case, that it is a fraud

13   case.  It's an intentional interference case.  It's a

14   violation of Pennsylvania law.  It's a violation of California

15   law.  This is a big deal and a big case.  That's what the case

16   is about.

17          Now, it may turn out to be a $5,000 collection case.

18   That's -- that's -- but you can't, ahead of time, know what it

19   is going to be --

20          MR. ARCHINACO:  Your Honor --

21          THE COURT:   -- except that we are, as you come

22   through the door, and as I'm listening to you, this is a big

23   case.

24          MR. ARCHINACO:  Importance-wise, absolutely.

25   Absolutely.

1          THE COURT:  Well, a big case in terms of numbers.

2   What these people have done is ripped off a lot of people for

3   a long period of time, and you are just the guy who is

4   complaining about it.  You want an injunction to stop them

5   from doing it to other people.  So, if you're here for a

6   $5,000 case, then you go back to State Court.  If you are here

7   on a case which, realistically, involves more money, then --

8   then you stay here.

9          But -- but I don't know -- you know, you -- you

10  know, maybe you don't have the authority to do this, but I --

11  I just find it hard to believe that you actually want to be --

12  unless, you know, Mr. Bragg is from Chester County, that may

13  have something to do with it --

14          MR. ARCHINACO:  He is, but it's --

15          THE COURT:  -- which is entirely appropriate.  I

16  mean, I'm not holding that -- anybody from Chester County, as

17  you say, some of my best friends are from Chester County, but

18  he may feel more comfortable in Chester County.  And that's an

19  entirely appropriate rationale, because I couldn't -- I

20  couldn't see that -- he is going to require a lot of attention

21  to this case, and I just don't see the State Court having the

22  ability to do that, nor a jury is going to make that much of a

23  difference in Chester County than in Philadelphia.

24          In fact, it probably, basically, is less likely to

25  empathize with something along these lines.  But those are

1    practical considerations that you have to make.  If what you

2    are saying is, this is the way it is, okay, we'll call it.

3    So, we'll -- we'll do the best we can and just call it once we

4    hear the defendant.

5             MR. ARCHINACO:  Your Honor --

6             THE COURT:  Yes.

7             MR. ARCHINACO:  -- and I don't want -- I don't want

8    the Court to think that, you know, obviously, this is an

9    argument -- I think Courts have recognized that when we come

10   before you on this type of argument --

11            THE COURT:  Yes.

12            MR. ARCHINACO:  -- I think both sides, and I would

13   recognize this with Andrew, as well, it puts us in a difficult

14   position because, as one Court has noted, we always argue the

15   opposite position, or, at least, that's the way it is.  The

16   way the rule has been contemplated is, we always argue the

17   opposite position.

18            But I will say to the Court, I mean, trebling of the

19   out of pockets, and the case law appears to be, on the Unfair

20   Trade Practice claim, that it's out of pockets.  I don't know

21   that you're entitled to trebling of the appreciation of an

22   asset.

23            And I just don't know that.  I don't --

24            THE COURT:  Yes, but unless you prove some kind of

25   fraud, if all you've proved is that you paid -- that there's a

1    breach of contract -- and that's going to be the big issue

2    here -- this is going to be a $5,000 case, no matter what --

3    what you call it.  If you prove that there is something going

4    on here beyond that, then this is going to be a case where you

5    will aggregate all kinds of various damages.

6              But, so far, you gave them some money, and they

7    didn't give you whatever it was.  I mean, it sounds like a

8    contract case, unless there is more to it, which you claim

9    there is.  Otherwise, every contract case involves somebody,

10   you know, lying.  They said they would provide the services,

11   and, you know, you sometimes hear that argument.  I paid for

12   it.  They said they would do it.  They didn't do it.  They

13   committed fraud, you know.

14             MR. ARCHINACO:  And if I take my biggest, I mean,

15   damage claim, aside from this nine or ten time multiple --

16             THE COURT:  Yes.

17             MR. ARCHINACO:  -- but if I take my biggest damage

18   claim, which is the Unfair Trade Practice claim --

19             THE COURT:  Yes.

20             MR. ARCHINACO:  -- I treble the amount in

21   controversy.  Let's assume that it was the appreciation of the

22   land.  We don't know what the number is for that.

