IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA

MARC BRAGG, Esq., an individual,            CIVIL DIVISION

                            Plaintiff,      No. 06-cv-4925

                v.                          **JUDGE EDUARDO ROBRENO**

LINDEN RESEARCH, INC., a corporation,
and PHILIP ROSEDALE, an individual,

                            Defendants.

### BRIEF IN OPPOSITION TO DEFENDANT ROSEDALE'S MOTION TO DISMISS

AND NOW, comes Plaintiff, Marc Bragg, Esq., by and through counsel, Jason A.
Archinaco, Esq., and the law firm of WHITE AND WILLIAMS, LLP, and files the
following Brief in Opposition to Defendants' Motion to Dismiss Defendant, Rosedale,
and avers as follows:

### FACTS

#### Background of the Massively Multiplayer Online Roleplaying Game ("MMORPG") Industy

The Defendant Linden is not the only company that operates a virtual world
known as a massively multiplayer online roleplaying game ("MMORPG") for profit.
See, Bragg Declaration, ¶ 48, Exhibit "1". The industry is populated with heavy weights
like Vivendi-Universal (Blizzard) and Sony (Sony Online Entertainment), including
numerous other companies. Id. at, ¶ 49. Studies have concluded that there are over 10
million players participating in such MMORPG worldwide, with the number growing
rapidly every year. Id. at, ¶ 49 The industry leading World of Warcraft boasts over 7
million participants. Id. at, ¶ 49. Such MMORPG are designed so that participants can

acquire virtual items, goods and, in some cases, land. Id. at, ¶ 50. The secondary market for such virtual items is estimated at, conservatively, over $100 million, with other estimates exceeding $1 billion worldwide annually. Id. at, ¶ 51. The secondary markets, however, are considered a "black market" by many of the companies operating the virtual worlds. Id. at, ¶ 52. Thus, despite the fact that accounts in popular MMORPG can sell for thousands of dollars in real world currency, or rare virtual items can also command such prices, the designers and game world operators like to claim that players do not have any rights to such virtual items and that such sales are a violation of End User License Agreements ("EULA"). Id. at, ¶ 52. Sony, at one time, threatened to sue eBay if it did not remove all listings pertaining to its then immensely popular Everquest. Id. at, ¶ 53. The MMORPG themselves, and the virtual items acquired and held by players in their accounts, are considered so addictive by some that Everquest was commonly referred to as "Evercrack". Id. at, ¶ 54.

Nevertheless, despite the existence of EULA in each of the MMORPG, transactions for virtual goods and items occur on a daily basis. Id. at, ¶ 55. A simply Google search for "virtual gold" turns up numerous sites selling virtual gold in popular MMORPG. Id. at, ¶ 55. The industry refers to the sale of virtual items for real world money as "real money trade" or "RMT". Those participating in such purchases and sales still run the risk of action being taken against them by the game publishers. Id. at, ¶ 56. In fact, this year Vivendi-Universal (Blizzard) is believed to have closed over 50,000 accounts because of alleged involvement in sale of virtual gold for real world money. Id. at, ¶ 57. Articles have recently been published discussing the fact that "sweat shops" have been opened in China and other third world countries where workers play games for

hours on end "farming gold" to sell on the open market. Id. at, ¶ 58. In one recent article, it was noted that Chinese "gold farmers" make better than the average wage for Chinese workers. Id. at, ¶ 58.

### Players' Rights to Virtual Items and Land

Despite the existence of the thriving "black market" for virtual items and goods, the business of RMT has remained "illegitimate" because of the EULA disclaiming any ownership rights in such virtual world items, goods and land. Id. at, ¶ 59. Player rights in such worlds have become a hotly debated issue, with many legal commentators writing on the subject. Id. at, ¶ 60. As the well known MMORPG game designer Ralph Koster[1] stated in his article "Declaring the Rights of Players" with regard to rights, "[p]layers keep claiming they have them." The State of Play, Law, Games, and Virtual Worlds, (2006), p. 55, attached hereto as Exhibit "2". Koster further wrote that "administrators of any virtual space are loathe to "grant player rights" because it curbs their ability to take action against people and holds them to standards they may not be able to live up to." Id. One Korean study demonstrated that in the game "Lineage", even though the EULA disclaimed any ownership rights in the virtual items in the game, a resounding majority of those participants polled believed that they had ownership rights in their virtual items. Exhibit "1", ¶ 62. Thus, participants in the virtual worlds are increasingly drawing the conclusion that they have rights in their virtual items and goods despite any "fine print" contained in EULA of popular virtual worlds. Id. at ¶ 62. Although the issue has yet to be directly addressed by U.S. courts, courts in other jurisdictions have recognized players rights. Id. at, ¶ 63. Nevertheless, despite the increasing sentiment that players have rights to their virtual items, goods and land, irrespective of what any EULA fine print

---

[1] Koster designed both Ultima Online and Star Wars Galaxies. Id. at, ¶ 61.

claims, it is believed that until late 2003 not a single publisher had acknowledged such rights. Id. at, ¶ 64. Accordingly, despite the massive RMT occurring, the transactions were all, in essence, branded illegitimate. Id. at, ¶ 64.

