

Slip Copy                                                                                                                         Page 1

Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

C
Briefs and Other Related Documents
Majer v. Sonex Research, Inc.E.D.Pa.,2006.
United States District Court,E.D. Pennsylvania.
Bruce W. MAJER, et al.
v.
SONEX RESEARCH, INC., et al.
**Civil Action No. 05-606.**

July 19, 2006.

Peter J. Weidman, The Law Office of Peter J. Weidman, Plymouth Meeting, PA, for Bruce W. Majer, Allen W. Fortna, and The Hermitage Partnership.
Francine Friedman Griesing, Eckert Seamans Cherin and Mellott, L.L.C., Philadelphia, PA, Joshua A. Glikin, Matthew G. Hjortsberg, Bowie & Jensen LLC, Towson, MD, for Sonex Research, Inc., George E. Ponticas, and Andrew A. Pouring Ph.D.
Roger D. Posey, Sykesville, MD, pro se.

*MEMORANDUM AND ORDER*
McLAUGHLIN, J.
\*1 This case involves the claims of Bruce W. Majer, Allen W. Fortna, and The Hermitage Partnership ("Hermitage"), who invested in Sonex Research, Inc. ("Sonex") through a private placement in 2004. The plaintiffs allege that Sonex and four individuals affiliated with it-Roger D. Posey, Jim Z.I. Williams, George E. Ponticas, and Andrew A. Pouring, Ph.D.-made misrepresentations about Sonex while they were soliciting the plaintiffs' participation in the private placement. The plaintiffs allege that their investments are now worthless.

The thrust of the complaint is the allegation that the defendants' actions constituted fraud in violation of federal securities law, and Pennsylvania securities and common law. The plaintiffs also make state law claims of negligent misrepresentation, breach of contract and rescission.

The Court here decides Pouring and Ponticas' motion to dismiss for lack of personal jurisdiction, which the Court will deny. The Court will grant Sonex, Pouring, Ponticas and Posey's motions to dismiss for failure to state a claim upon which relief can be granted.[FN1] The Court will allow the plaintiffs to amend their complaint if, in light of the Court's decision, they believe that it would be efficacious to do so.

> FN1. Williams has yet to enter an appearance or file a responsive pleading or motion. The Court, however, will consider the motions to dismiss for failure to state a claim as to Williams.

I. *Facts*

The facts alleged in the complaint are as follows.[FN2]

> FN2. In considering the defendants' motions to dismiss, the Court must accept the allegations in the Complaint as true and draw all reasonable inferences in favor of the plaintiffs. *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir.2004); *In re Rockefeller Ctr. Props., Inc Secs. Litig.,* 311 F.3d 198, 215 (3d Cir.2002).

Sonex is an engineering research and development ("R & D") firm that holds patented technology for in-cylinder control of ignition and combustion in various types of engines. Founded in 1980, Sonex originally focused on basic research into the principle of in-cylinder control of ignition and combustion. Although it went public in the mid-1980s, Sonex remained small and tightly managed, with only an office/warehouse in Annapolis, Maryland and a few full-time

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                                  Page 2
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

employees. In the late 1980s, Sonex focused on studying the effects of chemical and fuel disbursement characteristic changes within the combustion chamber. (Compl. at ¶¶ 21-22, 24, 32).

Pouring is a former Professor of Aerospace Engineering and Chairman of the Department of Aerospace Engineering at the U.S. Naval Academy. Pouring was a co-founder of Sonex. Since that time, he has remained an officer and director of Sonex. At the time of the complaint's filing, he was the Chairman of the Board, Chief Executive Officer and President. *Id.* at ¶¶ 22, 23.

Ponticas is a Certified Public Accountant. Sonex hired Ponticas as its Comptroller and Assistant Secretary in 1987. He has remained continuously at Sonex since then, and became its Chief Financial Officer and Secretary in 1991. He served on the Board of Directors at various times. *Id.* at ¶ 25.

Around late 2003, Pouring and Ponticas began taking steps to reposition Sonex's business and to enhance its capabilities and growth plan. They engaged Global Equity Consultants ("Global"), led by Jim Rose, to assist with this process. Pouring and Ponticas's plan was to transform Sonex from an R & D firm that relied mainly upon government grants for funding into a full-service firm that commercialized and marketed the technologies it developed. *Id.* at ¶¶ 26, 27.

*2 They sought a leader for this effort, and after considering several candidates, they decided to hire Posey, who came on as President in February of 2004. Soon after, Posey became Chief Executive Officer and a member of the Board of Directors. Pouring and Ponticas were aware that Posey came to Sonex shortly after the termination of his employment as a sales representative with BRD Noise and Vibration Control ("BRD"). The press release announcing Posey's hiring stated:
We are delighted to have Roger join Sonex as our President. Roger brings a wealth of management and industry turnaround experience to Sonex and with his efforts we look forward to profitable growth as we continue to provide products to the marketplace. At our 2003 Shareholder meeting in September, we announced the Company was focusing on business re-positioning, strengthening its internal capabilities, and planning for growth. Roger will play a major role in the continuing implementation of this strategy.

*Id.* at ¶¶ 11, 28-29, 31.

Sonex experienced cash flow difficulties in its transition from an R & D to a commercialization firm. To address this problem, Pouring, Ponticas and Posey all agreed to defer portions of their salary. The three officers searched for ways to raise short-term and long-term capital. They were particularly motivated to recoup their deferred income and ensure their future financial well-being. *Id.* at ¶¶ 34-35.

