**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA**

MARC BRAGG, Esq., an individual,       CIVIL DIVISION

                Plaintiff,      No. 06-cv-4925

         v.            **JUDGE EDUARDO ROBRENO**

LINDEN RESEARCH, INC., a corporation,
and PHILIP ROSEDALE, an individual,

             Defendants.

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

    AND NOW, comes Plaintiff, Marc Bragg, Esq., by and through counsel, Jason A. Archinaco, Esq., and the law firm of WHITE AND WILLIAMS, LLP, and files the following Brief in Support of Motion for Preliminary Injunction, and avers as follows:

### FACTUAL BACKGROUND

    Plaintiff requests that this Honorable Court enter a Preliminary Injunction returning the parties to the status quo immediately prior to the defendants' wrongful acts. Indeed, this is a straightforward case of liability as the defendants are saying one thing, then doing another. At the center of this case are repeated misrepresentations made by defendants about the ownership of virtual land. Those misrepresentations caused Plaintiff, who believed them, to expend over $8,000 in U.S. currency to purchase such land from Defendant Linden, pay Defendant Linden land taxes, and to deposit money for additional purchases and from sales into an account held in trust with Defendant Linden. Declaration of Marc Bragg, attached hereto as Exhibit "1," ¶¶ 7, 23. Defendants have founded their entire business model on the representations that Plaintiff (and other consumers generally) are being sold virtual land and that such consumers are the owners

1

Dockets.Justia.com

of that virtual land. *Id.* at ¶¶ 5, 6. Indeed, Defendant Linden represents prominently on the front page of its website:

<p style="text-align:center"><strong>OWN VIRTUAL LAND</strong></p>

Defendant Linden's Second Life website goes on to state, repeatedly, that the virtual land is being sold to the consumer, including Plaintiff. See, Second Life webpage printouts dated November, 28, 2006, attached hereto as Exhibit "2", Pages 2-1 and 2-23 in particular. Plaintiff's account page on Defendant Linden's site similarly stated, after he purchased the land "LAND: OWNED PARCELS." See, Bragg Account Printout dated May 9, 2006, showing LAND OWNED PARCELS, attached hereto as Exhibit "3." Further, Defendant Rosedale has repeatedly made the following statements to the public generally through a variety of interviews with the media:

> June 14, 2005: **"We started selling land free and clear, and we sold the title, and <u>we made it extremely clear that we were not the owner of the virtual property</u>"**

> September 8, 2005: "We're going to make more [money] because some people who wouldn't have otherwise signed up are going to buy land . . . ."

> April 13, 2006: "Things are pretty clear – as a user, you own what you create in Second Life."

> July 20, 2006: "everything inside it [Second Life] is made by the people who are there and in fact, the land itself and the space and everything is owned, controlled and built by the people who are there. . . ."

> July 20, 2006: "You just buy it [virtual land]."

> July 20, 2006: "You buy it generally from other users. You can participate in a land auction and buy it from us . . . ."

> July 20, 2006: ". . . everyone owns their own stuff, their own property – **there's no way we could just advertise on that property without asking because it isn't ours you know. It belongs to land owners."**

<p style="text-align:center">2</p>

July 20, 2006: "The majority of our money is made in recurring fees—think of them being like property taxes that you pay when you own land."

*See* interviews with Philip Rosedale, attached hereto as Exhibits "4-7".

Plaintiff purchased virtual land from Defendant Linden on multiple occasions through an auction similar to eBay. Exhibit "1," ¶¶ 9-10. On each occasion and at the conclusion of the auction, Defendant Linden would e-mail Plaintiff a receipt / confirmation that he had purchased the virtual land. Exhibit "1," ¶ 21. Defendant Linden would deliver a written acknowledgement of the purchase via e-mail identifying the name, amount of land, location and the amount that Plaintiff had paid and would also advise Plaintiff that the purchase was a separate "binding contract" between Plaintiff and Defendant Linden. Exhibit "1," ¶¶ 15, 17, 21. Thereafter, Plaintiff owned the land which was identified in his account. See, Exhibit "3." Plaintiff was required to pay a "land tier" tax on the land to retain ownership of the land. Exhibit "1," ¶ 7. Plaintiff, in fact, did so without fail. *Id.* at ¶ 7.

Like any other asset Plaintiff owned, Plaintiff had the ability to do whatever he pleased with the virtual land, including: leasing it, sub-dividing it for sale and/or developing it. Exhibit "1," ¶ 72. Plaintiff was freely able to sell his virtual land to others on the open market and was encouraged by Defendant Linden to do so. *Id.* Further, Defendant Linden used Plaintiff and others to actively recruit new participants to the Second Life world such that they would buy land and Defendants would thereby profit. *Id.* at ¶ 73. Moreover, Plaintiff purchased other virtual assets from third parties with the belief that he owned such items. *Id.* at ¶ 74.

Despite the obvious representations of defendants, they "confiscated" (aka stole) Plaintiff's virtual land and removed his title from the land. Exhibit "1," ¶¶ 3, 34 ; See also

3

Bragg Account Statement printed May 15, 2006, showing that Plaintiff owns no land, attached hereto as Exhibit "8." Further, Defendant Linden wrongfully destroyed all of Plaintiff's other virtual assets, many that were purchased from third parties and, additionally, took $2,000 U.S. currency from Plaintiff and have refused to return it despite repeated demands. Exhibit "1," ¶¶ 33, 34.

Either way, whether defendants admit that plaintiff owned the land by virtue of their agreement, or admit that they falsely represented to him (and other consumers) about virtual land ownership, a preliminary injunction is necessary to return the parties to the status quo immediately before the wrongful conduct. Defendants should not be permitted to make false representations to a consumer, induce him to entrust his money with them, and then simply steal that money when it suits their business model to profit by fraud and violations of the laws of the Commonwealth of Pennsylvania and the State of California.

I.    **STANDARD FOR GRANTING A PRELIMINARY INJUNCTION.**

The standard for granting a preliminary injunction is straight forward. Four factors govern a district court's decision whether to issue a preliminary injunction:

(1)    whether the movant has shown a reasonable probability of success on the merits;

(2)    whether the movant will be irreparably injured by denial of the relief;

(3)    whether granting preliminary relief will result in even greater harm to the nonmoving party; and

(4)    whether granting the preliminary relief will be in the public interest.

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). A district court should balance the four factors to determine if an injunction should issue. *Id.* at 158. The

4

moving party has the burden on proof on the first two factors; while the non-moving party has the burden on the second two factors should it feel it will suffer greater harm or irreparable harm from the injunction. *Neo Gen Screening, Inc. v. Telechem International, Inc.*, 2003 WL 21578070, *3 (3d Cir. 2003); See, *Acierno v. New Castle Country*, 40 F.3d 645, 653 (3d Cir. 1994)(noting that the burden is on the moving party on the first two issues, but that district court should itself consider the second two).

