IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA

MARC BRAGG, ESQ., an individual            CIVIL DIVISION

            Plaintiff                       No. 06-cv-4925

     v                                  **JUDGE EDUARDO ROBRENO**

LINDEN RESEARCH, INC., a corporation,
and PHILIP ROSEDALE, an individual,

            Defendants.

### DECLARATION OF MARC BRAGG, ESQ.

I, MARC BRAGG, ESQ., pursuant to 28 U.S.C. §1746, declare as follows:

1. I am attorney duly admitted to practice in the Commonwealth of Pennsylvania and before this Court. I have practiced before this Court without incident.

2. I am the Plaintiff in the above-captioned matter, and I have personal knowledge of the facts to which I make this declaration. Further, I have read numerous articles and legal materials in connection with virtual land and items and have personal knowledge and understanding of such articles.

3. I am a consumer who purchased "virtual land" from Defendant Linden Research (d/b/a Linden Labs) which I believed that I owned based on the representations of Linden Research and of Philip Rosedale. I believe that I still own the virtual land even though Defendants wrongfully confiscated the land from me and will not return it.

4. I read written statements and heard verbal representations made by Defendants in the media regarding virtual land ownership.

**EXHIBIT 1**

PITDMS 38301v.1

5. I believed the statements made by the Defendants that purchasing virtual land from Defendant Linden meant that I owned the land.

6. I believed Defendant Rosedale's repeated statements that a consumer who purchased virtual land from Defendants owned that land.

7. Defendants statements regarding ownership were made without reservation or condition except that I was required to pay a monthly "tax" on the virtual land I owned. I paid all my land taxes without fail.

8. Defendants apparently are admitting that their representations were false.

9. The repeated representations made by Defendants induced me into entered into a series of separate and distinct land auction contracts with the Defendant Linden.

10. To access the auctions, I would simply enter my user ID and password on the internet website of Defendant Linden.

11. I was not required to review or agree to the terms of the Terms of Service ("TOS") cited by the Defendants in connection with bidding, purchasing or paying for virtual land via Defendant's auction process.

12. The individual land auction pages did not make any reference to the TOS.

13. Neither the land auction pages nor any of the bidding process stated that it was "incorporating" the TOS.

14. When I bid on a piece of land, the TOS was not referenced in any way as part of the purchase agreement nor was it "incorporated" into the auction terms of bidding or payment.

15. I would type my bid into the auction page, press the submit button, receive a confirmation page confirming the bid, the press submit again and my bid would be entered.

16. At no time would the auction page identify the TOS or claim that the TOS was being incorporated into the auction.

17. The land auction page would inform me that I was entering into a binding contract, but it did not state anywhere that any dispute about any land auction contract was subject to the TOS and/or that there was any agreement to arbitrate.

18. None of the land auction pages ever disclosed to me that I was not truly purchasing and becoming the "owner" of the virtual land that I purchased.

19. None of the land auction contracts entered into by me with Defendant Linden contained any agreement to arbitrate or any reference whatsoever to the TOS or its arbitration provision.

20. During the process of viewing, bidding, and purchasing virtual land, Defendants could easily have included language relating to the arbitration provision of the TOS, but they did not.

21. When I would win an auction, I would receive a confirmation e-mail stating that I had won the land, and providing the size of the land, name, and winning purchase price.

22. After I won the auction, I had to go back to the page for the winning auction and click the pay button.

PITDMS 38301v.1

23. When I clicked the pay button, I could then either pay for the land by use of my credit card, or deduct the price from funds I had deposited in my account with Linden.

24. When I paid for the land, I was then allowed to go "in-world" and claim my land.

25. The confirmation e-mail did not state anything with regard to the TOS and/or that Defendants were somehow attempting to, after the fact, apply the TOS to the completed auction.

26. There was nothing in any of the confirming e-mails that said anything about the TOS and/or any agreement to arbitrate.

