BRAGG v. LINDEN RESEARCH, INC. et al                                                                                          Doc. 37 Att. 4
GameSpot: Spot On: Virtual worlds...trouble ahead                                                    Page 1 of 4
Case 2:06-cv-04925-ER    Document 37-5    Filed 02/08/2007    Page 1 of 4



## Spot On: Virtual worlds...trouble ahead

**White paper predicts that conflicts over "ownership" of virtual property will increase and intensify--and will play out soon in a courtroom near you.**

Surely one of the reasons the whole computer game experience is embraced by the millions who amuse themselves online, in single-player experiences, or in group play is that the moments at play so successfully replace the craziness, tedium, and even tragedy of real-world events. But now, the virtual terrain is becoming as complicated as any real-world landscape ever was. The reason? In part, it is due to a theme imported directly from the real world. In a word: ownership.

The topic of virtual-world property and its significance in the real world reached a new and able-to-be-understood-by-the-masses level when *Wired* ran a deceptively light piece by Julian Dibbell in its October 2002 issue. Titled "Unreal Real Estate Boom, or, The 79th Richest Nation on Earth Doesn't Exist," the article profiled "people who buy and sell--for real dollars, and sometimes for a living--imaginary fortresses, weapons, and other figments of the massively multiplayer role-playing game Ultima Online," as Dibbell put it.

The piece--which focused on Ultima Online but could have been about any number of massively multiplayer online role-playing games--wove social commentary and gee-whiz prose together as it profiled a 43-year-old delivery man who bought himself a spread in UO's Britannia for $750 on eBay and a construction worker who by day deftly nails two-by-fours together to build houses and offices and then by night wheels and deals in Britannia's coin of the realm, gold, building his "other" dream house. The subjects were not portrayed as lunatics or loons. On the contrary, the story uncovered the fascination of ownership of virtual property as a viable pastime and enterprise.

Since that *Wired* story, the virtual-property plot has thickened. Currently, the theme of virtual-world economics forms the base of an ongoing debate that takes place in numerous blogs (**Terra Nova** is possibly the most widely read), in academic circles (prompted by the writings of now Indiana University economics professor Edward Castronova, who was also the primary source for Dibbell's *Wired* piece), and in the occasional piece in mainstream publications that looks into the strange and interesting world of real money for fake goods.

The debate over who owns what in persistent-world games got a bit more knotty recently when online gaming consultancy **The Themis Group** released a white paper written by one of its advisory board members, **Richard Bartle**. Bartle is an Essex University principal fellow and author of the 1993 book, Designing Virtual Worlds. He has become one of the most visible commentators on the subject of "ownership" of virtual-world property. For anyone who has kept abreast of the conversation, the complications come as no surprise. As Dibbell wrote recently in his **blog**, "The games we choose for our amusement are becoming so complex, so involving, that the line between gameplay and career, between gameworld and society, begins to blur." According to Bartle, the blurring will get worse before it gets better.

With "The Pitfalls of Virtual Property," Bartle addresses some of the trickier, if not darker, sides of virtual-property ownership, ultimately suggesting that sooner rather than later, today's user-to-user conflicts will end up in court.

The main premise of Bartle's paper is that due to the ongoing and proliferating commodification of virtual-world goods, gamers who vest more and more of their time (which they value) and money (which already has value)

**EXHIBIT 3**

into objects made or otherwise secured online will come up against competing interests. For the uninitiated, Bartle defines commodification as what happens when players treat virtual-world goods as objects of real-world commerce. As a result of an increase in commodification, gamers and the industry, says Bartle, are fast moving toward a breaking point that will likely involve the real-world legal system to sort out the conflicts.

In other words: We're not in Britannia anymore, Blackthorn.

The "coming soon to a federal court near you" scenario, according to Bartle, flows from five pitfalls of virtual property.

Briefly, Bartle sees the debate turning on these five basic issues: The first is the fuzzy concept of virtual property in the first place. Is it at all meaningful, and if it is, is its meaning commonly shared among players, designers, and publishers? Obviously, this question wouldn't translate to being a pitfall if the answer were an easy yes. Bartle suggests that the confusion qualifies as a pitfall due to the "variety of explanations for how players can come to assert that they own virtual objects, none of which are convincing, even in their own terms."

