## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA
## PHILADELPHIA

MARC BRAGG, Esq., an individual,            CIVIL DIVISION

                    Plaintiff,           No. 06-cv-4925

        v.                          **JUDGE EDUARDO ROBRENO**

LINDEN RESEARCH, INC., a corporation,
and PHILIP ROSEDALE, an individual,

               Defendants.

### PLAINTIFF'S FIRST AMENDED COMPLAINT IN CIVIL ACTION

AND NOW COMES, the Plaintiff, Marc Bragg, Esq., by and through his attorneys, Jason

A. Archinaco, Esq. and the law firm of WHITE AND WILLIAMS, LLP, and avers as follows:

### THE PARTIES

1.      Plaintiff, Marc Bragg (hereinafter "Bragg"), is an adult individual resident of the

County of Chester, Commonwealth of Pennsylvania.

2.      Defendant Linden Research, Inc. (hereinafter "Linden"), is a Delaware

corporation, with a primary business address and at all relevant times, providing its services out

of the State of California at 1100 Sansome Street, San Francisco, CA.  Linden uses the name

"Linden Labs" on the internet to conduct business.

3.      Defendant, Phillip Rosedale, (hereinafter "Rosedale") is an adult individual and a

resident of the State of California with an address of 2717 Pacific Avenue, San Francisco, CA

94115-1129.



**EXHIBIT**

1

## FACTS

## BACKGROUND

4.     Linden operates a massively multiplayer role-playing game ("MMORPG") known as "Second Life" and hosted at http://secondlife.com.

5.     To participate in Second Life, a participant must download Linden's client software and install it on the user's computer. A participant may participate for free, or upgrade to a premium membership.

6.     In Second Life, participants from around the world interact together in a huge "virtual" world / environment.

7.     The virtual world / environment contains many of the real world goods and items from cars to homes to slot machines. Linden represents that it promotes the creation and trade of such goods and items by its participants and refers to such items as "virtual property."

8.     Defendants' computer code was designed and intended to act like real world property that requires the payment of U.S. Dollars to buy, own, and sell that property and to allow for the conveyance of title and ownership rights in that property separate and apart from the code itself, and as such, Plaintiff's rights in the virtual property should be regulated and protected like real world property.

9.     Participants in Second Life create characters called "avatars," develop their own unique reputation and/or buy and sell unique software, encoded and scripted "objects," design numerous creative and unique buildings, clothes, equipment, furnishings, etc., run businesses, and purchase uniquely located and described pieces of "virtual land" from the Defendants.

10.     Although referred to as a "game," Second Life is a business operated to generate a profit for Linden and, upon information and belief, Second Life generates a substantial profit for

Linden and Rosedale.  Rosedale has publicly stated that Second Life is not a game but rather is a "platform."

## VIRTUAL WORLDS

11.     Linden is not the only company that operates a virtual world for a profit and, indeed, the industry has become saturated with such games ranging from Blizzard's Worlds of Warcraft, to Sony's Everquest and Star Wars Galaxies.  However, unlike the industry leaders, Linden is the only MMORPG that represents that its participants retain / obtain ownership rights to the land they purchase from Linden and retain all intellectual property rights for any virtual items or content created by the participant and, indeed, Linden does not even restrict or disclaim such ownership interests in their "Terms of Service" agreement (hereinafter "TOS").

12.     A virtual world is a place one co-inhabits with hundreds of thousands of other people simultaneously. It is persistent and dynamic, in that the world exists independent of any participant's presence (much like the internet does), and in that a participant's actions can permanently shape the world. Even when one is not in the virtual world, the environment continues to exist and changes over time.

13.     Millions of people with Internet connections are now living large portions of their lives, forming friendships with others, building and acquiring virtual property, forming contracts, substantial business relationships and forming social organizations in these virtual worlds.

14.     These millions of individuals are paying substantial sums of money to exist in these virtual worlds; hundreds of millions of dollars flow into the coffers of Sony, Blizzard, and other companies like Linden that provide the servers upon which these virtual worlds reside. World of Warcraft, for example, boasts a subscriber base in excess of 7 million and is believed to be generating revenues in excess of $1 billion annually.

PITDMS 39275v.1

15.     There are no courts, no halls of Congress, and no visible mechanisms for civic governance; however, it is foreseeable to the corporate companies that own these virtual worlds, including Linden, that where large amounts of real money flow, legal consequences must follow and, indeed, Linden enforces its legal rights to payments to which it is entitled, and to protecting its business through real world laws.

16.     In many respects, these virtual worlds exist similar to theme parks such as Disney World.  Thus, although the park itself is an "attraction" in some respects, like Disney World, shops selling merchandise exist and a variety of transactions occur inside the virtual world just like such shops and transactions occur inside Disney World, independent of entrance to the park itself.  Unlike Disney World, where Disney chooses to operate many of the shops and control many of the transactions inside of Disney World, nearly every sale of virtual goods and/or virtual "shops" are operated by the third party individual participants of Second Life, as opposed to Linden itself.  Moreover, just like the transactions that occur inside Disney World are subject to the laws of the United States of America, so too are the transactions that occur inside and in connection with Second Life.

