IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |   |
|---|---|---|
| MARC BRAGG, | : | CIVIL ACTION |
|  | : | NO. 06-4925 |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| LINDEN RESEARCH, INC. and | : |  |
| PHILIP ROSEDALE, | : |  |
|  | : |  |
| Defendants. | : |  |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    May 30, 2007

This case is about virtual property maintained on a
virtual world on the Internet.  Plaintiff, March Bragg, Esq.,
claims an ownership interest in such virtual property.  Bragg
contends that Defendants, the operators of the virtual world,
unlawfully confiscated his virtual property and denied him access
to their virtual world.  Ultimately at issue in this case are the
novel questions of what rights and obligations grow out of the
relationship between the owner and creator of a virtual world and
its resident-customers.  While the property and the world where
it is found are "virtual," the dispute is real.

Presently before the Court are Defendants' Motion to
Dismiss for Lack of Personal Jurisdiction (doc. no. 2) and Motion
to Compel Arbitration (doc. no. 3).  For the reasons set forth
below, the motions will be denied.

Dockets.Justia.com

I.    **BACKGROUND**

A.    Second Life

The defendants in this case, Linden Research Inc. ("Linden") and its Chief Executive Officer, Philip Rosedale, operate a multiplayer role-playing game set in the virtual world[1] known as "Second Life."[2]  Participants create avatars[3] to represent themselves, and Second Life is populated by hundreds of thousands of avatars, whose interactions with one another are limited only by the human imagination.[4]  According to Plaintiff, many people "are now living large portions of their lives,

---

[1]    The virtual world at issue is an interactive computer simulation which lets its participants see, hear, use, and even modify the simulated objects in the computer-generated environment.  See Woodrow Barfield, Intellectual Property Rights in Virtual Environments: Considering the Rights of Owners, Programmers and Virtual Avatars, 39 Akron L. Rev. 649, 649 (2006) (defining virtual world).

[2]    Second Life is hosted at http://secondlife.com.

[3]    The term "avatar" derives etymologically from the Sanskrit word for crossing down or descent and was used originally to refer to the earthly incarnation of a Hindu deity. Webster's II New Riverside University Dictionary 141 (1998). Since the advent of computers, however, "avatar" is also used to refer to an Internet user's virtual representation of herself in a computer game, in an Internet chat room, or in other Internet fora.  See Wikipedia, Definition of Avatar, available at http://en.wikipedia.org.

[4]    Judge Richard A. Posner has apparently made an appearance in Second Life as a "balding bespectacled cartoon rendering of himself" where he "addressed a crowd of other animated characters on a range of legal issues, including property rights in virtual reality."  Alan Sipress, Where Real Money Meets Virtual Reality, the Jury is Still Out, Washington Post, Dec. 26, 2006, at A1.

forming friendships with others, building and acquiring virtual property, forming contracts, substantial business relationships and forming social organizations" in virtual worlds such as Second Life.  Compl. ¶ 13.  Owning property in and having access to this virtual world is, moreover, apparently important to the plaintiff in this case.

     B.   <u>Recognition of Property Rights</u>

       In November 2003, Linden announced that it would recognize participants' full intellectual property protection for the digital content they created or otherwise owned in Second Life.  As a result, Second Life avatars may now buy, own, and sell virtual goods ranging "from cars to homes to slot machines." Compl. ¶ 7.[5]  Most significantly for this case, avatars may purchase "virtual land," make improvements to that land, exclude other avatars from entering onto the land, rent the land, or sell the land to other avatars for a profit.  Assertedly, by recognizing virtual property rights, Linden would distinguish itself from other virtual worlds available on the Internet and thus increase participation in Second Life.

---

    [5]   Although participants purchase virtual property using the virtual currency of "lindens," lindens themselves are bought and sold for real U.S. dollars.  Linden maintains a currency exchange that sets an exchange rate between lindens and U.S. dollars.  Third parties, including ebay.com, also provide additional currency exchanges.

Defendant Rosedale personally joined in efforts to publicize Linden's recognition of rights to virtual property. For example, in 2003, Rosedale stated in a press release made available on Second Life's website that:

> Until now, any content created by users for persistent state worlds, such as Everquest® or Star Wars Galaxies™, has essentially become the property of the company developing and hosting the world. . . .  We believe our new policy recognizes the fact that persistent world users are making significant contributions to building these worlds and should be able to both own the content they create and share in the value that is created.  The preservation of users' property rights is a necessary step toward the emergence of genuinely real online worlds.

Press Release, Linden Lab, <u>Linden Lab Preserves Real World Intellectual Property Rights of Users of its Second Life Online Services</u> (Nov. 14, 2003).  After this initial announcement, Rosedale continued to personally hype the ownership of virtual property on Second Life.  In an interview in 2004, for example, Rosedale stated: "The idea of land ownership and the ease with which you can own land and do something with it . . . is intoxicating. . . .  Land ownership feels important and tangible. It's a real piece of the future."  Michael Learmonth, <u>Virtual Real Estate Boom Draws Real Dollars</u>, USA Today, June 3, 2004. Rosedale recently gave an extended interview for Inc. magazine, where he appeared on the cover stating, "What you have in Second Life is real and it is yours.  It doesn't belong to us.  You can

make money." Michael Fitzgerald, <u>How Philip Rosedale Created Second Life</u>, Inc., Feb. 2007.[6]

Rosedale even created his own avatar and held virtual town hall meetings on Second Life where he made representations about the purchase of virtual land. Bragg Decl. ¶ 68. Bragg "attended" such meetings and relied on the representations that Rosedale made therein. <u>Id.</u>

C.    <u>Plaintiffs' Participation in Second Life</u>

In 2005, Plaintiff Marc Bragg, Esq., signed up and paid Linden to participate in Second Life. Bragg claims that he was induced into "investing" in virtual land by representations made by Linden and Rosedale in press releases, interviews, and through the Second Life website. Bragg Decl. ¶¶ 4-10, 65-68. Bragg also paid Linden real money as "tax" on his land.[7] By April 2006,

_____

[6]    Plaintiff has inundated the Court with press releases, newspaper articles, and other media containing representations made by Rosedale regarding the ownership of property on Second Life. Plaintiff states in an affidavit that he reviewed and relied on some of these representations. Bragg Decl. ¶¶ 4-10, 65-68. It is of no moment that Plaintiff did not rely upon every single representation that Rosedale ever made regarding ownership of virtual property on Second Life. The immense quantity of such representations is relevant to showing that these are not isolated statements, but rather, part of a national campaign in which defendant Rosedale individually and actively participated.

[7]    Linden taxes virtual land. In fact, according to Bragg, by June 2004, Linden reported that its "real estate tax revenue on land sold to the participants exceeded the amount the company was generating in subscriptions." Compl. ¶ 42.

Bragg had not only purchased numerous parcels of land in his Second Life, he had also digitally crafted "fireworks" that he was able to sell to other avatars for a profit.  Bragg also acquired other virtual items from other avatars.

The dispute ultimately at issue in this case arose on April 30, 2006, when Bragg acquired a parcel of virtual land named "Taessot" for $300.  Linden sent Bragg an email advising him that Taessot had been improperly purchased through an "exploit."  Linden took Taesot away.  It then froze Bragg's account, effectively confiscating all of the virtual property and currency that he maintained on his account with Second Life.

