IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | : | |
| MARC BRAGG, Esq., an individual, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | Case No. 06-4925 |
| | : | |
| LINDEN RESEARCH, INC., a corporation, | : | |
| and PHILIP ROSEDALE, an individual, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |
| | : | |
| LINDEN RESEARCH, INC., a corporation, | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MARC BRAGG, an individual, | : | |
| | : | |
| Counterclaim Defendant. | : | |
| _____ | : | |

## DEFENDANTS LINDEN RESEARCH, INC. AND PHILIP ROSEDALE'S ANSWER TO COMPLAINT AND LINDEN RESEARCH, INC.'s COUNTERCLAIMS AGAINST PLAINTIFF MARC BRAGG FOR:

1) **FEDERAL COMPUTER FRAUD, 18 U.S.C. § 1030**

2) **CALIFORNIA STATUTORY COMPUTER FRAUD, CAL. PENAL CODE § 502**

3) **BREACH OF CONTRACT**

4) **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

5) **CALIFORNIA STATUTORY UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200**

6) **DECLARATORY JUDGMENT**

## DEMAND FOR JURY TRIAL

Dockets.Justia.com

## PRELIMINARY STATEMENT

In his complaint, Bragg attempts to cast this as a case with broad implications about whether "virtual land" – actually, access to computing resources that enable a virtual representation of land in a three-dimensional online digital "world" – is subject to the laws governing real property.   That is not what this case is about.  It is a dispute about whether an online service may suspend a user from that service for engaging in a fraudulent scheme to obtain money, to the detriment of the service and its user community.

## ANSWER

Defendants Linden Research, Inc. ("Linden") and Philip Rosedale ("Rosedale") (collectively, "Defendants") by and through their undersigned attorneys, hereby respond to the Complaint of Plaintiff Marc Bragg ("Bragg") in the above-captioned action as follows:

## THE PARTIES

**1.**      Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 1 of the Complaint, and on that basis deny them.

**2.**      Defendants admit the allegations in Paragraph 2 of the Complaint.

**3.**      Defendants admit that Rosedale is an adult individual and a resident of the State of California.   Rosedale's business address is 945 Battery Street, San Francisco, California 94111, and he can be contacted through counsel in connection with this matter.

## FACTS

## BACKGROUND

**4.**      Defendants aver that Linden operates a three-dimensional online platform known as "Second Life" and hosted at the URL http://secondlife.com.  Defendants deny that Second Life is accurately characterized as a massively-multiplayer-online-role-playing game ("MMORPG"), although Second Life does share certain characteristics with such games (in that both are online environments rendered in three dimensions in which users are represented by avatars) and is sometimes compared with them in the media.

**5.**      Defendants admit the allegations in Paragraph 5 of the Complaint.

2

**6.**     Defendants admit the allegations in Paragraph 6 of the Complaint.

**7.**     Defendants admit that the Second Life platform contains digital representations of many real world items, such as cars and clothing, as well as embodiments of fantasy that do not exist in the real world (hereafter, virtual items created by Second Life users are referred to as "Objects").  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 7 of the Complaint.

**8.**     Defendants admit that Second Life contains an integrated economy that enables users to purchase and sell rights in Objects or other user-created content for various forms of consideration.  Defendants further admit that, subject to the Second Life Terms of Service and other applicable rules and policies, Second Life users may also purchase and sell representations of parcels of "land" in Second Life, hereinafter referred to as "virtual land."  Defendants deny that Second Life allows for the actual "conveyance of title" in "virtual land," as "virtual land" is not property to which one may take "title," but instead a license of access to Linden's proprietary servers, storage space, bandwidth, memory allocation and computational resources of the server, which enables the experience of "land" and the things that one can do with "land" on the Second Life platform.  Defendants further admit that the access rights represented by "virtual land" in Second Life can be purchased using Linden Dollars or U.S. Dollars.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 8 of the Complaint.

**9.**     Defendants admit that the allegations in Paragraph 9 of the Complaint contain generally accurate descriptions of some of the things users can do in Second Life.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 9 of the Complaint.

**10.**     Defendants admit that Second Life has been referred to as a game, but aver that it is more accurately characterized as a three dimensional development platform or a computing platform.  Defendants further admit that Linden is a business that operates the Second Life development platform to generate revenue for the company.  Defendants further admit that Rosedale has referred publicly to Second Life as a platform, rather than a game.  Defendants deny that Second Life has generated a "substantial profit" for Linden, and further deny that

1045088 v4/SF

Rosedale shares directly in profit generated from Second Life, apart from participation in a profit sharing program available to all Linden employees.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 10 of the Complaint.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS REGARDING "VIRTUAL WORDS"

11.     Defendants deny that Second Life is accurately characterized as an MMORPG, although Defendants admit that Second Life does share certain characteristics with such games, in that both are online environments rendered in three dimensions in which users are represented by avatars.  Defendants admit that Linden acknowledges users' intellectual property rights in Objects or other content of their original creation as set forth in and subject to the Second Life Terms of Service.  Defendants admit that unlike users of MMORPGs, Second Life users can obtain rights analogous to ownership in "virtual land," as stated above in this Answer, and that Linden has made representations to this effect.  Linden avers that the Second Life Terms of Service agreement speaks for itself.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 11 of the Complaint.

12.     Defendants admit the allegations in Paragraph 12 of the Complaint.

13.     Defendants admit on information and belief that many people use the Internet to form friendships with others, create and acquire content, form contracts, and form business relationships and social organizations.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 13 of the Complaint.

14.     Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 14 of the Complaint, and on that basis deny them.

15.     Defendants admit that Linden reserves the right to enforce its contractual rights with users through real world laws.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 15 of the Complaint.

16.     Defendants deny that Second Life is comparable or analogous to Disney World. Defendants admit that Second Life users operate virtual shops selling Objects in Second Life.

4

Except as expressly admitted herein, Defendants deny the allegations in Paragraph 16 of the Complaint.

17.    Defendants admit that Linden sells to Second Life users rights to "virtual land" in Second Life, namely, a license of access to Linden's proprietary servers, storage space, bandwidth, memory allocation and computational resources of the server, which enables the experience of "land" and the things that one can do with "virtual land" on the Second Life platform. Defendants deny that "Linden no longer owns the very world they [sic] created." Defendants admit that Rosedale has referred generally to Second Life as being like a new country. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 17 of the Complaint.

18.    Defendants admit that in some respects the Second Life virtual platform, or environment, is like the Internet, but in three dimensions. Defendants further admit that the viewer, or client side of Second Life is analogous to an Internet browser, in that it gives the user access to the Second Life environment. Defendants further admit that the places one can visit using this browser, i.e., the "virtual land" in the Second Life environment, are essentially three dimensional graphical websites on which users can create content. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 18 of the Complaint.

19.    Defendants admit the allegations in Paragraph 19 of the Complaint.

20.    Defendants deny that Second Life was designed to compete with Microsoft Windows. On information and belief, Defendants admit the remaining allegations in Paragraph 20 of the Complaint.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS REGARDING "VIRTUAL ITEM AND PROPERTY OWNERSHIP"

21.    Defendants deny the allegations of Paragraph 21 to the extent they are based on the incorrect premise that an online platform such as Second Life is comparable or analogous to MMORPGs or other services that may fall within Bragg's definition of "virtual worlds." Defendants admit, on information and belief, that operators of some MMORPGs claim exclusive

5

ownership of the intellectual property rights in content that "exist[s] inside the game world." Defendants lack information and belief as to whether both "virtual items" and "virtual land" are "referred to generally by participants in such worlds as 'virtual property,'" and aver that in the case of Second Life there is a fundamental difference between user-created original Objects (as to which Linden recognizes users' intellectual property rights) and "virtual land" purchased from Linden or other users (as to which users do not have intellectual property rights). Except as expressly admitted herein, Defendants deny the allegations in Paragraph 21 of the Complaint.

22. Defendants deny the allegations of Paragraph 22 to the extent they are based on the incorrect premise that "virtual items" in MMORPGs that are not created by users, but are the intellectual property of the operator of the MMORPG, are analogous to Objects or other original content created by users in Second Life. Defendants admit, on information and belief, that MMORPG operators have objected to users' alleged violations of the operators' intellectual property rights in game items. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 22 of the Complaint.

23. Defendants admit, on information and belief, that some MMORPGs derive revenue from subscription fees. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 23 of the Complaint.

24. Defendants specifically deny that Second Life is part of the MMORPG "industry." Defendants lack information and belief as to whether there is an "industry standard" as alleged in Paragraph 24 of the Complaint, because what that "industry" is is not stated, and on that basis Defendants deny the allegations that purport to define such an "industry standard." Defendants deny the remaining allegations in Paragraph 24 of the Complaint.

25. Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 25 of the Complaint, and on that basis deny them.

26. On information and belief, Defendants are aware that a market exists for the exchange of non user-created MMORPG game items outside of the MMORPG environments, and that operators of MMORPGs have objected to that practice. Except as expressly admitted

herein, Defendants deny the allegations in Paragraph 26.

27.    Defendants lack information or belief as to whether a "golden opportunity has existed for some time for any virtual world game company to legitimize the buying and selling of" non-user created game items "by the payment and exchange of U.S. dollars," and on that basis Defendants deny the allegations in Paragraph 27 of the Complaint.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS REGARDING "SECOND LIFE'S PLACE IN THE CROWDED MMORPG MARKET"

28.    Defendants deny the allegations of Paragraph 28 of the Complaint to the extent it is based on the false premise that there is a broadly-defined "industry for participants in virtual worlds" that includes both Second Life and MMORPGs as competitors.  Defendants admit that commercial launch of Second Life occurred in 2003.  Defendants lack information and belief as to whether "the competition in the [MMORPG] industry for participants in virtual worlds was fierce and the industry was dominated by well-known players" and on that basis deny same. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 28 of the Complaint.

29.    Defendants deny the allegations in Paragraph 29 of the Complaint.

30.    Defendants deny the allegations in Paragraph 30 of the Complaint.

31.    Defendants aver that Linden has not created a significant portion of content in Second Life – its intent was to create a flexible three dimensional development platform with building tools, allowing users to design their own virtual environment.  Defendants deny that "Second Life generally languished and trailed its peers in terms of participants," as Second Life was unique, and not an MMORPG, and had no peers, and further deny that Second Life can be meaningfully compared to an MMORPG.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 31 of the Complaint.

32.    Defendants admit that from its inception, Linden differentiated Second Life from MMORPGs by providing users the opportunity to create a broad range of content of their own design, and that consistent with this principle, in or about November 2003, Linden announced a

revision to the Second Life's Terms of Service to expressly recognize users' intellectual property rights in such creations. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 32 of the Complaint.

33.    Defendants deny that Linden announced a "new business model," and aver that Linden announced a change to the Second Life Terms of Service to provide express recognition of users' intellectual property rights in their original content at the "State of Play" conference in November, 2003, and that a press release followed shortly thereafter. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 33 of the Complaint.

34.    Defendants admit the allegations in Paragraph 34 of the Complaint.

35.    Defendants admit that Linden's November 14, 2003 press release stated, among other things, that "the revised [Terms of Service] allows subscribers to retain full intellectual property protection for the digital content they create, including characters, clothing, scripts, textures, objects and designs." Except as expressly admitted herein, Defendants deny the allegations in Paragraph 35 of the Complaint.

