## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA
## PHILADELPHIA

| | |
|---|---|
| MARC BRAGG, Esq., an individual, | CIVIL DIVISION |
| Plaintiff, | No. 06-cv-4925 |
| v. | **JUDGE EDUARDO ROBRENO** |
| LINDEN RESEARCH, INC., a corporation, and PHILIP ROSEDALE, an individual, | |
| Defendants. | |

**BRIEF IN SUPPORT OF MOTION TO DISMISS DEFENDANTS' FIRST AMENDED COUNTERCLAIMS PURSUANT TO RULE 12 (b) (6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND/OR 12 (b) (7) FOR FAILURE TO JOIN AN INDISPENSABLE PARTY AND MOTION FOR MORE DEFINITE STATEMENT PURSUANT TO RULE 12 (e)**

AND NOW, comes Plaintiff, Marc Bragg, Esq. ("Plaintiff"), by and through counsel, Jason A. Archinaco, Esq., and the law firm of WHITE AND WILLIAMS, LLP, and files the following Motion to Dismiss Defendants' First Amended Counterclaims, pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, Rule 12(b)(7) for failure to join an indispensable party and for a more definite statement pursuant to Rule 12(e).

### I.    PROCEDURAL HISTORY

1. On or about May 2, 2006, Plaintiff initially filed his claims in magistrate court.

2. Defendants stated to this Court that they were prepared to defend the magistrate lawsuit, but that Plaintiff dismissed the claim without prejudice the day before the hearing. (Tr. 93, Hearing on Motion to Dismiss, 2-5-2007).

PITDMS 43916v.2

Dockets.Justia.com

3.    No counterclaims were ever filed against Plaintiff in connection with the magistrate action by Defendants' former counsel.

4.    Plaintiff filed a new Complaint on or about October 4, 2006, in Pennsylvania State Court.

5.    On or about November 7, 2006, the Defendants removed the case to this Court.

6.    Shortly thereafter, on or about November 14, 2006, Defendants filed a Motion to Compel Arbitration (seeking to transfer the case to arbitration in San Francisco, California) and Defendant Rosedale filed a Motion to Dismiss for Lack of Personal Jurisdiction.

7.    On or about May 30, 2007, this Court denied Defendants' Motion to Compel Arbitration and Defendant Rosedale's Motion to Dismiss for Lack of Personal Jurisdiction and rendered a forty-six (46) page opinion and ruling. (Docket 51).

8.    On or about June 8, 2007, Defendants' former counsel informed Plaintiff's counsel that an extension was needed to Answer the Complaint because Defendants would likely be filing an appeal.   See, Docket #55, Reply in Opposition to Defendants' Motion for Extension of Time to Respond to Complaint, p. 2, ¶ 6.   No mention was made of any new counsel entering their appearance or of any alleged counterclaims. *Id.* at ¶ 9-10.

9.    On June 11, 2007, Plaintiff's counsel was informed that new counsel had been hired. *Id.* at ¶ 13.   For the first time, Plaintiff's counsel was informed that the extension was necessary not only to answer the complaint, but now to file counterclaims. *Id.*

PITDMS 43916v.2

10.    On or about June 11, 2007, Plaintiff filed his opposition to Defendants' Motions

for Extension of Time.   Plaintiff also brought to the attention of the Court

statements made by Defendant Rosedale with regard to "price to pay" of filing a

lawsuit regarding virtual property.   *Id.* at ¶ 15 (Defendant Rosedale: "At what

point in a dispute are you willing to bring your identity into it, and **what's the**

**price to you of that?   I'd say for a lot of people, it would be quite**

**high.**")(emphasis added).

11.    On June 28, 2007, Defendants filed an Answer that, in legalese, stunningly

confesses to the massive fraud being perpetrated on consumers with regard to the

virtual land ownership lie.   See, Answer, ¶ 48 ("...Defendants aver that the

references to 'selling land free and clear' and selling 'title' are metaphors or

analogies to the concepts of ownership of real property, as what is 'owned' with

respect to 'virtual land' in Second Life is in fact a license to computing

resources...").

12.    However, in addition to Answering the Complaint, Defendants, having failed to

obtain a dismissal of this case with their unconscionable arbitration clause, held

true to Defendant Rosedale's promise of a "price to pay" and attempted to make

out six separate counterclaims against Plaintiff, the true purpose of which is to

harass and threaten Plaintiff and to send a message to consumers about "what will

happen" if you sue Defendants.

13.    The day after filing their frivolous and baseless counterclaims, on June 29, 2007,

Defendant Linden posted citations to portions of their Answer and Counterclaim

on their website.   See, blog.secondlife.com printout dated June 29, 2007, and

titled "Linden Lab Files Response to Complaint," attached hereto as Exhibit "1." In the citations, Robin Linden on behalf of Defendants refer to Plaintiff repeatedly as having "confederates," that he committed "computer fraud," engaged in a "scheme" and a "fraudulent scheme to obtain money." *Id.*

14.    Nowhere, however, did Defendants post to their website that they now admit that their clear public representation of "own," "ownership," and "sold the title" to land were, in actuality, "metaphors" (metaphor is evidently a "metaphor" for lie), nor did they post a link to the entire Answer and Counterclaim, instead intentionally choosing to cite to language limited to portraying Plaintiff as a criminal. *Id.*

15.    At the preliminary conference before this Court on or about January 4, 2007, Defendants requested an extension to respond to Plaintiff's outstanding Rule 12(b)(6) Motion. At no point did Defendants state or imply that they would be amending the Counterclaims.

16.    As previously set forth herein and in the pleadings filed with this Court, the latest filing is part of a larger continuing strategy by Defendants, having failed in making this litigation as costly as possible by transferring this case to arbitration in San Francisco, to harm Plaintiff as much as possible through alternative means by: (1) filing frivolous counterclaims under statutes designed to prevent harm to computers from viruses and worms, (2) a statute designed to prevent harm to consumers from fraudulent business practices and, (3) publishing claims to Defendant Linden's website that Plaintiff engaged in "computer fraud" and a

"scheme to obtain money" before this Court even had an opportunity to see the pleadings or rule. See, Exhibit "1."

17. On or about August 17, 2007, Defendant filed its first Amended Answer and Counterclaim further delaying the advancement of this case. Defendant did not change anything of substance in their Amended Answer.

18. With regard to the Amended Counterclaims, Defendant Linden did not cure the defects from its original Answer and Counterclaims so as to render "moot" the Rule 12 (b)(6) Motion to Dismiss. For example, although Plaintiff correctly pointed out that Defendant Linden did not attach the "chat logs" to the original Counterclaim, although relying upon those "chat logs" heavily for alleged support of its claims, Defendant Linden once again refused to attach the chat logs.

19. Defendant Linden is simply unreasonably delaying this Court's ruling on Plaintiff's Rule 12 (b)(6) Motion to Dismiss in an effort to keep portions of its frivolous and baseless Counterclaims posted on its website. Further, Defendant's Amended Answer and Counterclaims remain insufficient, lack merit, and were filed for the improper purpose of increasing the burden and expense of Plaintiff's litigation.

20. A reasonably careful attorney would have known after appropriate inquiry that the claims Defendant is pursuing are not plausible legally or factually. Because Defendant is pursuing claims that are without plausible legal or factual basis and lacking in justification further illustrates Defendant's bad faith and unreasonableness.

21. Plaintiff re-files its Motion to Dismiss in an attempt to cease Defendant's tactics.

PITDMS 43916v.2

22.     Defendant is delaying this Honorable Court's ruling on Plaintiff's Motion to

Dismiss in a bogus attempt to carry some leverage into a mediation in this case

which is scheduled for August 30, 2007.

23.     Defendant has not initiated suit against the alleged "cohorts" of Plaintiff.

Defendant has not joined them in this action which further shows Defendant's bad

faith in bringing these baseless and frivolous claims against Plaintiff.

24.     As set forth herein, the amended counterclaims lack merit and should be

dismissed with prejudice.   Defendants' attempts to implement Defendant

Rosedale's "pay the price" pre-designed plan, like their design to conceal the

oppressive arbitration provision in their TOS, should be rejected.

## II.     **SUMMARY OF THE FACTS ALLEGED BY DEFENDANT LINDEN RELEVANT TO THE MOTION TO DISMISS.**

### A.     **LAND AUCTIONS GENERALLY.**

Defendant Linden hosts virtual land auctions on the World Wide Web ("internet")

on its website.  Amended Answer, ¶ 91-2, Amended Counterclaim, ¶ 18.  Contrary to its

public representations and those on its website, Defendant Linden now claims that it does

not actually "sell virtual land."  Amended Answer, ¶ 48.   Indeed, when Defendant

Rosedale stated that "We started selling land free and clear, and we sold the title, and we

made it extremely clear that we were not the owner of the virtual property," he did not

really mean what he said, he did not intend those simple clear statements to reflect the

truth of what consumers were being told they were buying. In essence, he lied.  *See Id.*

Defendant Rosedale's most recent statement that he was instead using "metaphors" is

disingenuous by definition. Defendants were, in actuality, intending not to permit any

consumer to own anything despite their bold worldwide statements to the contrary.

Defendants were openly inducing consumers around the world to buy virtual land upon the false premise that the consumers would "own virtual land." Secretly, however, Defendants intended to only provide consumers with "a license in computing resources." Amended Answer, ¶ 48. Defendants' malicious intent to defraud all consumers is undeniably proven by the complete lack of any reference in the TOS (Exhibit "A" to Defendants' Amended Answer) to "land," "auctions," "owning land" or any definitions provided to the unambiguous words "own" and "ownership" which were publicly displayed. Defendants' TOS doesn't even infer or suggest that the words "own," "ownership," or "own virtual land" should have any meaning other than their plain meaning as utilized by Defendants to induce thousands (if not hundreds of thousands) of defrauded consumers out of their money. Nowhere did Defendants ever refer to the words "own," "ownership," or "virtual land" as a license until submitting Paragraph 48 to the Court.

Defendant Linden's virtual land auctions would have a minimum price set for each parcel of virtual land as set by Defendant Linden. Amended Counterclaim,¶ 18. Defendant Linden alleges that it set all prices for a "sim"[1] of virtual land "uniformly" at $1000, Amended Counterclaim, ¶ 19, although later it admits (in legalese) that it set land prices on some virtual land auction pages for a minimum price of $1 as pled in Defendant Linden's original Counterclaim. See, Original Counterclaim, at ¶ 35.

Virtual land auctions would run for forty eight (48) hours, a predetermined time set by Defendant Linden. Amended Answer, ¶ 99. The forty eight hour clock for a virtual land auction would not begin until a consumer placed a bid on a piece of virtual

---

[1] Defendant Linden defines the word "sim" as a mainland parcel offered by Linden for auction, also known as a "region." Counterclaim ¶19.

7

land at Linden's publicly available website. Amended Counterclaim, ¶ 18. Defendant Linden declared the highest bidder at the end of an auction as the winner of the virtual land auction. Amended Answer, ¶ 100. The winning bidder was then charged by Defendant Linden for the virtual land purchase. *Id.* at ¶ 100.