23             THE COURT:  Yes.

24             MR. ARCHINACO:  But if I treble that, and then add

25   on a reasonable attorney fee, I am not at 75,000.  That's the

1    reason why I don't think that they have presented the evidence

2    to you to keep the case before you.

3           Now, obviously, recognizing that there are other

4    issues here about appreciation.  Are there other people this

5    is happening to?  Yes.  This is happening -- this is happening

6    to everyone they make the promise to --

7           THE COURT:  Yes.

8           MR. ARCHINACO:  -- that they own the land.  And

9    there are people being induced into investing in this world --

10          THE COURT:  Yes.

11          MR. ARCHINACO:  -- and then, after being told one

12   story, it turns out that that story isn't true.

13          THE COURT:  Well, all I'm saying is that the heart

14   of this case is whether this is an ordinary breach of contract

15   or whether it involves fraud and a tort, whether this is a

16   contract or this is a tort.  And if -- if it is a contract

17   claim, it is a $5,000 claim.

18          If it's a tort claim, then, it's significantly more.

19   If they do it to everybody, if they do it as a matter of

20   practice, if this is a scheme, if all of those things that you

21   are alleging turn out to be so, then you've got a big case

22   here.

23          And I think that that's what your complaint reflects

24   in there.  But we'll see what we have.  Good.  Okay.

25          MR. ARCHINACO:  Thank you, Your Honor.

1          THE COURT:  Well, thank you.

2          MR. ARCHINACO:  Thank you, Your Honor.

3          THE COURT:  Okay.  Mr. Soven, please?

4          MR. SOVEN:  Thank you, Your Honor.  Let me begin

5    with just a little more.

6          THE COURT:  You're even in the same building?

7          MR. SOVEN:  Yeah.  Well, he's --

8          THE COURT:  You can take depositions.  And he's in

9    the 25th -- you can take depositions on the 21st floor,

10   halfway between.

11         MR. SOVEN:  Neither of us is in Chester County,

12   either, but anyway.

13         THE COURT:  Okay.

14         MR. SOVEN:  Your Honor, the way this got started,

15   before this complaint was even filed, is Mr. Bragg filed a

16   complaint for $8,000 with the local District Justice in

17   Chester County.

18         THE COURT:  Right.

19         MR. SOVEN:  That's when I got hired.  I was prepared

20   to go out there and litigate what I thought was an $8,000

21   claim.

22         THE COURT:  It's beneath your stature.

23         MR. SOVEN:  Well, the client gets to decide that, I

24   guess.

25         THE COURT:  Okay.

1    MR. SOVEN:  But anyway, so, the day before that was

2    supposed to be heard, that complaint is withdrawn, Mr. Bragg

3    hires counsel --

4    THE COURT:  Right.

5    MR. SOVEN:  -- and this complaint results a few

6    months later.  I think it's a little bit disingenuous for Mr.

7    Bragg to argue that he's now seeking less in this case than he

8    was seeking in the District Justice case where the complaint

9    asked for $8,000.  So --

10    THE COURT:  Well, that still would make it $8,000.

11    MR. SOVEN:  What's that?

12    THE COURT:  That would make it $8,000.  So, what

13    would that increase the multiplier, is that what you're

14    saying?

15    MR. SOVEN:  Well, it wouldn't even increase the

16    multiplier, but conceptually, we're at different universes.

17    THE COURT:  Yes.

18    MR. SOVEN:  I mean, that case was an $8,000 case.

19    All right.  There was no other -- I mean, in theory, if I had

20    thought, on the basis of that complaint, that complaint could

21    have been removed.  All right.  Although it's rare that

22    District Justice actions get removed to the Court -- it has

23    happened.  I did it once.  And I could have done that.  But

24    that complaint did not look like a case where $75,000 was

25    being sought.