The history of the industry is particularly important to understanding Defendant Rosedale's statements in context.

### Linden's emergence in the crowded MMORPG scene

In 2003, Linden launched Second Life. Complaint ¶ 28. It trailed the industry leaders significantly and, indeed, emerged onto a crowded MMORPG market with well known participants. Complaint ¶ 29. Unlike other worlds where participants could quest to kill dragons and obtain "priceless" virtual treasures, Second Life had no such appeal. Complaint ¶ 29, 31.

As such, struggling to finds its niche, in November, 2003, Philip Rosedale, the founder, primary shareholder and CEO of Defendant Linden announced that Linden would recognize participant / player rights in virtual items created by the participant / player that exist inside of Second Life. Complaint ¶ 33. Further, Rosedale repeatedly asserted that a participant, who purchased virtual land from Defendant Linden, owned such land. Complaint ¶ 87. For example (and not by way of limitation), Defendant Rosedale has stated to a national audience:

> **"We started selling land free and clear, and we sold the title, and we made it extremely clear that we were not the owner of the virtual property."**
> (Complaint at ¶¶ 47-48)(June 14, 2005);

"everyone owns their own stuff, their own property – there's no way we could just advertise on that property without asking because **it isn't ours you know. It belongs to land owners**." (Complaint at ¶ 57-60)( (July 20, 2006)

Those representations were made to "draw in" potential participants who would then see the Second Life website where it is proclaimed on the front page:

### OWN VIRTUAL LAND

See, Linden Website Printouts, attached collectively hereto as Exhibit "3".

Plaintiff read written statements and heard verbal representations made by defendants and, more specifically Defendant Rosedale, regarding virtual land ownership. Complaint ¶ 34-36.   Plaintiff believed the statements made by the defendants that purchasing virtual land from Defendant Linden meant that he owned the land.  Complaint ¶ 87.  Plaintiff believed Defendant Rosedale's repeated statements that a consumer who purchased virtual land from defendants owned that land with all ownership rights typically incident to such ownership.  Complaint ¶ 42.  Defendants' statements regarding ownership were without reservation or condition except for the requirement to pay a monthly tax to continue ownership.  Complaint ¶ 42.   Plaintiff did not believe that he was purchasing "Canned Florida Sunshine" or any "gag" gift.  Exhibit "1", ¶ 65; See, "Canned Florida Sunshine", Exhibit "9".  Defendant Rosedale's repeated representations about virtual land were made to a national audience, including Mr. Bragg and other Pennsylvania residents.   Id. at ¶ 66.  There is no evidence that Defendant Rosedale attempted to prevent his statements from being broadcast to Pennsylvania residents.  Id. at ¶ 67.  To the contrary, Defendant Rosedale's representations were made to the entire United States, without limitation.  Id. at ¶ 67.  They were done not only in medium

broadcast over the internet, but also in virtual town hall meetings where Pennsylvania residents were permitted to attend (and were not otherwise excluded). Id. at ¶ 68.

Further, Defendant Rosedale chose to make the statements personally, as opposed to selecting someone else at the company or issuing the statements through an intermediary / marketing agency. Id. at ¶ 69. Choosing to "directly" make such representations is not "accidental", but rather strategy chosen by Defendant Rosedale to further enhance the representations being made about virtual land ownership. Id. at ¶ 69. Indeed, the strategy closely parallels the use of Bill Gates, Steven Jobs and (in the non-tech arena), Dave Thomas as "corporate leaders" who have intentionally chosen to make representations personally, as opposed through corporate middlemen. Id. at ¶ 69. Plaintiff particularly believed the representations because they were being made in personal capacity by Defendant Rosedale, as opposed to simply through corporate "puffery". Id. at ¶ 69.

The repeated representations made by Defendants Rosedale in conjunction with the representations of Defendant Linden induced Plaintiff to enter into a series of separate and distinct land auction contracts with the Defendant Linden. Complaint ¶ 104. Plaintiff had approximately $8,000[2] taken wrongfully from him through defendants' false statements and scheme. Exhibit "1", ¶ 33. Further, not only did defendants obtain Plaintiff's money, but in addition, Defendant Linden improperly seized the virtual land purchased by Plaintiff as well as all his other virtual possessions and $2000 in U.S. currency held by Linden in trust for Plaintiff in his account with them; all without notice or discussion of any kind. Id. at ¶ 34

---

[2] Plaintiff was able to mitigate and reduce his out of pocket expenses to approximately $4,000.00 to $5,000.00.