To assist with this effort, Posey reached out to his friend and business colleague, Williams. Williams became a member of the Board of Directors of Sonex in April of 2004. Williams offered to try to arrange a capital investment exceeding $40 million by a group of Canadian investors led by Fred Hunter, a prominent Toronto businessman. He noted that the investment would not be available until at least the summer of 2004. *Id.* at ¶¶ 12, 36-38.

In February of 2004, to secure more immediate financing, Pouring, Ponticas, Posey and Williams (the "individual defendants") decided to pursue a private placement of equity marketed to individual investors. Private placement enabled Sonex to raise cash immediately while avoiding the requirements of registration with the SEC and state regulatory bodies associated with a public offering. *Id.* at ¶ 39.

The individual defendants completed a written business plan, entitled "Business Content 2004," with the assistance of Global. It was used primarily as a solicitation piece for the private placement. The individual defendants hired a Florida law firm, Winderweedle, Haines, Ward & Woodman, P.A. (" Winderweedle"), to prepare documents and counsel Sonex on the private placement. *Id.* at ¶ 40, 41.

The individual defendants also developed "talking

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                       Page 3

Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

points" highlighting two themes to entice investors for the private placement. The first message highlighted new noise and vibration control technologies as opposed to the company's traditional fuel-burning technologies. Particularly, the focus was on a new process called "active noise concealment." The second message overstated and exaggerated the immediacy of long-term capital infusion, to appease the private placement investors' concerns about the capital infusion above and beyond their own investment called for in the business plan. The individual defendants knew that, in fact, the loan was speculative, but also knew that the way to entice the private placement investors was to assure them that it was imminent. *Id.* at ¶ 42-43.

*3 The individual defendants told potential investors that: (1) Sonex was poised to become a leader in the area of active noise concealment, Posey's area of expertise; (2) to achieve that end, a group of Canadian investors led by Fred Hunter had committed up to $43 million in loans that were expected to close during the summer; (3) the company was looking to raise a few hundred thousand dollars through private placement as a short-term bridge until the Canadian financing closed; and (4) once the financing arrived, the company would implement the business plan and all shareholders would reap enormous benefits. *Id.* at 44.

The business plan stated that:
Roger Posey and his team have been developing and implementing this updated business plan, the primary goal of which is to transition Sonex from a research and development company into a technology, commercialization, and manufacturing enterprise. Roger Posey intends to use a combination of strategic alliances, immediately accretive acquisitions, and internal development to diversify the Sonex product offering.

The business plan described Posey as having a " career rich in the successful management of both large established corporate organizations and firms focused on research and development of innovative technologies." *Id.* at ¶¶ 45-46.

Around February of 2004, Posey approached Majer, a former colleague residing in Pennsylvania, to solicit his participation in the private placement. Majer said that he was willing to consider an investment, and spoke to the individual defendants during several conversations and meetings over the next two months. During these discussions, the individual defendants adhered to their talking points. The individual defendants furnished Majer with the completed business plan. *Id.* at ¶¶ 5, 47-49.

When Majer learned that Sonex had engaged Global and Winderweedle, he expressed concern about cash flow and asked how the companies would be paid. The individual defendants told Majer that the firms had agreed to accept stock in lieu of cash for all services. *Id.* at ¶ 50.

When Majer asked Posey whether he had any restrictive covenant from his former employer that might affect his work for Sonex, Posey said that he had a restrictive covenant, but that it would not be implicated by his Sonex employment, and that counsel had reviewed it and found it inapplicable. *Id.* at ¶ 51.

After these and other representations, Majer decided to purchase 1.2 units of the private placement equity, or 240,000 shares of common stock and a warrant, exercisable until May 31, 2006, to purchase 240,000 more shares at $0.25 per share. Around April 21, 2004, Majer delivered a check for $60,000.00 and a completed and signed subscription agreement [FN3] and confidential purchaser questionnaire [FN4] to Sonex. *Id.* at ¶ 52.

> FN3. The plaintiffs do not attach copies of the subscription agreements to their complaint, although Sonex, Pouring and Ponticas attach copies to their motion. The United States Court of Appeals for the Third Circuit has held that although "[a]s a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings, ... an exception to the general rule is that a document integral to or explicitly relied

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                  Page 4
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
(Cite as: Slip Copy)

upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Secs. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)(internal quotations omitted). In *Burlington,* the plaintiffs argued that data about one portion of the year was crucial to investors because it constituted the bulk of the inventory purchased for the entire year. *Id.* The Court found that this was "an unambiguous reference to full-year cost data" for that year, and considered full-year cost data not attached to the complaint. *Id.* The subscription agreements form the basis for the plaintiffs' claims of rescission and breach of contract. In addition, they are intimately involved with the plaintiffs' other claims. For example, in order to succeed with their claims of material omissions, the plaintiffs need to show the absence of statements from the materials with which they concede they were provided. The Court will consider the subscription agreements.

FN4. The defendants also seek the Court's consideration of confidential purchaser questionnaires, which they seek to file under seal. They state that Majer and Fortna executed these documents. The defendants provide no basis for the admission of these documents. In any event, they do not appear to be particularly relevant to any of the defendants' arguments, as they contain similar statements to those contained in the subscription agreements about the plaintiffs' appreciation of the risk of investment. The Court will not consider the confidential purchaser questionnaires.