## II.    PLAINTIFF SATISFIES ALL THE ELEMENTS NECESSARY TO GRANT A PRELIMINARY INJUNCTION.

### A.    PLAINTIFF CAN DEMONSTRATE A REASONABLE PROBABILITY OF SUCCESS ON MULTIPLE COUNTS OF HIS COMPLAINT.

Plaintiff can demonstrate a reasonable probability of success on multiple counts of his complaint. Although Plaintiff must only demonstrate a reasonable probability of success as to any one count in his complaint to properly obtain injunctive relief, Plaintiff has a reasonable probability of succeeding on the following claims:

1.    Breach of the consumer protection laws;

2.    Breach of contract;

3.    Breach of the Implied Covenant of Good Faith and Fair Dealing; and,

4.    Conversion.

Each will be discussed in turn.

1.    Plaintiff can demonstrate a reasonable probability of success on the merits of his consumer protection claims under either Pennsylvania or California law.

Plaintiff can demonstrate a reasonable probability of success on the merits of his consumer protection claims under either Pennsylvania or California law.  As set forth

5

herein, defendants collectively represented to Plaintiff that he was purchasing virtual land to own. Exhibit "1," ¶¶ 4-6, Exhibit "2." The fact that defendants are now contesting that Plaintiff owned the virtual land he purchased is an admission that their repeated representations to Plaintiff (and consumers generally), were and remain false. Defendants' fraudulent conduct in this instance is truly no different than those original land developers across this country in the 1950s that were selling "dream" lots of newly subdivided land to a newly recognized market, place fire water hydrants on those newly "subdivided" vacant lots, and represent to buyers that the property being offered had underground utilities when in fact there was no water below the surface, much less anything plumbed or connected to the land they were selling. Defendant's fraudulent conduct is similarly no different than some of the original condominium developers, apartment to condo converters, and/or time-share companies, who inventing a new business model fundamentally premised on the sale and transfer of "ownership" rights in the product / service being sold, arrogantly and egotistically believe that because they are the innovators of a new profit model, have no obligation, or legal, moral or ethical duty, to comply with the fundamentals of civil law.

Plaintiff is a "consumer" who purchased and paid for virtual land (and services) from the Defendant Linden. Exhibit "1," ¶ 3. Defendants' representations that Plaintiff, through contracting with Defendant Linden, acquired an "ownership" interest in the virtual land are, evidently, completely false. *Id.* at ¶¶ 4, 5, 8. Although false, Defendant Linden prominently displays on the front page of its internet website the following: "OWN VIRTUAL LAND". Exhibit "2." Plaintiff's account information also stated "LAND: OWNED PARCELS". Exhibit "3." Further, Defendant Linden's CEO Philip

Rosedale statements, all made without condition or reservation in the media, continuously and systematically represent to the public and owners of Second Life land that they truly own what they buy. Exhibits "4-7"; Exhibit "12." Defendant Rosedale stated:

> June 14, 2005: "**We started selling land free and clear, and we sold the title, and we made it extremely clear that we were not the owner of the virtual property**" (emphasis added)
>
> July 20, 2006: ". . . everyone owns their own stuff, their own property – **there's no way we could just advertise on that property without asking because it isn't ours you know. It belongs to land owners.**" (emphasis added)
>
> July 20, 2006: "The majority of our money is made in recurring fees—think of them being like property taxes that you pay when you own land."

The false representations of both Defendants Rosedale and Linden, and acting in concert, violate the consumer protection laws of both Pennsylvania and California. For example, such false statements violate 73 P.S. § 201-2 (4): (v), (ix) and (xxi), that provides:

> v.      Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have
>
> ix.     Advertising goods or services with intent not to sell them as advertised
>
> xxi.    engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding

The false representations of Defendants violate each of the enumerated sections above. Defendants have been selling goods that are misrepresented and are not being sold as advertised. Further, the virtual land is being represented as having qualities it does not truly have. In essence, Defendants "advertise" that a consumer owns the virtual land – while in truth those representations are simply false. As set forth repeatedly

7

herein, the wrongful acts of defendants caused Plaintiff to purchase virtual land that he though he owned, only to learn through defendants actions in confiscating and subsequently reselling his land to others that such representations were and remain false. Under 73 P.S. § 201-9.2, a plaintiff can successfully advance a claim if he establishes the following:

  a)    Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

The false statements of defendants are also a violation of the California Unfair and Deceptive Practices Act as set forth in Cal. Bus. & Prof. Code § 17200. In relevant part, the statute provides that a violation of Cal.Civ.Code § 1750 et. seq. is also a violation of the Unfair and Deceptive Practices Act. In relevant part, defendants' false statements violate Cal.Civ.Code § 1770 as follows (and nearly identical to the Pennsylvania statute):

  (a)    The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

  (7)    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

  (9)    Advertising goods or services with intent not to sell them as advertised.

(16)    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

(19)    Inserting an unconscionable provision in the contract.

Whether the Pennsylvania or California statute is applied, defendants' false statements violate each. Accordingly, Plaintiff has established a likelihood of success on his consumer protection claims. This Court should enter a preliminary injunction that returns the parties to the status quo prior to the wrongful conduct of defendants.

2.    <u>Plaintiff is likely to succeed on the merits of his breach of contract claim</u>.

Plaintiff is likely to succeed on the merits of his breach of contract claim. Under Pennsylvania law, the elements for breach of contract are: (1) the existence of a contract including its essential terms, (2) a breach of a duty disclosed by the contract and (3) resultant damages. *Omicron Systems, Inc. v. Weiner*, 860 A.2d 554, 564 (Pa.Super. 2004). California law is in accord with Pennsylvania law. A cause of action for breach of contract is comprised of four elements under California law: (1) the contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) the resulting damages to plaintiff. *Quick Loan Funding, Inc. v. Maguire Properties-3121 Michelson LLC*, 2006 WL 1725617, *4 (Super.Ct. 2006); *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal.App.4th 1375, 1391 n. 6 (2004). Irrespective of whether this Court applies Pennsylvania or California law, Plaintiff is likely to succeed on his breach of contract cause of action(s).