27. The TOS agreement attached to Defendant's Motion to Compel Arbitration is devoid of any reference to "land auctions."

28. Moreover, Defendants have modified the TOS several times since I joined Second Life, usually without informing the residents of the changes.

29. No consumer has the ability to negotiate the TOS with Defendant Linden; Linden is the only one who controls the language of the TOS.

30. Sometimes, I would be required to accept the modifications to the TOS when logging into Second Life, other times not.

31. There is no language in the TOS that states that by clicking the accept button I agree that the TOS applies to land auction contracts.

32. The arbitration clause purpose is to eliminate lawsuits not provide a true forum for them and is unconscionable.

33. I had approximately $8,000 taken wrongfully from me through Defendants false statements and scheme.

34. Defendant Linden unilaterally took my virtual land owned by me and froze $2,000 of my money that I had deposited in accounts at Linden without notice or discussion of any kind. I made repeated demands to return my money.

35. Now, confronted with my lawsuit, Defendants seek to not only transfer the case to the second most expensive city in the United States, but also to compel arbitration pursuant to the rules of the International Chamber of Commerce ("ICC").

36. The initial filing fee for such an arbitration appears to be $10,000 in addition to other fees and costs of the arbitrators, even for a claim of only $1.00.

37. In this case, in addition to the fact that I have already been deprived of $5,000 dollars of my own money, the following prohibitive costs would be included in litigating the case in the ICC forum in San Francisco:

Costs

$10,000 initial advance on costs without arbitrators expenses;
$unknown – additional hearing costs;
$600 (estimate for two days at $300 @ day);

Two day arbitration (arbitrators costs)

$1,356 – three arbitrators lodging for two days at the two star "Nob Hill Motor Inn" ($226 @ night)
$36 -- three arbitrators lunch at McDonalds (two days);
$36 – three arbitrators dinner at McDonalds (two days);
$40-- three arbitrators travel (taxis to hearing location from the Motor Inn, all arbitrators in the same taxi, arbitrators walking to McDonalds);

Plaintiff and his counsel's costs

$904 – two nights for Plaintiff and counsel at the "Nob Hill Motor Inn";
$24 – lunch at McDonalds two days;
$24 – dinner at McDonalds two days;
$40 – taxis two and from hearings;
$400 – coach airfare to San Francisco (Plaintiff and counsel)

$80 – taxis - airport

<u>Total ultra-conservative and unrealistically optimistic costs associated with hearings in San Francisco, CA</u>

**$13,540**

38. These costs are in addition to the legal fees I would incur from having to travel back and forth from San Francisco.

39. The reality is that the ultra-conservative and absurd listing of costs above is not realistic, in the end, it would be much higher.

40. Realistically, the incidental costs associated with litigating the case in San Francisco, CA pursuant to the ICC rules would exceed the amount in controversy, and would exceed $5,000, the amount already wrongfully deprived from Plaintiff.

41. Indeed, factoring in the up-front filing costs and the incidentals in light of the average transaction value between Defendant and its customers, demonstrates that the arbitration and venue clause is simply Defendants way of wrongfully insulating itself from liability by forcing me to abandon my claims, as opposed to advancing or potentially incurring costs equivalent to the down payment on a $135,000 house.

42. I only travel to California occasionally to visit my mother in San Diego, and I do not own any real-estate in California.

43. Defendants could have used a more common, accessible, and inexpensive arbitration forum, such as the American Arbitration Association (commonly, "AAA"), but chose not to do so.

44. If Defendants disclosed the arbitration clauses in connection with land auctions, up front, to customers, people might not enter into the transactions.

PITDMS 38301v.1

45. There is no other source of virtual land for sale anywhere were the consumer is stated to be the owner of such land; and this is the reason why many consumers, including myself, joined Second Life.

46. I would have to abandon my claims for damages if this Court enforces the arbitration provision as I simply cannot spend over $10,000 pursuing the $5,000 already wrongfully taken from me.