Regarding Pitfall #1, Bartle explains, "What it comes down to is that unless the developers say otherwise, players are paying to manipulate bits in a database, not for the rights to own any data their manipulations affect. They may legitimately say that certain emergent properties of those bits are 'theirs,' but that doesn't mean they own them. You can rent a house, redecorate it with the full permission of the owner, live in it for five years, fill the garden full of flowers, insulate the loft, do a whole bunch of other things, but you don't get to sell it. It's *not yours to sell*." The confusion results in the following, says Bartle. "It activates real-world property laws," and maybe most importantly, "it stops the game being a game."

Pitfall #2 revolves around the presumed responsibility of the developer to ensure that virtual property retains its value. "Virtual objects are no different from real objects in this regard," says Bartle. "Where they do become distinct is that they only have value because of the software that provides their context. If the software were to change the meaning of a virtual object, that object's value would also change." Bartle looks at the demise of Electronic Arts' MMORPG Earth & Beyond and, using that game as an example, asks to what extent is a game's publisher liable for a gamer's loss of real money spent on an in-game object. For example, if at the moment the game was killed, "a player was winning an eBay auction for an E&B character with a bid of $3,000...could it be argued that EA was liable [for the object's loss in value when the game was canceled]?" The answer, suggests Bartle (who comments that this is no idle hypothetical, but, in fact, occurred), is not entirely clear.

Pitfall #3 concerns the way the buying and selling of in-world objects spoils the fun of other gamers. Those two attitudes--the "I play for fun" attitude and the "I play for profit" attitude--are in conflict and will one day combust, with foreseeable *and* negative consequences.

Pitfall #4 is arguably an extension of #3--that player resentment of others will spin out of control and put the world off balance. "When poor people can't even role-play being rich, they're going to be disheartened," Bartle deadpans.

And finally, Pitfall #5 concerns untested issues related to ownership of intellectual property. "IP laws are currently a pitfall for virtual-world developers because they are inadequately stated; until the matter is tested in a court of law, developers and players alike are left wandering in a no-man's-land," says Bartle.

Speaking from his home in the UK, Bartle elaborated further, speculating on what he thinks is the most daunting pitfall of them all, that none of this is certain in the law. "Previously, the law didn't take any notice of this at all," said Bartle. "We all kept out of the way. We [gamers] were like people who flew model airplanes, or read science fiction, or went to country music concerts--all with the same sort of profile. Everyone knows they exist, but they don't necessarily pay them any attention."

What caused the change in attitude? Money. "Now that people have noticed there's lots of money to be made in computer games, [the legal community] is beginning to look at this."

Bartle is concerned that lawyers and judges will be compelled to make precedent-setting decisions that may not reflect what's right for gamers or the industry. According to Bartle, because of the uncertainty of virtual property's status in law, and the fact that the perceived value of virtual property is one that differs from player to player, designer to designer, and publisher to publisher, conflicts that start online will soon end up in court. "Different groups of people involved in virtual worlds want different things, not all of which are necessarily compatible with the wants of others," Bartle says.

At one end of the spectrum is the Star Wars Galaxies perspective (as manifest in the game's End User License Agreement), which discourages such commodification. At the other end of the spectrum is Second Life, which, by design, encourages the mingling of virtual- and real-world currencies. Said Bartle, "What the law really needs to do is to say there are several different kinds of virtual worlds. They should all be able to declare what kind of virtual world they are and be protected as that kind of virtual world under the law."

Sony Online Entertainment, developer of Star Wars Galaxies, is adamantly against such out-of-game buying and selling of objects and declined to comment on the subject for the article, but Second Life creator Philip Rosedale was happy to talk.

Rosedale, one of the founders of the MMORPG Second Life, takes a unique stand, which is reflective of the commodity-building options in his game. "I think the material debate will be between the users who are the ones with stakes themselves." But unlike "the EverQuest situation," as Rosedale puts it, where "scarcity of items drives value," he sees the conflict, for the time being, as staying out of the courts, resulting in "user-to-user arbitration."