17.     Unlike Disney World, however, Linden has been in the business of selling the land inside the "theme park."  Thus, Linden no longer owns the very world they created, instead choosing to sell the world / land to consumers.  Rosedale has referred generally to Second Life as a "country."   Indeed, the "world" operates similar to a common carrier's network in that large numbers of people can meet, interact and "speak" to one another on such network.

18.     In other respects, Second Life itself is much like Microsoft's Internet Explorer in that it simply gives a participant access to a "world" (like the internet), where the "participant" can enter into a variety of transactions and visit various places.  In many respects, Second Life is

simply a three-dimensional version of Microsoft's Internet Explorer – and the places one can visit using that graphical three-dimensional web browser are simply three dimensional graphical web sites. Rosedale has acknowledged that "Second Life is like the internet but it's 3-D . . . ."

19.    Unlike Microsoft's Internet Explorer, however, participants can "see" the other visitors to various "web sites" and locations and choose to interact with them by "chatting" with them.

20.    This similarity has lead some commentators to note that Second Life is, in actuality, an operating system like Microsoft Windows and is ultimately designed to compete with Microsoft's Windows. Indeed, Rosedale has promoted Second Life as a "platform."

## VIRTUAL ITEM AND PROPERTY OWNERSHIP

21.    Typically, in such virtual worlds, the operators of the worlds claim to not permit the participants to hold any rights to "virtual items" (houses, buildings, cars and other virtual objects) or "virtual land" that exist inside the game world. Both are referred to generally by participants in such worlds as "virtual property."

22.    Indeed, several of such companies, who have not provided any rights to the participants, have threatened lawsuits to prevent the trade and sale of virtual items, land, money and accounts and have attempted to prevent the sale and trade of virtual items, land, money, goods and even the accounts that contain such virtual items, lands, money and goods

23.    Generally speaking, most virtual worlds derive their revenue and profit, not from the sale of virtual items, land, money or goods, but rather from monthly subscription fees paid to the operators of the worlds.

24.    The industry standard has generally been to deny the participants hold any rights in the virtual items, land, money and/or goods that participants hold in their accounts. This

PITDMS 39275v.1

denial is despite the growing body of legal work that sets forth that, irrespective of such company's claims, participants in such worlds can, and do, have rights to their virtual property and any statements or claims to the contrary are unconscionable.

25.    Despite such denials of ownership by participants, the trade of virtual items, land, money and goods is believed, by some estimates, to have approached nearly $1 billion annually and is, in any event, a market and industry valued in excess of $100 million a year.

26.    Further, despite such a prospering "black market" for virtual items, land, money and goods, because such transactions have been branded as "illegitimate" by the operators of many (if not most) of the virtual worlds, many participants in such virtual worlds have refrained from buying or selling virtual items, land, money and goods despite their rights to do so.

27.    In many respects, a golden opportunity existed for some time for any virtual world game company to claim and represent to legitimization of buying and selling of virtual items, land, money and goods by the payment and exchange of U.S. Dollars and claim to preserve and protect the participant's intellectual property and ownership rights in any items or goods created inside the game world by the participant.

## SECOND LIFE'S PLACE IN THE CROWDED MMORPG MARKET

28.    When Second Life was first "opened" by Linden in 2003, the competition in the industry for participants in virtual worlds was fierce and the industry was dominated by well-known players.

29.    Upon information and belief, Linden had difficulty differentiating itself from other, higher profile games and thus, turning a profit for Linden.

30.    Initially, Linden chose the familiar route of refusing to recognize participants' rights to the virtual property in-game.

31.    Second Life, unlike other virtual worlds, was devoid of any name recognition, fancy graphics or exciting game-play.   As such, Second Life generally languished and trailed its peers in terms of number of participants.

32.    As such, desperate for a participant base to generate profits, Linden made a calculated business decision to depart from the industry standard of denying that participants had any rights to virtual items, land and/or goods.  Linden decided that it could maximize its own profits if it, instead, represented to participants in its world that their rights to the virtual items, land and goods held in the participants' accounts would be preserved and recognized for the participants and that participants' intellectual property rights would be preserved.

33.    Rosedale has admitted that the reason the decision to make such representations was because "we couldn't grow as quickly as [Second Life] needed to, we had one round of layoffs.  There were 31 of us and 11 of us left.  That was in late 2003, when **we pretty much thought we were dead**." (emphasis added).  Indeed, Rosedale was concerned specifically about himself as he had invested at least $1 million of his own money in the failing project.

34.    Thus, as Rosedale has admitted, the representation was made to consumers that "What you have in Second Life is real and it is yours.  It doesn't belong to us.  We have no claim to it.  Whatever you do in Second Life is your own intellectual property.  You can claim copyright on it.  You can make money."

35.    Further, Rosedale has admitted the representations with regard to land were identical.  "We said the same thing about land: Land is yours to own and resell. . . . Let's just make this a real world.  Let's let it have a real economy and let's make property have real value."

36.    Linden announced its new business model orally at the "State of Play" conference in or about November, 2003 and followed with a press release reducing those representations to

-7-

writing shortly thereafter, publishing the press release generally and also storing it on Linden's website. The press release, dated November 14, 2003, is entitled "Second Life Residents to Own Digital Creations" and quotes Rosedale through out.