Bragg brought suit against Linden and Rosedale in the Court of Common Pleas of Chester County, Pennsylvania, on October 3, 2006.[8]  Linden and Rosedale removed the case to this Court (doc. no. 1) and then, within a week, moved to compel arbitration (doc. no. 3).

## II.  MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

---

[8]    Bragg's complaint contains counts under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. (Count I), the California Unfair and Deceptive Practices Act, Cal. Bus. & Prof. Code § 17200 (Count II), California Consumer Legal Remedies Act, Ca. Civ. Code § 1750, et seq. (Count III), fraud (Count IV), the California Civil Code § 1812.600, et seq. (Count V), conversion (Count VI), intentional interference with a contractual relations (Count VII), breach of contract (Count VIII), unjust enrichment (Count IX), and tortious breach of the covenant of good faith and fair dealing (Count X).

Defendant Philip Rosedale moves to dismiss all claims asserted against him for lack of personal jurisdiction.

### A.    Legal Standards

A federal district court may exercise jurisdiction to the same extent as the state in which it sits; a state, in turn, may exercise jurisdiction over a non-resident defendant pursuant to its so-called "long-arm statute."  Because the reach of Pennsylvania's long-arm statute "is coextensive with the limits placed on the states by the federal Constitution," the Court looks to federal constitutional doctrine to determine whether personal jurisdiction exists over Rosedale.  Vetrotex Certainteed Corp. v. Consol. Fiber Glass Products Co., 75 F.3d 147, 150 (3d Cir. 1996); 42 Pa. C.S.A. § 5322(b).

Personal jurisdiction can be established in two different ways: specific jurisdiction and general jurisdiction. See Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-16 (1984).  Specific jurisdiction is established when the basis of the "plaintiff's claim is related to or arises out of the defendant's contacts with the forum."  Pennzoil Products Co. v. Colelli & Assoc., Inc., 149 F.3d 197, 201 (3d Cir. 1998) (citations omitted).  General jurisdiction, on the other hand, does not require the defendant's contacts with the forum state to be related to the underlying cause of action, Helicopteros, 466

-7-

U.S. at 414, but the contacts must have been "continuous and systematic."  Id. at 416.

Bragg does not contend that general jurisdiction exists over Rosedale.  Rather, he maintains that Rosedale's representations support specific personal jurisdiction in this case.[9]  The Court therefore need only address whether specific jurisdiction exists.

In deciding whether specific personal jurisdiction is appropriate, a court must first determine whether the defendant has the minimum contacts with the forum necessary to have reasonably anticipated being haled into court there.  Pennzoil, 149 F.3d at 201 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980)).  Second, once minimum contacts have been established, a court may inquire whether the assertion of personal jurisdiction would comport with traditional conceptions of fair play and substantial justice.  Id. at 201 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) and Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)). The first step is mandatory, but the second step is discretionary.  Id.

After a defendant has raised a jurisdictional defense, as Rosedale has in this case, the plaintiff bears the burden of

---

[9]     In the conclusion of the argument section of his brief, for example, Bragg argues that Rosedale's "representations and inducements properly form the basis of specific jurisdiction against Defendant Rosedale."  Pl.'s Resp. at 14.

coming forward with enough evidence to establish, with reasonable particularity, sufficient contacts between the defendant and the forum.  <u>Provident Nat'l Bank v. Cal. Fed. Savings & Loan Assoc.</u>, 819 F.2d 434, 437 (3d Cir. 1987).  "The plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence. . . . [A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction."  <u>Patterson by Patterson v. F.B.I.</u>, 893 F.2d 595, 604 (3d Cir. 1990).  "Once the motion is made, plaintiff must respond with actual proofs not mere allegations." <u>Id.</u>

       B.   <u>Application</u>

      In support of the Court's exercising personal jurisdiction over Rosedale, Bragg relies on various representations that Rosedale personally made in the media "to a national audience" regarding ownership of virtual property in Second Life.  Bragg maintains that Rosedale made these representations to induce Second Life participants to purchase virtual property and that such representations in fact induced Bragg to do so.  Bragg also relies on the fact that he "attended" town hall meetings hosted in Second Life where he listened to Rosedale make statements about the purchase of virtual land.

1.  <u>Minimum Contacts</u>

The first question the Court must answer, then, is whether Rosedale has minimum contacts with Pennsylvania sufficient to support specific personal jurisdiction.  The Court holds that Rosedale's representations--which were made as part of a national campaign to induce persons, including Bragg, to visit Second Life and purchase virtual property--constitute sufficient contacts to exercise specific personal jurisdiction over Rosedale.

<u>Wellness Publishing v. Barefoot</u> provides useful guidance, albeit in a non-precedential opinion.  128 Fed. App'x 266 (3d Cir. 2005).  In that case, the Third Circuit recognized that an advertising campaign of national scope could not, on its own, provide the basis for <u>general jurisdiction</u> in any state where advertisements were aired, but that under the appropriate circumstances, such contacts could provide the basis of exercising <u>specific jurisdiction</u> over a defendant in a particular state where the advertisements were aired.  <u>Id.</u>[10]

---

[10]    The Supreme Court has also held, under different circumstances, that defamatory statements distributed in the national media may support specific personal jurisdiction where those statements are relevant to a plaintiff's claims.  In <u>Calder v. Jones</u>, a Californian plaintiff sued a group of Floridian defendants for placing a defamatory article about her in a nationally circulated publication.  465 U.S. 783, 788-89 (1984).  The plaintiff claimed that the defendants should be subject to jurisdiction in her home state of California.  <u>Id.</u>  The Supreme Court held that, because the defendant's intentional and allegedly illegal actions were expressly aimed at California and

In <u>Barefoot</u>, a group of defendants produced infomercials for calcium supplements and related products that ran nationally, including in New Jersey. <u>Id.</u> at 269. The defendants also processed telephone orders for products promoted in the infomercials. <u>Id.</u> The District Court dismissed the plaintiff's case for lack of personal jurisdiction in New Jersey. <u>Id.</u> at 270. On appeal, however, the Third Circuit reversed, holding that specific personal jurisdiction existed over the defendants that ran the infomercials in New Jersey. <u>Id.</u> In doing so, it analogized the defendants' promotional activities to the maintenance of a website. <u>Id.</u> (citing <u>Toys "R" Us, Inc. v. Step Two, S.A.</u>, 318 F.3d 446, 452 (3d Cir. 2003)).

Under the Third Circuit's jurisdictional analysis of websites, if a defendant website operator intentionally targets the site to the forum state and/or knowingly conducts business with forum state residents via the site, then the "purposeful availment" requirement is satisfied. <u>Toys "R" Us</u>, 318 F.3d at 452. In addition, a court may consider the level of interactivity of the website and the defendant's related non-Internet activities as part of the "purposeful availment"

_____

caused harm there, jurisdiction over the defendants was "proper in California based on the 'effects' of their Florida conduct in California." <u>Id.</u> at 789. Here, as in <u>Calder</u>, Rosedale's alleged misrepresentations are relevant to Bragg's claims of fraud and deceptive practices, but Bragg has not argued that jurisdiction is proper based on <u>Calder</u>'s effects-based jurisprudence.

calculus.  Id. at 453.