36.    Defendants admit the allegations in Paragraph 36 of the Complaint, including that Linden's November 14, 2003 press release stated, among other things, that "'Until now, any content created by users for persistent state worlds, such as EverQuest® or Star Wars Galaxies™, has essentially become the property of the company developing and housing the world,' said Rosedale. 'We believe our new policy recognizes the fact that persistent world users are making significant contributions to building these worlds and should be able to both own the content they create and share in the value that is created. The preservation of users' property rights is a necessary step toward the emergence of genuinely real online worlds.'" Defendants further aver that the release continued: "Unlike traditional online game environments where anything created in-world is owned by the service provider, Second Life has responded to its residents' desire to own their work just as they would any other original creations. Under these terms they can create, and sell derivative works based on content they've made, or license the work to others."

8

37.    Defendants aver that Lawrence Lessig, a Stanford University Professor of Law, and Founder of the Stanford Center for Internet and Society, expressed support for Linden's recognition of the intellectual property rights of Second Life users. Defendants lack information or belief sufficient to admit or deny allegations regarding Professor Lessig's subjective beliefs, and on that basis deny the allegations in Paragraph 37 of the Complaint.

38.    Defendants admit that Professor Lessig consented to being quoted in Linden's November 14, 2003 press release, and that Paragraph 38 of the Complaint accurately reproduces that quote. Defendants lack information or belief sufficient to admit or deny allegations regarding Professor Lessig's subjective beliefs, and on that basis deny the remaining allegations in Paragraph 38 of the Complaint.

39.    Defendants admit that Lessig was quoted as stating that Linden was "poised for significant growth." Except as expressly admitted herein, Defendants deny the allegations in Paragraph 39 of the Complaint.

40.    Defendants admit that between November 2003 and the present Second Life's user base has grown. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 40 of the Complaint.

41.    Defendants deny the allegations of Paragraph 41 of the Complaint, and aver that in December 2003 Linden introduced version 1.2 of Second Life, which changed the model by which users could obtain rights to "virtual land."

42.    Defendants admit that "ownership" of "virtual land" in Second Life is associated with a charge known as a "tier" charge (also called a "land use fee"), corresponding to the amount of computing resources representing "virtual land" that a user is eligible to license. Defendants further admit that Rosedale stated to USA Today in or around June 2003 that under the new fee structure, revenue from tier charges exceeded revenue from subscription fees. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 42 of the Complaint.

43.    Defendants admit that Paragraph 43 accurately reproduces excerpts from quotes

attributed to Rosedale in an article in USAToday.com posted June 3, 2004.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 42 of the Complaint.

44.    Defendants lack information or belief sufficient to admit or deny Bragg's allegations that the alleged representations in fact caused users to purchase 'virtual land" or to incur tier charges, and on that basis deny the allegations in Paragraph 44 of the Complaint.

45.    Defendants admit that Linden and Rosedale generally promoted features of Second Life.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 45 of the Complaint.

46.    Defendants admit the allegations in Paragraph 46 of the Complaint, and aver that the quote "You create it, you own it – and it's yours to do with as you please" refers to users' ownership of intellectual property rights in Objects they create, and not to "virtual land."

47.    Defendants admit that on or about June 14, 2005 Guardian Unlimited: Gamesblog published an interview with Rosedale.  Defendants further respond that the statements in that article speak for themselves.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 47 of the Complaint.

48.    Defendants aver that in response to the question "Second Life famously offers its players total ownership of their in-game creations.  Why?" the June 14 Guardian Unlimited article quoted Rosedale as saying, in part, "We like to think of Second Life as ostensibly as real as a developing nation," and that, in the context of discussing the theories of Hernando DeSoto, author of "The Mystery of Capital: Why Capitalism Triumphs in the West and Fails Everywhere Else," Rosedale was quoted as saying that DeSoto concludes that "[t]he fundamental basis of a successful developing nation is property ownership."  Defendants admit that in response to the question "How does that Western capitalism translate into Second Life?" Rosedale was quoted as saying "We launched Second Life without out of world trade and after a few months we looked at it and thought, 'We're not doing this right, we're doing this wrong.'  We started selling land free and clear, and we sold the title, and we made it extremely clear that we were not the owner of the virtual property."  Defendants aver that the references to "selling land free and

10

clear" and selling "title" are metaphors or analogies to the concepts of ownership of real property, as what is "owned" with respect to "virtual land" in Second Life is in fact a license to computing resources. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 48 of the Complaint.

49.    Defendants admit that the user base for Second Life has grown over time. Defendants further admit that Linden earns revenue from Premium membership fees and from tier charges. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 49 of the Complaint.

50.    Defendants admit that at the same time Linden released version 1.2 of Second Life, Linden changed the fee structure to provide free access to Second Life. Defendants further admit that Paragraph 50 of the Complaint contains a portion of a quote attributed to Rosedale in an article posted at CNET news. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 50 of the Complaint.

51.    Defendants admit that a Linden press release dated March 28, 2006 stated in part that "Second Life has grown to over 165,000 residents with an economy worth over US$60mm per year." Defendants further admit that the press release also stated that "Second Life has enjoyed month over month record growth in subscriber acquisition, its economy and the number of subscribers that are generating profits in US currency." Except as expressly admitted herein, Defendants deny the allegations in Paragraph 51 of the Complaint.

52.    Defendants admit that the March 28, 2006 press release stated in part that Linden had "completed a successful financing round of $11M led by Globespan Capital Partners and with participation by Jeff Bezos. Current investors Benchmark Capital, Catamount Ventures, software pioneer Mitch Kapor, and the Omidyar Network also participated in the round." Defendants specifically deny the implication that Defendants have made any misrepresentations to, or withheld any material information from, Lawrence Lessig or any Linden investors. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 52 of the Complaint.

53.    Defendants admit that Defendants and Linden's investors have expressed interest

11

in the "social good" of technology.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 53 of the Complaint.

54.    Defendants admit that Paragraph 54 of the Complaint accurately quotes portions of an interview of Rosedale discussing users' rights in Objects they create in Second Life, and discussing Hernando de Soto's "The Mystery of Capital" as it influenced Linden's policies on management and distribution of the "virtual land" in Second Life.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 54 of the Complaint.

55.    Defendants admit that Rosedale has analogized Second Life to a developing country.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 55 of the Complaint.

56.    Defendants admit that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 56 of the Complaint.

57.    Defendants admit that Paragraph 57 contains a portion of a statement attributed to Rosedale from a podcast interview with AfterTV on or about July 20, 2006.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 57 of the Complaint.

58.    Defendants admit that Paragraph 58 contains a portion of a statement attributed to Rosedale from a podcast interview.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 58 of the Complaint.

59.    Defendants admit that Paragraph 59 contains a portion of a statement attributed to Rosedale from a podcast interview.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 59 of the Complaint.

60.    Defendants admit that Paragraph 60 contains a portion of a statement attributed to Rosedale from a podcast interview.  Except as expressly admitted herein, Defendants deny the

12

allegations in Paragraph 60 of the Complaint.

**61.**     Defendants admit that in July 2006 the number of registered users in Second Life was approximately 300,000.     Except as expressly admitted herein, Defendants deny the allegations in Paragraph 61 of the Complaint.

**62.**     Defendants deny the allegations in Paragraph 62 of the Complaint.

**63.**     Defendants admit, on information and belief, that generally press releases tend to increase interest in the service.     Except as expressly admitted herein, Defendants deny the allegations in Paragraph 63 of the Complaint.

**64.**     Defendants deny the allegations in Paragraph 64 of the Complaint.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS REGARDING "VIRTUAL PROPERTY IN SECOND LIFE"

**65.**     Defendants admit that Linden represented that Second Life allowed users to have rights analogous to ownership in "virtual land," although what is "owned" with respect to "virtual land" in Second Life is in fact a license to computing resources.     Defendants further admit that Linden represented that it recognized the intellectual property rights of Second Life users in content of their original creation.     Except as expressly admitted herein, Defendants deny the allegations in Paragraph 65 of the Complaint.

**66.**     Defendants admit the allegations in Paragraph 66 of the Complaint.

**67.**     Defendants admit that Second Life users' Objects and "virtual land" are stored as electromagnetic records on Linden's servers.     Except as expressly admitted herein, Defendants deny the allegations in Paragraph 67 of the Complaint.

**68.**     Defendants admit that Second Life users with active accounts in good standing may transfer the Objects they created or obtained as well as the "virtual land" they "own." Defendants deny that Objects may always be transferred "freely," as some users may put restrictions on copying or transfer of Objects they created.     Defendants further admit that users may exchange Second Life Objects and "virtual land" for various forms of consideration. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 68 of the

Complaint.

**69.** Defendants admit that the allegations in Paragraph 69 of the Complaint are generally accurate descriptions of some features of Second Life Objects. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 69 of the Complaint.

**70.** Defendants admit that the transfer of Second Life Objects between and among users can in some respects mimic real world exchanges. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 70 of the Complaint.

**71.** Defendants deny the allegations in Paragraph 71 of the Complaint.

**72.** Defendants admit that Linden recognizes users' intellectual property rights in content of their original creation in Second Life. Defendants aver that Linden owns the intellectual property in the code underlying the Second Life content. Defendants admit that some commentators have noted that Second Life is analogous to an operating system. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 72 of the Complaint.

**73.** Defendants admit that users who "own" "virtual land" in Second Life can invite other users to that "virtual land," hold meetings on it, create or purchase Objects to put on it, or sell it to other users. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 73 of the Complaint.

**74.** Defendants deny the allegations in Paragraph 74 of the Complaint.

**75.** Defendants admit that the Second Life Objects and "virtual land" may have value that can be measured in real U.S. dollars. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 75 of the Complaint.

**76.** Defendants admit that they have encouraged people to participate in Second Life, and have promoted Linden's policies regarding intellectual property in user-created content and its policies regarding "virtual land." Except as expressly admitted herein, Defendants deny the allegations in Paragraph 76 of the Complaint.

**77.** Defendants deny the allegations of Paragraph 77 of the Complaint to the extent they are based on a false premise, namely, that Defendants transferred "title and ownership

14

interests to Plaintiff in their virtual assets," when in fact Plaintiff was well aware that the "virtual land" he bought from Linden was a license to access Linden's proprietary server software, storage space, and computational power that enabled the experience of the "virtual land" in Second Life.  On that basis, Defendants deny the allegations in Paragraph 77 of the Complaint.

**78.**    Defendants deny the allegations in Paragraph 78 of the Complaint.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS REGARDING "VIRTUAL PROPERTY IN SECOND LIFE – PROPERTY OWNERSHIP"

**79.**    Defendants admit that the allegations in Paragraph 79 of the Complaint are generally accurate with respect to Premium membership in Second Life.  Defendants aver that the Second Life tier fee is more accurately described as an access fee based on the amount of computer resources representing "virtual land" a user is entitled to license; from a technical standpoint, tier is a service fee for ongoing maintenance of the servers required to host the "virtual land," as well as provision of the computational processing power consumed.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 79 of the Complaint.

**80.**    Defendants admit that Second Life users who purchase licenses to access the computing resources that enable the experience of "virtual land" can do many things with the "virtual land," such as changing its appearance and reselling the rights to other users.  Defendants deny that users hold or may convey "title" to "virtual land."  Defendants deny the allegations of Paragraph 80 of the Complaint to the extent they are based on the false premise that Linden actually "create[s] 'new' land" that "continues to exist," when in fact the "virtual land" is the output produced by Linden's computer software and hardware.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 80 of the Complaint.