**B.    THE ALLEGED LAND AUCTION 'SCHEME' / COMPUTER FRAUD.**

In April, 2006, at least one other consumer (referred to as "M.S." by Defendant Linden) had obtained multiple pieces of virtual land for a low price, i.e., $1 prior to Plaintiff ever bidding on low priced land. Amended Counterclaim, ¶¶ 34-38. M.S. had also bid on at least seven other parcels of land and was in the process of winning the auctions for $1. *Id.* at ¶ 89. Multiple consumers were bidding on such land. *Id.* at ¶ 47-49, 71. Defendant does not (and cannot) allege that Plaintiff participated or was even aware of the prior auctions "M.S." bid on and won until Defendant Linden declared M.S. the winner of such auctions.

Plaintiff saw multiple auctions that had concluded for low priced land. *Id.* at ¶¶ 34-37. Plaintiff inquired of M.S. how M.S. had obtained multiple "sims" for $1 in auctions that had already concluded. Amended Counterclaim, ¶¶ 34-37. Defendant Linden does not allege that it did anything whatsoever to prevent such auctions from concluding nor from posting any announcement that such auctions should not have occurred.

Plaintiff was ultimately informed by M.S. where on the internet Plaintiff could locate the auction pages for "sim" auctions as low as $1. *Id.* at ¶ 36. Defendants have refused to plead in any detail or with clarity how the auction pages that Defendant Linden

placed on the internet were located, and indeed, have refused to attach any entire chat log.[2]

Plaintiff, after repeated requests to Defendant Linden, informally and formally, on August 23, 2007, finally obtained "redacted" versions of the chat logs relied upon by Defendant Linden in its Counterclaim. See, Redacted Chat Logs, attached hereto as Exhibit "11." The reason for the "omission" of the chat logs is now completely obvious, as not only do they not support Defendant Linden's Counterclaims, they directly subvert such claims and make it abundantly clear that the computer fraud claims have always been without merit.

Despite Plaintiff's prior Rule 12(b)(6) Motion, Defendant Linden has still failed to plead that the land auctions had any type of password protection security device, or any notice whatsoever that access to the auction pages was not authorized, any mechanism of any sort to preclude the public or Defendant Linden's registered users from freely accessing such pages. Defendant Linden has admitted (in legalese), that such internet pages could be accessed by anyone in the world by simply typing a URL address in any internet browser, which they plead is what Plaintiff did. Id. at 87. ("Bragg and his co-conspirators accessed this information by synthesizing URLs and transmitting them over the Internet . . . .").[3]

---

[2] As will be set forth at length herein, Defendant Linden has intentionally not attached any entire chat log in an attempt to avoid court review and simply to survive a Rule 12(b)(6) Motion. Plaintiff raised this issue in his original Rule 12(b)(6) Motion. Despite doing so, Defendant Linden still refused to attach the chat logs. However, even though such attempts are improper, Defendant Linden's counterclaims still fail for numerous reasons.

[3] This practice is known as "backwards browsing." California Highway Patrol, Governor's Office Computer System Investigation Administrative Report, February 1, 2007, p. 5 (of fax). ("Backwards browsing" is a common practice in the media. Id. Although Defendant Linden attempts to dress up its claims by using the word "synthesize," synthesize simply means "to bring together into a whole by synthesis" with synthesis defined, "the putting together of parts or elements so as to form a whole." Webster's College Dictionary, 4th ed.

9

Defendant Linden intentionally does not explicitly define or explain what it means by the word "synthesize," and does not plead its auction process in sufficient detail, because if it did, it would have to explain to the Court that Plaintiff obtained the auction I.D. number for the land he purchased from Defendant Linden as it publicly published those auction I.D. numbers on the virtual land itself. The auction I.D. numbers assigned to a parcel of virtual land by Defendant Linden could be obtained by Plaintiff and all others directly from the parcels of light blue / purple virtual land[4] if anyone viewed the virtual land in Second Life (as Plaintiff truly did). Equally, however, Defendant does not and cannot plead that Plaintiff did anything whatsoever to "create" any land auction I.D. numbers. The chat logs upon which Defendant Linden claims to rely set forth that Defendant Linden provided the land auction I.D.'s for the low priced land. See Exhibit "11," Bates Stamp Nos. LRI 00290, LRI 00291, LRI 00297, and LRI 00304.

Once again, like the original deficient Counterclaims, nowhere does Defendant Linden plead (nor can it), that the internet page designed, placed and published by Defendant Linden on the internet had any password security feature that would prohibit access from anyone in the world using the internet. Nor has Defendant Linden alleged (nor can it), that Plaintiff did anything at all to circumvent any non-existent password or other protected security feature of Defendant Linden.

## C.    THE TAESOT SIM.

Defendant Linden pleads that another consumer (referred to as D.S. by Defendant Linden), on April 29, 2006, placed a bid on a piece of virtual land known as Taesot by

---

[4] Defendant Linden pleads that land "for auction" and "to be up for auction" was all color coded the same "in-world." Answer, ¶ 92, 95.

bidding $0 for the virtual land. Amended Counterclaim, ¶ 59.[5] The following day, on April 30, Plaintiff bid on the Taesot land, setting a maximum bid price of $5 for the parcel. *Id*. at 43. Defendant Linden does not plead nor explain why it set the minimum price on Taesot as it did, at $0. Nowhere does Defendant Linden allege (nor can it), that Plaintiff created the auction I.D. for the Taesot sim, the internet page for the Taesot virtual land auction nor set the minimum price on the Taesot internet auction. Defendant Linden has not (and cannot) allege that Plaintiff circumvented any non-existent password security feature of Defendant Linden in bidding on the Taesot sim.

Defendant Linden specifically pleads factual allegations about the Taesot internet virtual land auction, but intentionally and impermissibly has not attached the documents underlying such allegations, including the numerous e-mail sent **to** Plaintiff by Defendant Linden during the course of the Taesot virtual land auction. For example, at 2:31 p.m. on April 30, 2006, Defendant Linden e-mailed Plaintiff all the details of the Taesot virtual land auction as follows:

> From:        "Second Life" <support@secondlife.com>
> To:           <msb@lawy-ers.com>
> Sent:         Sunday, April 30, 2006, 2:31 p.m.
> Subject:      Second Life Auction: Bid Confirmation
>
> You are currently the high bidder for the following Second Life auction.
>
> Item Name:    Taesot 001 (128, 128) 60592 m 2
> Item Number: 0026198533
> Your current bid:      US$5
> Your maximum bid:   US$25.00
> End date:      May-01-2006 13:05:15 PDT
>
> View the item your bidding on:
> http://secondlife.com/auctions/detail.php?id=0026198533

---

[5] Although Defendant Linden admits in <u>its original counterclaim</u> that it placed a US$1 minimum on the virtual land auctions, Original Counterclaim, ¶ 35, Defendant Linden does not allege, <u>in either the original or amended counterclaim</u>, why it set the minimum price at US$1.

See, e-mail, attached hereto as Exhibit "2."[6]

The following day, Defendant Linden e-mailed Plaintiff again, this time to inform him that **"You've been outbid!"** (emphasis added) by another consumer. Defendant Linden identifies the consumer who outbid Plaintiff as "S.S." Amended Counterclaim, ¶ 48.

> From:       "Second Life" <support@secondlife.com>
> To:         <msb@lawy-ers.com>
> Sent:       Monday, May 1, 2006, 4:00 p.m.
> Subject:    Second Life Auction: You've been outbid!
>
> You have been outbid on the following Second Life auction:
>
> Auction #: 0026198533
> Auction: Taesot 001 (128, 128) 60592 m 2
> High Bid: US$30.00
>
> http://secondlife.com/auctions/detail.php?id=0026198533

See, e-mail, attached hereto as Exhibit "4."

Four minutes later, Defendant Linden again e-mailed Plaintiff to inform him that he was again the high bidder and that his current bid was US$300.01 with his maximum bid being US$450. See, e-mail, attached hereto as Exhibit "5." Plaintiff won the auction with the high bid of US$300.01. Amended Counterclaim, ¶ 64. Although Defendant Linden refers to the confirmation that Plaintiff won the auction, it again intentionally refused to attach the e-mail to the Amended Counterclaim. Amended Counterclaim, ¶ 64. Shortly after the auction, Defendant Linden (from a different Linden e-mail address than that previously used), sent an e-mail to Plaintiff congratulating him on winning the auction. See, e-mail attached hereto as Exhibit "6." The e-mail provided:

---

[6] One minute later, Defendant Linden sent Plaintiff another e-mail in the same form, noting that Plaintiff's current bid was $25 and Plaintiff's maximum bid was $30. See, e-mail, attached hereto as Exhibit "3."

PITDMS 43916v.2

From:          <land@secondlife.com>
To:            <msb@lawy-ers.com>
Sent:          Monday, May 1, 2006, 4:05 p.m.
Subject:       Second Life Auction: Item Won! Taesot 001 (128, 128) 60592 m2

**Congratulations Marc Woebegone!**

You have agreed to purchase the following item from Second Life:

Item Name:    Taesot 001 (128, 128) 60592 m 2
Item Number:  0026198533
Winning Bid:  $US300

Please go to the below link and pay for your auction:

http://secondlife.com/auctions/detail.php?id=0026198533

You will need to go in-world and claim the land within two days.   If you encounter a problem, email land@secondlife.com.

Please note: be sure to have enough land tier available before claiming your land, or you will be prompted to tier-up.

Linden Land and the Second Life Team
http://www.secondlife.com

See, e-mail, attached hereto as Exhibit "6" (emphasis added).  Although the face of the e-mail demonstrates that affirmative steps had to be taken to bill Plaintiff, Defendant Linden pleads (inconsistent with the truth), that Plaintiff was "automatically" charged for the virtual land.  Amended Counterclaim, ¶ 64.  Defendant Linden admits that it charged Plaintiff US$300.01 for the Taesot sim.  *Id.*  Although Defendant Linden claims that Plaintiff "obtained" the Taesot sim, it never specifically alleges how Plaintiff did so, as it knows that he never truly took possession of the Taesot sim.  Although Defendant Linden "took back" the Taesot Sim, it has not pled that it returned Plaintiff's money.

Although it does not plead with any specificity when, Defendant Linden pleads that its personnel "noticed" "at about the time" land auction sales of less than $1000 were

occurring.  Amended Counterclaim, ¶ 67.[7]  Curiously, Defendant Linden does not explain why it did not halt such auctions despite Defendant Linden being aware of them, nor why, with this knowledge it went ahead and billed Plaintiff for the purchase.  While Defendant Linden pleads that Plaintiff's account was put on hold and the Taesot sim taken back, Amended Counterclaim, ¶ 68-69, Defendant Linden intentionally avoided attaching the e-mail related to such allegations.  Just over two (2) hours following the close of the Taesot sim auction and after Plaintiff had been billed by Defendant Linden, Jack Linden of Defendant Linden wrote to Plaintiff at 6:16 p.m.:

> Jack Linden:
>
> Hi there Marc.  Your recent auction appears to have been the result of an exploit. The land will therefore be taken back and your money refunded.