1    This case gets filed.  And, although, you didn't

2    quite get, I don't think, a straight answer to your question

3    about whether or not it's about fraud, clearly, on the face of

4    the complaint --

5    THE COURT:  Well, it says fraud.

6    MR. SOVEN:  -- it's fraud.

7    THE COURT:  Yes.

8    MR. SOVEN:  Right.  I mean, the virtual ownership

9    lie is the key phrase that keeps coming up over and over

10   again.  And when you heard counsel's presentation about what

11   supposedly happened here, it's key that that "virtual

12   ownership lie" is going to be the centerpiece of the

13   plaintiff's case.

14   Now, the defendant will argue that the terms of

15   service that Mr. Bragg agreed to are what control the outcome,

16   but clearly, the plaintiff is not accepting that position,

17   and it wasn't accepted today.  I mean, it was disputed today.

18   So, the centerpiece of this complaint, which, of course, I

19   don't agree has merit and all that, is -- sounds -- sounds in

20   fraud.

21   The way -- a little bit more background.  What

22   happened -- if you look -- Exhibit A to the complaint reflects

23   that Mr. Bragg actually owned about a hundred of these virtual

24   properties.  What happened was, he had purchased a large

25   number of these virtual properties, and then he had purchased

1  several more surreptitiously, by sort of, rigging the auction

2  system.

3         Now, again, we're not here on the merits here today.

4  But that's what happened.  He was able to buy a few properties

5  at an unreasonably low price.  Linden found out about it and

6  kicked him off the system, and, you know, essentially, you

7  know, he no longer had access to those properties.

8         THE COURT:  So, this was a counter measure --

9         MR. SOVEN:  This was a -- yes, right.

10         THE COURT:  -- to an ongoing fraud by Mr. Bragg?

11         MR. SOVEN:  Right.  I mean, and we said, well, under

12  the -- you violated the terms of service.  You know, you

13  rigged -- you rigged the game, you're out.

14         THE COURT:  Now, was -- is -- is there a -- I think

15  I asked -- I asked a question from counsel -- is there a piece

16  of paper where the terms of this sale are contained or --

17         MR. SOVEN:  Well, there's not a piece of paper --

18  well, there may not be a piece of paper --

19         THE COURT:  Maybe --

20         MR. SOVEN:  -- as to each sale, but the --

21         THE COURT:  -- virtual paper.

22         MR. SOVEN:  -- the terms of service are attached to

23  our motion to compel arbitration --

24         THE COURT:  Right.

25         MR. SOVEN:  -- which will be heard, I guess --

1          THE COURT:  Yes.

2          MR. SOVEN:  -- if the case stays before Your Honor.

3   So, yeah, I mean, those terms of service are in writing, you

4   know, whether the consumer prints them, I don't know, but you

5   click on them, and you agree.

6          THE COURT:  But there is -- there is a -- there is a

7   site where these terms are -- are contained?

8          MR. SOVEN:  Right.  And it lays out the various

9   rules that govern your life in Second Life, so to speak, and

10  says what you own and what you don't own.  I mean, that's all

11  in the -- what we would call the contract.

12         All right.  So, that's, sort of, by way of

13  background.  I mean, I think it's a fraud case, and the

14  circumstances of how what happened here and "how much is at

15  stake" are just a little bit different than -- than as

16  presented.  I guess I do the math a little bit -- a little bit

17  differently.  I mean, if he's out of pocket, say, $5,000, I

18  guess we agree that that could, potentially, be multiplied by

19  nine or ten or --

20         THE COURT:  Well, how do you go to ten?  Is that

21  what Gore says or what is the other case?

22         MR. SOVEN:  Well, there's Gore, and I believe

23  there's State Farm.

24         THE COURT:  State Farm, okay.

25         MR. SOVEN:  I don't -- I don't think it makes a

1    difference for purpose of this --

2              THE COURT:    Okay.

3              MR. SOVEN:    -- whether it's nine or -- whether it's

4    nine or ten.

5              The point on the Unfair Trade Practices claim is

6    that that is a bench issue.    And the way the statute reads is

7    that gives the Court, the Judge, as opposed to a jury, the

8    discretion to -- to impose treble damages.    So, you know,

9    sitting here today, I think it's difficult to predict how a

10   jury might rule on the punitive damages side --

11             THE COURT:    Well --

12             MR. SOVEN:    -- and how the Court might rule on the

13   treble damages side.