Mr. Bragg brought the instant suit against Defendants Rosedale and Linden based on their fraudulent conduct. Defendants removed the action from state court, and argued against remand on the basis that this is "a big case" where the jurisdictional requirements are all met and that the case "sounds in fraud." The Court agreed and denied the remand motion.

Defendants' position with regard to the virtual land purchased by Mr. Bragg apparently will be that Mr. Bragg does not own the property he purchased for significant sums of money, instead he must have bought "Canned Florida Sunshine". It is still unclear at this point in the proceedings what position the defendants collectively will take with regard to the false representations made by Defendant Rosedale, in particular, i.e., whether Defendant Rosedale was acting on his own, independent of the company when he induced Mr. Bragg to purchase virtual land or, whether he was acting as the company's agent in doing so.

Defendant Rosedale has moved to dismiss the claims against him claiming that this Court is without jurisdiction because he was acting as Linden's CEO when making the fraudulent statements at issue. Noticeably, Defendant Linden has **not** filed a brief with this Court adopting that position or agreeing with Defendant Rosedale's legal assertions.

## ARGUMENT

### I.    STANDARD FOR CHALLENGES TO THE COURT'S JURISDICTION.

"Rule 4(e) of the Federal Rules of Civil Procedure authorizes a district court to assert personal jurisdiction over a non-resident to the extent permissible under the law of the state where the district court sits." *North Penn Gas Co. v. Corning Natural Gas*

*Corp.*, 897 F.2d 687, 689 (3d Cir. 1990).  Pennsylvania's Long Arm Statute provides, in relevant part:

> § 5322.  Bases of personal jurisdiction over persons outside this Commonwealth
>
> (a) GENERAL RULE.-- A tribunal of this Commonwealth may exercise personal jurisdiction over a person (or the personal representative of a deceased individual who would be subject to jurisdiction under this subsection if not deceased) who acts directly or by an agent, as to a cause of action or other matter arising from such person:
>
> (1) Transacting any business in this Commonwealth. Without excluding other acts which may constitute transacting business in this Commonwealth, any of the following shall constitute transacting business for the purpose of this paragraph:
>
> (i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.
>
> (ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.
>
> ***
>
> (3) Causing harm or tortious injury by an act or omission in this Commonwealth.
>
> (4) Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.
>
> ***
>
> (10) Committing any violation within the jurisdiction of this  Commonwealth of any statute, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or of any order of court or other government unit.
>
> (b) EXERCISE OF FULL CONSTITUTIONAL POWER OVER NONRESIDENTS.-- In addition to the provisions

of subsection (a) the jurisdiction of the tribunals of this Commonwealth shall extend to all persons who are not within the scope of section 5301 (relating to persons) to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States.

42 Pa.C.S. § 5322.

Specific jurisdiction exists "when the plaintiff's claim is related to or arises out of the defendant's contacts with the forum." *McMullen v. European Adoption Consultants, Inc.,* 129 F.Supp.2d 805, 810 (W.D.Pa. 2001); *Mellon Bank (East) P.S.F.S., Nat. Assoc. v. Farino,* 960 F.2d 1217, 1221 (3d Cir. 1992). Specific personal jurisdiction comports with due process as long as the defendant has sufficient minimum contacts with the forum state. *McMullen,* 129 F.Supp.2d at 810. The due process inquiry must focus on "the relationship among the defendant, the forum and the litigation." *Rush v. Savchuk,* 444 U.S. 320, 327, 100 S.Ct. 571 (1980) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569 (1977)). It has long been recognized that minimum contacts exist where the defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1229 (1950).

Put another way, when a defendant's conduct is such that she reasonably should have foreseen being called in to court and the forum, the necessary minimum contacts have been shown. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559 (1980). Even a single act can support specific jurisdiction, so long as it creates a "substantial connection" with the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174 (1985). It is the plaintiff's burden to demonstrate that the defendant has minimum contacts with the forum. *Timeshare Vacations Club v. Atlantic*

9

*Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir. 1984) (quoting *Compagnie des Bauxites D. E. Guinee v. L'Union,* 723 F.2d 357 (3d. Cir. 1983)).  To meet this burden, plaintiffs "must come forward with sufficient jurisdictional facts by affidavit, depositions or other competent evidence to establish the court's jurisdiction over the defendant." *National Precast Crypt Co. v. Dy-Core of Pennsylvania, Inc.*, 785 F.Supp. 1186, 1189 (W.D. Pa. 1992).  "[F]actual discrepancies created by affidavits are generally resolved in favor of the non-moving party." *Elbeco Inc. v. Estrella De Plato Corp.,* 989 F.Supp. 669, 674 N.3 (E.D. Pa. 1997).