Majer told some friends, relatives and colleagues that he was considering investing in Sonex. Some of these people expressed interest, and Majer referred them to the individual defendants. The individual defendants provided them with the business plan, held several meetings and discussions, and emphasized the company's pursuit of sound-dampening technologies, Posey's unique qualifications, and the imminence of the Canadian financing. The individual defendants also advised them that Global and Winderweedle had agreed to accept stock in lieu of cash for all services. *Id.* at ¶ ¶ 53-54.

*4 Some of these potential investors decided to invest. Allen Fortna, a Pennsylvania resident, purchased 1.4 units, representing 280,000 shares of common stock and a warrant to purchase 280,000 more. Around late April, he delivered a check for $70,000.00 to Sonex, along with a completed and signed subscription agreement and confidential purchaser questionnaire.

William P. McKinney, George McClennen, Donald E. Wynne, Alan S. Lurty, Jay Feinschil and Jeffrey J. Craighead, all Pennsylvania residents, formed Hermitage, a Pennsylvania partnership, to make their investment. Through it, they purchased 0.9 units, or 180,000 shares of common stock and a warrant to purchase 180,000 more. Around mid-July of 2004, they delivered a check for $45,000.00 to Sonex, along with subscription agreements and confidential purchaser questionnaires for each partner. *Id.* at ¶¶ 6-9, 55-56.

Majer and Fortna's subscription agreements are dated April 21, 2004. Hermitage's Subscription Agreement is dated July 2, 2004. In those agreements, the plaintiffs represented and warranted that they were "capable of evaluating the merits and risks of an investment in the Units," that they had "read and understood the Company Information [defined by the Subscription Agreements to include the Company's Annual Report on Form 10-KSB for the year ended December 31, 2003]," that in connection with their review, they had "consulted with such independent legal counsel, accountants and other advisers considered appropriate to assist [them] in evaluating [their] proposed investment in the Company," and that they had:
taken full cognizance of and underst[ood]:
(A) the Company's Annual Report on Form 10-KSB for the year ended December 21, 2003;
...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 5
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

(C) the Company's business plan entitled "Business Content 2004";
(D) the form of the Warrant;
(E) this Subscription Agreement;
(F) that there are substantial risk factors to be considered in connection with an investment in the Units, including without limitation those set forth in the Company Information;
(G) that the Units constitute a speculative investment and involve a high degree of risk, including the loss of the subscriber's entire investment in the Company; and
(H) that there are substantial restrictions on the transferability of the shares of Common Stock and the Warrants ... accordingly, the undersigned may be required to hold the shares of Common Stock and the Warrants comprising the Units indefinitely and it may not be possible for an investor to liquidate an investment in the Company.

(Mot. Exs. 2-A, 2-B, and 2-C at p. 5, 10).

The 2003 Form 10-KSBs that the plaintiffs warranted that they had "taken full cognizance of and understood" in the subscription agreements included the following disclosures: [FN5]

> FN5. The Court will consider the 2003 Form 10-KSBs for two reasons. First, these forms are essentially incorporated into the subscription agreements, which the Court has already explained it will consider. Second, when considering a motion to dismiss in a securities action, a court may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC." *Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000). The Court in *Oran* took judicial notice of such documents even though they had not been included in the complaint. *Id.*

Since its inception in 1980, the Company has generated cumulative net losses of approximately $23 million and anticipates continuing to incur operating losses for the foreseeable future.
*5 ....
Operating funds have been raised primarily through the sale of equity securities.
....
The continued deferral of portions of current wages by the Company's officers cannot be expected to continue indefinitely, and the Company will be required to pay amounts outstanding as soon as cash flow permits.
....
[A]s of January 1, 2004, the Company's chief financial officer is no longer deferring any portion of his current salary.
....
[Sonex has a] history of operating losses.
....
[Sonex's] prospects beyond [approximately June 30, 2004] are dependent upon its ability to enter into significant funded contracts ... or secure a major capital infusion.
....
The[ ] uncertainties [of] ... the Company's ability to generate sufficient revenue and ultimately achieve profitable operations ... raise substantial doubt about the Company's ability to continue as a going concern.
....
The agreement with the new legal counsel also requires the Company to remit a cash retainer of $50,000 by June 30, 2004.

(Mot. Ex. 1 at p. 15, 16, 35-36, 41).

With $175,000 of private placement money, the individual defendants over the next several weeks paid Sonex's operating expenses, including their own salaries. During the weeks following the investments, the investors' confidence waned. By late summer of 2004, the Canadian financing had not arrived. Majer pressed Williams and learned that the financing had always been speculative, and that at that point the Canadian investor group had lost all interest. (Compl. at ¶¶ 57, 59-60).

In late August of 2004, Sonex filed and published with the SEC a form 10-QSB [FN6] for the quarter ended June 30, 2004. This form stated that Sonex had signed an engagement agreement in which it agreed to pay Winderweedle in cash and agreed to pay a cash retainer of $50,000 by June 30, 2004, that Winderweedle had sent invoices to Sonex in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 6
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

May and July of 2004 totaling $102,000, that Sonex had not paid these invoices, and that Winderweedle had advised Sonex that Sonex was in default. Winderweedle sent out these invoices after Majer and Fortna's investment, but before Hermitage's investment. *Id.* at ¶¶ 61-62; (Mot. Exs. 2-A, 2-B and 2-C at p. 10).