First, several separate, distinct and independent contracts were entered into between Plaintiff and Defendant, Linden. Exhibit "1," ¶¶ 9-26. Each contract was conducted via "auction" on Linden's website. *Id.* at ¶¶ 10-11. Pursuant to each virtual

land auction contract, Plaintiff purchased virtual land from Linden for the auction price. *Id.* at ¶¶ 9-26. The money was then paid by Plaintiff to Linden, generally via credit card, Linden processed accepted the credit card payment and then claimed to transfer the title of the virtual land to Plaintiff. *Id.* at 21-4. Defendants have repeatedly and consistently represented to Plaintiff (and the general public) that once the sale of land is concluded that the buyer would be the owner of such land. Exhibits "2-7". As a condition of the sale of the land, Plaintiff would then have to make monthly "tax" payments to Defendant Linden. *Id.* at ¶ 7. Plaintiff did so as required by the contract(s). *Id.* at ¶ 7. Further, to the extent it was not explicit; implicit in the contract was the fact that Plaintiff would have access to the land for his own use and benefit. *Id.* at ¶ 72.

The term "own" is completely free from doubt. Black's Law Dictionary (Sixth Edition)(1983) defines the term "own" as follows:

> to have a good legal title; to hold as property; to have a legal or rightful title to; to have; to possess.

Defendant Rosedale has also used the term "own" in the same context as he stated nationally on June 14, 2005: **"We started selling land free and clear, and we sold the title, and <u>we made it extremely clear that we were not the owner of the virtual property</u>."** Exhibit "4."

Defendant Linden breached the contracts at issue by violating the contract terms. Apparently, after "temporarily" providing title to Plaintiff (as the land is identified generally in Exhibit "3"), Defendant Linden simply removed title of the virtual land from Plaintiff as it simply "confiscated" the land and removed Plaintiff's name from the title in violation of the multiple contracts transferring ownership to Plaintiff. See, see auction bid page re: "legally binding contract" and confirmation e-mail, attached hereto as

<div align="center">10</div>

Exhibit "9."[1] As set forth above and herein, Plaintiff has suffered irreparable harm from Defendant Linden's acts. *Id.* at ¶ 75.[2]

Simply put, Plaintiff has established a likelihood of success on his breach of contract claims. Accordingly, this Court should enter a preliminary injunction that returns the parties to the status quo prior to the wrongful conduct of Defendant Linden by providing title to the land in Plaintiff. Further, Plaintiff should be provided access to his land back to him so that he can use, exploit and/or transfer or properly dispose of such land.

> **a.** **If Defendants were to incredulously argue that the multiple independent contracts selling and transferring ownership of the virtual land to Plaintiff allegedly did not "actually" transfer such ownership contrary to their unqualified and repeated public written and representations, the doctrine of equitable estoppel precludes defendants from claiming that the virtual land is not owned by Plaintiff.**

Even if the defendants were to claim that the multiple contracts selling and transferring ownership of the virtual land to Plaintiff allegedly did not "actually" transfer such ownership, the doctrine of equitable estoppel precludes defendants from claiming that the virtual land is not owned by Plaintiff. Defendant Linden and its CEO Defendant Rosedale repeatedly represented to Plaintiff (and consumers generally) that when a

---

[1] As set forth previously, the account page for Plaintiff stated on May 9, 2006 "Owned Parcels" and listed numerous parcels of land. See, Exhibit "2." On May 15, 2006, the account page for Plaintiff stated "You do not own any parcels". See, Exhibit "8."

[2] The virtual land listed in Exhibit "3" was all purchased by Plaintiff, either from Defendant Linden, or third-parties. Not even Defendant Linden can argue that any of such land was acquired by "exploit". The only e-mail ever received by Plaintiff with regard to any alleged "exploit" was received on May 1, 2006. See, Exhibit "14". Therein, Defendant Linden (through its representative Jack Linden) wrote: "Hi there Marc. Your recent auction appears to have been the result of an exploit. The land will therefore be taken back and your money refunded." *Id.* Nowhere was there (or could there be) any claim that any of Plaintiff's virtual land holdings were the result of any alleged "exploit". Exhibit "1", ¶¶ 88-9. Indeed, the e-mail did not even notify Plaintiff that Defendant Linden would shortly be confiscating all of Plaintiff's virtual belongings, land, money and real world U.S. currency. Instead, they told a different story – stating Defendant Linden would actually be refunding Plaintiff. *Id.*

11

consumer purchases virtual land in Second Life, the consumer **owns** the land without limitation or qualification other than paying a monthly tax. Exhibit "1," ¶ 7; Exhibits "2-7". Further, Defendant Rosedale has specifically acknowledged that taking someone else's land in Second Life is akin to criminal conduct. Exhibit "7."

Defendants not only told Plaintiff prior to purchasing the property that he would own it when purchased, but subsequent to the purchase, defendants identified the virtual land in Plaintiff's account with Defendant Linden as "LAND: OWNED PARCELS". See, Exhibit "3." Defendant Linden induced Plaintiff, and has and continues to induce and influence thousands of other consumers to continue paying the monthly tax payment for the land, by systematically and continuously creating a reasonable expectancy interest in the buying public that consumers who purchase land from Defendant Linden own the land. Moreover, Defendant Linden specifically permitted, encouraged, and continues to permit and encourage the sale of virtual land by tax paying land owners to third parties even to the extent of conferring on buyers and sellers the rights to set their own prices, terms of sale, size of purchase, and not interfering or otherwise controlling or correcting any errors or mistakes, or any fraud or any misrepresentations that occur between land buyers and sellers. Exhibit "1," ¶ 72.

Indeed, defendants have intentionally made such representations in an effort to attract additional participants to the Second Life "world" / "platform". Defendants have inducing consumers to become owners of Second Life land by representing without qualification or reservation with respect to land sales, that buyers receive in their conveyance of title from Defendant Linden, the normal and customary bundle of rights incident to land ownership recognized by all states within the United States of America.

By way of further example, Defendant Rosedale has specifically identified one of the rights of virtual land owners as "**an ability to exclude other from it if you choose as the landowner**." See, "Interview with Second Life's Philip Rosedale, November 28, 2006, Parts I and II collectively attached hereto as Exhibit "10" (emphasis added); Exhibit "7." Defendant Rosedale has even gone so far as to state that landowners in Second Life can exclude Defendant Linden from their land – as Defendant "**there's no way we could just advertise on that property without asking because it isn't ours you know.  It belongs to land owners.**" Exhibit "7" (emphasis added).[3]  The Supreme Court of the United States has stated that the "right to exclude others" is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Dolan v. City of Fitzgerald*, 512 U.S. 374, 114 S.Ct. 2309, 2316 (1994)(quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 391 (1979)).  When read in connection with Supreme Court authority, Defendant Rosedale's representations about excluding others are no "accident" but rather further evidence of his attempts to mislead and cause consumers to rely on the ownership representations.