47. I attempted to cancel some of my accounts and remove my personal financial information but Defendant Linden refused to do so.

### Background of the Massively Multiplayer Online Roleplaying Game ("MMORPG") Industry

48. The Defendant Linden is not the only company that operates a virtual world known as a massively multiplayer online roleplaying game ("MMORPG") for profit.

49. The industry is populated with heavy weights like Vivendi-Universal (Blizzard) and Sony (Sony Online Entertainment), including numerous other companies. Studies have concluded that there are over 10 million players participating in such MMORPG worldwide, with the number growing rapidly every year. The industry leading World of Warcraft boasts over 7 million participants.

50. Such MMORPG are designed so that participants can acquire virtual items, goods and, in some cases, land.

51. The secondary market for such virtual items is estimated at, conservatively, over $100 million, with other estimates exceeding $1 billion worldwide annually.

52. The secondary markets, however, are considered a "black market" by many of the companies operating the virtual worlds. Thus, despite the fact that accounts in popular MMORPG can sell for thousands of dollars in real world currency, or rare virtual items can also command such prices, the designers and game world operators like to claim that players do not have any rights to such virtual items and that such sales are a violation of End User License Agreements ("EULA").

53. Sony, at one time, threatened to sue eBay if it did not remove all listings pertaining to its then immensely popular Everquest.

54. The MMORPG themselves, and the virtual items acquired and held by players in their accounts, are considered so addictive by some that Everquest was commonly referred to as "Evercrack."

55. Nevertheless, despite the existence of EULA in each of the MMORPG, transactions for virtual goods and items occur on a daily basis. A simple Google search for "virtual gold" turns up numerous sites selling virtual gold in popular MMORPG.

56. The industry refers to the sale of virtual items for real world money as "real money trade" or "RMT."

57. Those participating in such purchases and sales still run the risk of action being taken against them by the game publishers. In fact, this year Vivendi-Universal (Blizzard) is believed to have closed over 50,000 accounts because of alleged involvement in sale of virtual gold for real world money.

58. Articles have recently been published discussing the fact that "sweat shops" have been opened in China and other third world countries where workers play games

PITDMS 38301v.1

for hours on end "farming gold" to sell on the open market. In one recent article, it was noted that Chinese "gold farmers" make better than the average wage for Chinese workers.

### Players' Rights to Virtual Items and Land

59. Despite the existence of the thriving "black market" for virtual items and goods, the business of RMT has remained "illegitimate" because of the EULA disclaiming any ownership rights in such virtual world items, goods and land.

60. Player rights in such worlds have become a hotly debated issue, with many legal commentators writing on the subject.

61. Ralph Koster designed both Ultima Online and Star Wars Galaxies.

62. One Korean study demonstrated that in the game "Lineage," even though the EULA disclaimed any ownership rights in the virtual items in the game, a resounding majority of those participants polled believed that they had ownership rights in their virtual items. Thus, participants in the virtual worlds are increasingly drawing the conclusion that they have rights in their virtual items and goods <u>despite any "fine print" contained in EULA of popular virtual worlds</u>.

63. Although the issue has yet to be directly addressed by U.S. courts, courts in other jurisdictions have recognized players rights.

64. Nevertheless, despite the increasing sentiment that players have rights to their virtual items, goods and land, irrespective of what any EULA fine print claims, it is believed that until late 2003 not a single publisher had acknowledged such rights. Accordingly, despite the massive RMT occurring, the transactions were all, in essence, branded illegitimate.

65. When I purchased my virtual land from Linden, I did not believe that I was purchasing "Canned Florida Sunshine" or any "gag" gift.

66. Defendant Rosedale's representations (examples of which are included in the Complaint) were made to a national audience including Pennsylvania residents and have been repeatedly made. Defendant Rosedale intentionally spoke with national and internet news sources, including bloggers. Those interviews are published and readily accessible to the internet users that Defendant Rosedale is and was attempting to reach. A simply Google search will disclose such statements.