"Any system that increasingly allows creative tools to be used by the users will create a situation in which commodity value will be driven by the market rather than inherent scarcity...and when the market is what drives the commodifcation, you can immediately see that the nature of the arbitration and disputes will be more at the level of the market players." A theory perfectly matched for Second Life.

But even in the Second Life universe, "somebody will do something that damages the brand value," predicts Rosedale. "[When] somebody copies [a brand, for example], then the person who built that brand will bring a lawsuit claiming real damages, and they'll show receipts, and they'll show that they went to a currency exchange, and they'll say, 'Here's what I lost and here's what I'm suing for.'"

How soon will that happen? When people are willing to give up the anonymity of the virtual-world universe, says Rosedale–which might not be anytime soon. "That's why this [debate] is so cool. At what point in a dispute are you willing to bring your identity into it, and what's the price to you of that? I'd say for a lot of people, it would be quite high."

Rosedale predicts that "the disputes will probably be resolved in-world, because people value anonymity. If you have to lose anonymity to resolve a dispute, what's the value of that? You may be willing to settle on that basis alone."

Second Life, which supports a universe of gamers that number substantially less than for EverQuest, for example, still does a brisk "business."

Rosedale sales that "in May, Second Life saw 240,000 transactions made between users, with a US dollar value at current exchange rates of about $212,000—with actual profit-taking of about $40,000." Sony has not revealed a similar metric.

Turbine Entertainment executive producer Jessica Mulligan, a respected contributor to the MMORPG genre

who spent years on the Ultima Online team (and did a stint at Themis before her current role at Turbine), referred to a court case in Asia. "In the Chinese case," Mulligan says, "a player sued because someone hacked the server of an MMOG and stole his character's gear. The court ruled that the company was negligent in securing the server and found for the player." But she also refers to a stateside case: "In the US, Black Snow Interactive, a virtual game property broker that was doing a brisk business in Dark Age of Camelot, sued the developer and publisher, Mythic Entertainment, when Mythic shut down their accounts."

The victory in that case, Mulligan explains, was for Mythic, which essentially received judicial notice that the End User License Agreement for Camelot was valid, including the sections regarding Mythic's retaining ownership of all in-game assets and only licensing their use to the player--and forbidding buying and selling of in-game items. "Black Snow's management disappeared after that and [the business] closed down."

Mulligan concluded that the two cases "have more than one facet, [and that the issue] is going to have to be settled in each locality." Mulligan foresees the publisher's End User License Agreement holding sway. "I suspect that in the US, at least, the EULAs will continue to be the guiding force and every one of [the publishers] retain ownership of the assets, with the developer and/or publisher licensing the software to the players for use in the game."

Mulligan continued, "If any court of law here was foolish enough to rule that players actually own the assets the character picks up in the game, such as armor, weapons, et al., most of us would probably shut down the games and go do something else. It opens a whole kettle of fish no one has even begun exploring: If a company launches an MMOG, for example, are they required to keep it open as long as there is even one player still around, regardless of how much money the company might be losing? Or is it enough to just print out the scripting code used to make the object and mail it to the player?"

Is Bartle crying "wolf" needlessly, or does his forecast of legal tussles ahead warrant consideration? His words suggest that even he doesn't know for sure. "The biggest pitfall of virtual property comes from the fact that the concept is so new: there aren't the precedents, either in law or in practice, to be certain how it will finally be managed."

Bartle's **document** is available online, and the debate continues to draw much attention on sites such as Terra Nova. But Bartle is clear on one point: The discussion is not going to play out pretty. Bartle is anything but optimistic for the industry. "Professors at Yale and Harvard looking into cyber-law, as they call it, are prepared," he said. "Unfortunately, they aren't the people who will be approached. The people who will be approached will be the judge out in Santa Monica or someplace that's never heard of virtual worlds. Working with the unknown, while perhaps exciting for those who enjoy gambling, is nevertheless on the whole bad for business."

By Curt Feldman -- *GameSpot*
Posted Jun 30, 2004 10:45 am PT

Story from GameSpot: http://www.gamespot.com/news/6101604.html
Copyright ©2006 CNET Networks, Inc. All Rights Reserved.