37.   In the November 14, 2003 press release, Linden touted its modifications to Second Life's Terms of Service, stating that "the revised TOS allows subscribers to retain full intellectual property protection for the digital content they create."

38.   In the same press release, Linden, by and through Rosedale, stated: "Until now, any content created by users for persistent state worlds, such as EverQuest or Star Wars Galaxies, has essentially become the property of the company developing and hosting the world," said Rosedale. "We believe our new policy recognizes the fact that persistent world users are making significant contributions to building these worlds and should be able to both own the content they create and share in the value that is created. The preservation of users' property rights is a necessary step toward the emergence of genuinely real online worlds."

39.   Linden's claims to allow Second Life participants to retain their intellectual property rights was even believed by well-known, Stanford University Professor of Law, and Founder of the Stanford Center for Internet and Society, Lawrence Lessig.

40.   Indeed, Lessig had such confidence and belief in the representations made by Linden and Rosedale that he permitted himself to be quoted in the November 14, 2003 press release and stated that: "Linden Lab has taken an important step toward recognizing the rights of content generators in Second Life . . . As history has continually proven, when people share in the value they create, greater value is derived for all. Linden Lab is poised for significant growth as a result of this decision."

41.     As set forth above, even the well known law professor believed the press release and statements of Linden and noted that Linden was "poised for significant growth" as a result of the decision.

42.     Following those representations that were widely regarded as revolutionary to the virtual world industry, Linden's participant base greatly expanded, as predicted by Lessig.

43.     Further, in December, 2003, Linden and Rosedale again decided to attempt to increase the participant base of Second Life by representing that participants could own "virtual land" inside of Second Life.

44.     The representations of Defendants were so successful that Rosedale admits that "The investors could see this thing starting to go.  In early 2004 we got a couple million bucks more."

45.     Linden and Rosedale continued their pattern and practice of representations, not only in the media, but also through press releases stored on Linden's website.  For example, on March 30, 2004, a press release quoting Rosedale was issued called "Now Selling: Real Estate on the Digital Frontier."

46.     The land owned by participants was taxed by Linden.  Indeed, by June 3, 2004, as Rosedale acknowledged to the USA Today in his continued media campaign efforts led by him, the real estate tax revenue on land sold to the participants exceeded the amount the company was generating in subscriptions.

47.     Similarly, in 2004, Rosedale was quoted: "The idea of land ownership and the ease with which you can own land and do something with it… is intoxicating."  Rosedale fully expressed his concept of land ownership by admitting that "land ownership feels important and tangible.  It's a real piece of the future."

48.     Thus, by mid-2004, Linden and Rosedale's representations had caused significant dollars to not only be invested in Second Life, through the purchase of virtual land, but also a significant revenue stream generated from the taxation of that virtual land.

49.     Linden and Rosedale continued their publicity campaign regarding ownership rights in Second Life in an effort to continue increasing the participant base and the profits to both Linden and Rosedale.

50.     Defendants published their representations on the Second Life website, including a section called "Own Virtual Land," which discusses "owning land" in Second Life. Defendants also published on the Second Life website a section entitled "IP Rights," which stated that "Linden Lab's Terms of Service agreement recognizes Residents' right to retain full intellectual property protection for the digital content they create in Second Life . . . . This right is enforceable and applicable both in-world and offline . . . You create it, you own it – and it's yours to do with as you please."

51.     Not only did Defendants succeed through their representations in obtaining more participants, aka consumers, but they also obtained more money per investor.

52.     Thus, on or about October 28, 2004, Defendants announced that they had obtained another $8 million in financing.

53.     Following each advance, Defendants continued with their media campaign of representations of land ownership and intellectual property rights.

54.     On or about June 14, 2005, an interview with Rosedale was published by Guardian Unlimited: Gamesblog.  During the course of that interview, Rosedale represented to the world that participants who purchased land in Second Life owned the land.

PITDMS 39275v.1

55.    In response to a question about the integration of Western Capitalism into the Second Life world, Rosedale represented / stated: "We like to think of Second Life as ostensibly as real as a developing nation…The fundamental basis of a successful developing nation is property ownership…**We started selling land free and clear, and we sold the title, and <u>we made it extremely clear that we were not the owner of the virtual property.</u>**" (emphasis added)

56.    As Linden and Rosedale's representations about ownership of land in Second Life continued, and as Linden and Rosedale continued to represent that the participants in Second Life retained their intellectual property rights, the participant base for Second Life continued to grow, thereby generating more money for Linden and Rosedale.

57.    On September 7, 2005, Defendants issued another press release entitled "Virtual Land Sales and in-world economy driving growth." Rosedale is again quoted in that press release published to the public and stored on Linden's website.

58.    The following day, as of September 8, 2005, Defendants representations with regard to virtual land ownership had been so successful that Linden had eliminated subscription fees. In commenting on the elimination of subscription fees in an article posted at CNET news and in disclosing the profit motive of Defendants, Rosedale stated: "We're going to make more [money] because some people who wouldn't have otherwise signed up are going to buy land . . ."

59.    On October 3, 2005, Defendants issued another press release stating "Second Life Opens The Lindex Currency Exchange." In that press release, Rosedale is again quoted and such press release is archived on the Linden website. The press release generally describes the "currency exchange" as a real currency exchange and does not disclose that it is not really a true currency exchange.