        The Third Circuit applied this same jurisdictional
analysis in Barefoot to hold that the defendants who ran the
infomercials in New Jersey could be subject to personal
jurisdiction in that state.  128 Fed. App'x at 270.  First, it
reasoned that, as with the mere operation of a website, "an
advertising campaign with national scope does not by itself give
rise to general jurisdiction in a state where it is broadcast."
Id.  That principle was inapplicable, however, because it
involved precedents where the plaintiff's injuries were unrelated
to the broad case of the advertisement in the forum state, which
were therefore inapplicable to a specific-jurisdiction inquiry.
Id. (citing Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d
539 (3d Cir. 1985); Giangola v. Walt Disney World Co., 753 F.
Supp. 148 (D.N.J. 1990)).  Second, and most important for this
case, the Third Circuit reasoned:

> [T]he advertisement in this case induced
> viewers to establish direct contact with [the
> defendant] by calling its toll-free phone
> number to place orders.  This inducement
> destroys any semblance of the passive
> advertising addressed in Giangola, 753 F.
> Supp. at 155-56, which expressly
> distinguished advertisements in the form of
> direct mail solicitations.  For purposes of
> jurisdictional analysis, an infomercial
> broadcast that generates telephone customers
> is the equivalent of an interactive web-site
> through which a defendant purposefully
> directs its commercial efforts towards
> residents of a forum state.

Id. at 270 (some internal citations omitted).

Barefoot's analysis applies to the facts of this case. First, Bragg has provided evidence that Rosedale helped orchestrate a campaign at the national level to induce persons, including Bragg, to purchase virtual land and property on Second Life. As part of the national campaign, Bragg made representations that were distributed nationally, including in Pennsylvania. Moreover, this case does not involve "injuries unrelated to the broadcast of the advertisement in the forum state," as was the case in Gehling or Giangola.[11]  Cf. Barefoot, 128 Fed. App'x at 270. Rather, Rosedale's representations constitute part of the alleged fraudulent and deceptive conduct at the heart of Bragg's claims in this case.

Second, like the role of the infomericals in Barefoot,

---

[11]    The Third Circuit has consistently held that advertising in national publications does not subject a defendant to general jurisdiction in every state. See, e.g., Gehling, 773 F.2d 539 at 542; Giangola, 753 F. Supp. at 156 ("In an age of modern advertising and national media publications and markets, plaintiffs' argument that such conduct would make a defendant amenable to suit wherever the advertisements were aired would substantially undermine the law of personal jurisdiction."). In Giangola, for example, a district court held that plaintiffs' viewing of advertisements displaying Walt Disney World "as a must visit" on plaintiffs' vacation agenda, and which in fact induced plaintiffs to visit Disney World, did not constitute "minimum contacts" sufficient to justify personal jurisdiction in the plaintiffs' subsequent personal injury action, because the advertisements were not in any way related to the plaintiffs' personal injury action. 753 F. Supp. at 155. Moreover, as the Third Circuit noted in Barefoot, the advertisements were passive in nature and did not involve any interactivity with the plaintiffs. Id.; Barefoot, 128 Fed. App'x at 270.

Rosedale's personal role was to "bait the hook" for potential customers to make more interactive contact with Linden by visiting Second Life's website.  Rosedale's activity was designed to generate additional traffic inside Second Life.  He was the hawker sitting outside Second Life's circus tent, singing the marvels of what was contained inside to entice customers to enter.  Once inside Second Life, participants could view virtual property, read additional materials about purchasing virtual property, interact with other avatars who owned virtual property, and, ultimately, purchase virtual property themselves.  Significantly, participants could even interact with Rosedale's avatar on Second Life during town hall meetings that he held on the topic of virtual property.

Viewed in context, Rosedale's marketing efforts in this case are more "interactive" rather than "passive."  C.f. Barefoot, 128 Fed. App'x at 270 (emphasizing that "interactive" contacts are more significant for jurisdictional purposes than "passive" contacts).  Thus, they provide more than just "tangential" support for specific personal jurisdiction.  See Mesalic v. Fiberfloat Corp., 897 F.2d 696, 700 n.10 (3d Cir. 1990) (noting that a defendant's marketing strategy, including advertising in national publications distributed in the forum, provided only

"tangential" support for specific personal jurisdiction).[12]

        The Court's decision is also consistent with the decisions of courts in other jurisdictions which have extended specific jurisdiction over defendants who have made representations in national media when the dispute arose directly from those representations. See, e.g., Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship, 34 F.3d 410, 412 (7th Cir. 1994) (holding that national television broadcast into the forum state was sufficient for personal jurisdiction); Caddy Prods., Inc. v. Greystone Int'l., Inc., No. 05-301, 2005 U.S. Dist. LEXIS 34467, *4-5 (D. Minn. 2005) (holding that the defendant had sufficient contacts to support the exercise of specific personal jurisdiction, which included the defendant's marketing efforts, such as attending a national trade show and advertising in a national trade publication, coupled with defendant's shipment of the product into the forum state); Hollar v. Philip Morris Inc., 43 F. Supp. 2d 794, 802-03 (N.D. Ohio 1998) (holding specific personal jurisdiction existed over tobacco company that made false representations regarding smoking to a national audience, which induced plaintiffs to continue

_____

        [12]    Because the Court bases its holding on the interactive nature of the marketing scheme, the its holding does not "mean that there would be nationwide (indeed, worldwide) jurisdiction over anyone and everyone who establishes an Internet website" or made representations posted on a website accessible throughout the world. Weber v. Jolly Hotels, 977 F. Supp. 327, 333 (D.N.J. 1997).

smoking; it is "axiomatic that what is distributed and broadcast nationwide will be seen and heard in all states.") (internal quotation omitted); <u>Thomas Jackson Publ'g Inc. v. Buckner</u>, 625 F. Supp. 1044, 1046 (D. Neb. 1985) (holding that performance of songs and interviews on national television supported finding of specific personal jurisdiction over a defendant whose songs infringed the plaintiff's copyright).

Rosedale relies heavily on cases from other jurisdictions for the proposition that his statements do not subject him to personal jurisdiction in Pennsylvania because none of the statements were targeted directly at Pennsylvania as opposed to the nation at large. <u>See</u> Dfts.' Reply at 3. Rosedale's first cited case, however, involves representations specifically targeted at one state, as opposed to a national audience, that merely could be accessed worldwide because they were available on the Internet. <u>See</u> <u>Young v. New Haven Advocate</u>, 315 F.3d 256, 263 (4th Cir. 2002) ("[T]he fact that the newspapers' websites could be accessed anywhere, including Virginia, does not by itself demonstrate that the newspapers were intentionally directing their website content to a Virginia audience. Something more than posting and accessibility is needed to indicate that the newspapers purposefully (albeit electronically) directed their activity in a substantial way to the forum state. . .").  Rosedale did not target his

representations at any particular state, but rather to the nation at large.  The other two cases cited by Rosedale are also distinguishable, because they involved isolated statements that were not, as is the case here, an integral part of a larger publicity campaign of national scope.  See Revel v. Lidov, 317 F.3d 467, 475 (5th Cir. 2002) (finding that the court lacked personal jurisdiction over author of an Internet bulletin board posting "because the post to the bulletin board was presumably directed at the entire world" and was not "directed specifically at Texas"); Griffis v. Luban, 646 N.W. 2d 527, 536 (Minn. 2002) ("The mere fact that [the defendant], who posted allegedly defamatory statements about the plaintiff on the Internet, knew that [the plaintiff] resided and worked in Alabama is not sufficient to extend personal jurisdiction over [the defendant] in Alabama, because that knowledge does not demonstrate targeting of Alabama as the focal point of the . . . statements."). See also Growden v. Ed Bowlin & Assoc., Inc., 733 F.2d 1149, 1151-52 & n.4 (5th Cir. 1984) (holding no personal jurisdiction existed based on ads in two national publications for the sale of an airplane, the crash of which was the subject of the litigation).