**81.**    Defendants admit the allegations in Paragraph 81 of the Complaint as they apply to defendant Linden, except that the accounts are referred to as "Premium accounts," not "premier accounts."  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 81 of the Complaint.

**82.**    Defendants admit that Second Life users can access their personal account

information, purchase Linden Dollars, buy and sell Linden Dollars for U.S. currency, pay for land, and monitor their accounts via the Internet. Defendants further admit that a currency exchange is maintained that sets the exchange rate between Linden Dollars and U.S. currency. Defendants further admit that there are third party currency exchanges that provide for the exchange of Linden Dollars to U.S. Dollars, and that Linden Dollars have been available for purchase on the eBay marketplace, located at the URL http://www.ebay.com. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 82 of the Complaint.

83.    Defendants admit that the Second Life website states that users can cancel their active accounts at any time. Defendants aver that the Second Life Terms of Service provided additional detail regarding the cancellation, suspension, and termination of accounts, as well as providing that cancelled accounts remain dormant for 60 days, and can be reactivated any time within that period. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 83 of the Complaint.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS THAT "MARC BRAGG IS INDUCED INTO "PARTICIPATING" IN THE SECOND LIFE WORLD"

84.    Defendants admit the allegations in Paragraph 84 of the Complaint on information and belief as they apply to defendant Linden. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 84 of the Complaint.

85.    Defendants lack sufficient information or belief to admit or deny the allegations in Paragraph 85, and on that basis deny them.

86.    Defendants deny the allegations in Paragraph 86 of the Complaint.

87.    Defendants lack sufficient information or belief to admit or deny the allegations in Paragraph 87 that pertain to Bragg's state of mind, and on that basis deny them. Defendants deny the remaining allegations in Paragraph 87 of the Complaint.

88.    Defendants deny the allegations in Paragraph 88 of the Complaint.

89.    Defendants admit that Bragg acquired some "virtual land" in Second Life, as well as some virtual items. Defendants further admit that Exhibit 1 of the Complaint appears to be a

16

list of "virtual land" in Bragg's account as of May 9, 2006, but Defendants lack information or belief as to the authenticity of that document. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 89 of the Complaint.

90.     Defendants admit the allegations in Paragraph 90 of the Complaint.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS
## REGARDING "SECOND LIFE'S AUCTION OF LAND"

91.     Defendants admit that Linden generally sells "virtual land" via auctions hosted on the Second Life website through Linden's servers. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 91 of the Complaint.

92.     Defendants aver that the Second Life website states that to find "virtual land" currently up for auction, users should review the list posted on the main auction page of the website. Defendants further aver that to view parcels of "virtual land" set aside to be auctioned, users can search an in-world map of the Second Life environment for the "virtual land" that has been published for auction, or users can take their avatars to a region and view land marked purple, which, as the website explains, indicates both (a) parcels currently up for auction and (b) parcels that users can preview, but which are not yet up for auction. Defendants further aver that to determine which of the purple parcels are currently up for auction, and which are not, users simply check the names of the parcels against the list published on the Second Life main auction page. Defendants further aver that only those parcels that are listed on the main auction page are up for auction. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 92 of the Complaint.

93.     Defendants aver that Linden uses the same purple designation for "virtual land" parcels planned for future auctions (so that users may preview parcels that will be available in the future) as well as parcels currently up for auction on the Second Life website. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 93 of the Complaint.

94.     Defendants aver that Linden's auction FAQ for Second Life stated, in pertinent part, "When you are in Second Life, you can click on the "Find" button, select "Land Sales,"

check the "Auction" box and select "Search." You can also see land for auction by clicking on the "Map" button and selecting "Land for Sale." The land set up for auction appears as light blue [sic]. The map includes land that is planned for auction as well as those parcels currently on the block." Except as expressly admitted herein, Defendants deny the allegations in Paragraph 94 of the Complaint.

95. Defendants admit the allegations in Paragraph 95 of the Complaint, except that the parcels are purple, not blue.

96. Defendants admit that the allegations in Paragraph 96 of the Complaint are generally accurate as to defendant Linden and as to active auctions started and published by Linden, all of which appear in a list on the main auction page of the Second Life website. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 96 of the Complaint.

97. Defendants admit that users were allowed to go to the active auctions listed on the Second Life website, and select an auction from that list, which directs the user to the auction detail for that parcel of "virtual land." Defendants deny that Linden published a list of URLs for users to access, although Defendants admit that once a user selected a parcel from the auction list, that user could see the URL for that parcel's auction detail page. Defendants further deny that users were authorized to access auction interfaces for parcels that had not been published on the main auction page of the website, or to "initiate" an auction for "virtual land" not listed on that page. Valid auctions are initiated only by being given an auction start date by a Linden employee. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 97 of the Complaint.

98. Defendants deny that there are auctions "where participants could initiate the auction," because auctions are initiated based on start dates set by Linden. Defendants further deny that a search on Google.com would return a link to any auction detail pages for auctions yet to be initiated. Defendants lack information or belief sufficient to admit or deny the remaining allegations in Paragraph 98 of the Complaint, and on that basis deny them. Except as expressly

18

admitted herein, Defendants deny the allegations in Paragraph 98 of the Complaint.

99.      Defendants admit that auctions are set to automatically run for 48 hours from the initial bid.  Defendants aver that auctions published on the main auction page are open for bidding by any user with the requisite account criteria for bidding during the 48 hour auction period.  Defendants specifically deny the allegations in Paragraph 99 with respect to Bragg's fraudulently-forced auctions, which never appeared on the main auction page and thus could only be accessed by those involved in the fraudulent scheme.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 99 of the Complaint.

100.     Defendants admit that when auctions close 48 hours after the initial bid, the high bidder at that time is automatically designated the winner by the auction program, and that the billing system charges the winner's Second Life account via an automatic process.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 100 of the Complaint.

101.     Defendants admit the allegations in Paragraph 101 of the Complaint.

102.     Defendants deny the allegations in Paragraph 102 of the Complaint.

103.     Defendants deny the allegations in Paragraph 103 of the Complaint.

104.     Defendants deny the allegations in Paragraph 104 of the Complaint, and aver that at least one of Bragg's "virtual land" purchases was gained through computer fraud and was thus not a valid or enforceable contract.  Defendants further aver that each and every "virtual land" auction transaction is governed by the Second Life Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 104 of the Complaint.

105.     Defendants admit that Bragg used U.S. funds in his account to purchase "virtual land" from Linden.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 105 of the Complaint.

106.     Defendants admit that Bragg upgraded to a Premium Second Life account. Defendants further admit that Bragg made periodic tier payments to Linden, as are required on an ongoing basis to reserve the right to receive "virtual land" service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 106 of the Complaint.

1045088 v4/SF

## RESPONSES TO PLAINTIFF'S ALLEGATIONS
## THAT "LINDEN STEALS BRAGG'S PROPERTY"

**107.**    Defendants lack information or belief sufficient to admit or deny allegations relating to Bragg's state of mind, and on that basis deny the allegations in Paragraph 107 of the Complaint.    Defendants specifically deny that Paragraph 107 accurately characterizes Defendants' statements or actions.

**108.**    Defendants admit that as of April 2006 Bragg "owned" "virtual land" and Objects in Second Life, as such terms are defined in this Answer.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 108 of the Complaint.

**109.**    Defendants aver that in April 2006 Bragg learned from another user of a fraudulent way to subvert the auction system by accessing a page on the Second Life auction website that Bragg knew he was not authorized by Linden to access, and thereby purchasing land Linden had not yet released for auction at a price far below the US $1,000.00 minimum opening bid that Bragg knew would be set by Linden.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 109 of the Complaint.

**110.**    Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 110 of the Complaint, and on that basis deny such allegations.

**111.**    Defendants aver that on or about April 30, 2006, Bragg knowingly and intentionally subverted the auction system and placed bids in an unpublished auction, on a parcel of "virtual land" named "Taesot."  As more fully alleged in Linden's counterclaims below, Bragg's bids on the Taesot property were part of a computer fraud scheme, whereby Bragg and his confederates knowingly and with intent to defraud, without Linden's permission, obtained, used and altered data and computer software in a deliberate exploit to gain unauthorized access to Linden's server software in order to manipulate and subvert Linden's auction system. Defendants further aver that, in furtherance of this scheme, Bragg's confederate triggered the 48 hour period for the "Taesot" auction, and Bragg was the winner of that auction at his high bid of $300.01 U.S.  Defendants specifically deny that this transaction was a legally binding contract.

Except as expressly admitted herein, Defendants deny the allegations in Paragraph 111 of the Complaint.

**112.**    Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 112 of the Complaint, and on that basis deny such allegations.

**113.**    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 113 of the Complaint.

**114.**    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 114 of the Complaint.

**115.**    Defendants aver that, following suspension of his account, Bragg's access to computing resources represented by parcels of "virtual land" was made available for purchase by, and sold to, other users pursuant to Second Life's Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 115 of the Complaint.

**116.**    Defendants deny that the excerpted quote attributed to Rosedale in the July 20, 2006 AfterTV podcast relates in any way to the disposition of "virtual land" and other items in Bragg's Second Life account after it was suspended, and aver that the excerpted quote was taken from this response to questions regarding crime between Second Life users:  "We of course have not built crime into Second Life you know.  It's not a game, so you can't for example just take someone else's property in Second Life."  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 116 of the Complaint.

1045088 v4/SF

117.    Defendants admit that the "virtual land" previously in Bragg's account was not "deleted."    Except as expressly admitted herein, Defendants deny the allegations in Paragraph 117 of the Complaint.

118.    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 118 of the Complaint.

119.    Defendants deny the allegations in Paragraph 119 of the Complaint.

120.    Defendants admit that on or about May 1, 2006, Bragg had approximately $2,000 in his Second Life account.  Defendants aver that Linden suspended Bragg's account following discovery of his participation in the auction subversion scheme.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 120 of the Complaint.

121.    Defendants aver that, following suspension of his account, Bragg's access to computing resources represented by parcels of "virtual land" was made available for purchase by, and sold to, other users pursuant to Second Life's Terms of Service.  Except as expressly admitted herein, users deny the allegations in Paragraph 121 of the Complaint.

122.    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."   Defendants further aver that, following suspension of his account, Bragg's access to computing resources represented by parcels of "virtual land" was made available for purchase by, and sold to, other users pursuant to Second Life's Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 122 of the Complaint.

123.    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on

administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."  Defendants further aver that, following suspension of his account, Bragg's access to computing resources represented by parcels of "virtual land" was made available for purchase by, and sold to, other users pursuant to Second Life's Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 123 of the Complaint.

    **124.**    Defendants deny the allegations in Paragraph 124 of the Complaint.

    **125.**    Defendants deny the allegations in Paragraph 125 of the Complaint.

**RESPONSES TO PLAINTIFF'S ALLEGATIONS**
**REGARDING "THE TERMS OF SERVICE AGREEMENT ('TOS')"**

    **126.**    Defendants admit that Linden provides a Terms of Service agreement for the Second Life service.  Defendants aver that during the registration process, Bragg reached a screen containing the Terms of Service, which stated "Please read the following Terms of Service carefully.  To continue logging in to Second Life, you must accept the agreement."  Defendants further aver that Bragg selected "I Agree to the Terms of Service" before being allowed to enter Second Life.  Defendants lack information or belief sufficient to admit or deny allegations regarding whether Bragg read the Terms of Service, and on that basis deny such allegations.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 126 of the Complaint.