See, e-mail, attached hereto as Exhibit "9."  Nowhere did Defendant Linden inform Plaintiff that it would be confiscating all his virtual assets, land and money nor was any claim made that Plaintiff had engaged in any "computer fraud."  Indeed, to the contrary, Defendant Linden merely informed Plaintiff that the "offense" was considered of such a small nature that the land would be taken back and his money refunded.  No contemporaneous claim was made that Plaintiff had caused any "damages" to Defendant Linden.  While Defendant Linden alleges that it took the Taesot sim from Plaintiff, Amended Counterclaim, ¶ 69, Defendant Linden failed to plead that it returned Plaintiff his US$300.01 (because it knows that it refused to do so).

---

[7] For example, although Defendant Linden pleads its "discovery," it intentionally does not plead that Plaintiff sent Defendant Linden an e-mail on April 29, 2006 at 8:40 a.m. with the subject "Sims for $1.00." See, e-mail, attached hereto as Exhibit "7."  Plaintiff stated the following to Defendant Linden well in advance of the close of the Taesot sim: "Can you please tell me why the following sims were sold at auction to the same person for only $1.00; and, how I would go abut buying sims at auction for $1.00. Also, why those sims did not show up at auction." Id.  Shortly thereafter, Defendant Linden sent an "AutoReply" e-mail acknowledging receipt of Plaintiff's e-mail.  See, e-mail, attached hereto as Exhibit "8."

PITDMS 43916v.2

Despite being in possession of their own e-mail and relying on the "facts" underlying such e-mail, Defendant Linden intentionally chose not to attach the e-mail to their Counterclaim which disclose, for example, that the Taesot sim transaction was "undone" in approximately 2 hours (although Defendant Linden refused to refund Plaintiff's money as it represented it would).

**D.    THE REASON THE ALLEGEDLY RELIED UPON CHAT LOGS ARE NOT ATTACHED.**

Plaintiff directly pointed out Defendant Linden's attempt to avoid Rule 12(b)(6) scrutiny be relying extensively upon, yet refusing to attach, the "chat logs." Despite being apprized of that argument, Defendant Linden has persisted in its improper refusal to attach the chat logs. Defendant Linden has refused to do so because it knows that the chat logs not only do not support its claims, but the contents of those logs demonstrate that Defendant Linden's computer fraud claims are knowingly false.

For example, the chat logs, when read with other document Defendant Linden relies upon but refuses to attach, and with Defendant Linden's admissions reveal:

1.    Plaintiff saw low price land auctions that had concluded. Amended Counterclaim, ¶¶ 34.

2.    On April 29, 2006, at 8:40 a.m., Plaintiff sent Defendant Linden an e-mail inquiring how he too could obtain low priced land. Exhibit "7."

3.    Defendant Linden replied by automated response but did not respond further. Exhibit "8."

4.    Plaintiff went "in world" and, at approximately 11:37 a.m., inquired of user "M.S." how M.S. had obtained low price land. Amended Counterclaim, ¶ 34;

15

Exhibit "11," Bate Stamp No. LRI 00302.  Contrary to the partial chat log citation, here is what was actually said:

> LRI 00302:  Plaintiff—11:37:08:  "lol.. wish had? how did you manage to get those? i didn't even see them come up for auction?"

> LRI 00289:  **M.S.—11:37:40:  "just went to the purple sim on my map and looked on the site" (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

> LRI 00302:  Plaintiff—11:37:59:  "right.. and then u bid on them at the auction?"

> LRI 00290:  M.S.—11:38:09:  "mabey [sic] because I was actually standing on the sim?"

> LRI 00290:  M.S.—11:38:13:  "yep"

> LRI 00302:  Plaintiff—11:38:26:  "oh you did.. standing on the sim doesn't matter.. lol. hmmmm"

> LRI 00302:  Plaintiff—11:38:30:  "were there other bidders?"

> LRI 00290:  M.S.—11:38:37:  "no"

> LRI 00302:  Plaintiff—11:38:46:  "cool! you did well then.. that's good…"

> LRI 00303:  Plaintiff—11:39:02:  "so you go thtem for 1,000 each no othe rbidders.. interesting… and veryunusual…"

> LRI 00303:  Plaintiff—11:39:34:  "they were 1,000US each, weren't they?"

> LRI 00290:  M.S.—11:39:36:  "If I get any of the others I bid on, you want to buy?... I'm tiered to the hilt and would rather make money than pay penalties"

> LRI 00303:  Plaintiff—11:39:52:  "if they're wwater I'd be very interested, sure…"

16

PITDMS 43916v.2

LRI 00290:  M.S.—11:40:11:  "lemme see what I can do... they come up this afternoon"

5.    Shortly thereafter, M.S. explained that the auction I.D. number for land was placed on the land itself by Defendant Linden.  The following exchange occurred at approximately 12:18 p.m., portions of which have also been <u>intentionally omitted by Defendant Linden from the Counterclaim</u>:

LRI 00290:  M.S.—12:18:09:

"http://secondlife.com/auctions/detail.phh?id=0026198448"

LRI 00304:  Plaintiff—12:18:39:  "you see MUL on the active bid page?"

LRI 00304:  Plaintiff—12:18:48:

"http://secondlife.com/auctions/detail.phh?id=0026198448"

LRI 00290:  M.S.—12:18:51:  **"about land" (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

LRI 00290:  M.S.—12:19:00:  **"tells you the auction number"(INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

LRI 00290:  M.S.—12:19:20:  **"type it in over any active auction number on the page" (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

LRI 00304:  Plaintiff—12:19:23:  "if i do about land.. right i get the auction number.. but this sim is notavailable..."

LRI 00290:  M.S.—12:19:44:  "yes...it is... the auction is being bid right now"

LRI 00290:  M.S.—12:19:52:  "copy this url"

LRI 00304:  Plaintiff—12:19:52:  "wait a minute... this is crazy..."

17

LRI 00291: M.S.—12:19:54

"http://secondlife.com/auctions/detail.php?id=0026198448"

LRI 00304: Plaintiff—12:19:58: "what did you pay for the other sims?"

LRI 00304: Plaintiff—12:20:16: ":are u tellin me that if a sim is not on the active auction page, you can make it active for $1.00?"

LRI 00291: M.S—12:20:23: "nope"

LRI 00\304: Plaintiff—12:20:24: "you paid only 1.00? seriously?"

6.    Further, prior to Plaintiff bidding on any low priced land, the following chat log exchange occurred, again, intentionally omitted from the Counterclaim by Defendant Linden:

LRI 00317: M.S.—12:37:00: **"make enough to pay your tier cause Gov Linden will stop you from playin the game at all" (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

LRI 00317: D.S.—12:37:19: "if you don't pay tier right?"

LRI 00317: M.S.—12:37:32: **"or if you blab" (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

LRI 00317: Plaintiff—12:37:38: "ah.. sure…"

LRI 00317: D.S.—12:37:45: "oh yeah ok"

LRI 00317: M.S.—12:37:47: "they can change the website too, ya know"

LRI 00317: Plaintiff—12:38:01: "yea…i would think they will eventually.."

LRI 00317: M.S.—12:38:02: "it's an exploit as how they will see it"

LRI 00317: Plaintiff—12:38:03: "amazing…"

18

<u>LRI  00317</u>:  M.S.—12:38:28:  "and they will cancel the account for doin it, just because they are loosing $"

<u>LRI  00317</u>:    D.S.—12:38:49:    **"so why are they letting it happen?"** **(INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

<u>LRI  00317</u>:    M.S.—12:39:13:    **"(not against the rules... but they don't REALLY need a reason to close your account)" (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

<u>LRI  00317</u>:  Plaintiff—12:39:14:  "can you do this only with purple land, or can you do it with any land that has an auction id?"

<u>LRI  00317</u>:  Plaintiff—12:39:20:  "true…"

<u>LRI  00317</u>:  M.S.—12:39:29:  "only with purple land"

<u>LRI  00317</u>:  Plaintiff—12:39:35:  "amazin…."

<u>LRI  00317</u>:  M.S.—12:39:41:  "not really"

<u>LRI  00317</u>:  M.S.—12:40:01:  **"they give you all the info"** **(INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

<u>LRI  00317</u>:  Plaintiff—12:40:07:  "i think I have only two"

<u>LRI  00317</u>:  M.S.—12:40:16:  **"all you have to do, is go there"** **(INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

<u>LRI  00317</u>:  Plaintiff—12:40:25:  "oh, right.. ok…"

<u>LRI  00317</u>:  M.S.—12:40:47:  **"not a cheat" (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)**

7.    Furthermore, in yet another section of the chat logs that were in possession of Defendant Linden prior to it filing its Counterclaim, the following discussion occurred

(prior to Plaintiff winning the Taessot sim), <u>again intentionally omitted by Defendant Linden</u>:

> <u>LRI 00294</u>: M..S.—08:58:01: **"oh… and found out why Lindens are letting it go like this"** (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)

> <u>LRI 00294</u>: M.S.—08:58:17: **"if it is unadvertised, no one bids"** (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)

> <u>LRI 00294</u>: M.S.—08:58:49: **"If it goes without bids for long enough, they can release it into general population as 1ˢᵗ land"** (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)

> <u>LRI 00294</u>: M.S.—09:00:06: **"so i think they know all about it.. they just don't say anything about it because that's how they 'Donate' land"** (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)

> <u>LRI 00294</u>: M.S.—09:00:50: **"and if they say' naah mez.. you've had enough' they send Microdick Dinkens in whit a 1000$US bid and list it"** (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)

> <u>LRI 00295</u>: M.S.—09:01:33: **"a linden labs account"** (INTENTIONALLY OMITTED BY DEFENDANT LINDEN)

Reviewing the above, Defendant Linden's reason for the refusal to attach the chat logs is obvious.

## III.    SUMMARY OF THE ARGUMENT

Dangerous like a cornered rat is a metaphor. The metaphor means, in essence, that a cornered wounded animal is more dangerous than one that does not feel threatened and maintains its health and ability to run away. Once hurt and cornered, the wounded

animal loses much of its sense of logic and reasoning, and is left only with an inherent impulse to attack in order to defend.

Dangerous like a cornered rat is a metaphor that applies to Defendants Linden and Rosedale. Defendants Linden and Rosedale were wounded by this Court's proper ruling setting aside the unconscionable arbitration provision contained in Linden's Terms of Service Agreement (hereinafter "TOS"). Defendant Rosedale was wounded when this Court properly understood that his press campaigns were an intrinsic part of Linden's sales pitch to obtain customers under the false pretense that when they purchased land from Defendant Linden in Second Life, they obtained ownership rights in the virtual property. Left with little in the way of substantive arguments to overcome their wrongful taking of Plaintiff Bragg's property and the massive fraud being perpetrated on consumers, Defendants Linden and Rosedale have mounted a two-pronged attack.

First, they have thrown out the English language and claim that they cannot and will not be tethered to their public statements formulated to obtain customers through fraud. Everything that has been improperly and fraudulently stated to the public has now been claimed to be a "metaphor." What was once "We started selling land free and clear, and we sold the title, and we made it extremely clear that we were not the owner of the virtual property," has been cast as a "metaphor" for "license to computing resources." Amended Answer, ¶ 48. How can this Court hold Defendants to their words when they didn't say the words they meant?