14             THE COURT:    -- if -- if true -- if -- if the

15   defendant was engaged in a scheme that induced people to buy

16   virtual real estate and then did not deliver that property,

17   and it wasn't a mistake or an oversight or a single customer,

18   but it was a matter of course of how they did business, if

19   that is true, then treble damages may be warranted.

20             MR. SOVEN:    The Court might find --

21             THE COURT:    Why else would there be treble damages?

22             MR. SOVEN:    -- the Court might find as much.

23             THE COURT:    Okay.

24             MR. SOVEN:    And, so, I mean, if you start with five,

25   and you add 45 to the five for the punitive damages, and you

1    add 15 for the treble damages, and you add reasonable

2    attorneys' fees, and given the length of the complaint, we

3    already have several thousand dollars of those --

4            THE COURT:  Now, you said -- I -- I think there was

5    a question whether punitive damages would go on top of treble

6    damages.

7            MR. SOVEN:  Well, I mean, again, for purposes of

8    argument today, I believe the law is that they could.  You

9    know, the punitive damages would be an issue for the jury.

10   They could just easily decide that, you know, Mr. Bragg gets

11   back his $5,000 and, you know, he's entitled to nine times

12   that for punitive damages.

13           And then, you know, the Judge, sitting on the bench,

14   could decide, well, this was really outrageous, and I

15   potentially, have the authority to order another 15, plus

16   attorneys' fees on top of that, and that's what I'm going to

17   do, you know, assuming that that's the way the case goes in.

18   We don't think it will.  But all of that is possible.

19           THE COURT:  Well, the attorneys' fees will be

20   pursuant to the Pennsylvania statute?

21           MR. SOVEN:  Well, there's -- either the Pennsylvania

22   CPL law --

23           THE COURT:  Or California?

24           MR. SOVEN:  -- or the California statutes that are

25   in the complaint.

1          THE COURT:  Is that where the defendant is located,

2    in California?

3          MR. SOVEN:  Yes.

4          THE COURT:  Okay.

5          MR. SOVEN:  In San Francisco.  Although, it's only

6    $1,000 -- if we are counting, there's also $1,000 claim for

7    statutory damages under California law.  There is also a

8    tortious interference claim, which potentially, there are both

9    actual damages involved in that, as well as that's additional

10   grounds, potentially, for punitive damages.

11         And then there's the injunctive relief component of

12   the case, which is that Mr. Bragg wants all of his property

13   restored.  He wants access to the Second Life site, and in the

14   complaint, he asks for -- for Second Life or Linden to restore

15   the property of people who were treated similarly.

16         And so, when you add in all those factors, I think

17   that there's no question that you can get to a possibility of

18   there being $75,000 at issue.

19         THE COURT:  Well, I think it says a legal

20   certainty --

21         MR. SOVEN:  Well, but it's a -- but it's --

22         THE COURT:  -- not a possibility.  It's up for you

23   to prove that what appears to be to a legal certainty that the

24   plaintiff would not be entitled to a minimum amount so the

25   word, legal certainty is -- is something more than we can sit

1   around and speculate and conjecture that that would happen.

2          MR. SOVEN:   I agree, Your Honor.  But if you read --

3   but if you read KIA vs. -- I think it's -- or Samuel versus

4   KIA -- Bassett --

5          THE COURT:  Yes.

6          MR. SOVEN:  -- which, I think, is the Third

7   Circuit's most recent case on the issue, I mean, what the

8   Third Circuit says is that, you know, they haven't seen a case

9   yet where the precise phraseology as to the standard, really,

10  would make a difference --

11         THE COURT:  Yes.

12         MR. SOVEN:  -- whether it's called reasonableness or

13  called, legal certainty.  And then they come out, and they

14  say, we're going to use legal certainty.  And it has to be

15  that there's a legal certainty that the complaint, as phrased,

16  can't lead towards a result of $75,000.  I mean, it's actually

17  phrased in the negative in that case.