The touchstone of the jurisdictional inquiry is common sense: a defendant cannot claim to be insulated in the borders of his resident state impervious to suit simply because he has not physically left his home to conduct his business. *See, Burger King,* 471 U.S. at 476 (". . . It is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across the lines, thus obviating a need for physical presence within a state in which business is conducted."); *North Penn Gas v. Corning Natural Gas*, 897 F.2d 687, 691 (3d Cir. 1990)(the physical presence test is outmoded in the modern world); *McMullen,* 129 F.Supp.2d at 814 (same). This is especially true given the pervasive nature of internet commerce and communication. *See, e.g, Humphrey v. Granite Gate Resorts, Inc.,* 568 N.W.2d 715, 719 (Mn.App. 1997)(rejecting the claim that merely placing "information on the internet" was not a purposeful availment for purposes of personal jurisdiction, and holding that, where a defendant knows that its message will be broadcast in a state, personal jurisdiction is proper); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 939 F. Supp. 1032, 1044

PITDMS 38104v.1

(S.D.N.Y. 1996)(internet advertisement alone is sufficient to form the basis for personal jurisdiction).

## II. ROSEDALE MADE FRAUDULENT STATEMENTS IN THE NATIONAL MEDIA CALCULATED TO INDUCE CITIZENS OF ALL FIFTY STATES TO CONTRACT WITH LINDEN FOR HIS BENEFIT, INCLUDING MR. BRAGG AND OTHER PENNSYLVANIANS.

Accepting Plaintiff's allegations for purposes of this motion, which the Court must, Defendant Rosedale told citizens of all fifty states through national and online media that they would own the property they bought in Second Life[3]:

- Rosedale made oral representations at the "State of Play," and then reduced those representations to writing in a November 14, 2003 press release. Rosedale stated: "Until now, any content created by users for persistent state worlds, such as EverQuest or Star Wars Galaxies, has essentially become the property of the company developing and hosting the world," said Rosedale. "We believe our new policy recognizes the fact that persistent world users are making significant contributions to building these worlds and should be able to both own the content they create and share in the value that is created. The preservation of users' property rights is a necessary step toward the emergence of genuinely real online worlds." (Complaint at ¶¶ 33-34; 36);

- On June 3, 2004 Rosedale reported to USA Today that the real estate tax revenue on land sold to the participants exceeded the amount the company was generating in subscriptions in an effort to fraudulent further the impression that subscribers owned the virtual property.[4] (Complaint at ¶ 42.);

- Again in 2004 Rosedale promoted Second Life in the USA Today, stating that: "The idea of land ownership and the ease with which you can own land and do something with it…is intoxicating … Land ownership feels important and tangible.  It's a real piece of the future." (Complaint at ¶ 43);

---

[3] Defendant Rosedale also made similar representations in "town hall" meetings inside Second Life which were attended by Plaintiff. Exhibit "1", ¶ 68. Pennsylvania residents were not excluded from any such meetings. Id. at ¶ 68.

[4] USA Today is a widely known national publication with circulation to all fifty states. Plaintiff asks the Court to take judicial notice of this fact, but will provide evidence in support of this statement if requested.

- In a June 14, 2005 interview with Guardian Unlimited: Gamesblog, Rosedale represented to the world that participants that purchased land in Second Life owned the land. He went so far as to state: "We like to think of Second Life as ostensibly as real as a developing nation…The fundamental basis of a successful developing nation is property ownership…**We started selling land free and clear, and we sold the title, and we made it extremely clear that we were not the owner of the virtual property**." (Complaint at ¶¶ 47-48)(emphasis added);

- On September 8, 2005 Rosedale stated in an article on CNET.com that subscription fees were being eliminated "because some people who wouldn't have otherwise signed up are going to buy land . . . ." (Complaint at ¶ 50);

- Rosedale represented on April 13, 2006 in an interview with PSFK.com, in response to question about whether there was any "gray area" with regard to copyright and intellectual property rights in Second Life, that: "Things are pretty clear – as a user, you own what you create in Second Life." Further, in discussing the importance of land ownership and quoting the concepts set forth in Hernando de Soto's "The Mystery of Capital", Rosedale stated: "[S]uccessful countries always start by making sure that people can freely own, resell, and mortgage the real-estate on which they live. This is a Very Big Idea . . . This was one of the key things that drove our ideas around land ownership and the introduction of IP rights." (Complaint at ¶54);

- Rosedale gave a "podcast" interview with After TV on or about July 20, 2006, during which he stated that "everything inside it [Second Life] is made by the people who are there and in fact, the land itself and the space and everything is owned, controlled and built by the people who are there. . . ." When asked by the reporter about how one goes about "owning land" in Second Life, Rosedale replied "You just buy it." Further, he stated "You buy it generally from other users. You can participate in a land auction and buy it from us … everyone owns their own stuff, their own property – there's no way we could just advertise on that property without asking because **it isn't ours you know. It belongs to land owners**." (Complaint at ¶ 57-60)(emphasis added).