> FN6. This form was not attached to the complaint, but forms the basis for many of the plaintiffs' claims. The defendants attached it to their motion as Exhibit 4, and the Court will consider it.

The 10-QSB also explained that Sonex disputed the fees that Winderweedle claimed it owed, and had engaged separate counsel on a pro bono basis in connection with the matter. It stated: "[t]he Company believes that the amounts invoiced by [Winderweedle] are far in excess of what is reasonable based on the limited services requested by the Company and the limited work product produced by [Winderweedle]." It described Sonex's demand for return of the common stock it had issued to the firm and Sonex's reservation of its rights, "including the right to pursue affirmative claims" against the firm. It stated: "[w]hile the outcome of this dispute is uncertain and may have an adverse effect on the Company's financial condition, management believes that the Company has a defensible position. Accordingly, no liability for any amounts related to this dispute has been recorded in the accompanying financial statements as of June 30, 2004." (Mot. Ex. 4 at p. 15).

*6 In October of 2004, Sonex announced that Posey was resigning as President and Chief Executive Officer. About two weeks later, in November of 2004, Sonex announced that Posey was stepping down as a member of the Board of Directors. Although the formal announcements did not give a reason for the resignation, the plaintiffs learned that the sole reason for Posey's departure was a conflict with his former employer, BRD, about his non-competition agreement. The agreement prohibited Posey from competing with BRD in the area of sound-dampening and noise management. While they were soliciting the plaintiffs and touting Posey's qualifications, the defendants knew that if BRD pressed the non-competition issue, Posey would be forced to resign, as ultimately occurred. (Compl. at ¶¶ 63-65).

If Sonex had been as the defendants represented, the securities purchased by the plaintiffs would have been worth what the plaintiffs paid for them. Instead, because Sonex was in financial trouble, the securities became essentially worthless. *Id.* at 67.

Although the plaintiffs had signed their subscription agreements and delivered their checks, the defendants never delivered to the plaintiffs their stock certificates, despite numerous requests by the plaintiffs. *Id.* at ¶ 105.

Through a letter from their attorney dated December 9, 2004, the plaintiffs notified the defendants of their claims and demanded that Sonex return their investments. The plaintiffs thereby tendered the equity they had purchased in exchange for a refund of their money. Sonex, through Pouring and Ponticas, denied the plaintiffs' request. *Id.* at ¶ 68.

II. *The Complaint and the Motions to Dismiss*

The complaint contains six counts: Count One, violation of § 10(b) of the Securities Exchange Act of 1934 ("SEA") and 17 C.F.R. § 240.10b-5(b), (collectively, "Rule 10b-5"); Count Two, violation of the Pennsylvania Securities Act ("PSA"); Count Three, fraudulent misrepresentation; Count Four, negligent misrepresentation; Count Five, rescission; and Count Six, breach of contract.

Sonex, Pouring, and Ponticas filed a motion to dismiss, in which Pouring and Ponticas argue that the Court lacks personal jurisdiction over them, and Sonex, Pouring and Ponticas argue that the complaint fails to state a claim upon which relief may be granted. Posey also filed a motion to dismiss the complaint for failure to state a claim. [FN7]

> FN7. Posey is *pro se*. He purported to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

move to dismiss the complaint on behalf of both himself and Sonex. Sonex, however, is represented by separate counsel. The Court will consider Posey's motion only as to himself.

The Court will deny the motion to dismiss for lack of personal jurisdiction. The Court concludes that the defendants' contacts with the United States and with Pennsylvania are sufficient to justify the Court's exercise of personal jurisdiction over them.

The Court will grant the motions to dismiss for failure to state a claim, allowing the plaintiffs leave to amend their complaint within the contours of this decision. The Court concludes that the allegations of misrepresentations and omissions fail under the standards for claims of securities fraud under Rule 10b-5, the PSA, and Pennsylvania common law.

*7 The plaintiffs made only brief and bare allegations regarding their other claims of negligent misrepresentation, breach of contract and rescission. The Court concludes that these allegations, as well, fail to state a claim.

### III. *Analysis*

#### A. *Personal Jurisdiction Over Pouring and Ponticas*

The Court has personal jurisdiction over Pouring and Ponticas. The SEA and the cases interpreting it authorize nationwide service of process and confer to courts personal jurisdiction over a defendant served anywhere in the United States, provided that the defendant has minimum contacts with the United States. 15 U.S.C. § 78aa; *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 369 (3d Cir.2002). In other words, "a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process." *Pinker,* 292 F.3d at 369. In their reply brief, Pouring and Ponticas concede that they have minimum contacts with the United States.

The only remaining issue regarding personal jurisdiction is whether the exercise of personal jurisdiction "is consistent with 'traditional notions of fair play and substantial justice.' " *Id* . (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).[FN8] When, as here, federally-created rights are at issue, the fairness analysis is under the Fifth, and not the Fourteenth Amendment. *Max Daetwyler Corp. v. A West German Corp.,* 762 F.2d 290, 293 (3d Cir.1985). "Those strictures of fourteenth amendment due process analysis which attempt to prevent encroachment by one state upon the sovereignty of another do not apply with equal force to the adjudication of [a] federal claim in a federal court." *Id* . at 294. In addition, in this situation, "an alien defendant's preference for a particular state as a more or less convenient forum generally [should not] rise to the level of a constitutional objection." *Id.*

> FN8. Although "there has been some debate as to whether this second prong of the International Shoe analysis ought to apply in the context of a federal statute authorizing nationwide service of process," the United States Court of Appeals for the Third Circuit has "hinted that a fairness analysis consisting of more than an assessment of the defendant's national contacts would be appropriate ." *Pinker,* 292 F.3d at 370 n. 2.