"Reduced to its essence, equitable estoppel is a doctrine of fundamental fairness intended to preclude a party from depriving another of a reasonable expectation, when the party inducing the expectation knew or should have known that the other would rely to his detriment upon that conduct." *West American Insurance Co. v. Park*, 933 F.2d 1236, 1239 (3d Cir. 1991); *In re I.D. Craig Services Corp.*, 138 B.R. 490 (W.D.Pa. 1992).  See also, *Salton Community Services Dist. v. Southard*, 256 Cal.App.2d 526, 531 (1967)("[W]here a lessor, by conduct subsequent to execution of the lease, leads a lessee

---

[3] The Second Life "Land: How To" page also details how "you can restrict access to your land . . ." Exhibit 2.27.  Further, "Be aware that you can also freeze and eject people on your land . . . ." *Id.*

to believe strict compliance with a covenant will not be required and the latter acts accordingly to his detriment, the lessor will be estopped to assert a failure to comply as a ground for forfeiture.")    The doctrine of equitable estoppel is applied when a party intentionally "induces another to believe that certain facts exist and the other party justifiably relies and acts upon such belief" and will be prejudiced if the first is permitted to contradict the expectations it has created.    *In re Craig Services*, 138 B.R. at 497 (quoting *Straup v. Times Herald*, 423 A.2d 713, 720 (Pa.Super. 1980).[4]    California law is in accord with Pennsylvania law. See, *Quick Loan Funding, Inc. v. Maguire Properties-3121 Michelson LLC*, 2006 WL 1725617, *4 (Super.Ct. 2006)(quoting *Platt Pacific, Inc. v. Andelson*, 6 Cal.4[th] 307, 320 (1993)( "Under the doctrine of equitable estoppel, a party is prevented from contradicting facts if, by conduct or representation, it has mislead another to the latter's prejudice.").    In essence, this theory precludes a defendant from arguing that a plaintiff spent thousands of dollars only to have purchased "Canned Florida Sunshine".

In *West American Insurance Co.*, the court employed the doctrine to estop an insurance company from arguing that specific provisions of the insurance policy itself negated the plaintiff's claims.    In applying the doctrine and rejecting the insurance company's arguments, the court reasoned "[t]hus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents . . . the public has a right to expect that they will receive something of value in return for the premium paid."    933 F.2d at 1239.    Further, the Court reasoned "the insurer is bound not only by the expectations it

---

[4]A related concept is one where an irrevocable license is created by estoppel. See, *Morning Call, Inc. v. Bell Atlantic-Pennsylvania, Inc.*, 761 A.2d 139, 144 (Pa.Super. 2000).    "A license may become irrevocable under the rules of estoppel and in those circumstances it is similar to an easement." *Id.*    The doctrine of irrevocable license exists where "a license to do something on the licensor's land when followed by the expenditure of money on the faith of it, is irrevocable, and is to be treated as a binding contract." *Id.*

PITDMS 38300v.1

creates, but also by any other reasonable expectations of the insured. The insured's reasonable expectations control, even if they are contrary to the explicit terms of the policy." 933 F.2d at 1239.[5]

Similarly, in *In re I.D. Craig Services Corp.*, 138 B.R. 490 (W.D.Pa. 1992), a bankruptcy trustee moved to sell the renewal rights for Pittsburgh Steelers season tickets. The Pittsburgh Steelers Sports, Inc. objected to the sale of the tickets, claiming that the agreement contained a nonassignability clause and, further, that each individual ticket was a revocable license. *Id.* at 493, 497. The Court rejected both arguments. In relevant part, the court equitably estopped the Steelers from arguing that the nonassignability clause should be enforced. The Court reasoned that the Steelers had "intentionally created, encouraged and promoted the expectation" that the season ticket renewal "rights" were transferable. *Id.* at 497. Moreover, the Court found it significant that the Steelers referred to the season ticket holders as "owners" of the tickets. *Id.* at 498. Accordingly, the Court held that the Steelers were equitably estopped and the season ticket renewal right was properly transferable. *Id.* at 502. The Court stated that "the season ticket holders' interest in season ticket renewal may be better termed an expectancy interest rather than a contractual interest. The expectancy interest has been created and fostered by Sports, Inc. in the public, including season ticket holders, by virtue of Sports, Inc.'s long practice of offering to renew season tickets to the current registered holder on an annual basis." *Id.* As such, the "[t]he ticket renewals encompassed in the expectancy interest have been shown to have value and are property of the estate under § 541 of the

---

[5] There are, thus, two avenues for application of the doctrine: (1) the reasonable expectations created by the defendant and (2) other reasonable expectations of the plaintiff. As set forth herein, the first theory is applicable given the repeated representations of the defendants. Further, the second theory is also applicable given that participants in virtual worlds generally believe that they have ownership rights in virtual property and land, irrespective of any fine print contained in end user licenses.

15

Bankruptcy Code." *Id.*; See also, *In re Platt*, 292 B.R. 12 (Bankr. D. Mass. 2003)(Boston

Red Sox season tickets are property of the owner despite non-transferability clause).

In conclusion, even if defendants' repeated statements of ownership were not

enough to equitably estop any defense to Plaintiff's ownership of the virtual land,

Defendant Linden's subsequent conduct in encouraging and permitting such virtual land

sales to third parties would do so.    Accordingly, Plaintiff owns the virtual land he

purchased and an injunction should be granted not only returning title to him, but also

giving him full access to his land so that he can fully exploit, use or dispose of it.

> **b.    Even if Defendant Linden had attempted to only "license" the land to Plaintiff (which it did not), any such attempt would be ineffective pursuant to the "first sale" doctrine.**

Even if Defendant Linden had attempted to only "license" the virtual land to

Plaintiff (which it did not), any such attempt would be ineffective pursuant to the "first

sale" doctrine.  As courts have held, software is a good under the U.C.C.  *Advent System

Limited v. Unisys Corp.*, 925 F.2d 670, 675 (3d Cir. 1991); *Novell, Inc. v. Network Trade

Center*, 25 F.Supp.2d 1218 (D. Utah 1997), vacated in part on other grounds, 187 F.R.D.

657 (D. Utah 1999).  Under the "first sale" doctrine, irrespective of any attempts by the

copyright holder to retain "ownership" of software with a shrinkwrap license, a sale of

software causes title in the copy to pass to the purchaser.  *Novell*, 25 F.Supp.2d at 1230;

*Softman v. Adobe Systems, Inc.*, 171 F.Supp.2d 1075, 1084-6 (C.D.Cal. 2001)(where a

company attempts to claim that its end user license only provides the buyer of the

software with a "license" the first sale doctrine provides that the software is actually sold

and title transferred to the buyer).