67. Defendant Rosedale did not attempt to prevent his statements from being broadcast to Pennsylvania residents. To the contrary, his statements were made to the entire United States, including Pennsylvania, without limitation.

68. Defendant Rosedale, in addition to publishing his statements in national news sources and internet blogs, also made numerous statements in virtual town hall meetings (through his avatar "Philip Linden") where Pennsylvania residents were permitted to attend (and were not otherwise excluded). I attended such virtual town hall meetings and "heard" Philip Rosedale speak about land ownership. Such meetings are no different than a large conference everywhere at once, with the entire "nation" invited.

69. Defendant Rosedale chose to make the statements personally, as opposed to selecting someone else at the company or issuing the statements through an intermediary / marketing agency. Choosing to "directly" make such representations is not "accidental," but rather strategy chosen by Defendant

Rosedale to further enhance the representations being made about virtual land ownership. Indeed, the strategy closely parallels the use of Bill Gates, Steven Jobs and (in the non-tech arena), Dave Thomas as "corporate leaders" who have intentionally chosen to make representations personally, as opposed through corporate middlemen. I particularly believed the representations because they were being made in personal capacity by Defendant Rosedale, as opposed to simply through corporate "puffery."

70. Based upon information available to me, I believe that Defendant Rosedale initially personally capitalized Defendant Linden and remains the single largest or only shareholder of the company. Defendant Rosedale stands to gain significantly financially from his own representations to consumers.

71. I believe, based upon information available to me, that Defendant Rosedale is not only the CEO, but is the very person that is directing Defendant Linden's overall virtual land ownership representations. I also believe that Defendant Rosedale created the very strategy being utilized by Defendant Linden.

72. Once I purchased virtual land, I had the ability to do whatever I pleased with it, including: leasing it, sub-dividing it for sale and/or developing it. I was freely able to sell my land on the open market to others and, indeed, was encouraged to do so by Defendant Linden. Further, to the extent it was not explicit in my virtual land contracts, implicit was the fact that I would have access to the land for my own use and benefit. Defendant Linden specifically permitted, encouraged, and continues to permit and encourage the sale of virtual land by tax paying land owners to third parties even to the extent of conferring on buyers and sellers the

rights to set their own prices, terms of sale, size of purchase, and not interfering or otherwise controlling or correcting any errors or mistakes, or any fraud or any misrepresentations that occur between land buyers and sellers.

73. Defendants used me and other participants to recruit new participants to Second Life so that defendants would profit.

74. I purchased other virtual items from third parties. I believed that I owned such virtual items. I have no legal recourse against those third parties as those parties did not engage in any wrongful conduct.

75. I believe that I have suffered irreparable harm due to defendants actions.

76. I attempted to remove my U.S. currency from my Linden account but was blocked on approximately 50 occasions.

77. Defendants have been profiting from their wrongful conduct as they, not me, are able to obtain interest and other benefits from the money they took from me.

78. I never consented or otherwise permitted Defendant Linden to confiscate my virtual assets and/or U.S. currency.

79. The virtual land sold to me by Defendant Linden is unique. Like real world land, each piece of land's value is derived from its unique location, setting and development. Each individual piece of virtual land is in a unique location with unique longitude and latitude coordinates on the Second Life "grid" / world map. No two pieces of land occupy the same coordinates or location in the Second Life world. Each piece has a unique name, unique topography, unique environment, and unique value characteristics. Although Defendant Linden continues to create

new land, the land already created remains unique. In many ways, the virtual land in Second Life operates like a domain name.