PITDMS 39275v.1

60.    As of March 28, 2006, efforts to convince consumers that they, in fact, would own the land they bought from Defendants, was so successful that a company press release touted that "Second Life has grown to over 165,000 residents with an economy worth over $60mm per year." Linden boasted that "Second Life has enjoyed month over month record growth in subscriber acquisition, its economy and the number of subscribers that are generating profits in US currency."

61.    Further, the March 28, 2006 press release perpetuated Defendants' scheme of associating themselves with well-known and respected figures in an effort to further "legitimize" Defendants' representations they were making to consumers at large. Like the prior press release where Defendants associated themselves with Lawrence Lessig, the respected legal scholar, the March, 2006 press release announced that Linden had obtained $11mm in new financing from Globespan Capital Partners, with participation from Jeff Bezos, the founder of Amazon.com. Linden also noted that other investors, including Mitch Kapor, the founder of Lotus Development Corp., was also involved in their business as an investor. It is believed, and therefore averred, that Defendants have not disclosed to Lessig, Bezos or Kapor that the representations that they make to consumers about land ownership in Second Life are false.

62.    Defendants have aligned themselves in the media with their investors, including Kapor, because as Rosedale states, they are interested in the "social good" of technology.

63.    Even recently, Rosedale represented on April 13, 2006, in an interview with PSFK.com, in response to a question about whether there was any "gray area" with regard to copyright and intellectual property rights in Second Life, that: "Things are pretty clear – as a user, you own what you create in Second Life." Further, In discussing the importance of land ownership and quoting the concepts set forth in Hernando de Soto's "The Mystery of Capital,"

-12-

Rosedale stated: "[S]uccessful countries always start by making sure that people can freely own, resell, and mortgage the real-estate on which they live. This is a Very Big Idea . . . This was one of the key things that drove our ideas around land ownership and the introduction of IP rights."

64.    Thus, Rosedale continued the façade that Plaintiff and other participants actually owned the virtual property they purchased from Defendants and, in explaining that Second Life was akin to a country, added further "credibility" to the representations he and Linden were making to consumers at large.

65.    As is more fully set forth at length herein, it was the following month, in May, 2006, that Defendants simply took Plaintiff's virtual land and other virtual items from him without compensation.

66.    Despite Defendants acts that were inconsistent with their public announcements with regard to virtual land ownership and IP right retention, Rosedale and Linden continued with their public campaign to attract new participants with their promised "utopia" of virtual ownership rights. Approximately two months after stealing Plaintiff's virtual land and property, Rosedale gave a "podcast" interview with After TV on or about July 20, 2006. During that interview, Rosedale continued to reinforce the representations being made. In relevant part Rosedale stated that, "everything inside it [Second Life] is made by the people who are there and in fact, the land itself and the space and everything is owned, controlled and built by the people who are there. . . "

67.    Further, when asked by the reporter about how one goes about "owning land" in Second Life, Rosedale replied "You just buy it." Further, he stated "You buy it generally from other users. You can participate in a land auction and buy it from us . . ."

-13-

68.     Rosedale was also asked: "So your economic model is selling virtual land; do you have an advertising model?"  In response, Rosedale stated, in relevant part: ". . . everyone owns their own stuff, their own property – **there's no way we could just advertise on that property without asking because it isn't ours you know.  It belongs to land owners**." (emphasis added).

69.     Rosedale also admitted in the After TV interview that "The majority of our money is made in recurring fees—think of them being like property taxes that you pay when you own land."

70.     By July, 2006, the representations of Defendants succeeded in growing the participant base to over 300,000 consumers.

71.     Defendants have continued to make their representations to the present – and have succeeded in allegedly obtaining over 1 million participants and over 40,000 land buyers.

72.     Most recently, in February, 2007, Defendant Rosedale appeared on the cover of Inc.  Magazine and had a lengthy "interview" with the magazine.  On the cover, Rosedale reinforced the representations he has been making to consumers, stating: "**What you have in Second Life is real and it is yours.  It doesn't belong to us.  You can make money**." (emphasis added).

73.     As set forth previously, the course of representations by Linden and Rosedale resulted in an increased participant base and more profit for Defendants from each participant.

74.     It is believed, and therefore averred, that following each substantial press release / interview, that the participant base of Second Life spiked and continued to grow.

75.     The announcements and representations of Linden and Rosedale have been very successful for Linden and Rosedale.  Indeed, Linden currently boasts that it has nearly 4 million

-14-

participants (up from less than 200,000 approximately 1 year ago) and generates over $50,000,000.00 U.S. per year in real world dollar transactions.

76.    Rosedale's participation in the repeated representations is a purposeful campaign and is in no way unintentional.  Indeed, it is believed from statements made by Rosedale that he created a press campaign designed to cause consumers to believe: that they own virtual land, they retain their intellectual property rights.  Rosedale's statements have been mirrored by press releases issued by Defendant Linden in which he is quoted.  Further, the press releases, in addition to being intentionally circulated on the internet, are stored on Defendant Linden's website.

## VIRTUAL PROPERTY IN SECOND LIFE

77.    As set forth above and herein, Linden represented that it recognized rights of in-game participants to their virtual items, land, money and goods.   Moreover, Linden represented that it recognized the intellectual property rights of the participants in their creations.