Accordingly, the Court finds that Rosedale has minimum contacts with Pennsylvania sufficient to support specific personal jurisdiction.

2.    <u>Fair Play and Substantial Justice</u>

The Court also finds that the exercise of personal jurisdiction in this case would not offend due process.  <u>See</u> <u>Lehigh Coal</u>, 56 F. Supp. 2d at 569 (citing <u>Burger King</u>, 471 U.S. at 477).  The factors to be considered in making this fairness determination are: (1) the burden on the defendant, (2) the forum State's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies.  <u>Id.</u>

Nothing on the record counsels strongly against jurisdiction based on considerations of any undue burden to Rosedale.  Rosedale has not claimed that he does not have the financial ability or that he would otherwise be irreparably prejudiced by litigating this case here in Pennsylvania.  The Court also notes that Rosedale has able counsel on both coasts, i.e., in both his home state of California and here in Pennsylvania.  Additionally, Pennsylvania has a substantial interest in protecting its residents from allegedly misleading representations that induce them to purchase virtual property. Pennsylvania also has an interest, more particularly, in vindicating Bragg's individual rights.  Finally, Bragg may obtain

convenient and effective relief in Pennsylvania, the state in which he initiated this action.

     C.    <u>Fiduciary Shield Doctrine</u>

       The Court must also address Rosedale's argument that, because Rosedale made the alleged representations in his corporate capacity as Chief Executive Officer of Linden, he cannot be subject to personal jurisdiction based on those representations.

       The applicability of this so called "fiduciary shield" doctrine is in dispute. Although it has not definitively spoken on the issue, the Supreme Court appears to have rejected the proposition that this doctrine is a requirement of federal due process. <u>See</u> <u>Calder v. Jones</u>, 465 U.S. 783, 790 (1984) ("[Defendants'] status as employees does not somehow shield them from jurisdiction. Each defendant's contacts with the forum state must be assessed individually."); <u>Keeton v. Hustler</u>, 465 U.S. 770, 781 n.13 (1984) ("We today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity."). Moreover, neither the Pennsylvania Supreme Court nor the Third Circuit has squarely addressed the applicability of the fiduciary shield doctrine. <u>See</u>, <u>e.g.</u>, <u>Irons v. Transcor Am.</u>, 2002 WL 32348317, at *5 (E.D. Pa. 2002).

Fortunately, it is not necessary to untangle the
confused knot of caselaw surrounding the fiduciary shield's
status within the Third Circuit.[13]   The Court will, in Gordian
fashion, cut directly through the knot, because even if the
doctrine did apply, the fiduciary shield would not protect
Rosedale under these circumstances.

When corporate agents invoke the fiduciary shield as a
protection, courts "have held that in order to hold such a
defendant subject to personal jurisdiction, it must be shown that
[1] the defendant had a major role in the corporate structure,

---

[13]     Some Third Circuit precedent suggests that, where the
alleged contacts involve a corporate agent's personal
involvement, the "corporate shield" doctrine is obviated.  See
Al-Khazraji v. St. Francis College, 784 F.2d 505, 518 (3d Cir.
1986) ("An individual, including a director, officer, or agent of
a corporation, may be liable for injuries suffered by third
parties because of his torts, regardless of whether he acted on
his own account or on behalf of the corporation.").  On other
occasions, however, after finding personal jurisdiction has
existed over a corporation, the Third Circuit has remanded to
address the question of whether the individual corporate agents
were not subject to personal jurisdiction because their relevant
contacts were established in their roles as corporate officers.
See Barefoot, 128 Fed. App'x at 269.

Numerous recent cases within this district have applied
the fiduciary shield doctrine in one form or another.  E.g.
Schiller-Pfeiffer, Inc. v. Country Home Prods., Inc., 2004 WL
2755585 (E.D. Pa. 2004) ("[A] defendant is not individually
subject to personal jurisdiction merely based on his actions in a
corporate capacity.") (citing TJS Brokerage & Co. v. Mahoney, 940
F. Supp. 784, 789 (E.D. Pa. 1996); D&S Screen Fund II v. Ferrari,
174 F. Supp. 2d 343, 347 (E.D. Pa. 2001) ("As a general rule,
individuals performing acts in their corporate capacity are not
subject to the personal jurisdiction of the courts of that state
for those acts.").

[2] the quality of his contacts with the state were significant, and [3] his participation in the tortious conduct alleged was extensive." TJS Brokerage, 940 F. Supp. at 789.  First, as to his role in the company, Rosedale acted as the CEO and public face of Linden.  Second, as to the quality of Rosedale's contacts, Rosedale made numerous representations that were broadcast through the national media and through the Internet, via town hall meetings, that reached Pennsylvania.  These were not isolated statements, but part of a national campaign to distinguish Second Life from other virtual worlds and induce the purchase of virtual property.  Third, and finally, Rosedale did not simply direct others to publicize virtual property on Second Life.  He personally participated in creating such publicity and its dissemination.  Representations made as part of that publicity are at the heart of Bragg's case.[14]

Even if the fiduciary shield doctrine were expressly recognized by the Third Circuit, Rosedale's representations, though made on the behalf of Linden, would still count as contacts in the analysis of whether the Court may exercise personal jurisdiction over him.  Therefore, the Court will

_____

[14]    Defendants concede that the Court has personal jurisdiction over Linden.  However, Bragg does not argue that personal jurisdiction was appropriate over Rosedale based on his direction of Linden as it made contacts with Pennsylvania.  Bragg relies, instead, solely on Linden's individual contacts.  Had Plaintiff argued the former, the Court's application of the fiduciary shield doctrine could have been a closer call.

exercise personal jurisdiction over Rosedale.

## III. MOTION TO COMPEL ARBITRATION

Defendants have also filed a motion to compel arbitration that seeks to dismiss this action and compel Bragg to submit his claims to arbitration according to the Rules of the International Chamber of Commerce ("ICC") in San Fransisco.

A.    Relevant Facts

Before a person is permitted to participate in Second Life, she must accept the Terms of Service of Second Life (the "TOS") by clicking a button indicating acceptance of the TOS. Bragg concedes that he clicked the "accept" button before accessing Second Life.  Compl. ¶ 126.  Included in the TOS are a California choice of law provision, an arbitration provision, and forum selection clause.  Specifically, located in the fourteenth line of the thirteenth paragraph under the heading "GENERAL PROVISIONS," and following provisions regarding the applicability of export and import laws to Second Life, the following language appears:

> Any dispute or claim arising out of or in connection
> with this Agreement or the performance, breach or
> termination thereof, shall be finally settled by
> binding arbitration in San Francisco, California under
> the Rules of Arbitration of the International Chamber
> of Commerce by three arbitrators appointed in
> accordance with said rules. . . .  Notwithstanding the
> foregoing, either party may apply to any court of

competent jurisdiction for injunctive relief or
enforcement of this arbitration provision without
breach of this arbitration provision.