    **127.**    Defendants deny the allegations in Paragraph 127 of the Complaint.

    **128.**    Defendants deny the allegations in Paragraph 128 of the Complaint.

    **129.**    Defendants deny the allegations in Paragraph 129 of the Complaint.

    **130.**    Defendants admit that the Terms of Service do not "suspend the application of the laws of the United States."  Indeed, Defendants aver that the Terms of Service require that users shall not violate any law.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 130 of the Complaint.

23

**131.**    Defendants deny the allegations in Paragraph 131 of the Complaint.

**132.**    Defendants deny the allegations in Paragraph 132 of the Complaint.

**133.**    Defendants deny the allegations in Paragraph 133 of the Complaint.

**134.**    Defendants deny the allegations in Paragraph 134 of the Complaint.

**135.**    Defendants admit that Paragraph 135 of the Complaint (and subparagraphs thereof) contains excerpts from the current Terms of Service.  Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 135 of the Complaint that pertain to Bragg's state of mind, and on that basis deny all such allegations.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 135 of the Complaint.

**136.**    Defendants deny the allegations in Paragraph 136 of the Complaint.

**137.**    Defendants deny the allegations in Paragraph 137 of the Complaint.

**138.**    Defendants deny the allegations in Paragraph 138 of the Complaint.

### COUNT I:  VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (*73 P.S. § 201-1, et seq.*

**139.**    Defendants incorporate by reference their responses to Paragraphs 1 through 138 as set forth above.

**140.**    Defendants deny the allegations in Paragraph 140 of the Complaint.

**141.**    Defendants deny the allegations in Paragraph 141 of the Complaint.

**142.**    Defendants admit that Linden acknowledges Second Life users' intellectual property rights in their original  creations as set forth more fully in the Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 142 of the Complaint.

**143.**    Paragraph 143 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, and except as expressly admitted herein, Defendants deny the allegations in Paragraph 143 of the Complaint.

**144.**    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver

that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold." Except as expressly admitted herein, Defendants deny the allegations in Paragraph 144 of the Complaint.

**145.**    Defendants deny the allegations in Paragraph 145 of the Complaint.

**146.**    Paragraph 146 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 146 of the Complaint.

**147.**    Defendants deny the allegations in Paragraph 147 of the Complaint.

**148.**    Defendants deny the allegations in Paragraph 148 of the Complaint.

**149.**    Defendants lack information or belief sufficient to admit or deny allegations as to Bragg's state of mind, and on that basis deny all such allegations. Paragraph 149 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 149 of the Complaint.

**150.**    Defendants lack information or belief sufficient to admit or deny allegations as to Bragg's state of mind, and on that basis deny all such allegations. Defendants deny the remaining allegations in Paragraph 150 of the Complaint.

**151.**    Defendants deny the allegations in Paragraph 151 of the Complaint.

**152.**    Defendants deny the allegations in Paragraph 152 of the Complaint.

**153.**    Defendants deny the allegations in Paragraph 153 of the Complaint.

**154.**    Paragraph 154 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 154 of the Complaint.

**155.**    Defendants deny the allegations in Paragraph 155 of the Complaint.

**156.**    Defendants deny the allegations in Paragraph 156 of the Complaint.

**157.**    Defendants deny that they sell "title" to "virtual land." Defendants aver that, following suspension of his account, Bragg's access to computing resources represented by

parcels of "virtual land" was made available for purchase by, and sold to, other users pursuant to Second Life's Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 157 of the Complaint.

**158.**    Paragraph 158 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 158 of the Complaint.

**159.**    Paragraph 159 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 159 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count I of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT II:  VIOLATION OF THE CALIFORNIA UNFAIR AND DECEPTIVE PRACTICES ACT (Cal. Bus. & Prof. Code § 17200)

**160.**    Defendants incorporate by reference their responses to Paragraphs 1 through 159 as set forth above.

**161.**    Defendants deny the allegations in Paragraph 161 of the Complaint.

**162.**    Defendants deny the allegations in Paragraph 162 of the Complaint.

**163.**    Defendants deny the allegations in Paragraph 163 of the Complaint.

**164.**    Paragraph 164 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 164 of the Complaint.

**165.**    Defendants deny the allegations in Paragraph 165 of the Complaint.

**166.**    Defendants deny the allegations in Paragraph 166 of the Complaint.

**167.**    Defendants deny the allegations in Paragraph 167 of the Complaint.

**168.**    Defendants deny the allegations in Paragraph 168 of the Complaint.

1045088 v4/SF

**169.**    Paragraph 169 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 169 of the Complaint.

**170.**    Defendants deny the allegations in Paragraph 170 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count II of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT III:  VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, Ca. Civ. Code § 1750, et seq.

**171.**    Defendants incorporate by reference their responses to Paragraphs 1 through 170 as set forth above.

**172.**    Paragraph 172 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 172 of the Complaint.

**173.**    Defendants deny the allegations in Paragraph 173 of the Complaint.

**174.**    Defendants deny the allegations in Paragraph 174 of the Complaint.

**175.**    Defendants specifically deny the implication that they violated the Consumer Legal Remedies Act, and on that basis deny the allegations in Paragraph 175 of the Complaint.

**176.**    Defendants deny the allegations in Paragraph 176 of the Complaint.

**177.**    Defendants deny the allegations in Paragraph 177 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count III of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT IV:  FRAUD AND/OR FRAUD IN THE INDUCEMENT

**178.**    Defendants incorporate by reference their responses to Paragraphs 1 through 177

27

as set forth above.

**179.**    Defendants deny the allegations in Paragraph 179 of the Complaint.

**180.**    Defendants specifically deny that Defendants engaged in any fraudulent or deceptive conduct.  Defendants further deny that Bragg sustained any damages or was harmed. Defendants deny the allegations in Paragraph 180 of the Complaint.

**181.**    Defendants deny the allegations in Paragraph 181 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count IV of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

### COUNT V:  VIOLATION OF CALIFORNIA CIVIL CODE § 1812.600, et seq.

**182.**    Defendants incorporate by reference their responses to Paragraphs 1 through 181 as set forth above.

**183.**    Paragraph 183 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants respond that California Civil Code §1812.600 *et. seq.* governs auctions as defined in that statute.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 183 of the Complaint.

**184.**    Defendants deny the allegations in Paragraph 184 of the Complaint.

**185.**    Defendants deny the allegations in Paragraph 185 of the Complaint.

**186.**    Defendants deny the allegations in Paragraph 186 of the Complaint.

**187.**    Defendants deny the allegations in Paragraph 187 of the Complaint.

**188.**    Paragraph 188 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants respond that there is legal authority on the subject of waiver of this statute.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 188 of the Complaint.

**189.**    Paragraph 189 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph

189 of the Complaint.

**190.**    Defendants deny the allegations in Paragraph 190 of the Complaint.

**191.**    Defendants deny the allegations in Paragraph 191 of the Complaint.

**192.**    Defendants deny the allegations in Paragraph 192 of the Complaint.

**193.**    Defendants deny the allegations in Paragraph 193 of the Complaint.

**194.**    Defendants deny the allegations in Paragraph 194 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count V of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT VI:  CONVERSION

**195.**    Defendants incorporate by reference their responses to Paragraphs 1 through 194 as set forth above.

**196.**    Defendants deny the allegations in Paragraph 196 of the Complaint.

**197.**    Paragraph 197 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants admit that Bragg had U.S. currency on deposit with Linden.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 197 of the Complaint.

**198.**    Defendants deny the allegations in Paragraph 198 of the Complaint.

**199.**    Defendants deny the allegations in Paragraph 199 of the Complaint.

**200.**    Defendants deny the allegations in Paragraph 200 of the Complaint.

**201.**    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."  Defendants further aver that, following suspension of his account, Bragg's access to computing resources represented by parcels of "virtual land" was made available for purchase

1045088 v4/SF

by, and sold to, other users pursuant to Second Life's Terms of Service. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 201 of the Complaint.

202. Defendants deny the allegations in Paragraph 202 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count VI of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT VII:  INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONS / PROSPECTIVE ECONOMIC ADVANTAGE

203. Defendants incorporate by reference their responses to Paragraphs 1 through 202 as set forth above.

204. Defendants admit that Defendants do not claim intellectual property rights in any Second Life content of Bragg's original creation, except as provided in the Second Life Terms of Service. Except as expressly admitted herein, Defendants deny the allegations in Paragraph 204 of the Complaint.

205. Defendants lack information or belief as to the scope and nature of rights Bragg retained in Objects he may have received from third parties, and Defendants aver that Bragg's rights in Objects and "virtual land" are governed by the Second Life Terms of Service, and on those bases deny the allegations in Paragraph 205 of the Complaint.

206. Defendants specifically deny that Defendants "stole" any property owned by Bragg.  Defendants lack information or belief sufficient to admit or deny the remaining allegations in Paragraph 206, and on that basis deny them.

207. Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 207 of the Complaint, and on that basis deny them.

208. Defendants admit that Linden had knowledge that Bragg "owned" rights to certain parcels of "virtual land."  Except expressly admitted herein, Defendants lack sufficient information or belief to admit or deny the allegations in Paragraph 208 of the Complaint, and on

that basis deny them.

**209.**    Defendants deny the allegations in Paragraph 209 of the Complaint.

**210.**    Defendants deny the allegations in Paragraph 210 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count VII of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT VIII:  BREACH OF CONTRACT

**211.**    Defendants incorporate by reference their responses to Paragraphs 1 through 210 as set forth above.

**212.**    Defendants aver that one or more of the "virtual land" transactions between Linden and Bragg was a result of the fraudulent scheme to subvert the auction process, and therefore were not valid and enforceable contracts, and on that basis Defendants deny the allegations in Paragraph 212 of the Complaint.

**213.**    Defendants admit that Bragg paid money for the "virtual land" he purchased in Second Life.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 213 of the Complaint.

**214.**    Defendants specifically deny that Linden agreed to provide "title" in "virtual land," and aver that ownership of "virtual land" in Second Life means the right to server access and does not involve transfer of "title," and on that basis Defendants deny the allegations in Paragraph 214 of the Complaint.

**215.**    Defendants specifically deny any agreement to convey "title," and on that basis Defendants deny the allegations in Paragraph 215 of the Complaint.

**216.**    Defendants admit that, generally, "virtual land" auction agreements are executed through Linden's auction system, subject to the Second Life Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 216 of the Complaint.

**217.**    Paragraph 217 of the Complaint consists of legal conclusions to which no answer

31

is required, but to the extent an answer is required, Defendants lack information or belief sufficient to admit or deny the allegations in Paragraph 217 of the Complaint, and on that basis deny them.

**218.** Defendants deny the allegations in Paragraph 218 of the Complaint.

**219.** Defendants deny the allegations in Paragraph 219 of the Complaint.

**220.** Defendants admit that the parcels of "virtual land" that Bragg purchased from Linden had visual or other properties that may have differentiated them from other parcels of "virtual land." However, Defendants aver that to the extent that all "virtual land" in Second Life is code stored on Linden's servers, it may not be considered "unique" as used by Bragg in the Complaint, and on that basis Defendants deny the allegations in Paragraph 220 of the Complaint.