Dangerous like a cornered rat is a metaphor.

Saying "own virtual land" and "transfer title" when you really mean a "license to computing resources" is a lie, not a "metaphor."

Second, Defendant Linden has made **six** counterclaims in order to lash out at Plaintiff Bragg for bringing valid claims against it and Defendant Rosedale and bringing to a head Defendants' false and misleading statements to consumers. Three of the counterclaims have no basis in law nor fact, and were clearly brought for the improper purpose of perpetuating Defendant Linden and Rosedale's fraud on the consuming public. Marc Bragg is a criminal, they say, not just to this Court, but also on their website and to anyone who will listen. Perhaps in homage to ancient history, if you cannot kill the message, simply try to kill the messenger.

None of the criminal statutes plead were enacted to apply to these factual circumstances. However, it is of little import to Defendant Linden that these charges will ultimately not "stick." The charges have been placed in a formal pleading that Defendant Linden selectively posted to its website the day after filing them.[8]

In conjunction, if Plaintiff Bragg is scared off of his legitimate claims, all the better. Further, if this Court is bogged down in wading through motions, case law, and irrelevant arguments, then Defendants will continue their quest to perpetrate a grand fraud on the consuming public with temporary impunity.

Plaintiff's counsel will presently debunk Defendant Linden's baseless claims. There is no question, however, that the mere bringing of such claims must result in sanctions applied to Defendant Linden in an amount necessary to offset the costs Plaintiff incurred in order to illustrate to this Court the valid purposes of these criminal statutes.

---

[8] The selective posting of the Answer on Linden's website waives any claims to judicial immunity Linden and Rosedale may have had. *See Bochetto v. Gibson*, 580 Pa. 245, 860 A.2d 67 (2004) (holding party that posted *full* complaint was not entitled to immunity due to [vexatious purpose of posting]). By choosing phrases and portions of the answer, they have in fact re-written the answer on the website so that it is not the same content. In other words, the posting is not the answer and thus is not entitled to judicial immunity.

PITDMS 43916v.2

Accordingly, all of Defendants' improper claims found in Counts 1, 2, and 5 of the Counterclaims should be dismissed with prejudice.

## IV.    **MOTION TO DISMISS STANDARD**

In deciding a motion to dismiss, a court must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *Carino v. Stefan,* 376 F.3d 156, 159 (3d Cir. 2004) (dismissing claims against union members/employees when union was defendant in collective bargaining agreement claim). The court may grant such a motion only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957)).

Although the court must take all well-pleaded allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986). "General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) (*citing Jenkins v. S&A Chaissan & Sons, Inc.*, 449 F.Supp. 216, 227 (S.D.N.Y. 1978); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1363, at 464-65 (2d ed. 1990).

In addition to the facts set forth in the counterclaim, the court may also consider documents attached thereto and incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl., Sys., Inc.,* 155 F.3d 59, 67 (2d Cir. 1998), matters of public record such as case law and statutes, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998), and matters of judicial notice. *See Brass v. American Film*

*Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). *Pension Ben. Guar. Corp. v. White Consol. Inds. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Courts may consider matters of public record, exhibits attached to the complaint, and undisputedly authentic documents attached to a motion to dismiss. *Id.* (cited in *The Delaware Nation v. Commonwealth of Pennsylvania*, 446 F.3d 410 (3rd Cir. 2006); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (a court may consider a "document integral or explicitly relied upon in the complaint.") As such, Plaintiff has attached copies of the criminal statutes and publicly available legislative histories/interpretations to further illustrate the wholly inappropriate inclusion of these claims in the Amended Answer/Counterclaim. Further, as discussed above, Plaintiff has also attached copies of those electronic documents in his possession generated by Defendant Linden and relied upon in the Amended Counterclaims.[9]

## A.  THIS SHOULD PROPERLY CONSIDER ANY INCONSISTENT ALLEGATIONS FROM THE ORIGINAL COUNTERCLAIM WHEN DECIDING THE RULE 12(b)(6) MOTION.

As a general rule the averments of a party in one action, as well as pleadings which have been superseeded by amendment, withdrawn, or dismissed, may be taken as admissions against the interest of the pleading party with respect to the facts alleged therein. *Contractor Utility Sales Co., Inc. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1084 (7th Cir. 1981); *Frederic P. Wiedersum Assoc. v. national Homes Construction Corp.*, 540 F.2d 62, 65 (2d Cir. 1976); *Contintental Insurance Co.*, 439 F2.d at 1298; *Raulie v. United States*, 400 F2d 487, 526 (10th Cir. 1968).

---

[9] Defendant is in possession of the chat logs and emails that it cites but refused to attach to the Amended Counterclaim.

As the *Contractor Utility Sales Co.*, court explained:

> Although prior pleadings cease to be conclusive judicial admissions, they are admissible in a civil action as evidentiary admissions. McCormick, Handbook of the Law Evidence 633-34 (2d ed. 1974). As noted in Raulie v. United States, 400 F.2d 487, 526 (10th Cir. 1968), quoting Kungling Jarnvagsstyrelsen v. Dexter & Carpenter, 32 F.2d 195, 198 (2d Cir.), cert. denied, 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629 (1929): When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent.

*Contractor Utility Sales Co., Inc.,* 683 F.2d at 1085. Accordingly, to the extent that Defendant Linden has simply attempted to "change the facts" in an effort to create a cause of action, this Court should properly consider any prior inconsistent averments when deciding the Rule 12(b)(6) Motion.

**B.     THE COURT HAS DISCRETION TO ADDRESS AND CONSIDER DOCUMENTS THAT DEFENDANT LINDEN RELIES UPON AS PART OF ITS CLAIMS BUT INTENTIONALLY FAILED TO ATTACH TO THE COUNTERCLAIM.**

Generally speaking, a trial court has discretion to address evidence outside the complaint when ruling on a motion to dismiss. *Kulwicki v. Dawson,* 969 F.2d 1454, 1462 (3d Cir. 1992) (citing 5A Wright & Miller, Fed. Prac. & Proc. § 1366, at 491 (1990)). Further, as one court has explained, simply attaching exhibits to a complaint does not necessarily make that complaint amendable only to summary judgment or foreclose a court from considering those exhibits in its Rule 12 (b)(6) ruling:

> As a general rule, the court may only consider the pleading which is attacked by an FRCP 12(b)(6) motion in determining its sufficiency. The court is not permitted to look at matters outside the record; if such matters are considered, the FRCP 12(b)(6) motion to dismiss is, by express terms of FRCP 12(b), converted into a motion for summary judgment. However, the court may consider documents which are *attached* to or submitted with the complaint, as well as legal arguments presented in memorandums or briefs and arguments of counsel. **Further, documents whose contents are alleged in the complaint and whose**

25

**authenticity no party questions, but which are not physically attached to the pleading may be considered.** Documents that the defendant attaches to the motion to dismiss *are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim;* as such, they may be considered by the court.

*Pryor v. National Collegiate Athletic Assn.*, 288 F.3d 548, 560 (3d Cir. 2002)(italics in the original, bold added). The rationale for these exceptions is that "the primary problem raised by looking to documents outside the complaint-lack of notice to the plaintiff-is dissipated '[w]here plaintiff has actual notice... and has relied upon these documents in framing the complaint.'" *See Burlington*, 114 F.3d at 1426 (quoting *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993). As the Third Circuit held in *Pension Ben. Guar. Corp. v. White Consol. Inds. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993*)*, "[w]e now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied."

The rationale articulated above is particularly important in the current case as Defendant Linden, although relying on documents to formulate its alleged claims, intentionally did not attach such documents to the Counterclaim. Indeed, it appears that Defendant Linden did not do so in an effort to avoid an adverse Rule 12(b)(6) ruling. Moreover, even though Plaintiff pointed out in its original Rule 12(b)(6) Motion that Defendant Linden had improperly failed and refused to attach the documents upon which it apparently relies in making its Counterclaims, Defendant Linden **has intentionally persisted in refusing** to attach the documents upon which it allegedly relied. Accordingly, this Court should properly consider the undeniably authentic exhibits

attached to Plaintiff's Rule 12(b)(6) Motion and Brief given that Defendant Linden's claims are necessarily "founded" upon such documents but were intentionally not provided to the Court in an effort to avoid an adverse Rule 12(b)(6) ruling.

Further, to the extent that this Court does not grant Plaintiff's Rule 12(b)(6) Motion outright, it should grant Plaintiff's Rule 12(e) Motion for a More Definitive Statement and require that Defendant Linden attach to its Counterclaim the documents upon which it relies, including e-mail and complete, unedited versions of the alleged chat logs.

V.    **DEFENDANT LINDEN HAS FAILED TO STATE A CLAIM UNDER CALIFORNIA PENAL CODE § 502 AS 'BACKWARDS BROWSING', AS A MATTER OF LAW, DOES NOT VIOLATE THE STATUTE PARTICULARLY WHERE DEFENDANT HAS FAILED TO ALLEGE THAT PLAINTIFF CIRCUMVENTED ANY PASSWORD PROTECTION OR OTHER SECURITY FEATURES.**

Defendant Linden has failed to state a claim under California Penal Code § 502. Defendant Linden has claimed in its Amended Counterclaim that Plaintiff violated sections 502(c)(1), (4) and (6). Those sections provide:

(c)    Except as provided in subdivision (h), any person who commits any of the

following acts is guilty of a public offense:

(1)    Knowingly accesses and **without permission** alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(4)    Knowingly accesses and **without permission** adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(6)    Knowingly and **without permission** provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(emphasis added).    Subsection (e)(1) provides for a civil remedy under the act for "damages or loss . . . for compensatory damages . . .    Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner . . . to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access."    As will be set forth herein, as a matter of law, accessing a webpage placed on the internet cannot constitute a violation of California Penal Code § 502 particularly where no password protection or any other security devices were circumvented.

**A.    DEFENDANT LINDEN HAS NOT AND CANNOT PLEAD THAT ANY ACCESS TO WEBPAGES THEY PLACED ON THE WORLD WIDE WEB, AVAILABLE TO THE WORLD AND ACCESSED BY NUMEROUS CONSUMERS WAS 'WITHOUT PERMISSION' AS IS REQUIRED BY THE ACT.**

Defendant placed web pages on the internet without any password protection or security features.    Each of the subsections enumerated by Defendant Linden contains the requirement that the alleged "hacking" occur "without permission."    See, Cal. Penal Code 502(c)(1), (4) and (6).    The case authority with regard to the Act is scant.    However, the most recent administrative pronouncement by both the California Highway Patrol (who has jurisdiction in California to investigate such alleged violations) and the Attorney General's office of California provides compelling support for the dismissal of Defendant Linden's claims pursuant to California Penal Code § 502 as those agencies interpret the statute to require that: (1) there only be one person who would be able to access the site in the manner alleged, and (2) the alleged violator's access circumvented

some security such as password protected files.  Although not binding on this Court, the California Highway Patrol's report and the opinion of the California Attorney General's Office are both instructive.