18         THE COURT:  Okay.

19         MR. SOVEN:  So, you know, I think that -- so, as I

20  said, there were some other factors in there that counsel

21  didn't necessarily acknowledge.  I mean, the complaint, of

22  course, has never been amended.  I mean, you know, you might

23  face the argument of well, you know, I don't know if I would

24  be -- if the complaint had been amended, after we filed our

25  motion to dismiss to assert a single count for breach of

Argument - Soven

1    contract, I don't know if I would be able to stand here before

2    Your Honor.

3              But that's not what happened.  And in various ways,

4    counsel never conceded that he would agree, under any set of

5    circumstances, to accept $75,000.

6              THE COURT:  How about if he amended the complaint

7    afterwards?  Would -- would that --

8              MR. SOVEN:  After I removed the case?

9              THE COURT:  Yes.

10             MR. SOVEN:  Well, I mean, the Third Circuit standard

11   is at the time of the removal, but frankly, you know, the

12   plaintiff -- I mean, the defendant, you know, might have less

13   of an -- well, I guess, if we removed the case, and an amended

14   complaint was filed, frankly, as a strategic matter, we might

15   treat the motion to remand differently.  Well, I mean, I think

16   as a practical --

17             THE COURT:  But he couldn't file an amended

18   complaint tomorrow.  If -- if the motion to remand was denied,

19   could the plaintiff then file an amended complaint that says,

20   this is a contract matter or is it a --

21             MR. SOVEN:  Well, as I said, I think what would

22   happen, as a practical matter --

23             THE COURT:  Yes.

24             MR. SOVEN:  -- is I would say to my client, look, he

25   amended the complaint.  He's only seeking $5,000.  Should we

1    really spend more time arguing about this.  Maybe we --

2              THE COURT:  Let's go back to State Court.

3              MR. SOVEN:  Maybe we should just go back there, and

4    -- and resolve it --

5              THE COURT:  Okay.

6              MR. SOVEN:  -- and resolve it there.

7              THE COURT:  Thank you.  I think I get your point,

8    sir.

9              MR. SOVEN:  You think you got the point.

10             THE COURT:  Yes.

11             MR. SOVEN:  I mean, there are cases, I mean, the

12   Roth case --

13             THE COURT:  Yes.

14             MR. SOVEN:  -- there were $10,000 in out of pockets.

15   Judge Shapiro found that there was easily $75,000 at issue.

16             THE COURT:  Thank you.  Let me just hear rebuttal

17   here.

18             MR. ARCHINACO:  Your Honor, just a couple of points.

19             THE COURT:  Yes.

20             MR. ARCHINACO:  Defense counsel said that -- that he

21   didn't believe you got a straight answer about whether I

22   believe this case sounds in fraud.  I absolutely believe the

23   case sounds in fraud, and I actually agree with defense

24   counsel, this case definitely sounds in fraud.  So,

25   absolutely, I do not believe it's just a simple contract

1    action.

2              THE COURT:  Well, isn't the math, then, easy?

3    $5,000 out of pocket, $45,000 for treble damages, and if you

4    have to prove a complex scheme involving all of these

5    plaintiffs in a -- in a new area of the law, $15,000 would not

6    be unreasonable under those circumstances.  That puts you at

7    $75,000.

8              I mean, it seems to me, like, from the face of the

9    complaint, and what you have argued here, it is -- it is

10   nearly undisputable that you've got 70 -- that you have in

11   excess of $75,000 in this case, so long as you make a claim.

12             If your claim is -- you're not saying that it's even

13   in the alternative.  You're saying this is a fraud case.

14             MR. ARCHINACO:  Yes.

15             THE COURT:  It just began as a contract case, but it

16   is really a fraud case.

17             MR. ARCHINACO:  There are breach of contract

18   elements --

19             THE COURT:  Yes, sure.

20             MR. ARCHINACO:  -- that we would ask for --

21             THE COURT:  Well, sometimes, that's how you --

22             MR. ARCHINACO:  Yes.

23             THE COURT:  -- that's how you find out there's fraud

24   is when somebody doesn't carry out the contract.