- Rosedale, in the After TV interview, compared taking someone's virtual land to a crime. (Complaint at ¶ 116).

Defendant Rosedale made his repeated representations to set Second Life apart from other MMORPG's, i.e. Linden's subscriber base would improve if people thought that they owned the virtual land. His efforts were successful. Complaint ¶ ¶ 40, 44, 51

12

61 and 64; See, Linden Subscriber Growth Chart, attached hereto as Exhibit "4". As Rosedale has a personal financial interest in the success of the company, the success of Second Life benefits him. See, Dun & Bradstreet Report, attached hereto as Exhibit "8". Moreover, Defendant Rosedale principally capitalized the company himself and is believed to be its single largest shareholder. Exhibit "1", ¶ 70. This is not a situation where a CEO was simply sued because he is the CEO of a company. To the contrary, Defendant Rosedale has been sued because of his false representations.

The Pennsylvania long arm statute provides this Court with specific jurisdiction over Defendant Rosedale because of his false statements, including subsections:

- (a)(3) "Causing harm or tortious injury by an act or omission in this Commonwealth" by knowingly making false statements in the national and online media with the intent to induce Pennsylvanians, among others, to buy a product he had a financial interest in;

- (a)(4) "Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth" by knowingly making false statements in the national and online media with the intent to induce Pennsylvanians, among others, to buy a product he had a financial interest in; and,

- (a)(10) "Committing any violation within the jurisdiction of this Commonwealth of any statute" by violating the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq.

See 42 Pa.C.S. § 5322(a)(3), (a)(4), and (a)(10). Needless to say, Plaintiff has provided his sworn statement demonstrating the acts of Defendant Rosedale that are violations of Pennsylvania law and provide this Court with specific personal jurisdiction over Defendant Rosedale.

Defendant Rosedale, in his Motion, contends his activities have not been "directed" to Pennsylvania, despite the fact that his false statements were broadcast repeatedly in national and online media. The illogical argument that by directing

13

activities to the entire United States, as opposed to one state in particular, renders jurisdiction improper has been rejected as patently absurd. Indeed, the Arizona Supreme Court in *A. Uberti & C. v. Leonardo,* 892 P.2d 1354, 1362 (Az. 1995), addressing a duplicate argument reasoned:

> Defendant argues that its activities, at best, focused on the United States in general, not Arizona. Therefore, Arizona exceeds due process by asserting its jurisdiction here. With this true, then no individual state could assert jurisdiction over defendant simply because defendant did not target a particular state or group of states but instead intended to sell its product to all of America. The argument turns common sense on its head. Holding that a defendant intending to sell its products to any and all citizens of the United States could not be held accountable in any jurisdiction where its products cause injury defies any sensible concept of due process.

*Id.* at 1362. Simply put, Defendant Rosedale, intending to reach everyone in every state he could, made fraudulent statements in the national and online media that were, in fact, advertisements for Second Life. In doing so he purposefully availed himself of Pennsylvania, and is subject to jurisdiction here. *See, Burger King,* 471 U.S. at 476; *North Penn Gas,* 897 F.2d at 691. Mr. Bragg relied upon Defendant Rosedale's representations which induced him to act. Such representations and inducements properly form the basis of specific jurisdiction against Defendant Rosedale as set forth in the Pennsylvania long arm statute.[5]

## III.    DEFENDANT ROSEDALE IS NOT SHIELDED FROM PERSONAL LIABILITY FOR HIS INTENTIONALLY TORTIOUS CONDUCT.

---

[5] It should also be noted that Defendant Linden's position in this litigation seems to be (and the taking of Mr. Bragg's property without compensation strongly suggests), that Defendant Linden does not, itself, believe the representations that Defendant Rosedale repeatedly made. As such, if Defendant Linden successfully disproves its own liability, it may, in essence, prove the liability of Defendant Rosedale for his personally false assertions.