Factors to be considered under a fairness test include: (1) "the extent of the defendant's contacts with the place where the action was brought;" (2) " the inconvenience to the defendant of having to defend in a jurisdiction other than that of his residence or place of business;" (3) judicial economy, including concerns of split and duplicative litigation; (4) the probable location of discovery, and whether the likelihood of discovery out of the defendant's state of residence or business moots his claim of inconvenience; and (5) the nature of the regulated activity and the impact of the defendant's activities outside of his state of residence or business. *Oxford First Corp. v. PNC Liquidating Corp.,* 372 F.Supp. 191, 203-04 (E.D.Pa.1974).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 8
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

"The corporate shield doctrine protects officers and directors by limiting the extent to which their actions performed in the corporate capacity may be used to exercise jurisdiction over them individually." *Lautman v. Loewen Group, Inc.,* 2000 U.S. Dist. LEXIS 8241 at *15 (E.D. Pa. June 15, 2000). However, "courts have refused to permit a corporate officer to invoke the shield when the officer was involved in tortious conduct for which he or she could be held personally liable." *Id.* at *16. Factors to be considered under this analysis are (1) the defendants' role in the corporate structure; (2) the nature and quality of the defendants' forum contacts; and (3) the extent and nature of the defendants' participation in the allegedly wrongful conduct. *Id.* at *17-*18.

*8 Whether or not a fairness analysis is required in this Circuit, the Court concludes that in this case, the exercise of personal jurisdiction is consistent with traditional notions of fair play and substantial justice. Pouring and Ponticas have sufficient contacts with Pennsylvania, and the corporate shield doctrine does not protect them. Pouring and Ponticas led the effort to solicit the plaintiffs, who were Pennsylvania residents. (Compl. at ¶¶ 48-50, 54). They directed their allegedly fraudulent communications and solicitations into Pennsylvania. *Id.* They were at the top of the corporate structure, and were at the center of the allegedly wrongful conduct. *Id.* at ¶¶ 11-15. Pouring and Ponticas' contacts with Pennsylvania are sufficient to satisfy the first prong of the relaxed fairness test.

As stated in *Max Daetwyler Corp.,* 762 F.2d at 294, the second prong, relating to the defendants' inconvenience, is not particularly important in this type of case. The defendants argue that they are financially strapped; however, they already have local counsel. The Court concludes that the prospect of litigating in Pennsylvania, which is relatively close to Maryland, would not inconvenience the defendants to such an extent that personal jurisdiction is inappropriate.

The principle of judicial economy supports keeping the litigation whole in Pennsylvania, and avoiding split or duplicative litigation. In addition, discovery would necessarily take place in both Maryland and Pennsylvania. Finally, the defendants' activities, including soliciting Pennsylvania residents for investment, reached beyond Maryland into Pennsylvania. Thus, personal jurisdiction over Pouring and Ponticas is appropriate.

B. *Failure to State a Claim*

Counts One through Four of the complaint are based upon the alleged misrepresentations made by the defendants. Counts Five and Six allege that the defendants violated the subscription agreements by failing to deliver the stock certificates to the plaintiffs, and that the plaintiffs are entitled to rescission of the subscription agreements on that basis and because of the defendants' alleged fraud.

In their opposition to the motions to dismiss, the plaintiffs narrow their claims of alleged misrepresentations to the following:
(1) the defendants' touting of Posey as uniquely qualified to implement the company's business plan, when he was subject to a restrictive covenant with his former employer that would ultimately force him to resign;
(2) Posey's statement that this restrictive covenant was inapplicable, when in fact it was applicable [FN9];

 FN9. The plaintiffs specifically attribute this statement to Posey in ¶ 51 of the complaint. Then, in ¶ 75 and in their opposition to the motions to dismiss, they attribute it to "[t]he defendants."

(3) the individual defendants' representations that the Canadian investors' loan of up to $43 million was imminent and would close within months, when in fact it was highly speculative and had no realistic chance of being consummated; and
(4) Sonex and the individual defendants' statements that Winderweedle had agreed to accept payment in the form of stock rather than cash, when in fact the fee agreement required cash payment, the company had agreed to pay a cash retainer of $50,000, and the law firm had invoiced the company for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy   Page 9
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

$102,000 for services rendered.

*9 (Resp. at p. 1, 33). The Court will consider only these alleged misrepresentations in deciding whether the complaint states a claim.

1. *Rule 10b-5 Claims*

a. *Elements and Legal Standards*

A valid claim under Rule 10b-5 requires allegations that a defendant (1) made a misstatement or an omission of a material fact, (2) with scienter, (3) in connection with the purchase or the sale of a security, (4) upon which the plaintiff reasonably relied, and (5) that the plaintiff's reliance was the proximate cause of his or her injury. *In re Ikon Office Solutions, Inc., Secs. Litig.,* 277 F.3d 658, 666 (3d Cir.2002).[FN10]

> FN10. In addition, individuals may be jointly and severally liable for a company's actions under § 20(a) of the SEA if they influenced and directed its activities. " Plaintiffs alleging a Section 20(a) violation must plead facts showing (1) an underlying violation by the company; and (2) circumstances establishing the defendant's control over the company's actions." *Winer Family Trust v. Queen,* 2004 U.S. Dist. LEXIS 19244 at *74 (E.D.Pa. Sept. 27, 2004).