For example, in *Novell*, the court rejected the fact that the "purported license attempts to limit the rights of the possessors of the software by prohibiting copying and distribution of the software, and retains ownership of the software with the copyright holder." 25 F.Supp.2d. at 1230 n. 16. In rejecting the purported license, the *Novell* court held that "the purchaser is an "owner" by way of sale and is entitled to the use and enjoyment of the software with the same rights as exist in the purchase of any other good. Said software transactions do not merely constitute the sale of a license to use the software. The shrinkwrap license included with the software is therefore invalid as against such purchaser insofar as it purports to maintain title to the software in the copyright owner." *Id.* at 1230. Thus, the purchaser of software is the "owner" irrespective of the fact that the "shrinkwrap" license claims that only a license is being provided. *Id.* at 1230.

Courts applying Pennsylvania law have refused to enforce shrink wrap licenses in similar situations. *Step-Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91 (3d Cir. 1991)(additional terms of box-top license not enforceable); See also, *Advent System Limited*, 925 F.2d at 675 (software is a good). Needless to say, even if Defendant Linden had attempted to avoid transferring title to Plaintiff through the sale of the virtual land, any attempt to do so would have been ineffective and void as a matter of law.

3.    Plaintiff is likely to succeed on the merits of his Breach of the Implied Covenant of Good Faith and Fair Dealing Claim.

Plaintiff is likely to succeed on the merits of his Breach of the Implied Covenant of Good Faith and Fair Dealing Claim. Both Pennsylvania and California law are in accord generally with regard to the implied covenant of good faith and fair dealing.

17

Under Pennsylvania law, in the absence of an express provision, "the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 434 n. 11 (Pa. 2001). Similarly, Pennsylvania law also provides for the "doctrine of necessary implication". Under that doctrine, the law provides that one party to a contract will not unilaterally defeat the purposes of the contract. *Stamerro v. Stamerro*, 889 A.2d 1251, 1261 (Pa.Super. 2005).

Under California law, the implied covenant of good faith and fair dealing "not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." *Quick Loan Funding, Inc. v. Maguire Properties-3121 Michelson LLC*, 2006 WL 1725617, *6 (Super.Ct. 2006)(quoting *Pasadena Live v. City of Pasadena*, 114 Cal.App.4[th] 1089, 1093 (2004)); *April Enterprise v. KTTV*, 147 Cal.App.3d 805, 195 Cal.Rptr. 421 (1983).[6]

In the instant case, Defendant Linden has wrongfully violated the implied covenant of good faith and fair dealing. In particular, Defendant Linden has frustrated the entire purpose of the virtual land sales by: (1) confiscating the land and (2) preventing

---

[6] Only two differences between Pennsylvania law and California law appear to exist. Under Pennsylvania law, the implied covenant appears to be prosecuted as a breach of contract claim, as opposed to an individual cause of action. *Berlinerblau v. Psychoanalytic Center of Philadelphia*, 2005 WL 2562907, *1 n. 1 (Pa.Com.Pl. 2005); See, *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 434 (Pa. 2001). Further, under California law, in the right circumstances, a breach of the implied covenant of good faith and fair dealing can constitute a tort.

18

Plaintiff's access to his virtual land and other property.  As set forth above and herein, the confiscation of Plaintiff's virtual land is both a breach of contract, conversion and a breach of the implied covenant of good faith and fair dealing.  Indeed, what would the purpose of ownership of land be if you could not use or enjoy it?  Any argument to the contrary is nonsensical.  Furthermore, and in addition, Defendant Linden's acts in preventing Plaintiff from accessing his virtual land completely frustrate the entire purpose of the contract.  As set forth previously herein, Defendant Rosedale has repeatedly made statements about the rights an owner has with regard to his virtual property.  See, Exhibits "4-7" and "10."  In essence, by preventing access to the virtual land, Defendant Linden has frustrated the entire purpose of the land contracts.

Although not decided in the context of "implied covenant" case authority, both Pennsylvania and California law have adopted the theory of easements by necessity.  See, *Phillipi v. Knotter*, 748 A.2d 757 (Pa.Super. 2000)(an easement by necessity contemplates a situation in which a parcel of land is landlocked); *Rieger v. Stoudt*, 39 Pa.Super. 59, 1909 WL 3849 (1908); *Kellogg v. Garcia*, 102 Cal.App.4th 796, 125 Cal.Rptr.2d 817, 823 (2002).  Like the "implied covenant of good faith and fair dealing", the doctrine provides for an "implicit" promise contained in the sale of "landlocked" land, for example.  Thus, in appropriate circumstances, where a piece of land is "landlocked" the law presumes an easement so that the landlocked land owner can access, use and enjoy his land.[7]  Further, with regard to an implied easement by necessity,

---

[7]The elements necessary for an easement by necessity appear to be identical under both Pennsylvania and California law.  Under Pennsylvania law, the elements are: (1) the titles to the alleged dominant and servient properties must have been held by one person; (2) this unity of title must have been severed by a conveyance of one of the tracts; (3) the easement must be necessary in order for the owner of the dominant tenant to use his land, with the necessity existing both at the time of the severance of title and at the time of

courts have precluded the owner of the servient estate from interfering with the easement. See, *Epstein Family Partnership v. Kmart Corporation*, 13 F.3d 762, 766 (3d Cir. 1994)(owner of the servient estate may not interfere with the free and full use of the easement granted even though the owner of the easement may have an alternate route); *Rieger v. Stoudt*, 39 Pa.Super. 59, 1909 WL 3849 (1908). For example, in *Rieger*, the defendant closed, blocked and locked a right of way in an effort to have the other landowner remove garbage that had been causing an offensive odor. *Id.* at *2. The *Rieger* Court held that an injunction was properly granted to abate the nuisance to the right of way and caused the right of way to be reopened. *Id.*

Similarly, the doctrine of good faith and fair dealing works to imply such covenants in contracts parallel to the function of an easement by necessity in the real property context. The implied covenant causes the parties to a contract to perform those acts necessary to carry out the purpose of the contract and/or refrain from taking acts that would destroy or injure the other party's right to receive the fruits of the contract. In this case, logically, to fulfill the entire purpose of the contract (i.e., the sale of the virtual land), a couple things must necessarily happen:   (1) the title to the land must be transferred to Plaintiff and (2) Defendant Linden must provide access to the land. To hold otherwise would make a mockery of the entire purpose of the contract, which was to sell Plaintiff land for his own use and enjoyment, i.e., to "own" the land. As Defendant's CEO aptly stated in interviews, the land sold by Defendants is owned by the buyer who purchases it. See, e.g., Exhibit "4."