80. Like real land, location is everything to value; several pieces of virtual land owned by me were in highly developed and highly desirable areas in the Second Life world including many parcels with water and/or rare ocean front pieces. The exact view and location of the ocean front lot cannot be replicated and are unique giving some parcels far greater economic and other irreplaceable value. Those areas generated significant "foot traffic" even before the recent boom in new participants and land price increases that Second Life is currently experiencing. I enjoyed "relaxing" at my ocean front property, watching the virtual sun set and, on clear nights, the rise of the full moon.

81. The virtual land owned by me has not been deleted. In fact, all the land I purchased still exists inside the Second Life world with the same name, gross size, and location despite Defendant Linden wrongfully stripping me of my title to the land I purchased and owned.

82. I had developed a number of businesses on the land owned by me. Those businesses have been interrupted and disturbed. Such an interruption has caused me damages in an amount that cannot be accurately measured. Given the rapid growth of Second Life, it is simply impossible to know what additional income I would have generated from my businesses in Second Life.

83. By stripping me of my title to the land (that I paid for), I have been deprived of rights that inhere in ownership, including the ability to obtain a third-party loan

using the land as collateral or otherwise develop, exploit, rent, or sell my virtual land.

84. Defendant Linden recklessly and maliciously bulldozed all my existing developments including a nearly full condominium development with leased retail stores, an active casino and dance hall, a Venetian-styled town home development with its own separate dance area, interfering with numerous rental contracts for other large pieces of land, interfered with then existing land sales of subdivided land, and interfered with entertainment contracts entered into between me and other third parties.

85. Defendant Linden itself has nearly doubled its selling price for some of the new land it has recently offered to the public in response to the increasing demand it is receiving for virtual land.

86. If this Court grants the injunction, I believe that it will assist other consumers who have also relied upon the same false representations about ownership of virtual land in Second Life. I believe that this Court is in the best position to end the practices of the defendants and prevent them from harming other consumers who are also being taken advantage of and mislead.

87. I know of no harm that will occur to the defendants if they are ordered to return my wrongfully confiscated money and assets to me.

88. All of the virtual land identified and listed by Defendant Linden in Exhibit "3" as "Owned Parcels" was obtained prior to any allegations by Defendant Linden against me. At no point did Defendant Linden ever claim, dispute or inform me

that I was not truly the owner of those "Owned Parcels" listed and identified in Exhibit "3."

89. Attached to the Brief in Support of the Motion is a true and correct copy of the e-mail sent to me following the "taessot" virtual land sale which Defendant Linden claims I obtained by way of "exploit." Although obvious to the Court, nowhere in that e-mail does Defendant Linden state or otherwise imply that I was no longer the owner of the virtual land listed and identified in Exhibit "3." Further, Defendant Linden did not state or otherwise say that they were going to confiscate my virtual land, items and U.S. currency. To the contrary, Defendant Linden advised me that they were providing me a "refund." Rather than doing so as they said they would, Defendant Linden confiscated my belongings and money.

90. Defendant Linden, without my permission and for their own commercial gain, named a virtual piece of land "Bragg" and sold that land at auction. I did not approve or otherwise endorse use of my name by Defendant Linden in that auction.

91. Defendant Linden recently had a widely publicized security issue with Second Life in which it was disclosed that there was a "database breach" that "potentially exposed customer data."

92. Following the filing of this lawsuit, Defendant Linden unilaterally added language to their "Terms of Service" in or about December, 2006 stating "Your intellectual property rights do not confer any rights of access to the Service or any rights to data stored by or on behalf of Linden."

93. All of the exhibits attached to the initial Complaint, Brief in Opposition to the Motion to Compel Arbitration and the Brief in Opposition to the Motion to Dismiss Defendant Rosedale for lack of personal jurisdiction are true and correct copies and have not been altered or changed by me in any way.

94. The initial Complaint was verified by me under the penalties of perjury and is incorporated by reference herein as if more fully set forth at length.

I, MARC BRAGG, ESQ., declare under penalty of perjury that the foregoing is true and correct. Executed on January 23, 2007.

By: _____
Marc S. Bragg, Esq.