78.    The virtual items created by participants as well as the land owned by the participants is retained, preserved and stored by Linden on its servers.

79.    In other words, a participant's account and valuables of Second Life are stored as electromagnetic records on the Linden's servers.  Defendants are simply paid for that storage and to hold the land and objects in trust for the owners of the virtual items and property.

80.    The owner of the account is entitled to control the account and valuables' electromagnetic record and may freely sell or transfer it.  Although a participant's account and valuables are "virtual," they are valuable property in the real world. Participants can auction them, sell them, license them or transfer them online and through other third independent parties, like eBay.com, slexchange.com, and others.

-15-

81.    A participant can sell any code / virtual items they offer; may restrict the code so the purchaser cannot modify it, resell it or transfer it at all; alternatively, participants may author code that allows the buyer to resell it that may require the buyer to pay the seller for each such sale.

82.    Simply put, the system of transferring the virtual items and objects created by a participant mirrors that of the real world in nearly every respect.  As set forth previously, similar to a store that exists inside Disney World, participants list and sell their goods and virtual items for sale or trade.

83.    A participant's accounts and valuables are the same as its property in the real world.

84.    A participant's interests in these virtual items, objects and properties persist regardless of the system currently connected to it, separate from the intellectual property that exists in Defendants' underlying code, much similar to a document or book simply created with a program such as Microsoft Word.  Indeed, some commentators have noted that Second Life is, in essence, simply an "operating system" similar to Microsoft Windows.

85.    A participant can invite people into his virtual property, hold meetings in it, invest in it, and sell it to other people who might want to do the same independent of and regardless of the intellectual property that exists in Defendants' code.

86.    Accordingly, Plaintiff's virtual property rights are divisible and severable from the rights of other participants in the game and the owner of the server upon which Defendants' code resides.

87.     These virtual properties, both the virtual land and the virtual objects, have value in real U.S. Dollars across the globe measuring in the billions of dollars including millions of participants.

88.     Defendants intended their code and their public statements regarding ownership and use rights of the land and objects to materially induce Plaintiff, as well as thousands of other participants, to invest real U.S. Dollars in purchasing land, and buying and selling the objects described above, and Defendants have actively encouraged participants to do so.

89.     Because of Defendants' transfer of title and ownership interests to Plaintiff in his virtual assets, and Defendant's creation of a market economy in which Plaintiff's property interests may be sold for real cash value, expectations that these virtual assets constitute property are entirely foreseeable, in addition to the representations made by Linden and Rosedale specifically providing for such property rights and the preservation of the same.

90.     Along with Defendants' promise of the transfer of title to Plaintiff of the title to his land and the ownership rights to his copyright and intellectual property creations, Defendants' virtual world possesses all of the real world features of exclusive ownership; persistence of rights, transfer under conditions of agreement and duress, free alienability of title, and a currency system to support trade in these property-based assets, including the buying and selling of these assets with U.S. currency. Private property is the default in Defendants' service, providing its customers with a bundle of rights, including the fundamental rights to use, exclude and transfer property interests.

-17-

## VIRTUAL PROPERTY IN SECOND LIFE – PROPERTY OWNERSHIP

91.     For a participant to purchase and own land in Second Life, the participant must upgrade to a premium membership and pay a monthly "tier," or tax which varies in amount depending on the amount of land the participant owns.

92.     A participant may then, in his unbridled discretion and control, split the land into varying sizes and parcels, resell it to other participants and convey title, retain it, build upon it, restrict what can be built upon it, change the shape of the land, i.e. "terraform" it, rent it, lease it, and / or exclude all participants, or just some participants from trespassing upon it.  While Linden continues to create "new" land, once land is created and/or sold to a participant, it continues to exist and is not "deleted" or otherwise destroyed.  It is unique, just like real land.

93.     To obtain premier accounts, participants are required to provide Defendants with private and confidential information including a credit card number and associated information so it can be charged, or a PayPal account to debit.  Defendants retain participants' personal information on their servers.

94.     Participants access their personal account information, purchase "lindens" (the in-game money), buy and sell lindens for U.S. currency, pay for land, and monitor their accounts via the Internet.  A currency exchange is maintained that sets, just like any other currency exchange, the exchange rate between "lindens" and U.S. currency.  Third parties also provide for additional currency exchanges between "lindens" and U.S. currency, including ebay.com.

95.     Defendants' website expressly states that a participant may cancel an account at any time and leads participants to believe that upon canceling, their private account information, such as their credit card information or PayPal account information, will be destroyed and no longer used or retained or made available to the public.

-18-

## MARC BRAGG IS INDUCED INTO "PARTICIPATING" IN THE SECOND LIFE WORLD

96.     Plaintiff is an individual who signed up and paid Defendants to participate in Second Life in or about November / December 2005.

97.     Having had prior interest in developing real estate, Bragg was interested in developing the real estate in Second Life upon learning that Defendants had represented that title to the land and all associated ownership rights would pass to the buyer of that land and did so for primarily personal, family and/or household purposes.

98.     Plaintiff was induced into "investing" in and purchasing virtual property from Linden and Rosedale by the representations made by Linden and Rosedale in press releases, interviews and through the Second Life website.