TOS ¶ 13.


    B.   <u>Legal Standards</u>

    1.  <u>Federal law applies</u>

The Federal Arbitration Act ("FAA") requires that the
Court apply federal substantive law here because the arbitration
agreement is connected to a transaction involving interstate
commerce. <u>State Farm Mut. Auto. Ins. Co. v. Coviello</u>, 233 F.3d
710, 713 n.1 (3d Cir. 2000); <u>Marciano v. MONY Life Ins. Co.</u>, 470
F. Supp. 2d 518, 524 (E.D. Pa. 2007) (Robreno, J.); <u>see also</u>
Wright & Miller, <u>Federal Practice and Procedure</u> § 3569, at 173
(1984) ("[I]n a diversity suit . . . , the substantive rules
contained in the [Federal Arbitration] Act, based as it is on the
commerce and admiralty powers, are to be applied regardless of
state law.").

Whether the arbitration agreement is connected to a
transaction involving interstate commerce is a factual
determination that must be made by the Court. <u>State Farm</u>, 233
F.3d at 713 n.1. Here, Bragg is a Pennsylvania resident. Linden
is a Delaware corporation headquartered in California. Rosedale
is a California resident. Bragg entered into the TOS and
purchased virtual land through the Internet on Second Life as a

-23-

result of representations made on the national media.  The
arbitration agreement is clearly connected to interstate
commerce, and the Court will apply the federal substantive law
that has emerged from interpretation of the FAA.


        2.   The Legal Standard Under the FAA

        Under the FAA, on the motion of a party, a court must
stay proceedings and order the parties to arbitrate the dispute
if the court finds that the parties have agreed in writing to do
so.  9 U.S.C. §§ 3, 4, 6.  A party seeking to compel arbitration
must show (1) that a valid agreement to arbitrate exists between
the parties and (2) that the specific dispute falls within the
scope of the agreement.  Trippe Mfg. Co. v. Niles Audio Corp.,
401 F.3d 529, 532 (3d Cir. 2005); PaineWebber, Inc. v. Hartmann,
921 F.2d 507, 511 (3d Cir. 1990).

        In determining whether a valid agreement to arbitrate
exists between the parties, the Third Circuit has instructed
district courts to give the party opposing arbitration "the
benefit of all reasonable doubts and inferences that may arise,"
or, in other words, to apply the familiar Federal Rule of Civil
Procedure 56(c) summary judgment standard.  Par-Knit Mills, Inc.
v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 & n.9 (3d Cir.
1980); see also Berkery v. Cross Country Bank, 256 F. Supp. 2d
359, 364 n.3 (E.D. Pa. 2003) (Robreno, J.) (applying the summary

-24-

judgment standard to a motion to compel arbitration).  While there is a presumption that a particular dispute is within the scope of an arbitration agreement, <u>Volt Info. Scis., Inc. v. Bd. of Trustees</u>, 489 U.S. 468, 475 (1989), there is no such "presumption" or "policy" that favors the <u>existence</u> of a valid agreement to arbitrate.  <u>Marciano</u>, 470 F. Supp. 2d at 525-26.


    C.   <u>Application</u>

        1.   <u>Unconscionabilty of the Arbitration Agreement</u>

        Bragg resists enforcement of the TOS's arbitration provision on the basis that it is "both procedurally and substantively unconscionable and is itself evidence of defendants' scheme to deprive Plaintiff (and others) of both their money and their day in court."  Pl.'s Resp. At 16.[15]

        Section 2 of the FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Thus, "generally applicable

---

    [15]   This challenge must be determined by the Court, not an arbitrator.  <u>Bellevue Drug Co. v. Advance PCS</u>, 333 F. Supp. 2d 318 (E.D. Pa. 2004) (Robreno, J.).  Bragg does not challenge enforceability by claiming that a provision of the arbitration agreement will deny him a statutory right, a question of interpretation of the arbitration agreement which an arbitrator is "well situated to answer." <u>Id.</u> (citations omitted).  Rather, Bragg claims that the arbitration agreement itself would effectively deny him access to an arbitrator, because the costs would be prohibitively expensive, a question that is more appropriately reserved for the Court to answer.  <u>Id.</u>

contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." Doctor's Assocs. v. Casarotto, 517 U.S. 681, 687 (1996) (citations omitted). When determining whether such defenses might apply to any purported agreement to arbitrate the dispute in question, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Thus, the Court will apply California state law to determine whether the arbitration provision is unconscionable.[16]

Under California law, unconscionability has both procedural and substantive components. Davis v. O'Melveny & Myers, __ F.3d __, 2007 WL 1394530, at *4 (9th Cir. May 14, 2007); Comb v. Paypal, Inc., 218 F. Supp. 2d 1165, 1172 (N.D. Cal. 2002). The procedural component can be satisfied by showing (1) oppression through the existence of unequal bargaining positions or (2) surprise through hidden terms common in the context of adhesion contracts. Comb, 218 F. Supp. 2d at 1172. The substantive component can be satisfied by showing overly harsh or one-sided results that "shock the conscience." Id. The two elements operate on a sliding scale such that the

---

[16]    Both parties agree that California law should govern the question of whether the arbitration provision is unconscionable.

more significant one is, the less significant the other need be. Id. at 743; see Armendariz v. Foundation Health Psychcare Servs., Inc., 6 P.3d 669, 690 (Cal. 2000) ("[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."). However, a claim of unconscionability cannot be determined merely by examining the face of the contract; there must be an inquiry into the circumstances under which the contract was executed, and the contract's purpose, and effect. Comb, 218 F. Supp. 2d at 1172.

(a) Procedural Unconscionability

A contract or clause is procedurally unconscionable if it is a contract of adhesion. Comb, 218 F. Supp. 2d at 1172; Flores v. Transamerica HomeFirst, Inc., 113 Cal. Rptr. 2d 376, 381-82 (Ct. App. 2001). A contract of adhesion, in turn, is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." Comb, 218 F. Supp. 2d at 1172; Armendariz, 6 P.3d at 690. Under California law, "the critical factor in procedural unconscionability analysis is the manner in which the contract or the disputed clause was presented and negotiated." Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1282 (9th Cir. 2006). "When the

weaker party is presented the clause and told to 'take it or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present." Id. (internal quotation and citation omitted); see also Martinez v. Master Prot. Corp., 12 Cal. Rptr.3d 663, 669 (Ct. App.2004) ("An arbitration agreement that is an essential part of a 'take it or leave it' employment condition, without more, is procedurally unconscionable.") (citations omitted); O'Melveny & Myers, ___ F.3d ___, 2007 WL 1394530 at *6 (holding arbitration agreement presented on a take-it-or-leave-it basis was procedurally unconscionable, notwithstanding the fact that employee was provided three months to walk away from employment before agreement became effective).

The TOS are a contract of adhesion. Linden presents the TOS on a take-it-or-leave-it basis. A potential participant can either click "assent" to the TOS, and then gain entrance to Second Life's virtual world, or refuse assent and be denied access. Linden also clearly has superior bargaining strength over Bragg. Although Bragg is an experienced attorney, who believes he is expert enough to comment on numerous industry standards and the "rights" or participants in virtual worlds, see Pl.'s Resp., Ex. A ¶¶ 59-64, he was never presented with an opportunity to use his experience and lawyering skills to negotiate terms different from the TOS that Linden offered.