**221.** Defendants deny the allegations in Paragraph 221 of the Complaint.

**222.** Defendants deny the allegations in Paragraph 222 of the Complaint.

**223.** Defendants deny the allegations in Paragraph 223 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count VIII of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT IX:  UNJUST ENRICHMENT

**224.** Defendants incorporate by reference their responses to Paragraphs 1 through 223 as set forth above.

**225.** Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity. Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold." Defendants further aver that, following suspension of his account, Bragg's access to computing resources represented by parcels of "virtual land" was made available for purchase by, and sold to, other users pursuant to Second Life's Terms of Service. Except as expressly

admitted herein, Defendants deny the allegations in Paragraph 225 of the Complaint.

**226.**    Defendants deny the allegations of Paragraph 226 of the Complaint.

**227.**    Defendants deny the allegations of Paragraph 227 of the Complaint.

**228.**    Defendants aver that on or about May 1, 2006, Linden put Bragg's account on administrative hold pending investigation of irregular auction activity.  Defendants further aver that as a result of Linden's investigation Linden determined that Bragg had fraudulently subverted the Second Life auction system, and thus Bragg's account status was updated to "fraud hold."  Defendants further aver that, following suspension of his account, Bragg's access to computing resources represented by parcels of "virtual land" was made available for purchase by, and sold to, other users pursuant to Second Life's Terms of Service.  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 228 of the Complaint.

**229.**    Defendants deny the allegations in Paragraph 229 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count IX of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.

## COUNT X:  TORTIOUS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (CALIFORNIA LAW)

**230.**    Defendants incorporate by reference their responses to Paragraphs 1 through 229 as set forth above.

**231.**    Paragraph 231 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants admit the allegations in Paragraph 231 of the Complaint.

**232.**    Paragraph 232 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants admit that in the Terms of Service and in the contracts whereby Bragg purchased certain rights to Second Life "virtual land," there were mutual implied covenants of good faith and fair dealing, as defined by law.  Except as

33

expressly admitted herein, Defendants deny the allegations in Paragraph 232 of the Complaint.

**233.**    Paragraph 233 of the Complaint consists of legal conclusions to which no answer is required, but to the extent an answer is required, Defendants deny the allegations in Paragraph 233 of the Complaint.

**234.**    Defendants deny the allegations in Paragraph 234 of the Complaint.

**235.**    Defendants deny the allegations in Paragraph 235 of the Complaint.

**236.**    Defendants deny the allegations in Paragraph 236 of the Complaint.

**237.**    Defendants deny the allegations in Paragraph 237 of the Complaint.

**238.**    Defendants admit that in or about September 2005, CNET News quoted Rosedale as stating "We're going to make more because some of the people who wouldn't have otherwise signed up are going to buy land."  Except as expressly admitted herein, Defendants deny the allegations in Paragraph 238 of the Complaint.

**239.**    Defendants specifically deny that any representations by them on the subject of "ownership" of "virtual land" was a "lie," and further deny that Linden's business model was or is "crooked" and on that basis Defendants deny the allegations in Paragraph 239 of the Complaint.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor and against Plaintiff, dismissing Count X of the Complaint in its entirety and with prejudice, and award Defendants costs, attorneys' fees in accordance with applicable law, and further relief deemed appropriate by this Court.


## AFFIRMATIVE DEFENSES


### FIRST AFFIRMATIVE DEFENSE – ALL COUNTS

### (Failure to State a Claim)

**240.**    Each and every Count of the Complaint fails to state a claim for which relief may

be granted.

## SECOND AFFIRMATIVE DEFENSE – ALL COUNTS

### (Unclean Hands)

241.    Each and every Count of the Complaint is barred by the doctrine of unclean hands in that Bragg engaged in serious wrongdoing in connection with a scheme to subvert the Second Life auction system and thus should not be entitled to any equitable relief or recovery on his claim of conversion.

## THIRD AFFIRMATIVE DEFENSE – ALL COUNTS

### (Waiver)

242.    Each and every Count of the Complaint is barred by the doctrine of waiver in that Bragg knowingly and voluntarily relinquished any rights to the recovery sought in this action.

## FOURTH AFFIRMATIVE DEFENSE – ALL COUNTS

### (Contractual Limitation of Liability)

243.    Each and every Count of the Complaint is barred by the contractual limitation of liability provision of the Second Life Terms of Service, by which Bragg agreed that neither Linden nor any of its officers would be liable to him for any special, incidental, consequential, punitive or exemplary damages.

## FIFTH AFFIRMATIVE DEFENSE – COUNT I

### (Gist of the Action Doctrine)

244.    Count I of the Complaint is barred by the gist of the action doctrine, in that Bragg's claims arise out of the contracts and alleged contracts between Bragg and Linden and are based on obligations underlying those contracts.

## SIXTH AFFIRMATIVE DEFENSE – COUNT VI

### (Consent)

245.    Count VI of the Complaint is barred by the doctrine of consent, in that Bragg consented to having any Second Life content deleted at any time, and further consented to having any "virtual land" reclaimed and auctioned at Linden's discretion.

## SEVENTH AFFIRMATIVE DEFENSE – COUNT VI

### (Doctrine of Own Interests)

246.    Count VI of the Complaint is barred by the doctrine of own interests, in that defendant froze Bragg's Second Life account for the purpose of preventing further harm to Linden caused by Bragg's fraudulent conduct.

## EIGHTH AFFIRMATIVE DEFENSE – COUNT VIII

### (Mistake of Fact)

247.    Count VIII of the Complaint is barred by the doctrine of mistake of fact, in that, to the extent a contract was formed for the Taesot parcel, it was due to Bragg subverting the Second Life auction system and causing the system to mistakenly treat his illegitimate bids as a legitimate auction.

## NINTH AFFIRMATIVE DEFENSE – COUNT VIII

### (Fraud)

248.    Count VIII of the Complaint is barred by fraud, in that, to the extent a contract was formed for the Taesot parcel, it was procured through fraudulent means and may not be enforced by Bragg.

## TENTH AFFIRMATIVE DEFENSE – INJUNCTIVE RELIEF

### (Changed Circumstances)

249.    Each and every request for injunctive relief in the Complaint is barred by the doctrine of changed circumstances, in that the relevant rights to the "virtual land" Bragg seeks is now held by third parties.

## ELEVENTH AFFIRMATIVE DEFENSE – INJUNCTIVE RELIEF

### (Adequate Legal Remedy)

250.    Each and every request for injunctive relief in the Complaint is barred by the adequate legal remedy doctrine, in that, to the extent Bragg prevails on any of his claims, money damages would be an adequate legal remedy.

**TWELFTH AFFIRMATIVE DEFENSE – DAMAGES**

**(Setoff)**

251.    Defendant Linden is entitled to a setoff against any damages claims based on Linden's claims against Bragg as set forth in the Counterclaims below.

**THIRTEENTH AFFIRMATIVE DEFENSE – ALL COUNTS**

**(Other Defenses)**

252.    Defendants presently have insufficient knowledge or information upon which to form a belief as to whether Defendants may have additional, as yet unstated, separate defenses available.  Accordingly, Defendants reserve the right to assert additional separate defenses to the Complaint in the event that further discovery or inquiry indicated they are appropriate.

**LINDEN RESEARCH, INC.'S COUNTERCLAIMS
AGAINST PLAINTIFF MARC BRAGG FOR:**

1)    **FEDERAL COMPUTER FRAUD, 18 U.S.C. § 1030**

2)    **CALIFORNIA STATUTORY COMPUTER FRAUD,
       CAL. PENAL CODE § 502**

3)    **BREACH OF CONTRACT**

4)    **BREACH OF THE IMPLIED COVENANT OF GOOD
       FAITH AND FAIR DEALING**

5)    **CALIFORNIA STATUTORY UNFAIR COMPETITION,
       CAL. BUS. & PROF. CODE § 17200**

6)    **DECLARATORY RELIEF**

For its counterclaims against Plaintiff and counterclaim defendant Marc Bragg ("Bragg"), defendant and counterclaim plaintiff Linden Research, Inc. ("Linden") hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.    This Counterclaim arises from a fraudulent scheme perpetrated by Marc Bragg and persons acting in concert with him to obtain money through a scheme and artifice involving unauthorized access to Linden's proprietary computers that host the online digital platform, or

virtual world, known as "Second Life." As more fully alleged below, Bragg – who is a licensed attorney – and his confederates, knowingly and with intent to defraud, without Linden's permission, obtained, used and altered data and computer software in a deliberate exploit to gain unauthorized access to Linden's server software in order to manipulate and subvert Linden's standard system for making so-called "virtual land" available to its users through its land auction system. Linden sells rights to such "virtual land" – which are equivalent to access rights to a designated and dedicated portion of Linden's hosting servers, computational resources, and memory allocation – through auctions that are open to all residents simultaneously, with a set standard minimum bid of U.S. $1,000.00. The objective of Bragg's scheme was to obtain access to "virtual land" that was scheduled to be auctioned by Linden in the future and thus before it was available to any other users, and to acquire it for as little as one U.S. dollar rather than whatever winning bid (in excess of the minimum opening bid of U.S. $1,000.00) might have resulted from a legitimate auction. After acquiring the "virtual land" through this fraudulent scheme, Bragg intended to subdivide it, sell it to other Second Life users, and potentially obtain thousands of dollars in U.S. funds in ill-gotten profit. Prompted by the fortuitous discovery of Bragg's and his associates' anomalous auction transactions, Linden personnel investigated, and placed Bragg's Second Life account on hold before he was able to profit from the scheme. When Linden told Bragg that it had placed his account on hold pending their investigation of his activity, Bragg threatened to sue Linden, in an attempt to dissuade Linden from continuing its investigation into his fraudulent scheme. When Linden did not capitulate in response to Bragg's threats and remove the hold on his account, he immediately retaliated by bringing suit and – incredibly – demanding that Linden refund him his "expectation interest in the profit" he hoped to gain by reselling the fraudulently-purchased "virtual land." Linden brings these counterclaims to recover the losses it incurred as a result of Bragg's scheme, and to ensure that Bragg is appropriately punished and forever barred from Second Life.

## **THE PARTIES**

2.      Linden is a Delaware corporation with its principal place of business in San

Francisco, California, with offices at 945 Battery Street, San Francisco, California 94111.

3.     Bragg is an individual, on information and belief residing in Chester County, Pennsylvania.

4.     On information and belief, Bragg is an attorney admitted to the practice of law in Pennsylvania, New Jersey, and California.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## ALLEGATIONS COMMON TO ALL CLAIMS

6.     Linden created and operates Second Life, a three-dimensional online digital "virtual world" in which users develop and create the content and experiences that exist in the world, and determine their own ways to interact with and explore the world, much like the way users create websites on the Internet and other users interact with and experience those websites. To participate in Second Life, a user must choose a user name, agree to the Second Life Terms of Service, create an account by registering as a user, and then download Linden's proprietary viewer software to his or her computer.  A true and correct copy of the Second Life Terms of Service as they existed from at least December 2005 through May 2, 2006 is attached hereto as Exhibit A and incorporated herein by reference.

7.     After agreeing to the Terms of Service, registering, choosing a user name, and downloading the Second Life software, a user creates an avatar, a three-dimensional character through which the user can travel throughout the Second Life environment, interact with other users (also called "residents"), and create and experience representations of objects such as clothing, automobiles, and jewelry, conduct business, and attend events and meetings.  Linden does not claim intellectual property rights in the objects or other content users create in Second Life.