In or about September, 2006, a political opponent of California Governor Arnold Schwarzenegger used "backwards browsing" to locate an mp3 file that contained audio with inflammatory remarks made by the Governor.   California Highway Patrol, Governor's Office Computer System Investigation Administrative Report, (February 1, 2007), p. 5 (of fax), attached hereto as Exhibit "10."  The file was then leaked to the Los Angeles Times newspaper.  *Id.*  The Governor's site itself had a page that required a user name and password and stated, in relevant part, that: "THIS SYSTEM IS RESTRICTED TO AUTHORIZED USERS FOR AUTHORIZED USE ONLY.   UNAUTHORIZED ACCESS IS STRICTLY PROHIBITED AND MAY BE PUNISHABLE UNDER THE COMPUTER FRAUD AND ABUSE ACT OF 1986 OR OTHER APPLICABLE LAWS."  *Id.* at p. 32 (caps in the original).[10]  Although the warning existed on the site generally, a person did not necessarily see the warning because the page with the mp3 could be accessed / reached without logging in through the security page.  *Id.* at p. 5.  Thus, the file itself was not placed behind such a password protected security feature.  *Id.*

The California Highway Patrol concluded as follows:

> .  .  .  .  access to specific unsecured files on the Governor's website was accomplished by individuals modifying a Uniform Resource Locator (URL).  A URL, which is commonly called a web address, is a string of characters conforming to a standardized format and refers to a resource on the Internet by its location.  Modifying the URL enabled the individuals to access and download computer files throughout the Governor's webpage.  While the system was not originally designed to be accessed in this manner, the modification of the URL in this instance **did not constitute a criminal offense.**

---

[10] Defendant Linden has not (and cannot) allege that any such "warning" existed in this case.

*Id.* at p. 3 (emphasis added).  Further, the conclusion of the California Highway Patrol

was reached after consultation with the California Attorney General's office.  *Id.* at p. 5.

> The Attorney General's (AG) Office was contacted for an opinion on whether a criminal act had occurred.  The Deputy AG reiterated that the individuals who accessed the website used the practice of backward browsing.  This is a process that is a common practice in the media.  Further, there appeared to be no security feature in place which would have prevented an individual from accessing the website through backward browsing.

> He indicated that if one additional individual could gain access in a manner similar to the way the subjects gained access, the act would not be considered a crime.

*Id.* at pp. 5-6.  The Attorney General's Office's view of the statute turned also on the lack

of security devices that would prohibit "backwards browsing."    As the Attorney

General's Office reasoned:

> There also appeared to be no security features which would prevent an individual from accessing the website using this method [backwards browsing]. . . . He stated that based on the lack of security features there was no statute to charge.

*Id.* at p. 9; Compare, *People v. Lawton*, 1996, 56 Cal.Rptr.2d. 521, 48 Cal.App.4[th] Supp.

11 (bypassing security to access files found to be violation of statute).

The conduct investigated by the California Highway Patrol is nearly identical to

that being alleged by Defendant Linden.  Defendant Linden alleges that many different

consumers modified (i.e. "typed") a URL to access virtual land auctions by "backwards

browsing."  Indeed, Defendant Linden admits in its pleading that at least two consumers

engaged in the practice prior to Plaintiff and had successfully won several auctions for

low priced land.  See, Amended Counterclaim, ¶ 71.  As pled by Defendant Linden,

Plaintiff learned of the low priced land auctions simply by viewing information on

Defendant Linden's website.  Defendant Linden further admits that Plaintiff learned of

how to bid on the low priced land from another consumer.  Defendant Linden admits that

it, not Plaintiff or anyone else, placed the virtual land auction web pages on the Internet. See e.g. Amended Answer ¶¶ 91-93, 96-7.

Defendant Linden placed the starting price on the virtual land auction and has not and cannot claim that Plaintiff did.[11]    Further, Defendant Linden has not (and cannot) plead that it placed any password security feature that would have prohibited "backwards browsing."    Further, the Amended Counterclaim is devoid of any claim that Plaintiff created the land auction I.D., as Defendants are completely aware that Defendant Linden created the land auction I.D.  As pointed out to this Court, the chat logs that Defendant Linden refused to attach to its Counterclaim also specifically disclose that the auction I.D. numbers were created by Defendant Linden and appeared on the land itself.  Exhibit "11," Bate Stamp Nos. LRI 00290, LRI 00291, LRI 00296, LRI 00297, LRI 00304, LRI 00311, and LRI 00312.

    1.    Defendant Linden's charge to Plaintiff for the Taesot sim is conclusive proof that the transaction at issue was "authorized."

Moreover, it is simply stunning that Defendant Linden would actually attempt to advance any argument that there was no "permission" for the Taesot sim transaction particularly given that Defendant Linden charged Plaintiff over US$300 for virtual land it never provided him.  Defendant Linden simply cannot be permitted to now argue that any transaction lacked "permission" or was "unauthorized" particularly given the charges it made to Plaintiff.  Apparently, Defendant Linden, in an effort to advance a frivolous

---

[11] Even under the best case scenario for Defendant Linden, an analogous situation would be one where a store mismarked the price on a good and the consumer knowingly purchased the mismarked item.  Courts hold that no crime is committed by buying a mismarked item. *United States v. Neff*, 34 M.J. 1195, 1202 (A.F.C.M.R. 1992)("If a retailer negligently mismarks the price on an item and the buyer obtains a "bargain"" as the result of the purchase, this does not establish a duty to return and does not make [the buyer's] failure to return a criminal act."); *United States v. Vorda*, 34 M.J. 725, 727 (N.M.C.M.R. 1991)(no crime of larceny committed where purchaser knowingly buys mismarked item especially where "the inattentiveness or carelessness" of the store employees "placed an incorrect price tag on the box.")

PITDMS 43916v.2

claim against Plaintiff, would like to admit that it committed fraud by charging Plaintiff

money for an "unauthorized" transaction.[12]  Defendant Linden's attempt to plead a cause

of action with facts such as those presented here is utter nonsense.

2.    Defendant Linden's attempt to plead around the original Rule 12(b)(6)
      Motion with a conclusory legal statement that is inconsistent with other
      admissions by Defendant Linden should be rejected.

In an attempt to responding to the fact that Defendant Linden not only placed the

prices on the low priced land, but also placed the auction pages on the internet, Defendant

Linden has decided to plead, inconsistent with its other admissions and also reality, that

the auction pages were "not pages posted on the Internet by Linden." See, Amended

Counterclaim, ¶ 41.  Such a conclusory allegation is not only nonsense, but is

contradicted by the facts, other admissions of Defendant Linden and reality.  First, the

allegation is inconsistent with charging Plaintiff over $300 for the land he was not

provided.  Second, the allegation is inconsistent with the Amended Answer, paragraphs

91-93 and 96-7.  Third, simply typing a web address in a web browser does not "create" a

webpage.  The Court in *Epic Realm Leasing, LLC v Autoflex Leasing, Inc.* 492 F.Supp.

2d 608 (E.D. Tex. 2007), described, in detail, the interaction of the internet and a web

browser:

> The World Wide Web refers to all of the content stored on web servers and other
> computers that is accessible via the Internet.  This content exists in the form of
> web pages that form websites, stored on the web servers.  A web server may store
> numerous web pages, each accessible by a unique address known as a Uniform
> Resource Locator ("URL").  Typically, internet users access the World Wide Web
> using web browsers, such as Internet Explorer, that run on their computers (called
> "web clients" or simply "clients").  **A user can access a particular web page by
> entering the appropriate URL in his web browser.  The user's request is
> directed to and processed by the web server containing the requested web**

---

[12] Further, the repeated communications from Defendant Linden to Plaintiff during the course of Defendant Linden's virtual land auction contradicts Defendant Linden's claim that the Taesot auction was "unauthorized."

**page.** **Persons who send requests to a web server and receive a response do not control the operations** of the Apache and Tomcat software in managing incoming web page requests.

Macerich does not use the accused Apache and Tomcat software because it is not responsible for running that software to manage incoming requests to a web server. The patents in suit "claim[ ] a method and apparatus for managing dynamic web page generation requests." The claims, in turn, recite the steps involved in managing web page requests: intercepting a request, routing a request, dispatching a request, etc. Likewise, the apparatus claims recite structure configured, or software programmed, to carry out those steps. Thus, in the context of the claimed invention, the allegedly infringing "use" of Apache and Tomcat must be the operation of the software to manage dynamic web page requests. **That use is made by a web hosting provider, and not by the party that makes a request or sends information to a web server. The web hosting provider, and not the requester, manages a request,** and here, Red Five, and not Macerich, runs the Apache and Tomcat software to manage incoming requests on its web servers.

*Id.* at 615-16, 621. (emphasis added)(internal citations omitted). Simply put, typing a web address in a web browser does not cause the web user to "control" the server. All that the web browser user is doing is pointing to a web page that exists on a server. Accordingly, not only is claim about the "creation" of the web pages inconsistent with the facts as alleged by Defendant Linden, any such claim is also inconsistent with reality.

> 3. <u>Defendant Linden's conclusory statements and legal conclusions couched as fact need not be accepted by this Court and do not preclude granting Plaintiff's Motion.</u>

Although Defendant Linden attempts to cast the access to web pages placed by it on the world wide web without any password security features, as some "conspiracy" of "confederates," such are merely legal conclusions and inflammatory rhetoric that have no bearing on this Court's ability to grant the Motion to Dismiss. See, Amended Counterclaim, ¶¶ 34-59. Legal conclusions or legal conclusions disguised as facts do not preclude the grant of a Rule 12(b)(6) Motion. *Papasan*, 478 U.S. at 286. Defendant Linden has failed to state a claim upon which relief may be granted. Although Defendant

33

Linden repeatedly makes conclusory statements referencing a "scheme" and "confederates," the facts in the Amended Answer and Counterclaim, once the inflammatory rhetoric is removed, refute that any claim has been stated pursuant to California Penal Code § 502.

4.    <u>Defendant Linden's improper purpose in bringing the "criminal" claim so that it could post defamatory portions of the Answer and Counterclaim on its web site should result in an award of costs to Plaintiff.</u>

The failure to state a claim pursuant to California Penal Code § 502 was not inadvertent. The game plan is obvious. Defendant Linden will not change any of their fraudulent practices even when the Court finds them unconscionable. For example, Defendant Linden continues to force consumers to "accept" the unconscionable arbitration clause that remains in their latest TOS. Defendant Linden plead a criminal violation against Plaintiff for the purposes of casting a chilling effect on any and all consumers that consider bringing valid claims against them.

Defendant Linden's intent is evidenced by the fact that the day after filing their Answer and Counterclaim they posted excerpts on their web page, citing to the language "computer fraud," "fraudulent scheme to obtain money" and "scheme" repeatedly. See, Exhibit "1." The "computer fraud" Counterclaim was simply a tool used by Defendant Linden to "bootstrap" defamatory comments onto its website with an attempt to cloak itself in absolute immunity. The selective posting of the Answer on Linden's website waives any claims to judicial immunity Linden may have had. *See Bochetto v. Gibson*, 580 Pa. 245, 860 A.2d 67 (2004) (holding party that posted *full* complaint was not entitled to immunity due to [vexatious purpose of posting]). Since Defendant Linden has

34

failed to state such a claim, it should be dismissed. The improper motive for bringing the claim should result in the award of fees and costs to Plaintiff.