25             MR. ARCHINACO:  Correct.  When you buy something --

1          THE COURT:  So, there's always a breach of contract

2     that leads you to discover the fraud.  If they had lived up to

3     the contract, there would be no fraud.

4          MR. ARCHINACO:  When you buy, you know, several

5     pieces of land --

6          THE COURT:  Yes.

7          MR. ARCHINACO:  -- and you are told you own the

8     land, and you actually go to the land, and you actually do own

9     it for a period of time, and then, you know, the night before

10    Christmas or whatever it is, they say, we don't like you

11    anymore --

12         THE COURT:  Sure.

13         MR. ARCHINACO:  -- and then they reconfiscate the

14    land that you were told you own, and, Your Honor --

15         THE COURT:  And then you find out that they've done

16    it to 20 other people --

17         MR. ARCHINACO:  Yes.

18         THE COURT:  -- and that's when the fraud comes in.

19         MR. ARCHINACO:  Yes.  Yes.  And, Your Honor --

20         THE COURT:  This is -- this is something that they

21    do as a matter of practice, and they knew very well this is

22    what was going to happen.

23         MR. ARCHINACO:  Your Honor --

24         THE COURT:  Now, that may or may not be so, but

25    that's your theory.

1       MR. ARCHINACO:  -- I would -- I would also tell you

2  two points.  You mentioned with regard to amendment of the

3  complaint --

4       THE COURT:  Yes.

5       MR. ARCHINACO:  -- to the extent that the Court is

6  reading the complaint to -- I don't believe that I went as

7  broad as Mr. Sorven -- Soven, sorry -- as Mr. Soven stated

8  with regard to my injunctive relief, but there is injunctive

9  relief, which asks for a declaration as to all of the people

10 that have been induced into purchasing.

11      We would consider amending.  If you do keep the

12 case, we would consider amending to expand it classwide.

13      THE COURT:  Well, that -- that may be so, but I'm

14 considering it as of today.

15      MR. ARCHINACO:  Okay.

16      THE COURT:  As of the time of the removal action.

17      MR. ARCHINACO:  And, Your Honor, and when you point

18 out, in terms of importance, I absolutely believe this is an

19 important case.  There is one person, Anshe -- Anshe Chung, I

20 believe is the virtual name of the person, and that person

21 hasn't taken a position yet, but they are said to have a

22 million dollars in virtual assets invested with this company.

23      And why is it important?  Well, it's important

24 because tomorrow, according to what they are apparently saying

25 right now, is that they can just pull out the rug, and that

1    that money is theirs.  And there are other people this has

2    happened to.

3            THE COURT:  Yes.

4            MR. ARCHINACO:  And do I think it's important?  Do I

5    think, you know, flaunting the own word in this industry,

6    because that is the standard in this industry, ownership right

7    of virtual assets, I absolutely believe it's important.  And I

8    think it's the primary reason I took the case.

9            THE COURT:  Well, I mean, that was not a

10   requirement, but I guess I have -- low pay gives me the

11   privilege of telling an anecdote.  And that was from my

12   colleague, Judge Pollak.  And when somebody argued to him

13   that, Judge, this is not Sacco/Vansetti; this is not an

14   important case, his response was, every case is an important

15   case to the litigants.

16          So, we're not going to measure whether or not it

17   should stay here on the basis of whether or not it is going to

18   appear in the Wall Street Journal.  But I'm sure it's

19   important to you and to your clients.  And that's good enough

20   for us here.

21          And we'll let others consider whether it will be a

22   Sacco/Vansetti type or the more ordinary staple that we're

23   used to working with here.  But I appreciate both of you for a

24   very thorough briefing here, and I'm ready to rule on it.

25          MR. ARCHINACO:  Thank you, Your Honor.

1       THE COURT:  Motion to remand will be denied,

2  applying the well settled standard that the party removing the

3  case must show what appears to be a legal certainty that the

4  plaintiff would not be entitled to recover the minimum amount

5  set by Section 13:32.