Even if this Court was to provide Defendant Rosedale with the "benefit of the doubt" and, further, assume that Defendant Linden represents to this Court that all the misrepresentations of Defendant Rosedale are properly chargeable to Defendant Linden, jurisdiction is still proper over Defendant Rosedale personally. In an effort to avoid this result, Defendant Rosedale cites to the "fiduciary shield" doctrine. The case authority with regard to the "fiduciary shield" doctrine appears to be inconsistent and, indeed, there is an issue as to whether or not the doctrine has been adopted in Pennsylvania. See, *Irons v. Transcorp. America,* 2002 W.L. 32348317, *5 (E.D. Pa. 2002)(noting that neither the Pennsylvania Supreme Court nor the Third Circuit has addressed the applicability of the fiduciary shield doctrine); *Hodges v. Grieff*, 2001 W.L. 34368774, at *3 (E.D. Pa. 2001) (noting that the corporate shield doctrine has not been adopted in either Pennsylvania or the Third Circuit).

Assuming this Court finds that the doctrine is applicable, although corporate officers do not subject themselves to jurisdiction based on actions taken in their corporate role, they subject themselves to personal jurisdiction as individuals if they direct or are personally involved in the tortious conduct. *Al-Khazraji v. St. Francis College*, 784 F.2d 505 (3d Cir. 1986), aff'd, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987); *Maleski v. D. P. Realty Trust,* 653 A.2d 54, 63 (Pa.Commw. 1994). Thus, an officer's personal involvement in the alleged tortious conduct can obviate the "corporate shield" normally afforded by the corporate entity. *Id.* "To determine whether there is jurisdiction over a corporate officer or director whose only contact with Pennsylvania are allegedly tortious acts taken as corporate officers or directors, it is necessary under this case-by-case approach to examine factors such as the officer's role in the corporate

structure, the quality of the officer's forum contacts and the extent and nature of the officer's participation in the alleged tortious conduct." *Maleski,* 653 A.2d at 63 (adopting the approach set out in *Moran v. Metropolitan District Council of Philadelphia,* 640 F. Supp. 430 (E.D. Pa. 1986)). The state and federal courts of Pennsylvania have recognized that, "unless jurisdiction is obtained over those corporate officers engaged in tortious conduct, they will merely repeat the conduct over and over in other corporate guises." *Id.*

Even applying the "fiduciary shield" doctrine, each of the factors weighs in favor of jurisdiction over Defendant Rosedale. Although Defendant Rosedale's attack only focuses on the second two factors, conceding the first, it should be noted that Defendant Rosedale's attempt to concede the first element is done so for strategic benefit. Indeed, Defendant Rosedale seeks to avoid having this Court conduct any inquiry at all into the first element, given that it is not simply that Defendant Rosedale "concedes that he plays a significant role in the affairs of Linden." See, Brief in Support of Motion to Dismiss, p. 8. To the contrary, the officer's complete role in the corporate structure is of paramount importance.

A.    **ROSEDALE NOT ONLY "PLAYS A SIGNIFICANT ROLE" IN THE AFFAIRS OF DEFENDANT LINDEN, BUT IS BELIEVED THAT THE ENTIRE COMPANY REPORTS TO HIM AND THAT HE IS MAKING THE DECISIONS REGARDING LINDEN'S ADVERTISING CAMPAIGN AND PROMOTION OF THE CONCEPT THAT PARTICIPANTS OWN THE VIRTUAL LAND THEY PURCHASE FROM LINDEN.**

The first prong of the "fiduciary shield" doctrine weighs in favor of specific personal jurisdiction. This is not simply a case where a CEO has simply been sued, as Defendant Rosedale suggests, because of the "mere fact" that he is the CEO. Nor is this simply a case where a CEO has been used because he "plays a significant role" in the

corporate affairs – indeed, every CEO would concede he "plays a significant role" in the affairs of the corporation.[6]  This is a case where the CEO, Defendant Rosedale, the primary shareholder in the corporation, has been sued because of his own misrepresentations in a marketing strategy and campaign central to this case.  Defendant Rosedale has not just been acting as a "CEO" – but also as the company's spokesperson. Further, he is even listed as the contact person with regard to any complaints made to the better business bureau.  See, Better Business Bureau printout, attached hereto as Exhibit "5".

Moreover, it is believed upon information currently available to Plaintiff that Defendant Rosedale not only is the CEO, but is the very person that is directing the company's overall virtual land ownership representations.  Exhibit "1", ¶ 71; See, *McMullen*, 129 F.Supp.2d at 812 (the fact that the entire staff of the corporation reports to the officer is relevant).  That belief is bolstered by Defendant Rosedale's initial representations made at the State of Play conference in November, 2003 and continuing to the present.  Complaint at ¶ 33-64.[7]  Further, it is believed that Defendant Rosedale is actively involved in directing, controlling and ratifying the representations about virtual land he and the company have repeatedly been making.  See, *Streamline, Inc. v. ADT Tools, Inc.*, 2003 W.L. 22594316, *5 (E.D. Pa. 2003)(whether an officer was actively involved in directing, controlling, ratifying, and participating in the sale of the product in

---

[6] Counsel does note that recent criminal trials have spotlighted CEOs who have claimed as a defense that they did not "play a significant role" in running the organization.  Those defenses have largely been rejected by juries.