(1) *Specificity*

Rule 10b-5 claims are governed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("Reform Act"). The Reform Act heightened the pleading requirements in private securities actions. *In re Rockefeller Ctr. Props., Inc Secs. Litig.,* 311 F.3d 198, 217 (3d Cir.2002). It requires securities plaintiffs to specify with particularity at the outset of litigation all facts upon which they base their allegations or upon which they form their belief, if an allegation is made on information and belief. 15 U.S.C. § 78u-4(b)(1)(B).

They must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *In re NAHC, Inc. Secs Litig.,* 306 F.3d 1314, 1328 (3d Cir.2002)(quoting *In re Advanta Corp. Secs. Litig.,* 180 F.3d 525, 530 (3d Cir.1999)).

Group pleading, as opposed to the specific identification of who made alleged misrepresentations, is insufficient under the Reform Act. *Winer Family Trust v. Queen,* 2004 U.S. Dist. LEXIS 19244 at *17 (E.D.Pa. Sept. 27, 2004); *Marra v. Tel-Save Holdings, Inc.,* 1999 U.S. Dist. LEXIS 7303 at *13 (E.D.Pa. May 18, 1999). In *Winer Family Trust* and *Marra,* the Court found that the plaintiffs had relied on group pleading when their allegations against individual defendants were based solely upon their involvement in creating company publications. *Winer Family Trust,* 2004 U.S. Dist. LEXIS 19244 at *16-*17; *Marra,* 1999 U.S. Dist. LEXIS 7303 at *11-*13.

In *Rockefeller,* 311 F.3d at 217, the court stated that the Reform Act "requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." In that case, one statement was alleged to have been made by " an employee of Goldman Sachs." *Id.* at 218. The court held that this designation did not specifically identify the speaker, and rendered the allegation of the misstatement at issue insufficient. *Id.*

(2) *Materiality*

To survive a motion to dismiss, the misstatements or omissions alleged by a plaintiff must be material to the reasonable investor. In other words, there must be a "substantial likelihood that, under all the circumstances, the [statement or omission] would have assumed actual significance in the deliberations of the reasonable shareholder." *In re Aetna Inc. Secs. Litig.,* 34 F.Supp.2d 935, 945 (E.D.Pa.1999)(quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). "[T]he issue is whether there is a substantial likelihood that the disclosure would have been viewed by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 10

Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

reasonable investor as having significantly altered the total mix of information available to that investor." *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 280 n. 11 (3d Cir.1992) (citations omitted).

**\*10** "[V]ague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such.... Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material." *Advanta,* 180 F.3d at 538. The United States Court of Appeals for the Third Circuit has stated that "[i]n determining the effect of an omission, we examine whether the information omitted is speculative or unreliable, or if it is contingent." *In re Rockefeller Ctr. Props., Inc. Secs. Litig.,* 184 F.3d 280, 290 (3d Cir.1999).

(3) *Scienter*

The Reform Act also heightened the standard for pleading scienter. 15 U.S.C. § 78u-4(b)(2). The Reform Act requires "plaintiffs, with respect to each act or omission, to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir.2004)(internal quotations omitted). " The plaintiffs may establish a strong inference that the defendants acted with scienter either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

"Blanket assertions of motive and opportunity will not suffice, and catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *Id.*

"[M]otives that are generally possessed by most corporate directors and officers do not suffice" to give rise to a strong inference of scienter. *Id.* (internal quotations omitted). "In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a strong inference of fraudulent intent." *Id.* Examples of such insufficient allegations are allegations of "a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock." *Id.* at 238.

"A reckless statement is a material misrepresentation or omission involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 239 (internal quotations omitted). In addition, "in a non-disclosure situation, any required element of scienter is satisfied where ... the defendant had actual knowledge of the material information." *Id.*

Allegations that defendants "knew" or "must have known" that their statements were false, without allegations of the "who, what, when, where and how " of the events at issue, are insufficient to plead scienter. *Id.*

b. *The Alleged Misrepresentations Fail to State a Claim*

**\*11** Applying these standards, the defendants argue that the plaintiffs' allegations fail to establish a valid Rule 10b-5 claim. The Court agrees with many of the defendants' arguments.[FN11]

> FN11. Because the Court concludes that the failure of the complaint to state a claim based upon the factors above provides several independent bases for its dismissal, the Court will not address the issue of loss causation or proximate cause.

As an initial matter, only one of the alleged misrepresentations is specifically attributed to a defendant. Although at other points they attributed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                   Page 11
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

this statement to "the defendants" generally, the plaintiffs did allege that Posey said that he had a restrictive covenant, but that it was not implicated by his employment with Sonex, and that, in any event, it had been reviewed by counsel and found to be inapplicable. (Compl. at ¶ 51). Other than that, all of the alleged misrepresentations are attributed to "Sonex," "the defendants," or "the Individual Defendants." (Compl. at ¶¶ 49-50, 54). The plaintiffs do not specifically identify who made them, or where or when they were made. Under the Reform Act, these statements cannot form a basis for liability of the individual defendants.