---

the exercise of the easement. *Phillipi*, 748 A.2d at 760. Each of those elements appear to be satisfied in this case as well.

20

The defendants not only violated the implied covenant, but also know that they violated the covenant. Given that counsel for defendants has already claimed that the "Terms of Service" govern the dispute, following the filing of this lawsuit, Defendant Linden added the following language to its "Terms of Service" agreement: "Your intellectual property rights do not confer any rights of access to the Service or any rights to data stored by or on behalf of Linden Lab." See, Exhibit "11", ¶ 3.3. Such a change, particularly in response to this litigation, is an obvious admission that such language was not present when Plaintiff purchased his land. Although the TOS does not actually discuss land contracts, as pointed out by Plaintiff in other filings, even if it did purport to, the "rights of access" language was not present previously. Defendants simply know that the sale of the virtual land, even if the TOS were to be applied in this context, carried with it an implied right of access, otherwise why add the language after the suit was filed? Moreover, even such language had been included in some "governing document" – it is simply absurd to think that defendants would be permitted to sell landlocked land when their specific advertisements stress repeatedly the benefits of the use of virtual land. As cited earlier, the concept of equitable estoppel would then control.[8]

Indeed, in this case, Defendant has made a mockery of the entire purpose of the land sales and, in so doing, has violated the implied covenant of good faith and fair dealing by not only stripping Plaintiff of his title to the land but in also preventing him from accessing it. Like the landlocked owner of real property whose easement has been barricaded, Defendant Linden has "electronically" barricaded Plaintiff's land thereby preventing Plaintiff from receiving the fruits of the contract. To permit Defendant

---

[8] For example, despite the alteration to the TOS, Defendant Linden still states on its website that "A Resident is a uniquely named avatar **with the right to log into Second Life**, trade currency and visit the Community pages." Exhibit "13" (emphasis added).

Linden to act in such a way is simply absurd. For example, to condone such acts would permit Defendant Linden to accept thousands of dollars (as it did here) in selling pieces of virtual land and then simply frustrate the entire purpose of the contract by preventing Plaintiff to access that very same land. That is not and should not be the law in either Pennsylvania or California. Plaintiff did not buy "Canned Florida Sunshine".

Moreover, implied in Plaintiff depositing his U.S. currency with Defendant Linden was the promise that Defendant Linden would not simply take or otherwise steal his money. Any argument to the contrary is simply absurd and defendants cannot point to any law in the United States that would permit such an unconscionable and illogical result. Presumably, defendants would have this Court believe that Plaintiff somehow consented to being robbed by them. Any such argument is simply specious nonsense. Accordingly, Plaintiff has established a likelihood of success on his breach of the implied covenant of good faith and fair dealing claim. This Court should enter a preliminary injunction that returns the parties to the status quo prior to the wrongful conduct of Defendant Linden.

4.  <u>Plaintiff is likely to succeed on the merits of his conversion claim.</u>

Plaintiff is likely to succeed on the merits of his conversion claim. Under Pennsylvania law, the elements of a claim of conversion are: the deprivation of another's right to property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification. *Gottesfeld v. Mechanics and Traders Insurance Co.*, 173 A.2d 763, 766 (Pa.Super. 1961). In the instant case, Plaintiff can establish each element of his claim.

PITDMS 38300v.1

Defendant Linden first deprived Plaintiff of access to and, then later, title to his virtual property. Defendant Linden first denied Plaintiff access so he could sell his land and other items, and then removed his name and title from all of Plaintiff's virtual land. Plaintiff believe based on Defendant Linden's conduct, that his other assets have all been "deleted" including those Plaintiff acquired from third parties, as Defendant Linden has precluded him from even looking at his account.

This conduct is especially egregious because instead of deleting and/or denying Plaintiff access to his assets, Defendant Linden could potentially have limited Plaintiff's access to the Second Life world enabling Plaintiff to mitigate his damages and retrieve his items or place them for sale on third party websites where Plaintiff could have recouped some of the monies paid by him to other third parties. Defendant Linden's conduct was maliciously intended to be punitive in nature and to prevent Plaintiff from mitigating any damages he had suffered. Many of the assets that Defendant Linden deleted were obtained by Plaintiff from third parties and, hence, Plaintiff has absolutely no legal recourse against those third parties as those parties did not engage in any wrongful conduct. Exhibit "1," ¶ 74. Further, Defendant Linden has converted and deprived Plaintiff of his use of his $2000 U.S. currency that it has wrongfully taken and possessed along with continuing to convert personal financial data such as credit card information in spite of Plaintiff's request to remove that information.[9] Defendant Linden wrongfully blocked approximately 50 attempts by Plaintiff to remove his U.S. currency from his account. *Id.* at ¶ 76. In the meantime, Defendant Linden has been profiting from its wrongful conduct as it, not Plaintiff, is able to obtain interest and other benefits

---

[9] There was a recent break-in into Defendant Linden's "secure" database containing Plaintiff's confidential information. Exhibit "1", ¶ 91.

PITDMS 38300v.1

from that currency. *Id.* at ¶ 77. As set forth herein, Plaintiff never consented or otherwise permitted Defendant Linden to confiscated his virtual assets and/or U.S. currency. *Id.* at ¶ 78.

Accordingly, Plaintiff has established a likelihood of success on his conversion claim. This Court should enter a preliminary injunction that returns the parties to the status quo prior to the wrongful conduct of Defendant Linden.

## III.   ABSENT AN INJUNCTION, PLAINTIFF WILL BE IRREPARABLY INJURED BY BEING DEPRIVED OF HIS UNIQUE VIRTUAL LAND AND OTHER VIRTUAL ITEMS.

### A.   PLAINTIFF IS SUFFERING IMMEDIATE AND IRREPARABLE HARM BY BEING DEPRIVED OF HIS UNIQUE VIRTUAL LAND AND OTHER VIRTUAL ASSETS HE OWNS.