99.     Plaintiff believed the representations made by Linden and Rosedale and justifiably relied upon them.  Indeed, there was nothing to make Plaintiff suspect that the representations being made by Linden and Rosedale were false.

100.    By promising Plaintiff that he would receive and retain all right, title, interest, copyright and intellectual property rights to the land, objects and virtual property Plaintiff purchased and/or created in Second Life, Defendants intended to and did in fact deceptively induce Plaintiff to invest thousands in U.S. Dollars via the wires and mails crossing state lines.

101.    Indeed, over the course of his participation in the game, Plaintiff acquired a significant amount of virtual property from Defendants, or others in-game, as set forth and more fully described in Exhibit "1" attached hereto.

102.    Further, Plaintiff acquired a number of virtual items from independent third parties.

PITDMS 39275v.1

## SECOND LIFE'S AUCTION OF LAND

103.    Defendants generally sell their lands via auctions hosted on Defendants' website.

104.    On their website, Defendants identify various ways to discover which pieces of virtual land, or "sims," are being auctioned; (1) by reviewing the list posted on the secondlife.com website to see land currently on the auction block; and (2) by looking in-game at the land that has been set as a blue square by Defendants.

105.    Defendants used the same color blue for their "sims" to identify three different states of that land:

a.    Land that was currently on the auction block;

b.    Land that was intended to be auctioned once a participant initiated the auction;

c.    Land that was not on the auction block and where the auction could not be initiated by a participant.

106.    Defendants' FAQ on auctions advised a participant that, in order to find land intended to be auctioned or on the auction block, to go in-game to the Map provided by Defendants showing the squares set in blue by Defendants to determine which "sims" are to be auctioned.

107.    Any participant that would go in-game to those blue squares could obtain data associated with that particular blue square via the tools provided by Defendants. That data included the land size, name of the "sim," and a unique auction ID (which is the number associated in the auctions for that particular "sim").

108.    If a participant wanted to bid on an auction, Defendants provided unique auction pages for each piece of land being auctioned, which allowed the participant to enter the amount they intended to bid, confirm the bid, advising the participant that any bid won constituted a

"legal and binding contract," and then once bid, posting the amount bid on that auction page for anyone to review and bid against.

109.    A participant was allowed to either go to the auctions listed by Defendants on their ongoing auction page and bid there, or to enter the unique auction ID number in the URL provided by Defendants for auctions, and by so doing, initiate an auction for only those blue squares set by Defendants allowing the initiation to occur.

110.    Moreover, a participant could go to Google.com and conduct a search by entering the query "second life auctions [sim name or id number]" and Google would return a link to the various auctions; both those that were ongoing, having been initiated by Defendants and those where participants could initiate the auction.

111.    In all cases, the auction would then run for 48 or 72 hours at which time anyone else who was aware of the auction and wanted to bid on the land was free to do so.

112.    Once auctions were won, participants were charged for the purchase of the land at the final bid price via their credit cards and/or PayPal accounts, or by deducting the U.S. currency in their accounts then held in trust by Defendants for such purposes.

113.    Moreover, once the auction closed, the name of the "sim," winning participant's name, and final amount bid were displayed on the "secondlife.com" website.

114.    At no point prior to, during or following the sale of the virtual property via the auctions, did Defendants advise Plaintiff, nor any participant for that matter, that their public representations that Plaintiff would own all right, title and interest in such land were false or otherwise misleading.  Indeed, Defendants continued their ruse and caused Plaintiff to believe that the virtual land sold to Plaintiff by Defendants and all right, title and interest to such land had been transferred or otherwise provided to Plaintiff.

-21-

115.    Defendants' auctions, being held in California, are controlled by California Civil Code §1812.600 et seq., the statute relating to auctions held in California.

116.    Each and every virtual land purchase, independently, was a valid and enforceable contract for which Plaintiff paid valuable consideration either from Defendants or from third-parties in-game.

117.    Plaintiff deposited real world money with Linden to obtain the land.

118.    After upgrading to a premium account, Plaintiff paid real world money as "tax" on that land.

119.    Plaintiff trusted and believed that the money he deposited with Linden, as well as the money he invested in the virtual property, could not and would not be stolen or otherwise converted by the Defendants.  Further, Plaintiff trusted and believed that Linden's representations that Plaintiff would retain all of his intellectual property rights were true and that Defendants would not interfere in the use and/or exercise of those rights.

**"[Y]OU CAN'T FOR EXAMPLE JUST TAKE SOMEONE ELSE'S PROPERTY IN SECOND LIFE", (PHILIP ROSEDALE, JULY 20, 2006), i.e.  LINDEN STEALS BRAGG'S PROPERTY**

120.    In or about April, 2006, Bragg had significantly grown his real estate holdings as well as his own virtual goods, items and content that he had created and offered for sale.  Indeed, not only had Bragg purchased numerous parcels of land from Defendants, but he had also created content such as "fireworks" that Plaintiff offered for sale and did sell to other participants. Plaintiff had also acquired numerous other virtual items from third-parties, independent of Defendants.

121.    Bragg learned through other participants, messages posted by Defendants' agents in Defendants' forums on Defendants' website, and by Defendants' agents in forums hosted by

-22-

Linden Labs that there was more than one way to purchase land from Defendants via Defendants' auctions.