-28-

Moreover, there was no "reasonably available market alternatives [to defeat] a claim of adhesiveness."  Cf. Dean Witter Reynolds, Inc. v. Superior Court, 259 Cal. Rptr. 789, 795 (Ct. App. 1989) (finding no procedural unconscionability because there were other financial institutions that offered competing IRA's which lacked the challenged provision).  Although it is not the only virtual world on the Internet, Second Life was the first and only virtual world to specifically grant its participants property rights in virtual land.

The procedural element of unconscionability also "focuses on . . . surprise."  Gutierrez v. Autowest, Inc., 7 Cal. Rptr. 3d 267, 275 (Ct. App. 2003) (citations omitted). In determining whether surprise exists, California courts focus not on the plaintiff's subjective reading of the contract, but rather, more objectively, on "the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." Id.  In Gutierrez, the court found such surprise where an arbitration clause was "particularly inconspicuous, printed in eight-point typeface on the opposite side of the signature page of the lease."  Id.

Here, although the TOS are ubiquitous throughout Second

Life,[17] Linden buried the TOS's arbitration provision in a lengthy paragraph under the benign heading "GENERAL PROVISIONS." <u>See</u> TOS ¶ 13.  <u>Compare</u> <u>Net Global Mktg. v. Dialtone, Inc.</u>, No. 04-56685, 2007 U.S. App. LEXIS 674 at *7 (9th Cir. Jan. 9, 2007) (finding procedural unconscionability where "[t]here was no 'clear heading' in the Terms of Service that could refute a claim of surprise; to the contrary, the arbitration clause is listed in the midst of a long section without line breaks under the unhelpful heading of 'Miscellaneous'") <u>and</u> <u>Higgins v. Superior Court</u>, 45 Cal. Rptr. 3d 293, 297 (Ct. App. 2006) (holding arbitration agreement unconscionable where "[t]here is nothing in the Agreement that brings the reader's attention to the arbitration provision") <u>with</u> <u>Boghos v. Certain Underwriters at Lloyd's of London</u>, 115 P.3d 68, 70 (Cal. 2005) (finding arbitration clause was enforceable where it was in bolded font and contained the heading "BINDING ARBITRATION").  Linden also failed to make available the costs and rules of arbitration in the ICC by either setting them forth in the TOS or by providing a hyper-link to another page or website where they are available. Bragg Decl. ¶ 20.

<u>Comb</u> is most instructive.  In that case, the plaintiffs challenged an arbitration provision that was part of an agreement

---

17    For example, both the "Auctions" and the "Auctions FAQ" webpages in Second Life contain hyperlinks to the TOS.  <u>See</u> Bragg Br., Ex. 2 at 9, 15.

to which they had assented, in circumstances similar to this case, by clicking their assent on an online application page. 218 F. Supp. 2d at 1169.  The defendant, PayPal, was a large company with millions of individual online customers.  Id. at 1165.  The plaintiffs, with one exception, were all individual customers of PayPal.  Id.  Given the small amount of the average transaction with PayPal, the fact that most PayPal customers were private individuals, and that there was a "dispute as to whether PayPal's competitors offer their services without requiring customers to enter into arbitration agreements," the court concluded that the user agreement at issue "satisfie[d] the criteria for procedural unconscionability under California law." Id. at 1172-73.  Here, as in Comb, procedural unconscionability is satisfied.

(b) Substantive Unconscionability

Even if an agreement is procedurally unconscionable, "it may nonetheless be enforceable if the substantive terms are reasonable."  Id. at 1173 (citing Craig v. Brown & Root, Inc., 100 Cal. Rptr. 2d 818 (Ct. App. 2000) (finding contract of adhesion to arbitrate disputes enforceable)).  Substantive unconscionability focuses on the one-sidedness of the contract terms.  Armendariz, 6 P.3d at 690; Flores, 113 Cal. Rptr. 2d at 381-82 .  Here, a number of the TOS's elements lead the Court to

conclude that Bragg has demonstrated that the TOS are substantively unconscionable.

(i)  Mutuality

Under California law, substantive unconscionability has been found where an arbitration provision forces the weaker party to arbitrate claims but permits a choice of forums for the stronger party.  See, e.g., Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931, 940-41 (9th Cir. 2001); Mercuro v. Superior Court, 116 Cal. Rptr. 2d 671, 675 (Ct. App. 2002).  In other words, the arbitration remedy must contain a "modicum of bilaterality." Armendariz, 6 P.3d at 692.  This principle has been extended to arbitration provisions that allow the stronger party a range of remedies before arbitrating a dispute, such as self-help, while relegating to the weaker party the sole remedy of arbitration.[18]

_____

[18]    The Court notes that the Third Circuit has found that "parties to an arbitration agreement need not equally bind each other with respect to an arbitration agreement if they have provided each other with consideration beyond the promise to arbitrate."  Harris v. Green Tree Fin. Corp., 183 F.3d 173, 180-81 (3d Cir. 1999).  In Green Tree, however, the Third Circuit was applying Pennsylvania law, not California law.  Id.  In any event, Pennsylvania courts have criticized this aspect of Green Tree's holding.  E.g. Lytle v. Citifinancial Servs., 810 A.2d 643, 665 (Pa. Super. Ct. 2002) (holding that, under Pennsylvania law, the reservation by a company to itself of access to the courts, to the exclusion of the consumer, created a presumption of unconscionability, "which in the absence of 'business realities' that compel inclusion of such a provision in an arbitration provision, render[ed] the arbitration provision unconscionable and unenforceable").

In <u>Comb</u>, for example, the court found a lack of mutuality where the user agreement allowed PayPal "at its sole discretion" to restrict accounts, withhold funds, undertake its own investigation of a customer's financial records, close accounts, and procure ownership of all funds in dispute unless and until the customer is "later determined to be entitled to the funds in dispute."  218 F. Supp. 2d at 1173-74.  Also significant was the fact that the user agreement was "subject to change by PayPal without prior notice (unless prior notice is required by law), by posting of the revised Agreement on the PayPal website." <u>Id.</u>

Here, the TOS contain many of the same elements that made the PayPal user agreement substantively unconscionable for lack of mutuality.  The TOS proclaim that "Linden has the right at any time for any reason or no reason to suspend or terminate your Account, terminate this Agreement, and/or refuse any and all current or future use of the Service without notice or liability to you."  TOS ¶ 7.1.  Whether or not a customer has breached the Agreement is "determined in Linden's sole discretion."  <u>Id.</u> Linden also reserves the right to return no money at all based on mere "suspicions of fraud" or other violations of law.  <u>Id.</u> Finally, the TOS state that "Linden may amend this Agreement . . . at any time in its sole discretion by posting the amended Agreement [on its website]."  TOS ¶ 1.2.

In effect, the TOS provide Linden with a variety of one-sided remedies to resolve disputes, while forcing its customers to arbitrate any disputes with Linden.  This is precisely what occurred here.  When a dispute arose, Linden exercised its option to use self-help by freezing Bragg's account, retaining funds that Linden alone determined were subject to dispute, and then telling Bragg that he could resolve the dispute by initiating a costly arbitration process.  The TOS expressly authorized Linden to engage in such unilateral conduct. As in Comb, "[f]or all practical purposes, a customer may resolve disputes only after [Linden] has had control of the disputed funds for an indefinite period of time," and may only resolve those disputes by initiating arbitration.  218 F. Supp. 2d at 1175.