8.     Upon entering Second Life for the first time, users are directed to an "Orientation Island" where they gain instruction in various aspects of Second Life.  On the Orientation Island,

users are guided through the Second Life Community Standards, which include a set of principles known as the "Big Six," which prohibit intolerance, harassment, assault, invasions of privacy, indecency, and disturbing the peace.  As stated in the Second Life Community Standards, "The goals of the Community Standards are simple: treat each other with respect and without harassment, adhere to local standards as indicated by simulator ratings, and refrain from any hate activity which slurs a real-world individual or real-world community."  As such, Second Life is designed to be a safe environment where users can express themselves, be creative, and develop safe and legitimate relationships and businesses.

9.    Second Life has a fully-integrated virtual economy designed to reward users' entrepreneurship, innovation, and craftsmanship.  Because users retain whatever intellectual property rights exist in the objects they have created, subject to the Terms of Service and conditions the creators may impose, they may sell, transfer or gift them to other users within Second Life.  Likewise, users may also sell services to other users, such as design, advertising, and development services, within Second Life.

10.    Users engage in purchase and sale transactions within Second Life using an internal unit-of-trade called "Linden Dollars."  Linden Dollars may be bought and sold for real currency on an exchange provided by Linden, and also on third-party exchanges.

11.    Second Life users with "Premium" memberships (which require a monthly fee) may also purchase "virtual land," which enables them to create representations of buildings such as shops and homes, where they may display and store their virtual creations as well as host events and operate businesses.

12.    What a user actually obtains as a result of purchasing "virtual land" in Second Life is a license to have their created environment hosted on  a dedicated and designated portion of Linden's proprietary servers, storage space, bandwidth, memory allocation, and a portion of the computational resources of the server.  Each server contains two or more CPU cores that each represents a particular amount of "virtual land."

13.    A user who purchases "virtual land" does not obtain rights in or control over

40

Linden's server software, which is Linden's intellectual property, or in Linden's server hardware.

14.     Users may purchase newly created "virtual land" in the Second Life "mainland" from Linden by auction, and users may also purchase "islands" for a fixed fee.   Linden creates new "virtual land" in response to user demand, and does so by adding additional servers to its computing network on which to host the "virtual land" and the activities that occur and the content that users create on it.   Users may also may purchase existing "virtual land" from other users, in essence transferring the right to be hosted on, and computational resources of, Linden's servers, though the server software itself is not transferred.

15.     In order to hold "virtual land," a user must pay a monthly "land use fee," also called a "tier fee," based on the peak amount of "virtual land" the user "owned" during the previous 30 days.   The tier fee is determined by the user's "ownership tier," which the user may increase or decrease to accommodate the amount of "virtual land" he or she desires to "own." The tier fee is a fee for the services Linden provides that comprise and host the experience of "virtual land."

16.      "Virtual land" in Second Life is different from the objects and other content users create within Second Life.   "Virtual land" is part of the Second Life service; Linden provides Second Life users a license to use the services associated with "virtual land" pursuant to the Terms of Service and as long as tier fees and any other charges are paid.   Because the "virtual land" itself in Second Life is not content created by a user, but rather a graphical representation of server space in the form of land features that are produced by Linden, a user does not obtain or retain intellectual property rights in "virtual land."   Rather, "virtual land" is analogous to a canvas or blank page on which one may create his or her own original content:     the user could have intellectual property rights in what he or she creates on it, but not in the canvas – or "virtual land" – itself.

17.     Only a minority of Second Life users own "virtual land."   Most of those who own "virtual land" purchase it in order to build communities or businesses upon it.   Some others

purchase "virtual land" in order to subdivide it and sell it to other users at a profit.

18.    Linden offers different-sized parcels of newly-created "virtual land" to Second Life users by auction.  At all times relevant to these Counterclaims, Linden's procedure was to conduct auctions of specific, newly-available parcels of "land" as it added additional servers to its hosting networks.  The auctions were published on the main auction page of the Second Life web site.  Once published, the auctions would become visible to all Second Life users, so that all users with Premium memberships would have an opportunity to bid upon them.  A user who was interested in bidding on a particular parcel would click on the listing for that parcel, and then would be taken by hyperlink to the specific auction detail page for that parcel, much like the way an auction on eBay works.  Each auction would begin at a minimum bid set by Linden.  Users would make their bids by entering them on the auction detail page for the relevant parcel.  Once an opening bid was entered, users would have 48 hours from that point to bid before the auction automatically closed and the parcel automatically went to the high bidder; again, much like an eBay auction.

19.    At all times relevant to these Counterclaims, the largest size of mainland parcel that Linden offered by auction was called a "region," and also colloquially known as a "sim." Linden uniformly set the minimum bid for such parcels at U.S. $1,000.00.

20.    Each new region or "sim" requires its own computer central processing unit or CPU core.  As such, as Linden creates new regions of "virtual land," it must install new computer servers containing the CPU cores for those regions.  Linden set the opening bid at U.S. $1,000.00 to cover the cost of obtaining and installing the computer hardware for each new region.

21.    On or about December 7, 2005, Bragg opened an account and registered as a user of Second Life under the user name "Marc Woebegone" and agreed to the Terms of Service then in force.

22.    During the process of registering as a Second Life user, Bragg reached a screen containing the Terms of Service, which stated "Please read the following Terms of Service

42

carefully.  To continue logging on to Second Life, you must accept the agreement."  Bragg manifested his agreement to the Terms of Service by clicking a button on the screen containing the Terms of Service reading "I Agree to the Terms of Service."

23.    As an attorney admitted to the practice of law in three states and experienced in contract law, Bragg understood that by clicking the button reading "I Agree to the Terms of Service," he was entering into a contract with Linden.    On information and belief, he was also familiar with the standard and ubiquitous practice of Internet software and service providers requiring their potential customers to  accept an online agreement in order to gain access to such software and services.  Indeed, Linden relied on his reading and accepting its Terms of Service as a condition to allowing him to gain access to its servers and software.

24.    The Terms of Service to which Bragg agreed provided, among other things, that: Bragg would not:

(a)    "take any action or upload, post, e-mail or otherwise transmit content that violates any law or regulation" [Section 5.1(iii)],

(b)    "take any action that would violate any right or duty under any law or under contractual or fiduciary relationships" [Section 5.1(vi)], or

(c)    "interfere with or disrupt the Service or servers or networks connected to the Service, or disobey any requirements, procedures, policies, or regulations of networks connected to the Service" [Section 5.1(viii)].

25.    On information and belief, Bragg understood each of the terms of the Terms of Service referenced in the preceding paragraph.

26.    After opening his Second Life account, Bragg began purchasing "virtual land" from Linden through its customary auction system.  For example, on or about February 27, 2006, Bragg was the successful bidder on a region or "sim" called Songi, for which the bidding started at U.S. $1,000.00 and his winning bid was U.S. $1,605.00.  On or about March 19, 2006, he was the successful bidder on a region or "sim" called Shinjung, for which the bidding started at U.S. $1,000.00 and his winning bid was U.S. $1,798.00.  On or about April 13, 2006, he was the

43

successful bidder on a region or "sim" called Ho Su, for which the bidding started at U.S. $1,000.00 and his winning bid was U.S. $1,501.00.  Bragg also purchased other parcels at auction in Second Life.

27.     After purchasing his parcels of "virtual land," Bragg subdivided them and resold them to other Second Life users in order to make a profit.  Bragg used some of the proceeds from his sales to purchase other parcels from Linden.  Bragg converted some of the Linden dollars he earned from his transactions in Second Life into U.S. dollars.

28.     In or about April 2006, however, Bragg learned of a scheme that, if successful, would allow him to make far more profit from his "virtual land" sales, at Linden's expense. Specifically Bragg learned that another user with whom he was acquainted, "User M.S.," had acquired one or more full regions or "sims" of "virtual land" for as low as one U.S. dollar, despite the fact that the minimum bid set by Linden for "sims" was U.S. $1,000.00.

29.     On information and belief, Bragg realized that if he, too, could acquire "sims" for as little as one U.S. dollar, he could make much more money upon subdividing and reselling portions to other users than if he had to pay U.S. $1,000.00 or more for "sims," as he had done before in Linden's authorized auctions.

30.     As a result, on information and belief, Bragg sent User M.S. an electronic message in or about late April 2006 asking User M.S. how he was able to acquire full "sims" for as low as U.S. one dollar,  in the hope that he could do so, too.

31.     Thereafter, on April 29, 2006, Bragg participated in an exchange of electronic messages with User M.S. over the Internet within Second Life's chat environment under Bragg's user name of Marc Woebegone, in which he asked User M.S. "did u get my im from earlieri [sic] about the sims /auctions and the $1.00 price tag?"  and "how did you manage to get those? I didnd't [sic] even see them come up for auction?"

32.     In that exchange User M.S. told Bragg that there were "no other bidders," which Bragg observed was "interesting… and very unusual."  User M.S. told Bragg that he had bid on some other "sims" but did not want to pay the monthly tier fees he would have to pay if he

acquired them, and asked Bragg if he would want them.  Bragg said that he was "very interested," and User M.S. said "lemme see what I can do… they come up this afternoon."

33.    Later on April 29, 2006, Bragg, User M.S., and a third Second Life user already known to Bragg, "User D.S.," had an online chat within Second Life, in which the three discussed a means of subverting the Second Life auction system so that regions or "sims" of "virtual land" could be purchased covertly and at prices far below the U.S. $1,000.00 minimum opening bid.

34.    Essentially, the scheme User M.S. shared with Bragg and User D.S. involved surreptitiously and without authorization accessing auction detail pages for parcels that Linden had not yet published on the main auction page of the Second Life site, and before Linden had set the minimum opening bid of U.S. $1,000.00.  As these auction detail pages were unpublished, no user could access them by any method authorized by Linden.  Therefore, the scheme required the use of an artifice or "exploit" to access the auction detail pages in advance of the legitimately conducted auction, which User M.S. described to Bragg and User D.S.

35.    Upon accessing such an unpublished auction, User M.S. would enter a bid of as low as U.S. $1.00, which was possible because Linden had not intended to start the auction at that time, and therefore had not yet set the U.S. $1,000.00 minimum opening bid.  Entering a bid would automatically trigger the 48 hour term of the auction.  Because the auction had not been published, no one else could bid on it – except someone who knew of the exploit.  If no one else placed a bid, after 48 hours passed User M.S. would be the winner of the auction with a high bid of U.S. $1.00.

36.    In that same online chat Bragg asked User M.S. how the scheme worked, and User M.S. explained it to Bragg and User D.S.  Bragg immediately understood that the scheme involved deceptively and surreptitiously accessing auctions that Linden had not made available to users, that it could be used to obtain parcels of "virtual land" that otherwise would be offered upwards of U.S. $1,000.00 for as little as one U.S. dollar, and that Linden was unaware of the scheme.

37.    Specifically, in that chat Bragg observed that User M.S. "started an auctio [sic] no one else can see" and that "if a sim is not on the active auction page you can make it active for $1.00" even though "all sims started by linden start at 1,000US."  Bragg asked User M.S. "linden doesn't know this?"  User M.S. responded "no one knows," and Bragg replied "omg.. don't tell anyone [sic]… lol."  Bragg and User D.S. further agreed with User M.S. to keep the scheme a secret and that they would not bid against User M.S.

38.    During that same online chat on April 29, 2006 User M.S. directed Bragg to an unpublished auction for an entire region or "sim," No. 0026198448, on which User M.S. had started the clock approximately 48 hours earlier using this scheme, at a bid of U.S. $1.00, in an attempt to purchase the "sim" for that price.  This auction was not authorized by Linden nor visible on the Second Life main auction page – the only way to find it was by using the fraudulent scheme that User M.S. had discovered and that Bragg asked him to explain.