**B.    AS A MATTER OF LAW, DEFENDANT LINDEN HAS NOT AND CANNOT ALLEGE RECOVERABLE DAMAGES FROM PLAINTIFF.**

As a matter of law, Defendant Linden cannot recover any alleged damages from Plaintiff. Defendant Linden has admitted in its Counterclaim that several inexpensive land auctions were completed / permitted by Defendant Linden in advance of Plaintiff ever even bidding on the Taesot sim auction. The fact that Defendant Linden has admitted (as it must) that several low priced land auctions occurred prior to Plaintiff even bidding on land bars Defendant Linden's claims. The recent amendment by Defendant Linden simply stressed that Defendant Linden permitted at least seven (7) low priced land auctions in advance of Plaintiff ever attempting to acquire such land. Amended Counterclaim, ¶¶ 89. Further, Defendant Linden has even admitted that it permitted those seven parcels to be re-sold by the consumers that acquired them. *Id.* at ¶¶ 71. Under California law, there is a duty to mitigate damages and a plaintiff cannot recover losses it could have avoided through reasonable efforts. *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal.App.4[th] 1559, 1568 (1996).

In *Thrifty-Tel*, Plaintiff sued the parents of teenagers who used hacks to access a private computerized switching network. *Id.* at 1563. Using confidential access codes, the teenagers accessed plaintiff's computer network and then used computer technology to crack other codes needed to make free long-distance calls. *Id.* at 1559-64. In relevant part, there were two flurries of illegal computer hacking conduct. They were separated by approximately four months. *Id.* at 1568. Between the first episode and the second episode, the plaintiff did nothing to prevent the second intrusion. *Id.* at 1568-9.

35

Accordingly, the court held that plaintiff was precluded under the doctrine of failure to mitigate from pursuing any damages for the second intrusion and, as such, reversed a judgment entered for "damages" stemming from the second episode. *Id.* at 1569.

In this case, even if this Court assumed *arguendo* that Plaintiff's alleged conduct amounted to "hacking" (which it does not), Defendant Linden has specifically pled that other low priced land auctions were completed in advance of Plaintiff bidding on any such land. Amended Counterclaim, ¶¶ 34-59. Moreover, Defendant Linden not only permitted at least seven (7) auctions of low priced land to conclude, but also permitted those parcels to be subdivided and sold to other consumers. *Id.* at ¶¶ 71. Defendant Linden has failed to allege why it did nothing to prevent the alleged "harm" occurring to it prior to Plaintiff bidding on virtual land (land he was never provided by Defendant Linden). Further, this compelling argument exists even if this Court decides that it cannot properly consider Plaintiff's own e-mail to Defendant Linden on April 29, 2006, in advance of him bidding on any low priced land wherein he inquires about such sales.

Defendant Linden has not (and cannot) plead or explain why Plaintiff was capable of seeing the low priced land auctions on their website and why it either did not or could not see the identical information. Defendant Linden has not plead (nor can it) any explanation as to why it did nothing from <u>at least</u> April 29, 2006 until May 1, 2006 to preclude any additional low priced land auctions, following the (at a minimum) several that occurred before Plaintiff bid. Defendant Linden has not plead (nor can it) any explanation as to why it honored the sale of seven (7) low priced auctions and permitted that land to be re-sold. As such, Defendant Linden has pled facts that establish, as a

matter of law, that it failed to mitigate any damages to itself thereby barring any claims

that it might have had.

      1.     <u>Defendant Linden's new allegations, particularly when read with the
intentionally omitted chat logs, establishes a failure to mitigate as a matter
of law.</u>

In addition to new allegations where Defendant Linden has admitted to permitting

at least seven (7) low priced land auctions and the re-sale of that land, the chat logs also

establish that, contrary to Defendant Linden's false suggestions, it appears quite clear that

Defendant Linden was permitting the low priced land auctions and was not stopping

them, not only from being concluded, but also from selling that land to third parties. See,

Exhibit "11." Quite frankly, when the admissions in the Amended Counterclaim and the

chat logs as a whole are read, there is no other interpretation other than Defendant Linden

intentionally created the low priced land auctions. Even if, however, the items were

simply "mismarked" by Defendant Linden, no computer crime was committed by

Plaintiff.

## VI.    **DEFENDANT LINDEN HAS FAILED TO STATE A CLAIM PURSUANT TO 18 U.S.C. § 1030 AND, AS SUCH, PLAINTIFF'S 12(b)(6) MOTION MUST BE GRANTED.**

Defendant Linden pleads that Plaintiff's alleged conduct is a violation of the

Computer Fraud and Abuse Act, codified at 18 U.S.C. § 1030. Amended Counterclaim,

¶ 87-88. In particular, Defendant Linden pleads that Plaintiff violated subsections

(a)(2)(c), (a)(4) of the act. Section 1030(g) provides in relevant part:

> Any person who suffers damage or loss by reason of a violation of this section
> may maintain a civil action against the violator to obtain compensatory damages
> and injunctive relief or other equitable relief. A civil action for a violation of this
> section may be brought only if the conduct involves 1 of the factors set forth in
> clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation
> involving only conduct described in subsection (a)(5)(B)(i) are limited to

economic damages. . . . No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

18 U.S.C. § 1030(g). Defendant Linden has claimed that Plaintiff violated the following sections of the Act:

### 18 U.S.C. . § 1030 (a)(2)(c)

(a)(2)    intentionally accesses a computer without authorization or exceeds authorized

    access, and thereby obtains –

    (C)    information from any protected computer if the conduct involved

        interstate or foreign communication;

### 18 U.S.C. . § 1030 (a)(4)

(4)    knowingly and with intent to defraud, accesses a protected computer without

    authorization, or exceeds authorized access, and by means of such conduct

    furthers the intended fraud and obtains anything of value, unless the object of the

    fraud and the thing obtained consists only of the use of the computer and the

    value of such use is not more than $5,000 in any 1-year period;

### 18 U.S.C. . § 1030 (a)(5)(A)(i) and (iii)

(a) (5)(A)(i)    knowingly causes the transmission of a program, information, code, or

    command, and as a result of such conduct, intentionally causes damage without

    authorization, to a protected computer;

(5)(A)(iii)    intentionally accesses a protected computer without authorization, and as a

    result of such conduct, causes damage;

(B)    by conduct described in clause (i) . . . or (iii) of subparagraph (A), caused (or, in

    the case of an attempted offense, would, if completed, have caused) –

(i)     loss to 1 or more persons during any 1-year period (and, for purposes of an

        investigation, prosecution, or other proceeding brought by the United States only,

        loss resulting from a related course of conduct affecting 1 or more other protected

        computers) aggregating at least $5,000 in value;

As will be more fully set forth at length herein, locating a webpage placed on the

internet by Defendant Linden and available to the world is simply not actionable as a

matter of law, particularly where Defendant Linden authorized a charge to Plaintiff of

over US$300 for virtual land that was never provided to him.

**A.      AS PREVIOUSLY SET FORTH HEREIN, ACCESS TO A WEB PAGE
PLACED ON THE INTERNET BY DEFENDANT LINDEN CANNOT, AS
A MATTER OF LAW, CONSTITUTE 'UNAUTHORIZED' ACCESS.**

As previously detailed at length in the section pertaining to California Penal Code

§ 502 (that statute uses the term "without permission" as opposed to "unauthorized"), the

Computer Fraud and Abuse Act (hereinafter "CFAA"), codified at 18 U.S.C. § 1030, uses

a similar term "unauthorized" with regard to alleged violations.  The argument is simply

the same.  Defendant Linden placed the web pages on the internet.  Defendant Linden

placed the minimum bids on the land auctions.  Defendant Linden did not stop or remove

any such auctions, despite the fact that several low priced land auctions occurred before

Plaintiff bid on any low priced virtual land.  Defendant Linden permitted third parties to

re-sell their low priced land and did nothing, apparently, to reclaim that land.  Defendant

Linden has intentionally failed to plead where the auction I.D. numbers came from, as it

knows that Defendant Linden provided those auction I.D. numbers to anyone who looked

at the virtual land.[13]  Defendant Linden did not place any password protection security

device that would have prohibited "backwards browsing."  And, perhaps most

---

[13] As the chat logs disclose, the auction I.D. numbers were placed by Defendant Linden on the virtual land.

importantly, in the single auction for virtual land that Defendant Linden claims Plaintiff "obtained" a parcel of land, Taesot, Defendant Linden admits that it charged Plaintiff over US$300 for that parcel of land, i.e., it "authorized" a charge to Plaintiff, yet never provided the virtual land to Plaintiff.

Even if this Court was to ignore the numerous e-mail sent from Defendant Linden during the course of the Taesot auction and at its conclusion, Defendant Linden has not pled facts that properly set forth a cause of action under 18 U.S.C. § 1030. Placing web pages on the internet for the world to see and interact with, as a matter of law, cannot amount to "unauthorized access" when an internet user accesses or views those pages. Moreover, such cannot be the case particularly where Defendant Linden charged Plaintiff over US$300 in the very transaction that it now complains of.

**B.    THE ALLEGED DAMAGES PLEAD IN THE COUNTERCLAIM DO NOT GIVE RISE TO A CAUSE OF ACTION UNDER THE CFAA.**

The alleged damages contained in the Amended Counterclaim do not give rise to a cause of action under the CFAA. Defendant Linden does not allege that Plaintiff sent a computer virus. Defendant Linden does not allege that Plaintiff sent a worm. Defendant Linden does not allege that Plaintiff utilized any destructive software. Defendant Linden does not allege that any computer, any network, any software, any internet related function or application was functionally altered, damaged or destroyed. Defendant Linden alleges that Plaintiff typed an internet address in his web browser that took him to a page that it put on the internet where he bid on virtual land and, that ultimately, Defendant Linden charged him over US$300. In sum, Defendants have not alleged any violation of 18 U.S.C. § 1030.