6       The Court finds that the out of pocket minimum

7  recovery will be $15,000 -- will be $5,000, treble damaging

8  that recovery would bring the -- the amount to $45,000.  The

9  amount of attorneys' fees in this case, given the complexity

10  of the theory under which the plaintiffs are proceeding would

11  bring the case, to the Court's satisfaction, in excess of

12  $75,000.

13       The case -- the only way that the case could be

14  viewed as falling short of the $75,000 threshold is if it were

15  viewed as a contract case.  But the very essence of the

16  plaintiff's position is that this goes much beyond a contract

17  pled case, and it is a tort case.  Indeed, it's a fraud case.

18  And, indeed, it's a fraud case that encompasses not only this

19  particular plaintiff, but many similarly situated plaintiffs.

20       It's a novel area of law.  It is complicated.  If

21  litigated to its fullest extent, it will encompass a

22  significant amount of attorneys' fees, as to which the

23  plaintiff may be entitled to, depending on the application of

24  the state law in that -- in that regard.

25       But reading the complaint, I think one is impressed

1  by the plaintiff's belief that the facts here support an

2  ultimate judgment against the defendant for fraud and

3  deceptive practices under state law that would warrant those

4  -- those remedies.

5        So, the motion to remand having been denied, we'll

6  move on to the next stage of this proceeding.  And what would

7  that be?

8        MR. ARCHINACO:  Your Honor, I believe there are two

9  other motions --

10        THE COURT:  Yes.

11        MR. ARCHINACO:  -- that have been filed by -- by the

12  defendants, and I believe we have an agreement.  I'm not sure

13  how many days you had gave me to file my responses.  I don't

14  know if it was five or ten days after this argument.  But we

15  do owe the Court responses, both to the motion to transfer the

16  case to arbitration --

17        THE COURT:  Yes.

18        MR. ARCHINACO:  -- and there was also a motion to

19  dismiss Mr. Rosedale for lack of personal jurisdiction.  So, I

20  do owe the Court two -- two responsive pleadings to both of

21  those motions.

22        THE COURT:  And when would you -- when would you be

23  ready for -- to file that response?

24        MR. ARCHINACO:  I think within ten days would be

25  reasonable.

1    THE COURT:  Ten days, okay.

2    MR. ARCHINACO:  I've already --

3    THE COURT:  That would be fine.

4    MR. ARCHINACO:  -- done some work on those.

5    THE COURT:  Okay.  And if there is any rebuttal in

6  this -- in this case, and it may be appropriate, particularly

7  in a motion to dismiss case, that there may be something, ten

8  days to file a reply or a rebuttal.  Now, that's going to be

9  both a motion to dismiss and the motion to compel arbitration?

10    MR. ARCHINACO:  Correct, Your Honor.

11    THE COURT:  Okay.  Fine.  So, why don't we get a

12  look at those papers, and then, probably, bring you in once we

13  are ready to -- to address them, but let's take a look at them

14  first.  So, we'll issue an order today, scheduling those --

15  those matters.

16    And you, also, may want to have some discussions, so

17  when we have the hearing here, if the -- and maybe I'm getting

18  slightly ahead of myself -- but just so that we can continue

19  to move this matter, you would need to do this whether you're

20  here on arbitration, which is what kind of discovery you would

21  anticipate having so that you would have a sense of how long

22  it would take or should be allowed for discovery in this -- in

23  this case, which will proceed either here or in -- or in

24  arbitration.

25    So, please be prepared to discuss that, as well, you

1   know, the number of depositions, et cetera, that you envision,

2   you know, whether it's ten or 100 or whatever that may be.

3           Okay.  Very well.  Thank you.

4           MR. ARCHINACO:  Thank you, Your Honor.

5           MR. SOVEN:  Thank you, Your Honor.

6           (Proceedings concluded at 4:11 p.m.)

7                           *  *  *

8

9

10

11

12                  C E R T I F I C A T I O N

13

14           I, Lois A. Vitarelli, court approved

15   transcriber, certify that the foregoing is a correct

16   transcript from the official electronic sound recording of the

17   proceedings in the above-entitled matter.

18

19

20

21   _____  January 14, 2007

22   LOIS A. VITARELLI

23   DIANA DOMAN TRANSCRIBING

24

25