[7] To the extent this Court needed additional information with regard to this issue (or any personal jurisdiction issue), this Court has broad discretion to permit discovery as to the personal jurisdiction issue. *See, Massachusetts School of Law at Andover, Inc. v. American Bar Assoc.*, 107 F.3d 1026, 1042 (3d Cir. 1997); *Renner v. Lanard Toys, Ltd.*, 33 F.3d 277, 283 (3d Cir. 1994).

17

Pennsylvania is relevant to issue of personal jurisdiction).  As such, the first prong of the "fiduciary shield" doctrine weights in favor of jurisdiction over Defendant Rosedale.

**B.    DEFENDANT      ROSEDALE      HAS      MADE      REPEATED REPRESENTATIONS THAT HAVE BEEN DIRECTED AT THE ENTIRE UNITED STATES, INCLUDING PENNSYLVANIA, AND INDUCED PLAINTIFF TO RELY UPON SUCH STATEMENTS.**

The second prong of the "fiduciary shield" doctrine also weighs in favor of specific personal jurisdiction, i.e., the quality of the officer's forum contacts.  Although the Pennsylvania long arm statute provides for specific jurisdiction where there has been only one act causing harm to a Pennsylvania resident, Defendant Rosedale has engaged in repeated representations to the national media and through the internet.  Complaint at ¶ 36, 41-8, 54-60, 116; Exhibit "1", ¶ 66.  Moreover, as pled in the verified complaint, Plaintiff relied upon the false representations of Defendant Rosedale in purchasing virtual land from Defendant Linden.  E.g., Complaint at ¶ 139-170.

In an effort to divert the Court's attention from his continuously false representations, Defendant Rosedale suggests to this Court that because he, allegedly, has not "engaged in any business communications with Plaintiff, nor has he personally traveled to Pennsylvania to conduct business,"  See, Brief in Support of Motion to Dismiss, p.8, that this Court should revert to now ancient case authority for the proposition that Defendant Rosedale must have "physically" appeared in Pennsylvania for specific jurisdiction to be proper.  As set forth previously, Defendant Rosedale's argument defies common sense and must be rejected.  *See, Burger King,* 471 U.S. at 476; *North Penn Gas*, 897 F.2d at 691; *A. Uberti & C.,* 892 P.2d at 1362.  Indeed, with the advent of the internet, the notion of personal jurisdiction has <u>expanded</u>, not contracted.

As the Federal District Court in *Devukaj v. Maloney*, 447 F.Supp.2d 813 (E.D.Mich. 2006), recently reasoned with regard to the internet, "[t]o apply outmodeled or overly constrained notions of legal analysis to relationships formed through the internet is to turn a blind eye to the nature of the internet itself and its use by those engaging in commerce." *Id.* at 820. In holding the personal jurisdiction was proper in an internet auction case, the *Devukaj* Court reasoned:

> Internet forums such as eBay expand the seller's market literally to the world and sellers know that, and avail themselves of the benefits of this greatly expanded marketplace. It should, in the context of these commercial relationships, be no great surprise to sellers-and certainly no unfair burden of them-if, when a commercial transaction formed over and through the internet does not meet a buyer's expectations, they might be called upon to respond in a legal forum in the buyer's home state. Sellers cannot expect to avail themselves of the benefits of the internet-created world market that they purposefully exploit and profit from without accepting the concomitant legal responsibilities that such an expanded market may bring with it.

*Id* at. 820. Defendant Rosedale has demonstrated his sophistication for using the internet as a medium to advertise and induce consumers to rely upon his representations. The internet has caused communications to evolve – away from old "traditional" communications such as "direct mailers" and "phone calls". Indeed, in touting its revolutionary new communication platform that is Second Life, rather than "physically" travel to Pennsylvania, Defendant Rosedale created an avatar named Philip Linden who held (and still holds) in-game town halls where he has made representations about land in Second Life. Exhibit "1", ¶ 68. Mr. Bragg attended such town halls and "listened" to the statements of Defendant Rosedale. Id. at, ¶ 68. The reality is that such town hall meetings are really no different than Defendant Rosedale holding a large conference

everywhere at once, with the entire "nation" invited. Id. at, ¶ 68. In fact, there has never been any preclusion of Pennsylvania residents from such town hall meetings. Id. at, ¶ 68.