Another global problem with the complaint is that the plaintiffs fail to adequately allege scienter for any of the alleged misrepresentations. The plaintiffs' only allegations of motive are allegations that Pouring, Ponticas and Posey had deferred portions of their salaries and income, and were motivated by their desires to recoup that deferred income and ensure their personal well-being going forward. (Compl. at ¶¶ 34, 35, 38). As the United States Court of Appeals for the Third Circuit has expressly held, allegations of officers' desires to reap the financial benefits of a successful transaction are not sufficient to survive a motion to dismiss on the motive element of scienter. Thus, the plaintiffs cannot satisfy the first scienter option.

The plaintiffs also cannot make out the second scienter option, which requires a showing of circumstantial evidence of conscious misbehavior or recklessness. The plaintiffs simply allege that the defendants "knew" of the applicability of Posey's restrictive covenant, the speculative or tenuous nature of the Canadian financing, and the Winderweedle payment arrangement. (Compl.¶¶ 60, 62, 65). This is precisely what the *GSC Partners CDO Fund* court held was insufficient as an allegation of scienter.

These global failures alone would justify the Court's dismissal of the Rule 10b-5 claim. The Court will also address additional failings specific to some of the misrepresentations.[FN12]

> FN12. Because the plaintiffs failed to adequately plead an underlying Rule 10b-5 claim against any of the moving defendants, including Sonex, their claim that the individual defendants are liable as control persons of Sonex under § 20(a) also fails.

(1) *Alleged Misrepresentation Relating to Posey's Qualifications*

The plaintiffs' allege that the defendants violated Rule 10b-5 by touting Posey's qualifications when he was in fact prohibited from working for Sonex by a restrictive covenant. This allegation fails to state a claim for the fundamental reason that it is not clear why it was a misstatement at all. A person can be qualified for a position that he is prohibited from filling because of a restrictive covenant. It would perhaps be more persuasive if the plaintiffs could argue that the defendants made a material omission by failing to disclose the existence of the restrictive covenant. They cannot, however, because they admit that "Posey said that he had a restrictive covenant." (Compl. at ¶ 51).

**\*12** The statements about Posey's qualifications also fail because they constitute puffery. Statements about Posey's "wealth of management and industry turnaround experience," and his "career rich in the successful management of both large established corporate organizations and firms focused on the research and development of innovative technologies" are classic puffing statements. (Compl. at ¶¶ 31, 46).[FN13]

> FN13. In several places in the complaint, the plaintiffs allege that the defendants emphasized Posey's expertise in the key area of noise and vibration control or active noise concealment, and then cite to statements that make no mention of noise and vibration control or active noise concealment. (Compl. at ¶¶ 31, 45). Even if the statements were as the plaintiffs characterize them, they would likely constitute puffery. Regardless, the plaintiffs do not deny that Posey had expertise in these areas, and in fact allege

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 12

Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

that "Posey came to Sonex shortly after the termination of his employment as a sales representative with BRD Noise and Vibration Control." *Id.* at ¶ 29. Statements about such experience, then, would not be material misstatements.

(2) *Alleged Misrepresentations Relating to the Payment of Winderweedle*

The plaintiffs allege that the defendants told them that Winderweedle had agreed to accept stock in lieu of cash for all services. The materiality of any such statement is negated by the disclosure in Sonex's 2003 Form 10-KSB, which the plaintiffs warranted that they read and understood in their subscription agreements, that the "agreement with the new legal counsel ... requires the Company to remit a cash retainer of $50,000 by June 30, 2004." (Mot. Ex. 1 at p. 41).[FN14]

> FN14. The plaintiffs' argument that this disclosure is somehow insufficient because it was "one sentence, buried in a 70-page, single-spaced document," is unpersuasive. (Resp. at p. 37). If the plaintiffs were not capable of making an informed investment, then they should not have warranted in their subscription agreements that they were "capable of evaluating the merits and risks of an investment in the Units," that they had "read and understood the Company Information," that in connection with their review, they had "consulted with such independent legal counsel, accountants and other advisers considered appropriate to assist [them] in evaluating [their] proposed investment in the Company," and that they had "taken full cognizance of and underst[ood] ... the Company's Annual Report on Form 10-KSB for the year ended December 21, 2003." (Mot. Exs. 2-A, 2-B, and 2-C at p. 5).

The plaintiffs also allege that the defendants failed to inform them that Winderweedle had sent invoices to Sonex in May and July of 2004 totaling $102,000, that Sonex had not paid these invoices, and that Winderweedle had advised Sonex that Sonex was in default. (Compl. at ¶ 62). These alleged omissions could not have been material to Majer and Fortna, because Majer and Fortna signed their subscriptions in April of 2004, before Winderweedle sent out these invoices. (Mot. Exs. 2-A and 2-B at p. 10).

Hermitage signed its Subscription Agreement in July of 2004, which may have been after Winderweedle sent out some of the invoices. (Mot. Exs. 2-C at p. 10). As Sonex's 2004 Form 10-QSB disclosed, however, Sonex disputed Winderweedle's bill, and did not record liability for any amounts related to this dispute because it believed that its position was "defensible." (Mot. Ex. 4 at p. 15). Sonex's obligation to pay Winderweedle's bill, then, was not material because it was contingent upon Sonex's failure or success in disputing that bill.