There is no dispute that the virtual land in this case is unique. Exhibit "1," ¶ 79. Like real world land, each piece of land's value is derived from its unique location, setting and development. *Id.* at ¶ 79. Each individual piece of virtual land is in a unique location with unique longitude and latitude coordinates on the Second Life "grid" / world map. *Id.* No two pieces of land occupy the same coordinates or location in the Second Life world. Each piece has a unique name, unique topography, unique environment, and unique value characteristics. *Id.*[10]

Like real land, location is everything to value; several pieces of virtual land owned by Plaintiff were in highly developed and highly desirable areas in the Second Life world including many parcels with water and/or rare ocean front pieces. *Id.* at ¶ 80. Those areas generated significant "foot traffic" even before the recent boom in new

---

[10] In a further attack on Plaintiff, defendants named a piece of land "Bragg" and sold that land despite not having any permission to use Mr. Bragg's name. Exhibit "1", ¶ 90.

participants and land price increases that Second Life is currently experiencing. *Id.* at ¶ 80. The virtual land owned by Plaintiff has not been deleted. In fact, all the land Plaintiff purchased still exists inside the Second Life world with the same name, gross size, and location despite Defendant Linden wrongfully stripping Plaintiff of his title to the land he purchased and owned. *Id.* at ¶ 81. Moreover, although Defendant Linden continues to "create" new virtual land, the land of Plaintiff remains unique by virtue of its specific and identified location on the Second Life map and unique environmental characteristics. *Id.* at ¶ 79. In many respects the individual pieces of virtual land owned by Plaintiff operated just like "domain names" on the internet, in that participants could seek out those unique land parcels on the internet and then visit those specific locations. By virtue of just its location, each parcel is different and unique. *Id.* at ¶ 79. As stated, in addition to various parcels of virtual land that Plaintiff owned and had developed businesses upon, Plaintiff also owned highly coveted ocean front property. *Id.* at ¶¶ 80, 82. Plaintiff enjoyed "relaxing" in that ocean front property and watching the virtual sun set and on clear nights, the rise of the full moon. *Id.* at ¶ 80. Just like a real life ocean front property, the exact view and location of the ocean front lot cannot be replicated and are unique giving some parcels far greater economic and other irreplaceable value. *Id.* By stripping Plaintiff of his title to the land (that he paid for), he has been deprived of rights that inhere in ownership, including the ability to obtain a third-party loan using the land as collateral or otherwise develop, exploit, rent, or sell his virtual land. *Id.* at ¶ 83.[11]

Indeed, Defendant Rosedale has specifically acknowledged the inherent value to a land

---

[11] Even should the virtual land be considered a "general intangible" like a trademark or other "bundles of rights", such an interest is subject to Article Nine considerations and can be used to secure a loan from a third party. See, *Klinger v. Pocono International Raceway, Inc.*, 433 A.2d 1357, 1361 (Pa.Super. 1981). (general intangibles are subject to article nine considerations).

owner as he has stated that "the number one creator of new business in the US is second mortgage on property." See, Exhibit "4". Plaintiff is being irreparably harmed by being deprived of such rights.

Courts in the Third Circuit and in Pennsylvania have repeatedly held that specific performance is an appropriate remedy where something unique is involved. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 159-60 (3d Cir. 1999)(business acquisition); *In Re Brown's Estate*, 289 A.2d 77 (Pa. 1972)(stock certificates); *Aldrich v. Geary*, 61 A.2d 843 (Pa. 1948)(stock in closely held corporation); *Cochrane v. Szpakowski*, 49 A.2d 692 (Pa. 1946)(liquor license); *Unatin 7-Up Co. v. Solomon*, 39 A.2d 835 (Pa. 1944)(plant and contents); *Rusiski v. Pribonic*, 474 A.2d 624, 629 (Pa.Super. 1984)(land); *Tomb v. Lavelle*, 444 A.2d 666 (Pa.Super. 1982)(liquor license); *Emert v. Hanchett Manufacturing Division of MWA Co.*, 41 Pa.D.&C.3d 659 (1983)(special piece of equipment); *Ace Equipment Co., Inc. v. Aqua Chem, Inc.*, 73 Pa.D.&C.2d 300 (Pa.Com.Pl. 1975)(special piece of equipment); *American Bank v. Lied*, 71 Pa.D.&C.2d 308 (1975)(stock certificates).

"Damages cannot be accurately ascertained 'where the subject matter of an agreement is an asset that is unique or one such that its equivalent cannot be purchased on the open market.'" *Allegheny Energy,* 171 F.3d at 160 (quoting *Tomb v. Lavelle*, 444 A.2d 666, 668 (Pa.Super. 1981). A good need not be inherently unique as it may become unique by virtue of its context. *Allegheny Energy*, 171 F.3d at 160 n. 9; See, *Emert*, 41 Pa.D.&C.3d at 662 (the test of uniqueness must consider the circumstances surrounding the contract). For example, in *Cochrane*, the Pennsylvania Supreme court held that specific performance with regard to the sale of a particular restaurant and liquor license at

a definite location was the appropriate remedy given that there was no other restaurant or liquor license exactly like the one that was the subject of the contract. *Cochrane*, 49 A.2d at 694. [13]

Where an asset is unique and the plaintiff is deprived of its use, as here, irreparable harm is suffered and established as a matter of law. *Elfman v. Berman*, 2001 WL 1807377, *3 (Pa.Com.Pl. 2001); See, *Emerman v. Baldwin*, 142 A.2d 440, 445 (Pa.Super. 1958). For example, the loss of use of "office space" under a lease is considered irreparable harm. *Elfman*, at *3; See, *Checker Oil Co. of Del. V. Harold H. Hogg, Inc.*, 380 A.2d 815, 820 (Pa.Super. 1977)(en banc)(where landlord breaches covenant of quiet enjoyment, "[t]he difficulty of establishing the amount of pecuniary loss and the continuing nature of the wrong make the remedy of legal damages inadequate."). Further, where interference with the unique asset has caused the dislocation and disruption to a business and the threat of an unascertainable profit loss, such constitutes irreparable harm. *Elfman*, at *3; See, *Sovereign Bank v. Harper*, 674 A.2d 1085, 1093 (1996) ("An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard.").

In this case, in addition to the fact that Plaintiff's loss of use and enjoyment of his unique virtual land and assets is causing an immediate and irreparable harm, Plaintiff's "business" ventures inside the Second Life world have been interrupted and disturbed. Such an interruption has caused Plaintiff damages in an amount that cannot be accurately measured. Exhibit "1," ¶ 82. Indeed, given the rapid growth of the Second Life

---

[13] The remedy of specific performance is equally applicable to tangible and intangible rights; location of restaurant – tangible; liquor license – intangible right to sell alcohol at a specific location.

PITDMS 38300v.1

participant base since Linden wrongfully confiscated Plaintiff's virtual assets (and prohibited his access to and use of them), it is simply impossible to know what additional income Plaintiff would have generated from his businesses located inside Second Life. *Id.* Land values themselves have tripled from purchase prices in locations similar to show owned by Plaintiff, without considering the value of the stream of income attributable to rented / leased land, or land with established business operations. Indeed, Defendant Linden itself has nearly doubled its selling price for some of the new land it has recently offered to the public in response to the increasing demand it is receiving for virtual land. *Id.* at ¶ 85.