122.    Until April, 2006, Bragg had acquired all land he purchased via ongoing auction or other sellers within Second Life.

123.    On or about April 30, 2006, Bragg bid on and subsequently won the bid on a piece of virtual land named "Taessot." Bragg paid Defendants $300.00 in U.S. currency for that land, which amount Defendants accepted per the terms of their "legally binding contract" and then transferred title to Bragg. The purchase of the land was memorialized on Defendants' closed auction list reflecting the price paid.

124.    On or about May 2, 2006 or May 3, 2006, however, Bragg received an e-mail from "Jack Linden," a Linden agent, employee and/or servant, advising Bragg that the Taessot land had been purchased using an "exploit" in the system, and accordingly, the land had been taken away from Bragg and further, that Bragg would receive his $300.00 U.S. currency refunded to him.

125.    The statements of the Linden agent were a lie.  While Defendants did remove Bragg's name from the title to the Taessot land, they failed and subsequently refused to return Bragg's $300 that they had agreed to refund.

126.    Even worse and deceptive, Linden "froze" Bragg's account preventing him from accessing the account to use, cancel or modify it.  In essence, Linden prevented Bragg from accessing any of his items, land or goods to which he had all rights, title and interest.  Moreover, despite preventing Bragg access to his items, land and goods, Linden continued to charge Bragg a "tax" on the land he owned and, also, refused to relinquish Bragg's credit card information.

127.    In the ultimate act of deception and fraud, Linden, without any right to do so or any consent from Bragg, removed Bragg's name from all other land owned by Bragg as described in Exhibit "1." Moreover, Linden proceeded to convert the title and all associated value away from Bragg without notice, process of any kind, reimbursement, or consideration of any kind.

128.    Bragg repeatedly tried to contact Defendants Linden and Rosedale, but he received absolutely no response nor communication regarding the auctions or the seized assets until he was finally contacted by Linden's legal counsel, who promised to "get back to him" with information regarding the situation, but never did.

129.    Such actions were taken despite Rosedale's specific admission and statement on July 20, 2006 that "**you can't for example just take someone else's property in Second Lif**e." (emphasis added).  Moreover, Rosedale's comment was made in the context of him referring to such an act as a **crime**.  Rosedale's statements are an admission against he and Linden that Defendants acts were improper and, in fact, a crime and that Rosedale and Linden considered such acts to be criminal.

130.    The land that Bragg owned was taken from him but not "deleted" from the game world.  Indeed, had Linden done so, it would have undermined their own plan to enrich themselves at the expense of Plaintiff.  See, Exhibit "2," map of Second Life world, attached hereto.

131.    In so wrongfully taking Bragg's land, Defendants also removed, retained, and/or converted all other personal property and objects then owned by Bragg in-game, all of which Bragg had purchased with U.S. currency, and all of which, including the land, had real value and could have been sold to multiple ready, willing and able buyers.  Bragg was never offered the

-24-

opportunity to do so.  Defendants also interfered and prevented Plaintiff from exercising his

rights to sell and/or otherwise trade his "fireworks" and other content created by him and, in

which, he retained all intellectual property rights.

132.    Defendants took, retained and converted Bragg's virtual property, without just

cause, excuse or notice of any kind, including his virtual land, buildings, businesses, code

scripted objects, and linden dollars all of which had been purchased with real world U.S. dollars

as a result of Defendants' fraudulent representations.

133.    Moreover, Bragg had a significant amount of U.S. currency in his account,

approximately $2000.  Linden simply took this money, along with all of Bragg's other

possessions.  Despite approximately fifty (50) attempts to withdraw his money from the account,

Linden blocked those attempted transactions and prevented Bragg from transferring any of his

money.

134.    With regard to the land owned by Bragg and wrongfully confiscated and taken by

Linden, Defendants listed the property at auction and sold it to the highest bidder.

135.    In the ultimate act of fraudulent bravado, Defendants kept the proceeds of the

auctions of Bragg's land for themselves and provided none of the money to Bragg.  In essence,

Defendants doubled their own profits by charging twice for the same land – and unjustly

enriching themselves at the expense of an unsuspecting consumer who had been defrauded.

136.    Thus, not only did Defendants "eject" Bragg from their "Disney World," but

before doing so, they confiscated all the goods he had purchased at the stores, refused to refund

his money for the purchases, re-listed the purchased goods for re-sale, resold the goods to third

parties, did not provide the proceeds to Bragg (keeping it for themselves) and – to top it off –

simply took his other possessions as well as his wallet (with all his U.S. currency in it) that Bragg had, evidently, made the serious mistake of bringing into the "park" with him.

137.    Defendants' conduct, as described, is part of a continuing and systematic plan and scheme using the national wires and mails intended to, and in fact, defrauding Plaintiff, and other similarly situated consumers, out of thousands of dollars by promising to preserve and/or otherwise provide rights that the Defendants do not provide, never intended to provide, and, indeed, lie about to potential participants.

138.    The utopia of Second Life and the promise by Defendants to potential participants that they will retain all rights, title and interest in the virtual land, property and goods was a lie. Apparently, Defendants never intended to perform according to their promises and representations.