Linden's right to modify the arbitration clause is also significant.  "The effect of [Linden's] unilateral right to modify the arbitration clause is that it could . . . craft precisely the sort of asymmetrical arbitration agreement that is prohibited under California law as unconscionable.  Net Global Mktg., 2007 U.S. App. LEXIS 674, at *9.  This lack of mutuality supports a finding of substantive unconscionability.

(ii) Costs of Arbitration and Fee-Sharing

Bragg claims that the cost of an individual arbitration

-34-

under the TOS is likely to exceed $13,540, with an estimated initiation cost of at least $10,000.  Pl.'s Reply at 5-6.  He has also submitted a Declaration of Personal Financial Information stating that such arbitration would be cost-prohibitive for him (doc. no. 41).  Linden disputes Bragg's calculations, estimating that the costs associated with arbitration would total $7,500, with Bragg advancing $3,750 at the outset of arbitration.  See Dfts.' Reply at 11.

At oral argument, the parties were unable to resolve this dispute, even after referencing numerous provisions and charts contained within the ICC Rules.  See Tran. of 2/5/07 Hrg. at 65-74.  The Court's own calculations, however, indicate that the costs of arbitration, excluding arbitration, would total $17,250.  With a recovery of $75,000,[19] the ICC's administrative expenses would be $2,625 (3.5% of $75,000).  See ICC Rules at 28. In addition, arbitrator's fees could be set between 2.0% ($1,500) and 11.0% ($8,250) of the amount at issue per arbitrator.  Id. If the ICC set the arbitrator's fees at the mid-point of this range, the arbitrator's fees would be $4,875 per arbitrator.  Id. Here, however, the TOS requires that three arbitrators be used to

---

[19]    The Court's calculations are based on its finding that $75,000 is at issue, the minimum necessary to satisfy the requirements of diversity jurisdiction in this case.  After a hearing on Bragg's motion to remand this case back to state court, the Court found that this jurisdictional threshold had been met (doc. no. 14).

resolve a dispute.  TOS ¶ 13.  Thus, the Court estimates the
costs of arbitration with the ICC to be $17,250 ($2,625 + (3 x
$4,875)), although they could reach as high as $27,375 ($2,625 +
(3 x $8,250)).[20]

These costs might not, on their own, support a finding
of substantive unconscionability.  However, the ICC Rules also
provide that the costs and fees must be shared among the parties,
and an estimate of those costs and fees must be advanced at the
initiation of arbitration.  See ICC Rules of Arbitration, Ex. D
to Dfts.' Reply at 28-30.  California law has often been applied
to declare arbitration fee-sharing schemes unenforceable.  See
Ting v. AT&T, 319 F.3d 1126, 1151 (9th Cir. 2003).  Such schemes
are unconscionable where they "impose[] on some consumers costs
greater than those a complainant would bear if he or she would
file the same complaint in court."  Id.  In Ting, for example,
the Ninth Circuit held that a scheme requiring AT&T customers to
split arbitration costs with AT&T rendered an arbitration
provision unconscionable.  Id.  See also Circuit City Stores v.
Adams, 279 F.3d 889, 894 (9th Cir. 2002) ("This fee allocation
scheme alone would render an arbitration agreement
unenforceable."); Armendariz, 6 P.3d at 687 ("[T]he arbitration

_____

[20]    At oral argument, Bragg asserted repeatedly that the
schedule of arbitrator's fees in the ICC Rules represents the fee
"per arbitrator," which would have to be tripled in this case as
the TOS provides for three arbitrators.  See Tran. of 2/5/07 Hrg.
at pp. 68, 74.  Defendants never refuted this point.  See id.

process cannot generally require the employee to bear any <u>type</u> of expenses that the employee would not be required to bear if he or she were free to bring the action in court.") (emphasis in original); <u>Ferguson v. Countrywide Credit Indus.</u>, 298 F.3d 778, 785 (9th Cir. 2002) ("[A] fee allocation scheme which requires the employee to split the arbitrator's fees with the employer would <u>alone</u> render an arbitration agreement substantively unconscionable.") (emphasis added).

Here, even taking Defendants characterization of the fees to be accurate, the total estimate of costs and fees would be $7,500, which would result in Bragg having to advance $3,750 at the outset of arbitration. <u>See</u> Dfts.' Reply at 11. The court's own estimates place the amount that Bragg would likely have to advance at $8,625, but they could reach as high as $13,687.50. Any of these figures are significantly greater than the costs that Bragg bears by filing his action in a state or federal court. Accordingly, the arbitration costs and fee-splitting scheme together also support a finding of unconscionability.

(iii) <u>Venue</u>

The TOS also require that any arbitration take place in San Francisco, California. TOS ¶ 13. In <u>Comb</u>, the Court found that a similar forum selection clause supported a finding of

substantive unconscionability, because the place in which arbitration was to occur was unreasonable, taking into account "the respective circumstances of the parties." 218 F. Supp. 2d at 1177. As in Comb, the record in this case shows that Linden serves millions of customers across the United States and that the average transaction through or with Second Life involves a relatively small amount. See id. In such circumstances, California law dictates that it is not "reasonable for individual consumers from throughout the country to travel to one locale to arbitrate claims involving such minimal sums." Id. Indeed, "[l]imiting venue to [Linden's] backyard appears to be yet one more means by which the arbitration clause serves to shield [Linden] from liability instead of providing a neutral forum in which to arbitrate disputes." Id.

### (iv) Confidentiality Provision

Arbitration before the ICC, pursuant to the TOS, must be kept confidential pursuant to the ICC rules. See ICC Rules at 33. Applying California law to an arbitration provision, the Ninth Circuit held that such confidentiality supports a finding that an arbitration clause was substantively unconscionable. Ting, 319 F.3d at 1152. The Ninth Circuit reasoned that if the company succeeds in imposing a gag order on arbitration proceedings, it places itself in a far superior legal posture by

ensuring that none of its potential opponents have access to precedent while, at the same time, the company accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract.  Id.  The unavailability of arbitral decisions could also prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct against a company.  See id.

This does not mean that confidentiality provisions in an arbitration scheme or agreement are, in every instance, per se unconscionable under California law.  See Mercuro v. Superior Court, 116 Cal. Rptr.2d 671, 679 (Ct. App.2002) ("While [the California] Supreme Court has taken notice of the 'repeat player effect,' the court has never declared this factor renders the arbitration agreement unconscionable per se.") (citations omitted).  Here, however, taken together with other provisions of the TOS, the confidentiality provision gives rise for concern of the conscionability of the arbitration clause.  See also O'Melveny & Myers, __ F.3d __, 2007 WL 1394530, at *11 ("The concern is not with confidentiality itself but, rather, with the scope of the language of the [arbitration agreement.]").

Thus, the confidentiality of the arbitration scheme that Linden imposed also supports a finding that the arbitration clause is unconscionable.