39.    However, about 10 minutes before this auction was scheduled to end, another Second Life user who was aware of the scheme, "User S.S.," had outbid User M.S. with a bid of U.S. $20.00.  User M.S. was unable to make further bids, so he asked Bragg to bid for him.

40.    On information and belief, "User S.S." had also learned of the scheme from User M.S. or an associate of User M.S., but nonetheless decided to bid against User M.S.

41.    Bragg obliged User M.S., and bid U.S. $25.00 for the purchase of parcel No. 0026198448.  After User S.S. increased his bid, Bragg then bid U.S. $35.26 for the parcel. Ultimately Bragg was outbid by User S.S. who was the high bidder at U.S. $50.00 at the end of the auction.

42.    Undaunted, Bragg, User M.S., and User D.S. then began looking for other unpublished auctions to which they could apply their scheme, and engaged in the following chat on April 29, 2006:

    User M.S.:    "havin fun yet"

    User D.S.:    "oh yeah"

46

| Bragg: | "yes, lol… u r a wizard" |
| User M.S.: | "kid getting away with fingers in the candy jar?" |
| Bragg: | "guess so… lol" |

43. Thereafter, in another online chat in Second Life later in the day on April 29, 2006, Bragg provided User D.S. step-by-step instructions on how to activate an unpublished auction, in furtherance of the scheme User M.S. described to him. Shortly thereafter, on April 29, 2006, User D.S. caused the 48-hour period to begin for an unpublished auction for an entire region or "sim" known as "Taesot," No. 0026198533, by making a bid of zero. The next day, April 30, 2006, Bragg placed a bid of U.S. $5.00 for the parcel. User S.S. then made a higher bid, but when the auction ended on May 1, 2006, Bragg won the auction with the high bid of U.S. $300.01.

44. On information and belief, Bragg and User S.S. realized that they could profit more if they did not bid against each other using the fraudulent scheme, and on May 1, 2006, User S.S. sent an electronic message to Bragg saying "Dear Marc… it seems we are two bidders to cool auctions… and we are costing ourselves money… I propose we call a truce… maybe fet [sic] together and help each other out." On information and belief, Bragg thereupon agreed with User S.S. not to bid against him in the fraudulent auctions.

45. Also on April 29, 2006, User D.S. attempted to cause the 48-hour period to begin for an unpublished auction, No. 0026196776, by making a bid of zero, and later that day, Bragg placed a bid of U.S. $1.00. When the auction ended on May 1, 2006, there had been no other bids, and Bragg was the high bidder at U.S. $1.00. However, this did not result in the acquisition of a parcel.

46. Based on typical winning bids for auctions of entire regions or "sims" published by Linden and conducted legitimately and openly at or about the time Bragg and his associates perpetrated this scheme, including parcels previously purchased by Bragg before the scheme, the fair market value of each of the two parcels on which Bragg bid using this scheme was

substantially in excess of U.S. $1,000.00.

47.    Bragg placed each of his bids in the unpublished auctions Nos. 0026198448 and 0026198533 (Taesot) knowingly and with intent to defraud Linden, with knowledge that legitimate auctions initiated by Linden for full mainland regions or "sims" such as those on which Bragg had bid always required an opening bid of U.S. $1,000.00.

48.    As Bragg was the winning bidder in Auction No. 0026198533, his Second Life account was automatically charged U.S. $300.01 and he obtained the parcel known as Taesot.

49.    On information and belief, based on Bragg's transaction history in Second Life, Bragg would have subdivided the parcels he purchased through the fraudulent auction scheme, sold them to other Second Life users, and converted the proceeds (to the extent they were in Linden Dollars) to U.S. dollars.

50.    At about the time that Bragg and his confederates were engaging in their scheme, Linden personnel noticed certain anomalous auction transactions and began to investigate. Linden discovered the fraudulent transactions of Bragg and his confederates as a result of their investigation.  Linden reasonably and necessarily incurred expenses in connection with this investigation and as a result of the fraudulent scheme, in an amount to be proven at trial.

51.    Upon discovering the irregular auction activity, on May 1, 2006 Linden put Bragg's account under user name Marc Woebegone on a "administrative hold," preventing Bragg from further transactions in Second Life pending investigation.

52.    Thereafter, Linden took back the Taesot "sim" from Bragg's account.

53.    Shortly after Linden put Bragg's "Marc Woebegone" account on administrative hold, on May 1, 2006, and before Linden had completed its investigation, Bragg sent Linden an instant message demanding that Linden honor the fraudulent Taesot auction purchase and threatened that he would be filing a lawsuit against Linden at 7:00 a.m. California time the next morning if the matter were not resolved by then.  On information and belief, Bragg made such demands and threats in an effort to divert Linden from further investigating and discovering his fraudulent scheme.

54.    Linden did not yield to Bragg's demands and threats. As such, the very next day, on May 2, 2006, Bragg sent Linden a letter demanding, among other things, that his account be reactivated, that he be reimbursed for the amount of his fraudulent winning bid for the Taesot parcel and that "my expectation interest in the profit from that sim be added to the amount reimbursed based on at least the average selling price of land in secondlife.com."

55.    In other words, Bragg demanded that Linden pay him the illegitimate profit he would have realized by subdividing the Taesot "sim" and reselling it to other Second Life users had his fraudulent transaction not been discovered and reversed. Linden is informed and believes that this was part of Bragg's plan to divert Linden from further investigating and discovering his fraudulent scheme.

56.    Bragg enclosed with his May 2, 2006 letter a copy of a complaint he claimed to have filed that day against Linden in the Chester County Magisterial District Court seeking damages of $8,000.00.

57.    Thereafter, after finalizing its investigation and determining that Bragg had indeed participated in a fraudulent scheme against Linden, Linden placed Bragg's Second Life account under the user name Marc Woebegone on "fraud hold."

58.    At the time Bragg's account under the user name Marc Woebegone was placed on administrative hold on May 1, 2006, the account had a cash balance of U.S. $1,970.79, and that remains the balance in that account as of the date of this Counterclaim. This did not include the U.S. $300.01 that was deducted from his account for his fraudulent purchase of the Taesot parcel.

59.    In addition, other "virtual land" that was in Bragg's account prior to engaging in the fraudulent scheme was sold by Linden to other users at auction on or about May 23, 2006, pursuant to Section 7.1 of the Terms of Service then in force and in an effort to mitigate its own damages, and yielded a total of U.S. $3,632.00.

60.    The total of these three amounts is U.S. $5,902.80. Section 7.1 of the Terms of Service in force at the time Bragg perpetrated the fraudulent scheme and at the time his account

was placed on fraud hold, provided that in the event an account is suspended or terminated for material breach by the user, Linden would attempt to sell at auction any "virtual land" held by the user, and that any money received from such auctions would be applied to satisfy the user's existing obligations to Linden and others, and any money remaining from the sale of land after the repayment of the user's obligations and a $100 resale fee may be returned to the user. Section 7.1 also provided that "Notwithstanding the foregoing, no money will be returned to [the user] in the event that [the user's] Account is terminated due to suspicions of fraud, violations of other laws or regulations, or deliberate disruptions to or interference with the Service."

     **61.**     Linden has not returned any money to Bragg pending the litigation he initiated.

     **62.**     There is a dispute between Bragg and Linden as to who is entitled to all or part of the above-referenced sum of $5,902.80.  As such, Linden has moved for leave to deposit this total with the Court pending resolution of this matter.

## COUNT 1:  FEDERAL COMPUTER FRAUD, 18 U.S.C. § 1030

     **63.**     Linden incorporates by reference Paragraphs 1 through 62, inclusive, as if fully set forth here.

     **64.**     Linden operates computers and computer servers over a computer network. Linden's computers are used in interstate commerce and communication.

     **65.**     Bragg knowingly, intentionally, and with the intent to defraud Linden, and without Linden's authorization, accessed unpublished auction interfaces on Linden's computers and thereby obtained information from Linden's protected computers that he was not authorized to have.  Bragg accessed these unpublished pages by synthesizing URLs and transmitting them over the Internet to gain access to functionality not authorized by Linden and contrary to Linden's reasonable expectations.

     **66.**     Bragg furthered his auction fraud scheme by surreptitiously (and without authorization) accessing interfaces for auctions of "virtual land" that Bragg knew Linden had not

opened to users and that were not accessible to bidders except through the fraudulent scheme, and that lacked the minimum opening bid of U.S. $1,000.00 that Linden would have set before it made those auctions open and available to users for bidding.  As a result, Bragg willfully caused Linden's computers to declare him the winner of such an auction with a bid of only U.S. $300.01, well below Linden's minimum opening bid.

67.    By way of this conduct, Bragg obtained something of value, namely, access to Linden's computing resources, as digitally represented by the parcel of "virtual land" known as Taesot, with a value of no less than U.S. $1,000.00, and which Bragg intended to subdivide and resell to other Second Life users at a further profit.  By virtue of his fraudulent conduct, Bragg obtained such resources at a price he knew was well below market value or what Linden would auction such resources for, indeed, below Linden's cost of providing these services.  In so doing, Bragg intentionally interfered with Linden's auction system, thereby causing damage to the integrity of that system.

68.    Linden's servers are located in California and Texas.  On information and belief, Bragg resides in and conducted all relevant activity from Pennsylvania, User M.S. resides in and conducted all relevant activity from Florida, and User D.S. resides in and conducted all relevant activity from New York.  On that basis, Linden alleges that in connection with Bragg's unauthorized access of Linden's computers, Bragg communicated across state lines with Linden's computers, with User M.S., and with User D.S.

69.    Bragg's conduct as alleged above caused damage to Linden by impairing the integrity of the auction system and misappropriating Linden's server bandwidth.  Bragg's conduct further caused Linden to incur significant expense in responding to his unlawful conduct, including but not limited to investigating his fraudulent scheme, conducting a damage assessment, and restoring the system to its condition prior to the offense.

70.    Bragg's conduct further damaged Linden's goodwill, disrupted the orderly virtual economy Linden sought to establish for Second Life, and thus interfered with the rights of other Second Life users, by enabling the acquisition of "virtual land" at below-market, indeed, below-

51

cost, prices.

**71.**     Bragg's conduct has caused Linden a loss of at least $5,000.

**72.**     Bragg's conduct as alleged above is in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, including subsections (a)(2)(C), (a)(4), (a)(5)(A)(i), and (a)(5)(A)(iii).

**73.**     Accordingly, Linden is entitled to bring the present civil suit against Bragg and is further entitled to recover economic damages in an amount to be proven at trial, and to obtain injunctive or other equitable relief to prevent further harm, including an injunction barring Bragg from ever again attempting to participate in Second Life or accessing Linden's computers.

JURY TRIAL DEMANDED

WHEREFORE, counterclaim plaintiff Linden Research, Inc. respectfully requests that the Court enter judgment in its favor and against counterclaim defendant Marc Bragg for compensatory damages in excess of $5,000 and in an amount to be proven at trial, together with interest and costs and attorney's fees according to applicable law, and such other relief deemed appropriate by this Court.