18 U.S.C § 1030 originally had no civil remedy, and only after Congress determined that it needed aid in containing the proliferation of viruses and worms and other destructive computer software was the act amended to include a civil remedy. The act is aimed at containing the proliferation of viruses and worms and also to deter the wrongful and unauthorized obtaining of private information. As such, the case law illustrates that cases sustained under 18 U.S.C. § 1030 involve computer "hacking" and/or often former employees who use their user names and passwords to obtain private and confidential information contemporaneously with leaving employ to the detriment of their former employers. *See e.g.*, *L-3 Communications Westwood Corp. v. Robicharux*, 2007 WL 756528 (E.D.La. 2007) ("Losses under CFAA are compensable when they result from damage to a computer system or the inoperability of the accessed system."); *Civil Center Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F.Supp.2d 378, 381 (S.D.N.Y. 2005); *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F.Supp.2d 468, 475 (S.D.N.Y. 2004), *aff'd* 166 Fed.Appx. 559 (2006)) ("[C]osts not related to computer impairment or computer damages are not compensable under the CFAA").[14]

Rather than plead allegations concerning the interference with the **function** of their networks, servers, or computers that would amount to a cause of action under 18 U.S.C. § 1030, Defendants have plead:

> By way of this conduct, Bragg and his co-conspirators, knowingly, and with the intent to defraud Linden, exceeded authorized access to Linden's computers and thereby obtained information from Linden's protected computers that they were not authorized to have, namely, information that enabled them to purchase "sims" of "virtual land" at prices far below the minimum opening bid of U.S. $1000.00. Bragg and his co-conspirators accessed this information by synthesizing URL's and transmitting them over the Internet in interstate communications to gain access to functionality not authorized by Linden and contrary to Linden's

---

[14] The *Nexans* Court also stated that revenue lost because a defendant used unlawfully gained information to unfairly compete was not a type of "loss" contemplated under the CFAA. *Nexans*, 319 F.Supp.2d at 478.

reasonable expectations. On this basis, Bragg and his co-conspirators violated the Computer Fraud Act, 18 U.S.C. § 1030 (a)(2)(C). Amended Counterclaim, ¶ 87.[15] As set forth in the chat logs, Defendant Linden's statement not only does not support a cause of action, but is just plainly false as the land auction I.D. appeared on the land itself, as placed there by Defendant Linden. Exhibit "11," Bate Stamp Nos. LRI 00290, LRI 00291, LRI 00296, LRI 00297, LRI 00304, LRI 00309, LRI 00311, and LRI 00312.

Noticeably, although relying on facts that are included in e-mail transmissions from Defendant Linden to Plaintiff, Defendant Linden intentionally chose not to attach such e-mail to its Counterclaim. Indeed, Defendant Linden has attempted to avoid informing this Court that the Taesot auction ended at approximately 4:05 p.m. on May 1, 2006 and Plaintiff was informed by Defendant Linden at 6:16 p.m., just over two hours later that "Your recent auction appears to have been the result of an exploit. The land will therefore be taken back and your money refunded." Exhibit "9." The reason for this intentional omission is not an innocent one. Defendant Linden was fully aware when it did not attach the e-mail and refused to specifically plead the times of events that to do so would be fatal to any claim pursuant to 18 U.S.C. § 1030. Defendant Linden is fully aware that any alleged "transient" unavailability of the Taesot sim (the best case scenario for Defendant Linden) does not satisfy the damage requirement of 18 U.S.C. § 1030, which is precisely the reason Defendant Linden attempted to avoid informing this Court.

One court has addressed a similar allegation of alleged transient unavailability of data and concluded that the allegation, like Defendant Linden's, does not provide for the

---

[15] According to Defendant Linden, all that was being auction was a "license to computing resources." See, Amended Answer, ¶ 48. Under 18 U.S.C. § 1030 (a)(4) if the alleged "object of the fraud" "consists only of the use of the computer," then claims are barred unless the "value of such use" exceeds $5000. As is set forth herein, such "use" as pled by Defendant Linden (if any occurred) cannot, as a matter of law exceed $5000.

type of "damages" contemplated by the CFAA. *Davies v. Afilias Limited*, 293 F.Supp.2d 1265, 1273 (M.D.Fla. 2003). The *Davies* court analyzed a situation where the alleged offender used incorrectly received authorization codes to register domain names he was not entitled to. *Id*. at 1273. The claim was that the plaintiff's improper "reservation" of such domain names precluded others (who were likely entitled to obtain the domain names), from obtaining those domain names until the transaction was reversed by the defendant. *Id*. at 1273. The *Davies* court held:

> Plaintiff cannot be held liable under the CFAA simply on the basis that he used the codes to register domain names. Plaintiff's actions may have lead Defendant to lock the domain names and hence cause them to be unavailable, but this is not the sort of "impairment to the . . . availability of data" contemplated by the CFAA. As the legislative history indicates, a civil cause of action was added to redress damage and loss as a result of serious computer abuses, such as transmission of viruses or destructive worms and use of fraud to access non-public information.

*Id.* at 1273. See*., In re DoubleClick Inc.,* 154 F.Supp.2d 497 (S.D.N.Y. 2001) ("To the contrary, the histories of these statutes reveal specific Congressional goals – punishing destructive hacking, preventing wiretapping for criminal or tortious purposes, securing the operations of electronic communication service providers --- that are carefully embodied in these criminal statutes and their corresponding civil rights of action").

Unlike the *Davies* case where the counter claimant alleged that certain computer resources in the form of domain names was even "transiently" unavailable, Defendant Linden has not even made such an allegation in this case. To the contrary, Defendant Linden alleged that the Taesot sim was allegedly not to be auctioned at all. Thus, by Defendants' own allegations, the Taesot sim was not even "transiently" unavailable to anyone else, as it was not being auctioned. Moreover, as detailed in the e-mail, even if Defendant Linden attempted to claim that anyone else was "deprived" of the Taesot sim,

43

as set forth herein, the alleged deprivation was just over two (2) hours, hardly what it required to state a claim under the statute. As such, Defendant Linden has pled less than even the *Davies* counter claimant who did not set forth a claim.

Further, Congress considered:

Technology is hurling us into the 21st century at speeds that leave lawmakers gasping. This bill catches up with some problems already out of hand, by strengthening laws against computer abuse, deterring malicious computer hacking, and aiding prosecution of computer crimes without criminalizing creative attempts at legitimate experimentation.

*S.Rep. 101-544 (1990).* As set forth in the Legislative history of the CFAA, this is simply not the type of "behavior" the CFAA was designed to address.

Further, the CFAA simply cannot be interpreted as a substitute for website security. A company like Defendant Linden cannot place web pages on the internet, a medium that is by its very nature open to the public, and then simply be permitted to later claim that they did not "intend" for anyone to access them. Such an argument would seemingly permit any website operator to make the same argument. Both the California Highway Patrol and the Attorney General of California reject such an argument, as this Court should as well.

C.    **DEFENDANT LINDEN HAS FAILED TO PROPERLY ALLEGE FACTS TO SUPPORT ITS CONCLUSORY ALLEGATION THAT THERE ARE OVER $5000 IN DAMAGES ATTRIBUTABLE TO PLAINTIFF AND, AS SUCH, HAS FAILED TO SET FORTH A CLAIM UNDER THE STATUTE.**

In order to plead a cause of action pursuant to 18 U.S.C. § 1030, a plaintiff must plead damages meeting the statutory $5000 threshold. 18 U.S.C. § 1030 (e)(8)(A); *see also DoubleClick, Inc.*, 154 F.Supp.2d at 523-524. In its original counterclaim, Defendant Linden simply pled the conclusory statement that Plaintiff caused Defendant

Linden over $5000 in damages. Realizing that they have no evidence to support that wild and false accusation, Defendant Linden has attempted to "plead around" the $5000 requirement that they know would be fatal to any Section 1030 claim. Indeed, Defendant Linden has now pled that Plaintiff should be held liable to them because Defendant Linden: (1) put virtual land for one dollar on the internet, (2) permitted at least seven (7) low priced auctions to conclude, (3) processed those land sales and provided the land to those consumers and (4) permitted those consumers to resell the land to others. How Plaintiff could, under any theory, be liable for such actions makes absolutely no sense. And, to further underscore the absurdity, Defendant Linden has not even attempted to sue anyone else who (under Defendant Linden's best case scenario) purchased allegedly mismarked items.[16] Moreover, contrary to the statute, Defendant Linden has not and cannot allege that Plaintiff acquired anything of value with regard to those seven (7) previous low priced land auctions. See, 18 U.S.C. . § 1030 (a)(4).

D.    **DEFENDANT LINDEN HAS NOT PLED ANY DAMAGES ALLEGEDLY ATTRIBUTABLE TO PLAINTIFF.**

Defendant Linden has not pled any damages allegedly attributable to Plaintiff. Plaintiff was not the first person to access any low priced land auction page. Amended Counterclaim, ¶¶ 34-59. No password protected security methods were breached in order to access the auction page. Any remedial steps taken by Defendant Linden to prohibit the world from bidding on land auction pages that they put on the internet but not intend bidding on would have been necessary regardless of Plaintiff's alleged conduct. As previously discussed, this Court may disregard allegations made that are belied elsewhere by Defendants. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995)

---

[16] The chat logs, in the very least, suggest strongly that the items were not mismarked. Indeed, Plaintiff was told they were not, but were, instead intentionally marked with low prices.

("General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."). Defendant Linden has admitted in the first Answer and Counterclaim that it placed the auctions on the internet, not Plaintiff or even any of his alleged "confederates."

Further, since Plaintiff was not the first to bid on low priced land, there is no allegation that he proximately caused any remedial steps to be taken. Moreover, Defendant Linden admits that it permitted at least seven (7) low priced land auctions and even permitted that land to be re-sold to others prior to Plaintiff bidding on any low priced land. Again, even if this Court was to ignore the chat logs where Plaintiff was essentially told that Defendant Linden marked the land low price intentionally, Defendants have not alleged any recoverable loss/damage attributable to Plaintiff. *See Doubleclick Inc.*, 154 F.Supp.2d at 525 ("[Plaintiffs] have not pled that DoubleClick caused any damage whatsoever to plaintiffs' computers, systems or data that could require economic remedy. Thus, these remedial economic losses are insignificant if, indeed, they exist at all."). The fact that Defendant Linden has refused and/or failed to sue anyone other than Plaintiff underscores the point.

Moreover, Defendant Linden appears to be advancing an argument that its own employees mismarked numerous items throughout its store. Thus, once it discovered that consumers were purchasing negligently mismarked items, that Defendant Linden then engaged in some process to go through its own store correcting the items that its employees negligently mismarked. It is nonsensical to argue that Plaintiff should be required to pay for Defendant Linden to correct its own mistakes. Furthermore, even if it is assumed *arguendo* that the items were mismarked (as opposed to intentionally marked

46

low as the chat logs support), there is no theory where Plaintiff can be held liable for other consumers purchases of mismarked items.

E.     **THE TRUE FACTS DISCLOSE THAT ANY ALLEGED 'HARM' FROM THE 'UNAVAILABILITY' OF THE TAESOT SIM EXISTED AT MOST FOR APPROXIMATELY TWO (2) HOURS AND CANNOT, AS A MATTER OF LAW, EQUATE TO $5000 IN DAMAGES.**

Assuming all of Defendant Linden facts as true and properly considering the documents underlying the allegations in the Amended Counterclaim, the Taesot purchase only amounted, in the best case scenario for Defendant Linden, in a two hour "unavailability" of the virtual land. The reality is that the US$300 plus charge to Plaintiff negates any inference that the virtual land was not, in actuality, sold to Plaintiff. However, even if this Court was to ignore that allegation in the Amended Counterclaim, it is impossible, as a matter of law, that Defendant Linden incurred any damages in excess of $5000 for a two hour period. Any such claim is nonsensical which is why Defendant Linden has failed to plead any such damages.