Further, Defendant Rosedale has also utilized the internet for purposes of making national representations. Defendant Rosedale has purposefully given interviews to internet news sources and blogs who print those interviews for the entire county to see and read. Id. at, ¶ 66. Thus, gone is the need to engage in an interview with a Pennsylvania specific newspaper to reach a Pennsylvania audience. The reality is that a national interview published on the internet for everyone to see and read has a significantly greater effect – and in particular for the very people Defendant Rosedale is attempting to reach (internet users). Id. at, ¶ 66. Simply put, the quality of Defendant Rosedale's internet publications and town hall meetings, weigh in favor of specific personal jurisdiction over Defendant Rosedale.

## C.    DEFENDANT ROSEDALE IS DIRECTLY AND INDISPUTABLY INVOLVED IN THE TORTIOUS CONDUCT AT THE CENTER OF THIS CASE.

The third prong of the "fiduciary shield" doctrine weighs heavily in favor of specific personal jurisdiction over Defendant Rosedale, i.e., the extent and nature of the officer's participation in the alleged tortious conduct. The third prong is the most important to the overall inquiry. *See Lautman v. Loewen Group, Inc.*, 2000 U.S. Dist. LEXIS 8241 *22, 2000 W.L. 772818 *6 (E.D. Pa. 2000)(the third factor is the most important factor, i.e., participation in unlawful conduct)(memorandum decision attached hereto as Exhibit 6). Even if this was simply a case where Defendant Rosedale was directing corporate agents to commit tortious acts, he could be held personally liable for the acts that the corporation committed under his direction or with his participation. E.g.,

*Maleski v. D. P. Realty Trust,* 653 A.2d 54, 63 (Pa.Commw. 1994); *Al-Khazraji v. St. Francis College,* 784 F.2d 505 (3d Cir. 1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022 (1987). This is, however, not simply a case where Defendant Rosedale has been directing others. To the contrary, Defendant Rosedale is personally involved in the tortious conduct at the focal point of this case.

In his attempt to downplay this prong of the test, Defendant Rosedale has simply chosen to ignore the allegations against him. Defendant Rosedale wholesale ignores the Complaint's allegations of fraud and violations of the consumer protection statutes, and argues to this Court that the "primary contention clearly is that <u>Linden</u> deprived Plaintiff … of his computer-simulated 'real estate'." See, Brief in Support of Motion to Dismiss, p. 8. In fact, <u>as acknowledged by Defendant in open court during the argument of the Motion to Remand</u>, this is a case "sounding in fraud" where Defendant Rosedale's participation in a scheme to defraud consumers is squarely at the heart of the dispute. Defendant Rosedale attempts to recast the Complaint's allegations against him as Rosedale simply "comment[ing] on Second Life's gaming environment", Brief in Support of Motion to Dismiss, p. 8, as if Defendant Rosedale is some passive, disinterested observer as opposed to the primary beneficiary of the false representations. Quite to the contrary, as pled in the Complaint, Defendant Rosedale's repeated false representations about virtual land ownership in Second Life are the cornerstone of the fraud and consumer protection actions. Complaint at ¶ 139-170. Upon information available to Plaintiff, it appears that not only is Defendant Rosedale implementing the strategy with regard to the representations of virtual land ownership, but he, in fact, <u>created</u> the very strategy being implemented. Exhibit "1", ¶ 71. Defendant Rosedale's

PITDMS 38104v.1

participation in the fraud is central to this case. Accordingly, the third, and most important, prong of the test weighs heavily in favor of jurisdiction over Rosedale. *See Majer v. Sonex Research, Inc.*, 2006 U.S. Dist. LEXIS 49531 *7, 2006 W.L. 2038604, *8 (E.D. Pa. 2006) (officers who led the effort to solicit plaintiff's investment and stock were subject to personal jurisdiction)(memorandum decision attached hereto as Exhibit "7"). In fact, given that Defendant Rosedale has admitted he plays a "significant role" in the operation of Defendant Linden, Defendant Rosedale's representations about ownership of virtual land and Defendant Linden's inconsistent position with regard to ownership of virtual land are impossible to reconcile.

## IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss Rosedale.

Respectfully submitted,

Date: January 16, 2007                WHITE AND WILLIAMS, LLP


By CB 1429
    Jason A. Archinaco, Esq.
    PA ID 76691
    Christopher Ballod, Esq.
    PA ID 89462
    The Frick Building, Suite 1001
    437 Grant Street
    Pittsburgh, PA 15219
    (412) 566-3520
    *Counsel for Plaintiff*