In addition, Sonex's 2003 Form 10-KSB discloses that Sonex was in a financially unstable position, that it was operating at a loss, that it would continue to do so for the foreseeable future, and that the plaintiffs might lose their entire investments. (Mot. Ex. 1 at p. 15). Given Sonex's much larger problems, the fact that Winderweedle claimed that Sonex owed it $102,000, when Sonex disputed that amount, would not alter the total mix of available information.

2. *Other Fraud Claims*

The Court will also grant the motions to dismiss the plaintiffs' claims of violation of the PSA and fraudulent misrepresentation. The PSA, like Rule 10b-5, prohibits false statements and omissions of material fact in connection with the sale of securities in Pennsylvania. 70 Pa.C.S. §§ 1-401(a), 501(a).[FN15]

> FN15. Although the state law fraud claims are not subject to the heightened pleading requirements of the Reform Act, they must be "stated with particularity" under the heightened pleading standard of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 13
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

Fed.R.Civ.P. 9(b).

The elements of a claim of fraudulent misrepresentation or omission under Pennsylvania law are: "(1) a representation [or omission]; (2) which is material to the transaction at hand; (3) made [or concealed] falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst,* 647 A.2d 882, 889 (Pa.1994).

**\*13** The elements of common law fraud are "almost identical" to the elements of Rule 10b-5 claims and claims under the PSA. *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 659 (W.D.Pa.1999). For the same reasons that their Rule 10b-5 claim fails, the plaintiffs' PSA and fraudulent misrepresentation claims also fail.

The Court will grant the motions to dismiss the fraud claims. The plaintiffs may amend their complaint if they feel that it would be efficacious to do so in light of the Court's decision.

3. *Negligent Misrepresentation, Breach of Contract and Rescission*

The Court will dismiss the plaintiffs' claims of negligent misrepresentation, breach of contract and rescission. The vast majority of the complaint deals with the plaintiffs' fraud claims, and the bases for their other claims are not entirely clear to the Court. [FN16] If the plaintiffs wish to proceed with their claims of negligent misrepresentation, breach of contract and rescission, they should amend their complaint to explain the bases for these claims.

FN16. For example, a theory of fraud permeates the complaint, and the plaintiffs do not explain why the defendants should have known the falsity of their alleged misrepresentations. Instead, the negligent misrepresentation count simply incorporates the rest of the complaint by reference and states that "[i]f and to the extent the misrepresentations or omissions set forth in the [fraudulent misrepresentation] count were not made knowingly or recklessly, they were made negligently, giving rise to liability for negligent misrepresentation." (Compl. at ¶ 103). In addition, the complaint does not explain how the alleged failure to deliver the stock certificates violates the subscription agreements or justifies rescission.

An appropriate Order follows.

*ORDER*

AND NOW, this 19th day of July, 2006, upon consideration of the Motion to Dismiss Complaint for Lack of Personal Jurisdiction as to Defendants Pouring and Ponticas and to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted as to Defendants Sonex, Pouring and Ponticas (Docket No. 5), the Answer to Complaint and Memorandum in Support of Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted as to Defendants Sonex, and Roger D. Posey [FN17] (Docket No. 18), the Supplemental Memorandum of Law in Further Support of Motion to Dismiss Plaintiffs' Complaint as to Defendants Sonex Research, Inc., George E. Ponticas and Dr. Andrew A. Pouring, the response to all of the above documents, and the reply thereto, IT IS HEREBY ORDERED that:

FN17. As explained in the Memorandum, the Court considered Posey's motion only as to himself, and not as to Sonex, because Sonex is represented by separate counsel.

1. Pouring and Ponticas' motion to dismiss for lack of personal jurisdiction is DENIED.

2. Sonex, Pouring, and Ponticas' motion to dismiss for failure to state a claim is GRANTED. If they wish, the plaintiffs may amend their complaint within 30 days of the date of this Order.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                   Page 14
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915
**(Cite as: Slip Copy)**

3. Posey's motion to dismiss for failure to state a claim is GRANTED. If they wish, the plaintiffs may amend their complaint within 30 days of the date of this Order.

E.D.Pa.,2006.
Majer v. Sonex Research, Inc.
Slip Copy, 2006 WL 2038604 (E.D.Pa.), Fed. Sec. L. Rep. P 93,915

Briefs and Other Related Documents (Back to top)

• 2006 WL 2702093 (Trial Pleading) Amended Complaint (Aug. 18, 2006) Original Image of this Document (PDF)
• 2005 WL 3723477 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to the Motions to Dismiss of Defendants Sonex Research, Inc., George E. Ponticas, Andrew A. Pouring, and Roger D. Posey (Nov. 16, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3136051 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Law in Further Support of Motion to Dismiss Plaintiffs' Complaint as to Defendants Sonex Research, Inc., George E. Ponticas and Dr. Andrew A. Pouring (Oct. 27, 2005) Original Image of this Document (PDF)
• 2:05cv00606 (Docket) (Feb. 8, 2005)
• 2005 WL 3723478 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Motion to Dismiss by Defendants Sonex Research, Inc., George Ponticas and Dr. Andrew Pouring (2005) Original Image of this Document (PDF)
• 2005 WL 453028 (Trial Pleading) Complaint (2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.