> 2.    The lost business opportunities and market advantage caused by Plaintiff is irreparable injury requiring the imposition of a preliminary injunction.

In addition to the above, Pennsylvania case law makes clear that the impending loss of a business opportunity or market advantage may aptly be characterized as an "irreparable injury" for this purpose, i.e. for the purpose of a preliminary injunction. *Allegheny Energy*, 171 F.3d at 159-60; *Kessler v. Broder*, 851 A.2d 944 (Pa.Super. 2004). In this case, Plaintiff has additionally suffered such an irreparable harm given that along with stealing Plaintiff's land, Defendant Linden recklessly and maliciously bulldozed all his existing developments including a nearly full condominium development with leased retail stores, an active casino and dance hall, a Venetian-styled town home development with its own separate dance area, interfering with numerous rental contracts for other large pieces of land, interfering with then existing land sales of subdivided land, and interfering with entertainment contracts entered into between Plaintiff and other third parties. *Id.* at ¶ 84.

PITDMS 38300v.1

3.    Defendant's wrongful taking of Plaintiff's money is irreparable harm requiring the imposition of a preliminary injunction.

Plaintiff held approximately $2000 U.S. dollars in his account along with personal financial data held in trust with Defendant Linden.  Defendant, Linden, wrongfully took that money along with all of Plaintiff's other virtual assets.  Exhibit "1," ¶¶ 3, 33, 34 Given that the virtual land and U.S. dollars in the account were owned by Plaintiff, such a wrongful taking requires the imposition of a preliminary injunction.  Even when monetary damages are fully calculable, an injunction is properly granted where a defendant improperly takes money which unquestionably belongs to the plaintiff.  See, *American Express Travel Related Services Company, Inc. v. Laughlin*, 623 A.2d 854, 856-7 (Pa.Super. 1993)(affirming entry of preliminary injunction entered to enjoin the concealing or dissipation of funds where defendant, a fiduciary, admitted to not remitting funds to plaintiff); *East Hills TV & Sporting v. Dibert,* 531 A.2d 507, 509 (Pa.Super. 1987)(enjoining seller from using funds in seller's bank so as to prevent potential loss of funds belonging to buyer and necessary to carry on its business); *Citizens Bank v. Myers*, 872 A.2d 827 (Pa.Super.2005)(freezing defendants' accounts that contained monies defendants embezzled from plaintiff).

4.    Defendants' violations of the Unfair Trade Practices and Consumer Protection Law permit the court to presume irreparable harm for purposes of granting a preliminary injunction.

Where a statutory violation is alleged, such as here, irreparable harm is presumed for purposes of granting a preliminary injunction. *Commonwealth v. Richard A. Cole, M.D.*, 709 A.2d 994, 996 (Pa.Commw. 1998), rearg. dn.; *Pennsylvania Public Utility Commission v. Israel*, 52 A.2d 317 (Pa. 1947)(holding that a determination of irreparable

29

harm for the purpose of granting an injunction is not necessary when the legislature has

prohibited certain conduct). In this case, Plaintiff has alleged that defendants violated the

Unfair Trade Practices and Consumer Protection Law as set forth more fully at length

herein. The false representation were made solely to further their business model of

profiting by the sale of land and representing that a consumer owns such land while never

actually intending to allow the consumer to actually own the virtual land. Such a false

representation is a violation of sections 73 P.S. § 201-2 (4): (v), (ix) and (xxi) of the

Unfair Trade Practices and Consumer Protection Law, as is set forth more fully herein.

And, accordingly, such violations give rise to the presumption of irreparable harm for

purposes of the imposition of a preliminary injunction.


**IV.    ALTHOUGH NOT PLAINTIFF'S BURDEN TO ESTABLISH, THE GRANTING OF PRELIMINARY RELIEF WILL BE IN THE PUBLIC INTEREST AND WILL NOT RESULT IN A GREATER HARM TO DEFENDANTS.**

As set forth previously herein, it is not Plaintiff's burden to establish the third and

fourth elements with regard to a preliminary injunction. Instead, such factors are for the

Court to independently consider and/or are the burden of defendants to establish. See,

*Neo Gen Screening*, 2003 WL 21578070 at *3; *Acierno*, 40 F.3d at 653. In any event, to

the extent necessary, Plaintiff briefly addresses these factors.


**A.    AN INJUNCTION NOT ONLY DOES NOT ADVERSELY AFFECT THE PUBLIC INTEREST, BUT IT PROMOTES IT.**

An injunction not only does not adversely affect the public interest, but it

promotes it. Indeed, the injunction sought by Plaintiff will assist other consumers who

have also relied upon the same false representations about ownership of virtual land in

30

Second Life. Exhibit "1," ¶ 86. By granting the injunction, this Court will (at least temporarily), hold the defendants accountable for the repeated representations the defendants have been making to consumers all across the United States. As set forth herein, the representations of defendants are misleading and false. This Court is in the best position to end the practices of the defendants and prevent them from harming other consumers who are also being taken advantage of and mislead. *Id.* The reality is that, even by Defendant Linden's own financial data, consumers are paying large sums of money for land that they believe they own. See, Second Life economic information webpage prints, collectively attached hereto as Exhibit "13." It is time for defendants to be held accountable for their representations and this Court is in a position to advance the public interest by granting the preliminary injunction.

**B.    DEFENDANTS CANNOT ESTABLISH THAT ANY GREATER HARM WILL OCCUR TO THEM BY THE GRANT OF THE PRELIMINARY INJUNCTION.**

Defendants cannot establish that any greater harm will occur to them by the grant of the preliminary injunction. In particular, Plaintiff knows of no harm that will occur to the defendants if they are ordered to return his wrongfully confiscated money and assets to him. Exhibit "1," ¶ 87. Moreover, no "greater harm" will come to defendants should this Court hold defendants accountable for the representations they are making to the public at large. *Id.* The preliminary injunction will simply return the parties to the status quo prior to the wrongful conduct of defendants. No "greater harm" comes to the defendants by this Court preventing them from violating the law.

PITDMS 38300v.1

V.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court grant his request for a preliminary injunction.

<div style="margin-left: 45%">

Respectfully submitted,

WHITE AND WILLIAMS, LLP


By <u>CB 1429</u>
   Jason A. Archinaco, Esq.
   PA ID 76691
   Christopher Ballod, Esq.
   PA ID 89462
   The Frick Building, Suite 1001
   437 Grant Street
   Pittsburgh, PA 15219
   (412) 566-3520
   *Counsel for Plaintiff*

</div>

Date:  January 25, 2007

32