## **"THE LIQUIDITY EVENT"**

139.    Defendant Linden has recently announced that it was "open sourcing" its software platform.

140.    Indeed, Mitch Kapor, board chairman of Linden, has discussed the concept in terms of a "liquidity event", i.e., taking the company public where he, Rosedale and other insiders will likely make a substantial profit from the public offering of the company.

141.    In so announcing, Kapor also announced that Defendant Linden was moving its business model away from their land sales business model as Defendant Linden hopes to aim for over 100 million servers running on its platform.

142.    Commentators have noted that the net effect of such a decision is, in essence, the long term devaluation of all the land purchased by consumers to zero, as now any individual can simply hook up a server to the Linden "platform" and create their own land.

PITDMS 39275v.1

143.    Thus, although Defendant Linden continues to host auctions for land and continues to expressly state and otherwise imply that the virtual land they are selling is "owned" by the participants and has value, the land does not given the profit decisions Defendants are now making for their own benefit.

144.    Indeed, if Defendants' claim to be advancing the interests of "shareholders", they intend not to honor the representation of land ownership and, instead, seek to retain the right to devalue the land and/or otherwise impermissibly and improperly convert consumers money through their false representations.

145.    Irrespective of any duties that Defendant Linden's management may have to shareholders, it is simply impermissible to allow Defendants to defraud consumers to maximize their own profits at the expense of such consumers through repeated false statements.

146.    Kapor claims the Defendants have made a "clearly stated intent" to move away from the land sale business.  To the contrary, prior to Kapor's statements, the intent of the Defendants in defrauding consumers was never stated and was and has been in fact, concealed.

147.    Indeed, despite Kapor's statements to a media outlet in an interview, the Defendants have never publicly announced to consumers that they intend on devaluing the land for which consumers have paid large sums of money to Defendants.

148.    The sad reality is that Defendants are simply planning a return to their original business model, i.e., that consumers truly own nothing through deceit.

149.    The business model of Defendant Linden is, thus, modeled after a real world dictatorship that causes investors to build an infrastructure in the country claiming there are "ownership" rights where the true but secret intent is actually to nationalize the assets and infrastructure built by the "investors" or in actuality unsuspecting consumers.

-27-

150.    Kapor has acknowledged specifically that such decisions will cause a devaluation of the money invested by consumers and has stated that Defendant Linden needs to engage in a "managed transition" and it would be "insanely stupid to do it any other way". Kapor has also stated that there will be "plenty of advance notice."

151.    Indeed, there is no advance notice, given that Plaintiff and numerous other consumers have already invested their time and money based on one set of representations. Indeed, what Kapor is talking about is not "notice" at all but Defendant Linden simply unilaterally changing the deal after the fact and imposing new terms upon consumers to the consumer's detriment.

### "THE CURRENCY EXCHANGE"

152.    Defendant Linden operates a currency exchange. Indeed, Defendant portrays to consumers that it is truly a currency exchange. In truth, it is not really a currency exchange but instead a way to simply take consumers money, devalue it and not return the money to consumers.

153.    At least one knowledgeable expert has written a detailed analysis that suggests that Defendant Linden is either a ponzi / pyramid scheme or a High Yield Investment Program, which inevitably become ponzi / pyramid schemes. See, Capitalism 2.0, The Linden Dollar Game article, attached hereto as Exhibit "4."

154.    Thus, contrary to the representations of Defendants that they are operating a true "currency exchange," the reality is that they are not operating such an exchange.

### SECOND LIFE'S ATTEMPTED FINE PRINT, AKA THE TERMS OF SERVICE AGREEMENT ("TOS")

155.    Defendants provide what is known as a Terms of Service Agreement ("TOS"). Although referred to as a TOS, the reality is that the "agreement" is nothing more than a contract

-28-

of adhesion. Like many participants, Bragg never read the TOS although he was forced to click the "accept" button to gain access to his virtual property, land and items.

156. Defendants' TOS is very similar, in essence, to the fine print on the back of a ticket checking your automobile with a valet or, similarly, entrance to a theme park.

157. Like the unconscionable terms contained within such contracts of adhesion that provide the potential participant with absolutely no negotiating leverage, the Linden TOS is similarly drafted in such an unconscionable, heavy handed way. Moreover, the TOS is consistently changed and, despite the fact that a participant may "join" while one TOS is in "effect" and may have already "invested" thousands of dollars based on one TOS, the participant is forced to "accept" any revised TOS to gain access to his virtual property, land and items. Thus, Linden simply unilaterally imposes any contract terms on the participant without regard to whether the participant signed up under a different TOS and does so without consideration.

158. Further, like such fine print upon access to a theme park, the TOS is naturally limited and cannot possibly apply to any valid transaction that occurs within the theme park itself. Thus, similar to operating shops inside of Disney World (selling all types of goods and items), many operated by Disney itself, and others operated by third parties, the laws of the United States of America do not cease to exist inside of a theme park like Disney World, irrespective of any fine print on the back of a ticket providing access to Disney World. Indeed, such fine print could not possibly operate to suspend the laws of the United States inside of Disney World, nor the transactions that occur inside its "walls." Equally, no fine print provided by Defendants could possibly operate to suspend the laws of the United States inside of Second Life.

PITDMS 39275v.1