(v) <u>Legitimate Business Realities</u>

Under California law, a contract may provide a "margin of safety" that provides the party with superior bargaining strength protection for which it has a legitimate commercial need.  "However, unless the 'business realities' that create the special need for such an advantage are explained in the contract itself, . . . it must be factually established."  <u>Stirlen v. Supercuts, Inc.</u>, 60 Cal. Rptr. 2d 138, 148 (Ct. App. 1997).  When a contract is alleged to be unconscionable, "the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."  Cal. Civ. Code § 1670.5.  The statutory scheme reflects "legislative recognition that a claim of unconscionability often cannot be determined merely by examining the face of the contract, but will require inquiry into its setting, purpose, and effect."  <u>Stirlen</u>, 60 Cal. Rptr. 2d at 148 (citations and internal quotations omitted).

Here, neither in its briefing nor at oral argument did Linden even attempt to offer evidence that "business realities" justify the one-sidedness of the dispute resolution scheme that the TOS constructs in Linden's favor.

(c)   <u>Conclusion</u>

When a dispute arises in Second Life, Linden is not

obligated to initiate arbitration.  Rather, the TOS expressly allow Linden, at its "sole discretion" and based on mere "suspicion," to unilaterally freeze a participant's account, refuse access to the virtual and real currency contained within that account, and then confiscate the participant's virtual property and real estate.  A participant wishing to resolve any dispute, on the other hand, after having forfeited its interest in Second Life, must then initiate arbitration in Linden's place of business.  To initiate arbitration involves advancing fees to pay for no less than three arbitrators at a cost far greater than would be involved in litigating in the state or federal court system.  Moreover, under these circumstances, the confidentiality of the proceedings helps ensure that arbitration itself is fought on an uneven field by ensuring that, through the accumulation of experience, Linden becomes an expert in litigating the terms of the TOS, while plaintiffs remain novices without the benefit of learning from past precedent.

Taken together, the lack of mutuality, the costs of arbitration, the forum selection clause, and the confidentiality provision that Linden unilaterally imposes through the TOS demonstrate that the arbitration clause is not designed to provide Second Life participants an effective means of resolving disputes with Linden.  Rather, it is a one-sided means which tilts unfairly, in almost all situations, in Linden's favor.  As

in Comb, through the use of an arbitration clause, Linden

"appears to be attempting to insulate itself contractually from

any meaningful challenge to its alleged practices."  218 F. Supp.

2d at 1176.

The Court notes that the concerns with procedural

unconscionability are somewhat mitigated by Bragg's being an

experienced attorney.  However, "because the unilateral

modification clause renders the arbitration provision severely

one-sided in the substantive dimension, even moderate procedural

unconscionability renders the arbitration agreement

unenforceable."  Net Global Mktg., 2007 U.S. App. LEXIS 674, at

*9 (internal citations omitted).

Finding that the arbitration clause is procedurally and

substantively unconscionable, the Court will refuse to enforce

it.[21]

---

[21]    Having determined that the arbitration provision is
unenforceable as an unconscionable agreement, the Court need not
determine whether the specific dispute in this case falls within
the scope of that agreement. The Court notes, however, that the
arbitration clause clearly exempts from its scope claims for
"injunctive relief."  See TOS ¶ 13.  At the hearing on the motion
to compel arbitration, the Court asked whether Bragg wanted the
Court to decide the motion to compel arbitration, or allow
Plaintiff file an amended complaint seeking only injunctive
relief.  See Tran. of 2/5/07 Hrg. at pp. 89-90, 108.  He elected
to file an amended complaint.  Id.  Subsequently, however, he
filed supplemental briefing in support of his original complaint,
and after Defendants objected, filed a Proposed Amended Complaint
"[a]s promised."  Pl.s' Suppl. Brf. in Opp. to Mot. to Compel at
12 (doc. no. 43).  During a telephone conference on May 8, 2007,
however, Bragg finally clarified that he intended to stand on his
original complaint.

2.    "Bluelining" the Arbitration Agreement

Alternatively, Linden has offered to ameliorate the one-sidedness of the TOS's arbitration provision by suggesting that Linden could waive the requirements for three arbitrators, post the initial fees of arbitration, and agree to arbitrate in Philadelphia instead of San Francisco.  See Dfts.' Sur-Reply Brf. at 2-3 (doc. no. 2).

California law allows a court to "blueline" an arbitration agreement to remove an element that renders it substantively unconscionable.  See Cal. Civ. Code § 1670.5(a) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.").  However, a court is not obligated to blueline when an "arbitration provision is so permeated by substantive unconscionability that it cannot be cured by severance or any other action short of rewriting the contract."  Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1293 (9th Cir. 2006).  Where an arbitration provision has "multiple defects that indicate a systematic effort to impose arbitration on [the plaintiff], not simply as an alternative to litigation, but as an inferior forum that works to [the defendant's] advantage," and

-43-

there simply is "no single provision [the court] can strike or restrict in order to remove the unconscionable taint from the agreement," the court can simply refuse to enforce the arbitration provision.  Id. (citing Armendariz, 6 P.3d at 696).

The arbitration clause before the Court is simply not one where a single term may be stricken to render the agreement conscionable.  "The unilateral modification 'pervade[s]' and 'taint[s] with illegality' the entire agreement to arbitrate, [and] severance of terms within the arbitration clause would not cure the problem.  Net Global Mktg., 2007 U.S. App. LEXIS 674, at *9 (quoting Circuit City, 279 F.3d at 895 (citations omitted)); see also Armendariz, 6 P.3d at 697 ("[M]ultiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage. . . . Because a court is unable to cure this unconscionability through severance or restriction, and is not permitted to cure it through reformation and augmentation, it must void the entire agreement."). Davis, 2007 WL 1394530, at * 15 (refusing to rewrite arbitration agreement that contained four substantiviely unconscionable or void terms because "[t]hese provisions cannot be stricken or excised without gutting the agreement").  Bluelining in this case will require the redrafting of the agreement.

The Court declines to rewrite the agreement, at

-44-

Linden's request, to save an unconscionable arbitration provision
which Linden itself drafted and now seeks to enforce.  Rather
than provide a reasonable alternative for dispute resolution,
this agreement compels a one-sided resolution of disputes between
the parties.

**IV.  CONCLUSION**

For the reasons set forth above, the Court will deny
Rosedale's motion to dismiss for lack of jurisdiction.  The Court
will also deny Defendants' motion to compel arbitration.  An
appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
                                    :    CIVIL ACTION
MARC BRAGG,                         :    NO. 06-4925
                                    :
        Plaintiff,                  :
                                    :
    v.                              :
                                    :
LINDEN RESEARCH, INC. and          :
PHILIP ROSEDALE,                   :
                                    :
        Defendants.                 :
```

## ORDER

**AND NOW**, this **30th** day of **May, 2007,** it is hereby

**ORDERED** that defendant Philip Rosedale's Motion to Dismiss for

Lack of Jurisdiction (doc. no. 2) and defendant Linden Research,

Inc.'s Motion to Compel Arbitration (doc. no. 3) are **DENIED.**

It is **FURTHER ORDERED** that Plaintiff's Motion for Leave

to File Supplemental Briefs in Opposition to Defendants Motions

to Dismiss and to Compel Arbitration to Address Issues Raised by

the Court at Argument on February 5, 2007 (doc. no. 34) is **DENIED**

**as moot.**


**AND IT IS SO ORDERED.**


 **S/Eduardo C. Robreno**
**EDUARDO C. ROBRENO, J.**