## COUNT 2:  CALIFORNIA STATUTORY COMPUTER FRAUD, CAL. PENAL CODE § 502

**74.**     Linden incorporates by reference Paragraphs 1 through 73, inclusive, as if fully set forth here.

**75.**     Bragg knowingly and with the intent to defraud Linden accessed unpublished auction interfaces or pages on Linden's computers and computer network, and thereby, without Linden's permission, obtained, used, and altered data and computer software on Linden's computers and computer network, in order to execute a scheme or artifice to defraud, and to wrongfully control or obtain money, property, or data.  Bragg accessed these unpublished pages by altering and synthesizing URLs and transmitting them over the Internet to gain access to functionality not authorized by Linden and contrary to Linden's reasonable expectations.

76.     Bragg furthered his auction fraud scheme by surreptitiously (and without authorization) accessing interfaces for auctions of "virtual land" that Linden had not opened to other users and that were not accessible to other bidders except through the fraudulent scheme, and that lacked the minimum opening bid of U.S. $1,000.00 that Linden would have set before it made those auctions open and available to users for bidding. As a result of his scheme, Bragg caused Linden's computers to declare him the winner of such an auction with a bid of only U.S. $300.01, well below Linden's minimum opening bid.

77.     By way of this conduct, Bragg fraudulently obtained something of value, namely, access to Linden's computing resources, as digitally represented by the parcel of "virtual land" known as Taesot, with a value of no less than U.S. $1,000.00, and which Bragg intended to subdivide and resell to other Second Life users at a further profit. Bragg obtained this at a price that was well below market value, indeed, below Linden's costs of providing these services. In so doing, Bragg intentionally interfered with Linden's auction system, thereby causing damage to the integrity of that system.

78.     Bragg knowingly and without permission provided and assisted in providing User D.S. a means of accessing Linden's computers and computer network in furtherance of their fraudulent scheme. With Bragg's assistance, User D.S. knowingly and with the intent to defraud Linden accessed unpublished auction interfaces on Linden's computers and computer network, and thereby, without Linden's permission, obtained, used, and altered data and computer software on Linden's computers and computer network in order to execute Bragg and User D.S.'s scheme to defraud Linden.

79.     Bragg's conduct as alleged above caused damage to Linden by impairing the integrity of the auction system and misappropriating Linden's server bandwidth. Bragg's conduct further caused Linden to incur significant expense in responding to his unlawful conduct, including but not limited to investigating his fraudulent scheme, conducting a damage assessment, and restoring the system to its condition prior to the offense.

80.     Bragg's conduct in perpetrating the scheme as alleged above was willful and was

committed with oppression, fraud, or malice.

**81.** Bragg's conduct is in violation of California Penal Code § 502, including subsections (c)(1), (c)(4), and (c)(6).

**82.** Accordingly, Linden is entitled to bring the present civil suit against Bragg and is further entitled to recover compensatory damages in an amount to be proven at trial, and to obtain injunctive or other equitable relief, including an injunction barring Bragg from ever again attempting to participate in Second Life or accessing Linden's computers, and reasonable attorney's fees.

**83.** Because Bragg's conduct as alleged above was a willful violation of this statute and Bragg is guilty of oppression, fraud, or malice, Linden is further entitled to an award of punitive or exemplary damages.

JURY TRIAL DEMANDED

WHEREFORE, counterclaim plaintiff Linden Research, Inc. respectfully requests that the Court enter judgment in its favor and against counterclaim defendant Marc Bragg for compensatory damages in an amount to be proven at trial, together with interest and costs and attorney's fees and costs according to applicable law, and such other relief deemed appropriate by this Court.

## <u>COUNT 3:  BREACH OF CONTRACT</u>

**84.** Linden incorporates by reference Paragraphs 1 through 83, inclusive, as if fully set forth here.

**85.** Bragg registered as a Second Life user, downloaded the Second Life software, and entered the Second Life platform, acknowledged and accepted the Second Life Terms of Service, attached hereto as Exhibit A and incorporated by reference, thereby entering into a contract with Linden. The Second Life Terms of Service is a valid and binding contract.

**86.** Bragg has violated the Terms of Service, thereby breaching his contract with Linden, by at least the following conduct:

54

**(a)**    Fraudulently and intentionally accessing unauthorized Second Life auction interfaces in violation of 18 U.S.C § 1030 and California Penal Code § 502, and thereby violating Sections 5.1(iii) and (vi) of the Terms of Service;

**(b)**    Interfering with and disrupting the Second Life servers or networks, and disobeying requirements, procedures, policies, or regulations of networks connected to the Service, in violation of Section 5.1(viii) of the Terms of Service.

87.    Linden has performed or is excused from performing all the material obligations required of it under the Second Life Terms of Service.

88.    As a proximate result of Bragg's breach of contract, Linden has suffered damages in an amount to be proven at trial.

JURY TRIAL DEMANDED

WHEREFORE, counterclaim plaintiff Linden Research, Inc. respectfully requests that the Court enter judgment in its favor and against counterclaim defendant Marc Bragg for compensatory damages in an amount to be proven at trial, together with interest and costs and attorney's fees according to applicable law, and such other relief deemed appropriate by this Court.

## COUNT 4:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

89.    Linden incorporates by reference Paragraphs 1 through 88, inclusive, as if fully set forth here.

90.    Bragg registered as a Second Life user, downloaded the Second Life software, and entered the Second Life platform, thereby entering into a contract with Linden by accepting the Second Life Terms of Service, attached hereto as Exhibit A and incorporated by reference. The Second Life Terms of Service is a valid and binding contract.

91.    The contract between Bragg and Linden contained an implied covenant that Bragg would conform his conduct in connection with the Second Life service to standards of

55

good faith and fair dealing.

**92.**     Bragg consciously, deliberately, and in bad faith frustrated the purpose of the Second Life Terms of Service by disrupting and subverting an element of the Second Life service, namely, the Second Life auction system.

**93.**     To the extent that Bragg's participation in the auction fraud scheme as alleged above is determined not to be a breach of an express contractual provision, such conduct constitutes a breach of the implied covenant of good faith and fair dealing.

**94.**     Linden has performed or is excused from performing all the material obligations required of it under the Second Life Terms of Service.

**95.**     As a proximate result of Bragg's breach of contract, Linden has suffered damages in an amount to be proven at trial.

JURY TRIAL DEMANDED

WHEREFORE, counterclaim plaintiff Linden Research, Inc. respectfully requests that the Court enter judgment in its favor and against counterclaim defendant Marc Bragg for compensatory damages in an amount to be proven at trial, together with interest and costs and attorney's fees according to applicable law, and such other relief deemed appropriate by this Court.

## COUNT 5:  CALIFORNIA STATUTORY UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200

**96.**     Linden incorporates by reference Paragraphs 1 through 95, inclusive, as if fully set forth here.

**97.**     On information and belief, Bragg participated in the Second Life service with the intent of making a profit through the purchase, subdivision and resale of "virtual land."

**98.**     Bragg's conduct as alleged above constitutes unlawful, unfair, and fraudulent business practices.

**99.**     Bragg's conduct as alleged above caused Linden injury in fact and caused Linden

to lose money as more fully alleged above.

100.    Accordingly, Linden is entitled to injunctive relief and, to the extent proven at trial, restitution for any ill-gotten gains Bragg obtained through his unlawful, unfair, and fraudulent conduct.

JURY TRIAL DEMANDED

WHEREFORE, counterclaim plaintiff Linden Research, Inc. respectfully requests that the Court enter judgment in its favor and against counterclaim defendant Marc Bragg, together with interest and costs and attorney's fees according to applicable law, and such other relief deemed appropriate by this Court.

## COUNT 6: DECLARATORY JUDGMENT

101.    Linden incorporates by reference Paragraphs 1 through 101, inclusive, as if fully set forth here.

102.    An actual controversy has arisen and now exists between Linden and Bragg concerning their respective rights and duties in that Linden contends it was entitled to terminate Bragg's participation in the Second Life platform at its sole discretion, and certainly upon a determination that Bragg materially breached the Second Life Terms of Service, whereas Bragg disputes these contentions and contends that Linden should be ordered to allow him access to Second Life.  (See Complaint, ¶¶ 159, 222, 223.)

103.    An actual controversy has arisen and now exists between Linden and Bragg concerning their respective rights and duties in that Linden contends that upon suspension of Bragg's account for fraudulent conduct, Linden was entitled to (a) sell at auction the rights of access to computing resources ("virtual land") associated with Bragg's account, and (b) decline to refund any money to Bragg, whereas Bragg disputes these contentions and contends that Linden's auction of the "virtual land" in Bragg's account was a breach of contract, and further contends that he is entitled to a full refund of any and all value associated with his account.  (*See* Complaint ¶ 212-223.)

104.    Linden desires a judicial determination of its rights and duties, and a declaration that Linden was entitled to suspend or terminate Bragg's Second Life account and any other account Bragg attempted to open.

105.    Linden desires a judicial determination of its rights and duties, and a declaration that Linden was entitled to sell at auction the rights to any "virtual land" held in Bragg's account. Linden further requests a declaration as to which party is entitled to: (a) the U.S. $1,970.79 in Bragg's account at the time of his termination; (b) the U.S. $3,632.00 obtained through liquidation of so-called "virtual land" in Bragg's Second Life account; and (c) the U.S. $300.01 deducted from Bragg's account for his fraudulent purchase of the "Taesot" parcel.  In the event the Court determines that Bragg is entitled to any of the foregoing, Linden further requests a declaration that Linden is entitled to a set-off against such sums for amounts to which Linden is entitled, including without limitation damages, costs, and attorneys fees as requested in Linden's Answer and Counterclaims.

106.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that Linden may ascertain its rights and duties under the Second Life Terms of Service and applicable law.

JURY TRIAL DEMANDED

WHEREFORE, counterclaim plaintiff Linden Research, Inc. respectfully requests that the Court issue judicial declarations in its favor as set forth above, and such other relief deemed appropriate by this Court.

58

Dated: June 28, 2007

/s/   John W. Crittenden
John W. Crittenden (Cal. 101634)
Kathleen E. Treiber (Cal. 232353)
*ADMITTED PRO HAC VICE*
COOLEY GODWARD KRONISH LLP
101 California St.
5th Floor
San Francisco, CA  94133
(415) 693-2000

Lawrence Z. Shiekman (15203)
Thomas T. Watkinson, II (200697)
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103
(215) 981-4000

Attorneys for Defendant and Counterclaim
Plaintiff LINDEN RESEARCH, INC. and
Defendant Philip Rosedale

## <u>DEMAND FOR JURY TRIAL</u>

Defendant and counterclaim plaintiff Linden Research, Inc. and defendant Philip

Rosedale hereby demand a jury trial.


Dated: June 28, 2007

/s/   John W. Crittenden
John W. Crittenden (Cal. 101634)
Kathleen E. Treiber (Cal. 232353)
*ADMITTED PRO HAC VICE*
COOLEY GODWARD KRONISH LLP
101 California St.
5th Floor
San Francisco, CA  94133
(415) 693-2000

Lawrence Z. Shiekman (15203)
Thomas T. Watkinson, II (200697)
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103
(215) 981-4000

Attorneys for defendant and counterclaim Plaintiff
LINDEN RESEARCH, INC. and defendant Philip
Rosedale

1045088 v4/SF

## CERTIFICATE OF SERVICE

I, John W. Crittenden, hereby certify that the foregoing Defendants Linden Research, Inc. and Philip Rosedale's Answer to Complaint and Linden Research, Inc.'s Counterclaims Against Plaintiff Marc Bragg, Demand for Jury Trial, has been filed electronically on this 28th day of June, 2007 and is available for viewing on the Court's ECF system.


/s/   John W. Crittenden
John W. Crittenden

1045088 v4/SF