Further, Defendant Linden has attempted to plead a claim pursuant to CFAA § 1030 (a)(4) which required Defendant Linden to plead to as a result of his alleged "fraud," "further[ed] the intended fraud and obtain[ed] anything of value." 18 U.S.C.A. § 1030 (a) (4); *see also Pacific Aerospace & Elecs., Inc. v. Taylor*, 295 F.Supp.2d 1188, 1195 (E.D.Wash. 2003). Defendant Linden alleges that all that was "truly being acquired" was a "license to computing resources." Amended Answer, ¶ 48. Although consumers truly obtained more than a simple "license to computing resources," for the purposes of the Amended Counterclaim, Defendant Linden must be held to its own representations. Under 18 U.S.C. § 1030(a)(4) if the alleged "value" of the "use of the computer" is less than $5000, then a claim is not properly pled. Defendant Linden has

47

not (and cannot) allege that any transient computer use for two hours (although there was truly no use), amounts to over $5000. As set forth herein and above, Defendant Linden has not pled that Plaintiff actually obtained anything of value and certainly not "anything of value" in excess of $5000.

Having failed to plead any damages, much less damages amounting to $5000, Defendant Linden allegations pursuant to 18 U.S.C. § 1030 fail to state a claim upon which relief may be granted. The claim must be dismissed with prejudice. Further, Defendant Linden's clearly improper and vexatious purpose behind stating a claim for relief pursuant to this statute requires that this Court assess costs associated with the original, and now, this motion to dismiss. Absent such court granted relief, Defendant Linden will have succeeded in heaping unnecessary work upon Plaintiff's counsel while prejudicing Plaintiff's valid claims.

**F.    IT IS NOT A CRIME TO BUY MISMARKED ITEMS AND, MOREOVER, THE CHAT LOGS THAT DEFENDANT LINDEN HAS INTENTIONALLY HIDDEN FROM THIS COURT UNDERMINE ANY ARGUMENT THAT THE VIRTUAL LAND WAS 'MISMARKED' IN THE FIRST PLACE.**

As previously cited, it is not a crime to buy a mismarked item. Further, there is absolutely nothing in the computer abuse statute that would even remotely suggest that attempting to buy mismarked virtual land constitutes a "computer crime." Further, as pointed out to this Court herein, Defendant Linden has intentionally hidden the chat logs from this Court in an effort to assist it into duping this Court into not granting the Rule 12(b)(6) Motion. When the chat logs are reviewed, they disclose that the consumers bidding on the virtual land not only did not believe that it was "not a cheat" but it was "not against the rules." Exhibit "11," Bate Stamp No. LRI 00317. Further, the

consumer who told Plaintiff about the low priced virtual land also told Plaintiff and others that "Governor Linden" would stop you from "playing the game" if you do not pay tier or "if you blab." Further, M.S. even told Plaintiff "why Lindens are letting it go like this." Exhibit "11," Bate Stamp No. LRI 00294 .

Thus, even if this Court was to entertain an argument that bidding on "mis-marked" virtual land could even remotely satisfy any "intent" requirement of the computer abuse statute, the chat logs that Defendant Linden refused to attach to its Amended Counterclaim gut any such argument.

**VII.    DEFENDANT LINDEN HAS NOT ALLEGED (NOR CAN IT), THAT PLAINTIFF VIOLATED CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 17200.**

Defendant Linden has attempted to plead a count against Plaintiff for violation of the California Business and Professional Code § 17200 (hereinafter "Section 17200"). Research has not disclosed cases where a merchant was permitted to sue a consumer pursuant to the statute. Section 17200 "establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent." *See Belton v. Comcast Cable Holdings, LLC*, 151 Cal.App.4[th] 1224, 1233   (2007) (*quoting Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4[th] 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) ("It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' By proscribing 'any unlawful' business practice, 'section 17200' "borrows" violations of other laws and treats them as 'unlawful practices' that the unfair competition law makes independently actionable.")

PITDMS 43916v.2

Accordingly, to bring an action pursuant to Section 17200, a claimant must allege: (1) an unlawful *business* practice grounded in antitrust; (2) an "unfair" *business* practice based on an underlying antitrust law[17]; or (3) an unfair competition claim under the "fraudulent" prong of Section 17200, showing "representations that were false or were likely to have misled "reasonable consumers." *See Belton*, 151 Cal.App.4[th] at 1241 (*quoting South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal.App.4[th] 861, 878, 85 Cal.Rptr.2d 301 (1999)).

Defendant Linden has not (and cannot) allege that Plaintiff was its competitor. Further, Defendant Linden has not (and cannot) allege anything remotely close to a "business" practice conducted by Plaintiff. Further, no representation to consumers or the public at large has been alleged, much less a fraudulent representation. As such, this Court must dismiss this cause of action. Defendant Linden's conclusory allegations that, "On information and belief, Bragg participated in Second Life service with the intent of making a profit through the purchase, subdivision and resale of 'virtual land,'" (Amended Counterclaims ¶ 112) and "Bragg's conduct as alleged above constitutes unlawful, fraudulent, and/or unfair business practices," (Amended Counterclaims ¶ 113) need not be accepted by this court. Such are merely conclusory legal conclusions, not factual allegations.

The fact that Defendant Linden has attempted to implement a consumer cause of action against Plaintiff, a consumer, should shock the conscience of this Court. The motive for bringing such a claim is improper and should not be countenanced. As such,

---

[17] As stated in *Cel-Tech*, "unfair" is defined as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 973 P.2d at 565.

PITDMS 43916v.2

the claim should be dismissed and costs associated with this motion should be awarded to Plaintiff.

**VIII.   IN THE ALTERNATIVE, THIS COURT SHOULD GRANT PLAINTIFF'S RULE 12(e) MOTION FOR A MORE DEFINITIVE STATEMENT.**

In addition to, and in the alternative, Pursuant to Rule 12 (e), Plaintiff requests a more definite statement with regards to the counterclaims brought by Defendant Linden. Although Rule 12(e) appears to be rarely used, it appears to be appropriately applied in this case. Rule 12(e) provides that if a pleading is so vague or ambiguous that a responsive pleading cannot be framed, the responding party may request a more definitive statement. Rule 12(e) seems appropriately applied in an instance like the one presently where Defendant Linden has intentionally: (1) not attached the documents that form the basis of their allegations and (2) intentionally have not attached chat logs allegedly quoted and done so obviously selectively. See, Amended Counterclaim, ¶¶ 37-40, 45-47.

As set forth earlier, Defendant Linden cannot be permitted to attempt to avoid a Rule 12(b)(6) Motion, in particular, by refusing to attach documents that underlie its claims. See, *Pension Ben. Guar. Corp.*, 998 F.2d 1192, 1196 (3d Cir. 1993*)*, "[w]e now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied.")

In particular, Defendant Linden should be ordered to attach the entire chat logs that it cites selectively. Otherwise, Plaintiff is left to try to formulate a response to incomplete and selectively quoted chat logs. Additionally, Defendant Linden can obtain

the benefit of only selectively quoting such chat logs to avoid any discussions that would assist Plaintiff in securing dismissal of the case pursuant to Rule 12(b)(6). Accordingly, should this Court not grant Plaintiff's Rule 12(b)(6) Motion (or refuses to consider the entire chat logs), Plaintiff requests that the Court order Defendant Linden to attach the entirety of the alleged chat logs to an Amended Counterclaim.

IX.    **DEFENDANT LINDEN HAS FAILED TO JOIN NECESSARY PARTIES PURSUANT TO RULE 19 AND, AS SUCH, THE COUNTERCLAIMS MUST BE DISMISSED PURSUANT TO RULE 12(b)(7).**

Rule 19(a) requires joinder of necessary parties if feasible. The court may order joinder of a person in whose absence complete relief cannot be granted to those already parties to the case. Rule 19(a) provides, in relevant part, that "[a] person . . . shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties . . . ." The court has the discretion to dismiss claims where a claimant does not properly join indispensable parties. *See e.g., International Paper Co. v. Denkmann Assoc.*, 116 F.3d 134 (5th Cir. 1997) (partnership deemed indispensable party in action seeking to compel arbitration price of option to purchase timber land.)

When a court determines that joinder is necessary under Rule 19(a) and that joinder is not feasible, the court must then determine whether the non-joined party is indispensable under Rule 19(b). The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate;

52

fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

Presently, this Court is faced with Counterclaims brought against Plaintiff, which include allegations made against at least four other individuals, if not more.  Defendant Linden has included at least four users, identified by user names S.S., M.S., D.S. and T.L. in their counterclaims alleging violations of computer and business practice statutes. Defendant Linden makes clear in its counterclaims that at least two of these users are alleged to have participated in the purchase of low-priced land **prior to** Plaintiff.  Further, Defendant Linden's failure to identify these individuals makes their joinder not feasible.

Defendants in their original Answer and Counterclaim dropped hints as to an alleged ongoing conspiracy between unidentified individuals and the Plaintiff. Defendant in its Amended Counterclaims is not specifically charging conspiracy, yet continually refers to "co-conspirators," "cohorts," "perpetrating a scheme," and "entering into an agreement." Defendants have not joined or initiated suit against these alleged "co-conspirators." Defendants can not formally allege any conspiracy because there is no factual basis for alleging one.  In order for a conspiracy to exist, there must be an agreement between two people to commit a crime and an overt act in furtherance of the crime.  Defendant Linden has cited no statute that would support such a theory, in any event.

Defendants continual reference to "co-conspirators" further demonstrates the ultimate purpose of these alleged counterclaims. Defendant's merely want to pervert court proceedings in an effort to obtain internet publicity. Not only should these baseless

PITDMS 43916v.2

counterclaims be dismissed, Defendants should be sanctioned from such abuses to the orderly administration of justice.

Additionally, Defendant Linden admits that its own employees (who remain unidentified) apparently negligently put the wrong prices on the low priced land. To the extent that Defendant Linden is truly seeking to hold Plaintiff responsible for Defendant Linden having to "go through its own store" and correct all its mismarked items, Defendant Linden would have to sue its own employees. Defendant Linden having to sue itself, in essence, is nonsensical and renders joinder of the indispensable Linden employees impracticable. Given the same, Plaintiff's Rule 12(b)(7) Motion should be granted and the Counterclaims dismissed with prejudice.

## X.    **CONCLUSION**

WHEREFORE, for the foregoing reasons, Plaintiff requests that Defendant Linden's Counterclaims found in Counts I, II and V be dismissed with prejudice pursuant to Rules 12(b)(6) and 12(b)(7). Alternatively, Plaintiff requests that Defendant be ordered to provide a more definite statement pursuant to Rule 12(e).

Respectfully submitted,

Date: August 27, 2007

WHITE AND WILLIAMS, LLP

By JAA7341
    Jason A. Archinaco, Esq.
    PA ID 76691
    Christopher Ballod, Esq.
    PA ID 89462
    Colin G. Schafer, Esq.
    PA ID 202515
    The Frick Building, Suite 1001
    437 Grant Street
    Pittsburgh, PA 15219
    (412) 566-3520
    *Counsel for Plaintiff*

PITDMS 43916v.2