IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARC BRAGG, Esq., an individual, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | Case No. 06-4925 |
| | : | |
| LINDEN RESEARCH, INC., a corporation, and PHILIP ROSEDALE, an individual, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| LINDEN RESEARCH, INC., a corporation, | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MARC BRAGG, an individual, | : | |
| | : | |
| Counterclaim Defendant. | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____,

2007, upon consideration of Plaintiff/Counterclaim Defendant's Motion To Dismiss The

Counterclaims Pursuant To Rule 12(B)(6) And Rule 12(B)(7) and Motion For More Definite

Statement Pursuant To Rule 12(E), and the papers submitted by the parties, it is hereby

ORDERED that the Plaintiff/Counterclaim Defendant's Motion is DENIED.

**BY THE COURT**

_____

, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARC BRAGG, Esq., an individual, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | Case No. 06-4925 |
| | : | |
| LINDEN RESEARCH, INC., a corporation, | : | |
| and PHILIP ROSEDALE, an individual, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| LINDEN RESEARCH, INC., a corporation, | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MARC BRAGG, an individual, | : | |
| | : | |
| Counterclaim Defendant. | : | |

**COUNTERCLAIM PLAINTIFF LINDEN RESEARCH, INC.'S BRIEF IN OPPOSITION
TO COUNTERCLAIM DEFENDANT MARC BRAGG'S MOTION TO DISMISS THE
COUNTERCLAIMS PURSUANT TO RULE 12(B)(6) AND RULE 12(B)(7) AND
MOTION FOR MORE DEFINITE STATEMENT PURSUANT TO RULE 12(E)**

# TABLE OF CONTENTS

**Page**

I.    Introduction .................................................................................................1

II.   Factual Background .......................................................................................2

    A.    Second Life.........................................................................................2
    B.    Bragg Agrees to Second Life's Terms of Service ...............................4
    C.    Bragg's Fraudulent Scheme to Knowingly and Unlawfully Access
        and/ or Use Linden's Computer Network to Obtain "Virtual Land" .....5

III.  Standard for Rule 12(b)(6) Motion to Dismiss.............................................11

IV.   Linden's California Statutory Computer Fraud Claim (Cal. Penal
    Code § 502 Is Sufficiently Pled ...................................................................12

    A.    Legal Standard...................................................................................12
    B.    Linden Has Sufficiently Pled a Claim Under Penal Code Section 502.................12
    C.    Bragg's Reliance on The California Highway Patrol's Administrative
        Report Does Not Compel Dismissal of Linden's Penal Code
        Section 502 Claim .............................................................................14
    D.    Linden Has Properly Pled That It Suffered Injury Under
        Penal Code Section 502......................................................................16

        1.    Linden has properly alleged that it suffered cognizable injury
            under Penal Code Section 502....................................................16
        2.    Bragg's "mitigation" defense has no merit.................................17

V.    Linden's Federal Computer Fraud Claim (18 U.S.C. § 1030) Is Sufficiently Pled..............19

    A.    Legal Standard...................................................................................19
    B.    Linden alleges that it suffered "loss" under the CFAA ......................20
    C.    Linden has properly alleged facts supporting the necessary $5,000 loss
        threshold under Section 1030(a)(5)(B)(i) ...........................................25
    D.    Each of Linden's CFAA claims is sufficiently pled.............................27

        1.    Linden alleges that Bragg's "access" to Linden's computers
            was "unauthorized" or "exceeded authorized access" under
            Sections 1030(a)(2)(C) and 1030(a)(4) ......................................27
        2.    Linden has alleged facts supporting its allegation that
            Bragg's access and use of Linden's computers to
            unlawfully bid on unlisted "sims" was "unauthorized" or in
            "excess of authorized use".........................................................29

|   |   |   | a. | Linden's claim under Section 1030(a)(2)(C) is sufficiently pled ................................................................ 30 |
| VI. | Linden's California Statutory Unfair Competition Claim (Cal. Bus. & Prof. Code § 17200) Is Proper ................................................ 32 |
|   |   | b. | Linden's claim under Section 1030(a)(4) is sufficiently pled ................................................................ 31 |

VI.  Linden's California Statutory Unfair Competition Claim
     (Cal. Bus. & Prof. Code § 17200) Is Proper ................................................ 32

        1.  Bragg, as a person, is a proper UCL defendant, and whether his
            actions are properly termed "business practices" is a question of fact ...... 33
        2.  Linden has properly pleaded a Section 17200 claim based
            on Bragg's unlawful business practices .................................... 34
        3.  Linden had properly pled a claim for unfair business practices by Bragg. 35

VII.  Bragg's Rule 12(e) Motion For a More Definite Statement Should be Denied ............... 36

VIII.  Bragg's Rule 12(b)(7) Motion to Dismiss for Linden's Alleged Failure
       to Join Necessary Parties Should Be Denied ................................................ 37

       A.  Legal Standard for Rule 12(b)(7) Motion and Joinder Under Rule 19. ................ 37
       B.  Neither of the Two Sets of Parties Are Necessary Parties Under Rule 19 ........... 38

           1.  The users identified in the Counterclaim are not necessary parties. ......... 38
           2.  Linden's employees are not necessary parties ............................. 39

IX.  Conclusion ................................................................................ 40

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*In re America Online*, 168 F. Supp. 2d 1359 (S.D. Fla. 2001)......................................................21

*America Online v. LCGM, Inc.*, 46 F. Supp. 2d 444 (E.D. Va. 1998)....................................21, 29

*Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224 (2007) .....................................3

*Bro-Tech Corp. v. Thermax, Inc.*, 2006 WL 516767 (E.D. Pa. Feb. 28, 2006)...........................28

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone*, 20 Cal. 4th 163 (1999)..............................................................................................................................................5

*Conley v. Gibson*, 355 U.S. 41 (1957).........................................................................................11

*Creative Computing v. Getloaded.com LLC*, 386 F.3d 930 (9th Cir. 2004) .....................21, 25, 26

*D.P. Enterprises, Inc. v. Bucks County Committee College*, 725 F.2d 943 (3d Cir. 1984)...........11

*Davies v. Afilias Ltd.*, 293 F. Supp. 2d 1265 (M.D. Fla. 2003)...............................................24, 25

*In re Doubleclick Inc. Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001).......................22

*Dudick v. Vaccarro*, 2007 WL 1847435 (M.D. Pa. June 25, 2007).......................................passim

*EF Cultural Travels v. Explorica, Inc.*, 274 F.3d 577 (1st Cir. 2001) .............................23, 24, 29

*Facebook, Inc. v. ConnectU LLC*, 2007 WL 1514783 (N.D. Cal. May 21, 2007).................13, 14

*Freedom Properties, L.P. v. Lansdale Warehouse Co., Inc.*, 2007 WL 1683850 (E.D. Pa. June 7, 2007).............................................................................................................................7, 9

*Gould Electrics v. United States*, 220 F.3d 169 (3d Cir. 2000).....................................................11

*Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035 (C.D. Ca. 1998) ......................................................................................................................................3

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399 (3d Cir. 1993).......................9

*Koppers Co., Inc. v. The Aetna Casualty and Surety Co.*, 158 F.3d 170 (3d Cir. 1998)................7

*L-3 Communications Westwood Corp. v. Robicharux*, 2007 WL 756528 (E.D. La. Mar. 8, 2007)...................................................................................................................................23

*Metropolitan-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Ca. 2003) ..................................................................................................................5

*Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735 (1980) ......................................2

*Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468 (S.D.N.Y. 2004)..................22

*Nilfisk v. Advance, Inc. v. Mitchell*, 2006 WL 827073 (W.D. Ark. March. 28, 2006)..................28

*P.C. of Yonkers, Inc. v. Celebrations! The Party & Seasonal Superstore*, L.L.C., 2007 WL 708978 (D.N.J. Mar. 5, 2007) ...........................................................................passim

*Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188 (E.D. Wash. 2003)..................................................................................................20, 26, 27

*Paige v. Philadelphia Housing Authority*, 2002 WL 500677 (E.D. Pa. Mar. 28, 2002)................8

*People v. E.W.A.P., Inc.*, 106 Cal. App. 3d 315 (1980) ....................................................3

*Pujol v. Shearson/American Express, Inc.*, 877 F.2d 132 (1st Cir. 1989)........................9

*Sackett v. Spindler*, 248 Cal. App. 2d 220 (1967) ........................................................17

*Saunders v. Superior Court*, 27 Cal. App. 4th 832 (1994)..........................................2, 4

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000)..................................................................................27, 28

*Sun Co v. Badger Design & Constructors, Inc.*, 939 F. Supp. 365 (E.D. Pa. 1996) ......................6

*Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991 (E.D. Cal. 2007) ............16, 17

*Thrifty-Telegraph, Inc. v. Bezenek*, 46 Cal. App. 4th 1559 (1996) ........................18, 19

*United States v. Morris*, 928 F.2d 504 (2d Cir. 1991)....................................................28

*Wood & Locker, Inc. v. Doran & Associates*, 708 F. Supp. 684 (E.D. Pa. 1989)..................6, 7, 8

## STATUTES AND RULES

18 U.S.C. § 1030(a)(2)(C) ......................................................................................19, 30

18 U.S.C. § 1030(a)(2)(C) ..........................................................................................27

18 U.S.C. § 1030(a)(4) ..........................................................................................19, 27

**Page(s)**

18 U.S.C. § 1030(a)(5)(B)(i) ..................................................................26, 27

18 U.S.C. § 1030(e)(6) ...............................................................................27

18 U.S.C. § 1030(g) ...........................................................................passim

Fed. R. Civ. P. 12(b)(6) .......................................................................passim

Fed. R. Civ. P. 19 ...............................................................................passim

Cal. Penal Code § 502 .......................................................................12, 13

Cal. Bus. & Prof. Code § 17200 ........................................................passim

## **MISCELLANEOUS**

*California Business & Professions Code § 17200 Practice*, ¶ 6:2 (2007) .......................................3

Defendant / Counterclaim Plaintiff Linden Research, Inc. ("Linden") files this Opposition to Plaintiff / Counterclaim Defendant Marc Bragg's ("Bragg") Motion to Dismiss ("Motion") Linden's Counterclaims ("Counterclaims").

## I.    INTRODUCTION

This case is not, as Bragg wants the Court to believe, about whether so-called "virtual land" is governed by the same laws as real property.  Nor is it about how computing resources that emulate property in the virtual world Linden maintains called "Second Life" were described by the company founder.  Rather, this case involves the simple question of whether Linden has the contractual and legal right to protect itself and its Second Life users from the type of "exploit" in which Bragg spoofed the system into allowing him to obtain an in-world advantage that violated the published terms of use to which all users must agree.

Simply put, Bragg learned from another Second Life user how to spoof the in-world virtual land allocation system to enable him to acquire so-called regions (or "sims") for less than the minimum starting bids of $1,000.  Linden detected the exploit and put a stop to it and, in accordance with the express terms of its Terms of Service ("TOS"), prevented Bragg from having computer access to the misappropriated virtual land and suspended his account and associated funds.  The suspended funds have been deposited with the Court pending the outcome of this case.

The counterclaim fully complies with the pleading requirements of the federal rules. Bragg's only retort is to file a voluminous motion filled with extraneous information and arm-waving arguments which only underscore that, on the merits, Bragg cannot establish that Linden fails to allege facts sufficient to state the claims set forth in its Counterclaim.   Linden respectfully submits that the motion to dismiss should be denied.

## II.    FACTUAL BACKGROUND

### A.    Second Life.

Linden created and operates Second Life, a three-dimensional online digital "virtual world" in which users develop and create the content and experiences that exist in the world, and determine their own ways to interact with and explore the world, much like the way users create websites on the Internet and other users interact with and experience those websites. (Counterclaims ("CC"), ¶ 6).  To participate in Second Life, a user must choose a user name, agree to the TOS, create an account by registering as a user, and then download Linden's proprietary viewer software to his or her computer.  (*Id.*)  A true and correct copy of the TOS as they existed from at least December 2005 through May 2, 2006 is attached to the Counterclaims as Exhibit A.

After agreeing to the TOS, registering, choosing a user name, and downloading the Second Life software, a user creates an "avatar," a three-dimensional character through which the user can travel throughout the Second Life environment, interact with other users (also called "residents"), and create and experience representations of objects such as clothing, automobiles, and jewelry, conduct business, and attend events and meetings.  (*Id.*, ¶ 7).  Second Life users with "Premium" memberships (which require a monthly fee) may also purchase "virtual land," which enables them to create representations of buildings such as shops and homes, where they may display and store their virtual creations as well as host events and operate businesses.  (*Id.*, ¶ 11).

What a user actually obtains as a result of purchasing "virtual land" in Second Life is a license to have their created environment hosted on a dedicated and designated portion of Linden's proprietary servers, storage space, bandwidth, memory allocation, and a portion of the computational resources of the server.  (*Id.*, ¶ 12).  A user who purchases "virtual land" does not

obtain rights in or control over Linden's server software, which is Linden's intellectual property, or in Linden's server hardware. (*Id.*, ¶ 13).

"Virtual land" in Second Life is different from the objects and other content users create within Second Life. "Virtual land" is part of the Second Life service; Linden provides Second Life users a license to use the services associated with "virtual land" pursuant to the TOS and as long as tier fees and any other charges are paid. Because the "virtual land" itself in Second Life is not content created by a user, but rather a graphical representation of server space in the form of land features that are produced by Linden, a user does not obtain or retain intellectual property rights in "virtual land." Rather, "virtual land" is analogous to a canvas or blank page on which one may create his or her own original content: the user could have intellectual property rights in what he or she creates on it, but not in the canvas – or "virtual land" – itself. (*Id.*, ¶ 16).

Linden offers different-sized parcels of newly-created "virtual land" to Second Life users by auction. At all times relevant to these Counterclaims, Linden's procedure was to conduct auctions of specific, newly-available parcels of "land" as it added additional servers to its hosting networks. The auctions were published via listings on the main auction page of the Second Life web site. Once listed, the auctions would become visible to all Second Life users, so that all users with Premium memberships would have an opportunity to bid upon them. A user who was interested in bidding on a particular parcel would click on the listing for that parcel, and then would be taken by hyperlink to the specific auction detail page for that parcel, much like the way an auction on eBay works. Each auction would begin at a minimum bid set by Linden. Users would make their bids by entering them on the auction detail page for the relevant parcel. Once an opening bid was entered, users would have 48 hours from that point to bid before the auction

automatically closed and the parcel automatically went to the high bidder; again, much like an eBay auction. (*Id.*, ¶ 18).

The only way Linden authorized users to bid on parcels of "virtual land" it had offered for sale by auction was by entering a bid on the Auction Details page for a parcel listed on the main auction page. (*Id.*, ¶ 29). As such, any means of obtaining parcels of "virtual land" to be offered by Linden by auction other than by entering a bid on the Auction Details page for a parcel listed on the main auction page was a violation of section 5.2 of the Terms of Service and contrary to the Auction FAQs[1], and therefore not authorized by Linden. (*Id.*, ¶ 30).

**B.      Bragg Agrees to Second Life's Terms of Service.**

On or about December 7, 2005, Bragg opened an account and registered as a user of Second Life under the user name "Marc Woebegone" and agreed to the TOS then in force. (*Id.*, ¶ 21). During the process of registering as a Second Life user, Bragg reached a screen containing the Terms of Service, which stated "Please read the following Terms of Service carefully.  To continue logging on to Second Life, you must accept the agreement."  Bragg manifested his agreement to the TOS by clicking a button on the screen containing the TOS reading "I Agree to the Terms of Service." (*Id.*, ¶ 22).

The TOS to which Bragg agreed provided, among other things, that Bragg would:

(a)      not "take any action or upload, post, e-mail or otherwise transmit content that violates any law or regulation" (Ex. A, ¶ 5.1(iii)),

---

[1] The Auction FAQ page explained that the "auctions are located at the Second Life Auction House" and provided a hyperlink to the main auction page on the Second Life website.  The Auction FAQ page also explained that users can search for land they may wish to purchase within Second Life using the Second Life map, and that this map "includes land that is planned for auction as well as those parcels currently on the block." (CC, ¶, 27). The main auction page stated "Welcome to the Second Life auction block.  The listings below let you know what land is currently on offer, and new auctions are added frequently."  The page also listed all the parcels that Linden had made available for bidding.  Each of the parcels listed on the main auction page had a hyperlink to an "Auction Details" page where a user could make a bid. (*Id.*, ¶ 28).

(b)     not "take any action that would violate any right or duty under any law or under contractual or fiduciary relationships" (Ex. A, ¶ 5.1(vi)),

(c)     not "interfere with or disrupt the [Second Life] Service or servers or networks connected to the Service, or disobey any requirements, procedures, policies, or regulations of networks connected to the Service" (Ex. A, ¶ 5.1(viii)),

(d)     "use the Service only as offered by Linden at its web site or partner websites and not through any other means" (Ex. A, ¶ 5.2), and

(e)     not "create or provide any other means through which the Service may be accessed or used, as through server emulators" (Ex. A, ¶ 5.2).  (*See* Ex. A to the Counterclaims).

Further, the TOS explicitly states that Linden is simply granting to Second Life users "a non-exclusive, limited, fully revocable license to use the Service and the Linden Software during the time you have paid for but only as long as you are in full compliance with these terms and conditions [listed in the TOS]."  (Ex. A, ¶ 4.1).[2]

## C.     Bragg's Fraudulent Scheme to Knowingly and Unlawfully Access and/ or Use Linden's Computer Network to Obtain "Virtual Land."

As alleged on information and belief, in or about April 2006, Bragg learned of a scheme that, if successful, would allow him to make far more profit from his "virtual land" sales, at Linden's expense.  Specifically Bragg learned that another user, "User M.S.," had acquired one or more full regions or "sims" of "virtual land" for as low as one U.S. dollar, despite the fact that the minimum bid set by Linden for "sims" was U.S. $1,000.00.  (CC, ¶ 34).[3]  As alleged on

---

[2] This is of course in direct contrast to Bragg's unsupported assertion in the Motion that "[n]owhere did Defendants ever refer to the words 'own,' 'ownership,' or 'virtual land' as a license until submitting Paragraph 48 [in the Answer] to the Court."  (Motion at 7).

[3] While Bragg alleges in the Motion that "Defendant Linden does not allege that it did anything whatsoever to prevent such auctions from concluding nor from posting any announcement that such auctions should not have occurred [sic]" (Motion at 8), this allegation is completely irrelevant.  Linden did not know about the fraudulent

(continued...)

information and belief, Bragg realized that if he, too, could acquire "sims" for as little as one U.S. dollar, he could make much more money upon subdividing and reselling portions to other users than if he had to pay U.S. $1,000.00 or more for "sims." (*Id.*, ¶ 35).

As a result, as alleged on information and belief, Bragg sent User M.S. an electronic message in or about late April 2006 asking User M.S. how he was able to acquire full "sims" for as low as U.S. one dollar,  in the hope that he could do so, too. (*Id.*, ¶ 36).  Thereafter, on April 29, 2006, Bragg participated in an exchange of electronic messages with User M.S. over the Internet within Second Life's chat environment and instant message system under Bragg's user name of Marc Woebegone, in which he asked User M.S. "did u get my im from earlieri [sic] about the sims /auctions and the $1.00 price tag?"  and "how did you manage to get those? I didnd't [sic] even see them come up for auction?" (*Id.*, ¶ 37).  In that exchange User M.S. told Bragg that there were "no other bidders," which Bragg observed was "interesting… and very unusual." (*Id.*, ¶ 38).[4]

Later on April 29, 2006, Bragg, User M.S., and a third Second Life user, "User D.S.," had an online chat within Second Life, in which the three discussed a means of subverting the Second Life auction system so that regions or "sims" of "virtual land" could be purchased covertly and at prices far below the U.S. $1,000.00 minimum opening bid. (*Id.*, ¶ 39). Essentially, the scheme User M.S. shared with Bragg and User D.S. involved surreptitiously and

---

(continued...)

scheme at that time, and did not learn about the scheme until later.  (CC, ¶ 67).  At any rate, it appears that Bragg makes this argument in an effort to excuse his unlawful behavior.  It does not.

[4] Bragg repeatedly asserts that it makes a difference that Linden does not attach the Chat Logs to its Counterclaims.  *See, e.g.*, Motion at 9, n.2.  Bragg fails to mention that Linden has given Bragg the Chat Logs, and accordingly, Bragg cites the Chat Logs in his Motion.  Bragg was free to bring to the Court's attention any portion of the Chat Log he believes "vindicates" him, and he in fact did so.  *See, e.g.*, Motion at 16-20.

without authorization accessing auction detail information on Linden's computers for auctions that Linden had not yet activated and listed on the main auction page of the Second Life site, and before Linden had set the minimum opening bid of U.S. $1,000.00, in order to trick Linden's computer system into starting an auction that was not visible to those who were unaware of the scheme. As these auctions had not yet been activated or made publicly available by Linden, no user could access the auction detail information by any method authorized by Linden. Therefore, the scheme required the use of an artifice or "exploit" to access the auction detail information in advance of the legitimately conducted auction, which User M.S. described to Bragg and User D.S. (*Id.*, ¶ 40).

In their online chat on April 29, 2006, Bragg asked User M.S. how the scheme worked, and User M.S. explained it to Bragg and User D.S. Bragg immediately understood that the scheme involved deceptively and surreptitiously accessing auctions that Linden had not yet made publicly available to users, that it could be used to obtain parcels of "virtual land" that otherwise would be offered upwards of U.S. $1,000.00 for as little as one U.S. dollar, and that Linden was unaware of the scheme. (*Id.*, ¶ 45). Specifically, in that chat, Bragg observed that User M.S. "started an auctio [sic] no one else can see" and that "if a sim is not on the active auction page you can make it active for $1.00" even though "all sims started by linden start at 1,000US." Bragg asked User M.S. "linden doesn't know this?" User M.S. responded "no one knows," and Bragg replied "omg.. don't tell anyhone [sic]... lol."[5] Bragg and User D.S. agreed with User M.S. to keep the scheme a secret and that they would not bid against User M.S. (*Id.*, ¶ 46).

During that same online chat on April 29, 2006 User M.S. directed Bragg to an unauthorized auction for an entire region or "sim," Auction No. 0026198448 ("Mul"), on which

---

[5] In common instant message shorthand, "omg" means "oh my God," and "lol" means "laugh out loud."

User M.S.2 had started the clock approximately 48 hours earlier using this scheme, at a bid of zero, and User M.S. had then stepped in with a bid of U.S. $1.00, in an attempt to purchase the "sim" for that price. This auction was not authorized by Linden nor visible on the Second Life main auction page – the only way to find it was by using the fraudulent scheme that User M.S. had discovered and that Bragg asked him to explain. Indeed, when User M.S. directed Bragg to the Mul "sim," and started explaining how to bid on it using the exploit, Bragg stated repeatedly to User M.S. that the Mul "sim" was not on the active bid list on the main auction page. (*Id.*, ¶ 47).

Bragg, User M.S., and User D.S. began looking for unpublished auctions to which they could apply their scheme, and engaged in the following chat on April 29, 2006:

| User M.S.: | "havin fun yet" |
| User D.S.: | "oh yeah" |
| Bragg: | "yes, lol… u r a wizard" |
| User M.S.: | "kid getting away with fingers in the candy jar?" |
| Bragg: | "guess so… lol" |

(*Id.*, ¶ 51).

User M.S. then instructed Bragg and User D.S. that there were "2 rules" to the scheme, namely, "do NOT ge[t] greedy" and "keep prices low so everyone can have a piece" and Bragg agreed, saying "so we don't bid against you" and "we'll keep land prices low." Bragg and User M.S. both acknowledged the need to keep their unauthorized activity quiet, so that Linden would not shut down the exploit and terminate their accounts. (*Id.*, ¶ 52). In their online chat on April 29, 2006, User M.S. also discussed how the parcels acquired in the scheme would be liquidated. Bragg asked User M.S. "how much do you and [User M.S.2] want for" the "sim," and User M.S.

stated "we're asking a few of the [other Second Life users] for just under $900 us... they still think they go 4 $1000US." (*Id.*, ¶ 53).

On April 29, 2006, Bragg caused the 48-hour period to begin for an unauthorized auction for an entire region or "sim" known as "Pak," Auction No. 0026198533, by making a bid of zero. About five minutes later, at Bragg's direction, User D.S. caused the 48-hour period to begin for an unauthorized auction for an entire region or "sim" known as "Taesot," No. 0026198533, by making a bid of zero. Neither auction ever publicly appeared on the main auction page. Bragg subsequently entered bids of U.S. $5.00 for both "sims," and a bid for $25.00 for the Taesot "sim." For most of the auction periods for both "sims," the only bidders were Bragg and User D.S., working together. But with only minutes left in the auctions, User S.S. swooped in and began bidding. When the auction for "Pak" ended on May 1, 2006 at 1:00 p.m., User S.S. was the high bidder at $151.00. When the auction for "Taesot" ended five minutes later, Bragg won the auction with the high bid of U.S. $300.01. (*Id.*, ¶ 59). As Bragg was the winning bidder in Auction No. 0026198533, his Second Life account was automatically charged U.S. $300.01 and he obtained the parcel known as Taesot. (*Id.*, ¶ 64).[6]

At about the time that Bragg and his confederates were engaging in their scheme, Linden personnel noticed certain anomalous auction transactions and began to investigate. Linden also received a complaint from another user who had discovered that User M.S. and User M.S.2 had won auctions for as little as $1. Linden promptly investigated this auction activity, and determined that Bragg and his confederates had used an exploit to access auction detail

---

[6] Bragg submits emails from Linden to Bragg regarding the fraudulent "Taesot" auction purportedly to support his allegation that this auction was somehow authorized by Linden. *See, e.g.*, Motion at 11. Of course, these emails prove nothing of the sort. As Linden has alleged, Bragg engaged in a fraudulent actions that resulted in Linden's computer being "tricked" into starting an unauthorized auction. (CC, ¶ 40). These emails simply confirm that Linden's computer system was tricked into starting the unauthorized auction.

information they were not authorized to access and trick Linden's computers into allowing them to secretly bid on certain "sims" before Linden activated the auctions. Linden reasonably and necessarily incurred expenses in connection with this investigation. (*Id.*, ¶ 67).

Upon discovering the irregular auction activity, on May 1, 2006, Linden put Bragg's account under user name Marc Woebegone on "administrative hold," preventing Bragg from further transactions in Second Life pending further investigation. Linden also placed administrative holds on the other accounts associated with the irregular auctions. In addition, on May 1, 2006, Linden altered the code associated with its auction system to prevent future use of the exploit. (*Id.*, ¶ 68). Linden also took back the Taesot "sim" from Bragg's account. (*Id.*, ¶ 69). Once the relevant accounts had been placed on hold, Linden continued its investigation into the matters surrounding the exploited auctions in order to determine the nature and extent of users' participation in the exploit and the extent of any additional risk to the Second Life auction system. Linden conducted extensive investigation into the accounts and recent activity of the users known to have unlawfully accessed auction detail information for "sims" that Linden had not yet listed on the main auction page. Linden reasonably and necessarily incurred expenses in connection with this investigation. (*Id.*, ¶ 70).

Shortly after Linden put Bragg's "Marc Woebegone" account on administrative hold, on May 1, 2006, and before Linden had completed its investigation, Bragg sent Linden an instant message demanding that Linden honor the fraudulent Taesot auction purchase and threatened that he would be filing a lawsuit against Linden. (*Id.*, ¶ 74). Linden did not yield to Bragg's demands and threats. As such, the very next day, on May 2, 2006, Bragg sent Linden a letter demanding, among other things, that his account be reactivated, that he be reimbursed for the amount of his fraudulent winning bid for the Taesot parcel and that "my expectation interest in

the profit from that sim be added to the amount reimbursed based on at least the average selling price of land in secondlife.com." (*Id.*, ¶ 75). Thereafter, after finalizing its investigation and determining that Bragg had indeed participated in a fraudulent scheme against Linden, Linden placed Bragg's Second Life account under the user name Marc Woebegone on "fraud hold." (*Id.*, ¶ 78). At the time Bragg's account under the user name Marc Woebegone was placed on administrative hold on May 1, 2006, the account had a cash balance of U.S. $1,970.79, and that remains the balance in that account as of the date of this Counterclaim. This did not include the U.S. $300.01 that was deducted from his account for his fraudulent purchase of the Taesot parcel. (*Id.*, ¶ 79).

## III.    STANDARD FOR RULE 12(B)(6) MOTION TO DISMISS

In deciding a Rule 12(b)(6) motion, factual allegations of the complaint are to be accepted as true and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. *D.P. Enters., Inc. v. Bucks Co. Comm. Coll.*, 725 F.2d 943, 944 (3d Cir. 1984); *see also Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000) (same). "Reasonable factual inferences will be drawn to aid the pleader." *Id.* The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. *Gould*, 220 F.3d at 178. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## IV.     LINDEN'S CALIFORNIA STATUTORY COMPUTER FRAUD CLAIM (CAL. PENAL CODE § 502) IS SUFFICIENTLY PLED

### A.     Legal Standard.

Linden alleges that Bragg violated subsections (c)(1)(A) and (B)[7] and (c)(2)[8] of the California Penal Code § 502 ("Penal Code Section 502"). Penal Code Section 502 provides for a civil right of action: "In addition to any other civil remedy available, the owner of lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." Cal. Pen. C. § 502(e)(1). There is no minimum loss requirement to bring a civil action under Penal Code Section 502.

### B.     Linden Has Sufficiently Pled a Claim Under Penal Code Section 502.

Bragg argues, without citing a single case, that Linden has failed to state a claim under Penal Code Section 502, as a matter of law, for two reasons: (1) Linden has failed to allege that Bragg "circumvented some security such as password protected files"; and (2) Linden placed the "webpages" on the internet, and because they were "available to the world," Bragg did not engage in "hacking" into the website "without permission." (Motion at 27-31). But Bragg fails to apprise this Court that the United States District Court for the Northern District of California specifically rejected the <u>exact same arguments</u> by a defendant seeking to dismiss a Penal Code

---

[7] "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." Cal. Pen. C. § 502(c)(1).

[8] "Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." Cal. Pen. C. § 502(c)(2).

Section 502 claim. *See Facebook, Inc. v. ConnectU LLC*, 2007 WL 1514783, *2-*3 (N.D. Cal. May 21, 2007) (denying Rule 12(b)(6) motion to dismiss Penal Code Section 502 claim).

In *Facebook*, the plaintiff alleged that the defendant violated Penal Code Section 502 by accessing the plaintiff's website, which was available to registered users of the website, and collecting email addresses from the website. *Id.* at *1. The defendant filed a Rule 12(b)(6) motion to dismiss, arguing that the complaint did not allege that its "access" to the Facebook website was "unauthorized" or undertaken "without permission." *Id.* at *2. The defendant further argued that it accessed information on the Facebook website that was accessible to all registered users. Thus, the defendant argued that it did not engage in "hacking" or other "unauthorized" access, and thus, could not as a matter of law be found liable under Penal Code Section 502. *Id.*

The court rejected this argument and denied the defendant's motion to dismiss. Specifically, the court held that, under Section 502(c)(2), it is a crime for a person to "knowingly access" and "without permission" take, copy, or make use of any data. *Id.* (citing Cal. Pen. C. § 502(c)(2)). The court put it simply: "Penal Code section 502 prohibits *knowing* access, followed by *unauthorized* (i.e., 'without permission') taking, copying, or use of data." *Id.* at *3 (emphasis in original). Thus, the court held that the complaint sufficiently alleged a Penal Code Section 502 claim because the plaintiff alleged that the defendant had "knowingly" accessed the plaintiff's website "to use data thereon in a manner not authorized or permitted by" the plaintiff. *Id.* The court found that it was not necessary under Penal Code Section 502 that the plaintiff allege that the accessed data be password protected or secured, nor did the court find that the defendant was required to have engaged in "hacking."

-13-

Linden has similarly alleged the following facts that the court in *Facebook* found sufficient to state a claim under Penal Code Section 502, notably that Bragg (1) knowingly accessed Linden's website (*see, e.g.*, CC, ¶¶ 59, 63), and (2) used data[9] (*see, e.g., id.*),  (3) in a manner not authorized or permitted by Linden.[10]  (*See, e.g.*, CC, ¶¶ 63, 94).   Under Penal Code Section 502, and the case law interpreting that Section, Linden's factual allegations in the Counterclaims satisfy the applicable pleading standard, and Bragg's motion to dismiss should be denied.

### C.    Bragg's Reliance on The California Highway Patrol's Administrative Report Does Not Compel Dismissal of Linden's Penal Code Section 502 Claim.

Bragg's sole citation in support of his argument that Linden fails to state a claim under Penal Code Section 502 is a California Highway Patrol ("CHP"), Governor's Office Computer System Investigation Administrative Report ("CHP Report").   The CHP Report has limited (if any) application[11] to the allegations in the Counterclaims because Linden alleges that Bragg did not simply "back browse."    Additionally,  if anything,  the  CHP  Report  demonstrates  that dismissing Linden's claims at the pleading stage would be <u>inappropriate</u>, where the Court and

---

[9] "'Data' means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions.  Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."  Cal. Pen. C. § 503(b)(6).  Bragg has not argued, nor can he, that the auction detail information is not "data" as defined in the Code.

[10] Bragg also argues that "Linden's charge to Plaintiff . . . is conclusive proof that the transaction at issue was 'authorized.'" (Motion at 31).  This argument is easily dismissed.  As explained in the Counterclaim, Bragg's use of an artifice or exploit tricked Linden's computer system into starting an auction. (*See, e.g.*, CC, ¶ 40).  Once the auction was finished, Linden's computer system, which because of the artifice or exploit did not know the auction was fraudulent, automatically charged Bragg as the "winning bidder."  (*Id.*, ¶ 64).  The email and the charge hardly show that Linden authorized Bragg's fraudulent scheme; they simply show that Bragg's scheme was successful.

[11] As Bragg concedes, the CHP Report has no precedential value to this Court.  And, neither the CHP nor the California Attorney General wrote California Penal Code Section 502, so their opinions have no value from a "legislative history" perspective either.

Linden have not yet had the opportunity to undertake the same exhaustive investigation that formed the basis for the CHP Report.

Bragg's argument is twofold, that: (1) Bragg engaged in "backwards browsing," which Bragg defines as "modifying a URL," to access virtual land auctions; and (2) that the CHP has found that "backward browsing" is not a violation of Penal Code Section 502. (Motion at 29-31). However, Bragg starts from a faulty premise—that he simply engaged in "backwards browsing."[12] This simply ignores the actual and express allegations in the Counterclaim. Linden alleges that Bragg "use[d] an artifice or 'exploit' to access the auction detail pages in advance of the legitimately conducted auction." (CC, ¶ 40, *see also id.*, ¶¶ 41-42). This went beyond simply "modifying a URL."

Second, Bragg misstates the CHP Report, which summarized the CHP's investigation of the downloading of a digital file from the Governor of California's website. The CHP conducted an exhaustive investigation into the matter, including the circumstances of the Angelides Campaign's access of the file. The CHP interviewed twelve different people, collected images from 11 computer workstations, and conducted a forensic analysis of the Governor's Office computer system. CHP Report at 4. After this investigation was concluded, the CHP found that "[w]hile the system was not originally designed to be accessed in this manner, the modifications of the URL <u>in this instance</u> did not constitute a criminal offense." CHP Report at 2 (emphasis added). Thus, the conclusion of the CHP was limited to the specific facts of that matter.

Accordingly, because the CHP Report was limited to the facts of that matter, it has no bearing on the present action. If anything, the CHP Report details how fact specific a Penal

---

[12] Bragg's claim that he engaged in "backwards browsing" is a factual question, and Linden is entitled to conduct discovery to test Bragg's bald assertion.

Code Section 502 claim is, thereby making a Rule 12(b)(6) motion particularly inappropriate for addressing such a claim. The determination by the CHP that the Angelides Campaign's conduct did not constitute a criminal offense was based entirely on the facts discovered in the investigation. *See* CHP Report and the accompanying interviews. In that "instance," and under those facts, the conduct of the Angelides Campaign, did not warrant a criminal prosecution under Penal Code Section 502.

But the facts of this case are necessarily different. Here, discovery will serve to replicate the CHP's exhaustive investigation in that matter. Only through discovery, and the facts discovered therein, can the Court determine whether, "in this instance," Bragg violated Penal Code Section 502. Linden is entitled to interview (at least) Bragg (through deposition), image his computer, and conduct discovery akin to that conducted by the CHP to determine how he accessed the auction detail information for the unlisted auctions. While Bragg argues that he simply engaged in "backwards browsing," Linden is entitled to test that assertion through discovery. And, even if Bragg engaged in just "backwards browsing," as he asserts in the Motion, it still may very well be that "in this instance," "backwards browsing" alone may still constitute a Penal Code Section 502 violation.

**D.**     **Linden Has Properly Pled That It Suffered Injury Under Penal Code Section 502.**

   **1.**     **Linden has properly alleged that it suffered cognizable injury under Penal Code Section 502.**

Penal Code Section 502(b)(8) defines "injury" as "any alteration . . . of a computer system, computer network, computer program, or data caused by the access. . . ." Cal. Pen. C. § 502(b)8). In *Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991 (E.D. Cal. 2007), the court denied a Rule 12(b)(6) motion to dismiss a Penal Code Section 502 claim, holding that the plaintiff's mere allegation that it suffered an "injury" was sufficient to survive a

motion to dismiss because "nothing" in Penal Code Section 502 requires more.  *Id.* at 998 (denying motion to dismiss and rejecting argument that the "bald representation that an injury has occurred . . . is insufficient to state a claim under Penal Code § 502").

Here, Linden has alleged that Bragg "accessed" Linden's computers and computer network and thereby "caused Linden loss and damage." (CC, ¶ 95).  Accordingly, Linden has properly alleged a cognizable injury under Penal Code Section 502.  *Therapeutic Research Faculty*, 488 F. Supp. 2d at 998.  Bragg does not argue to the contrary.

### 2. Bragg's "mitigation" defense has no merit.

Bragg argues that Linden cannot allege recoverable damages from him because Linden failed to mitigate damages because other users allegedly accessed other unlisted auctions before he did, and Linden purportedly did not stop such behavior. (Motion at 35-37).  This argument is wrong legally, misstates the allegations in the Counterclaims, and is a misguided effort to make an evidentiary argument in the context of a pleading challenge.

First, Bragg's argument that Linden's purported failure to mitigate damages bars Linden's damages claims "as a matter of law" (*see* Motion at 35) is legally incorrect.  "The question of whether the injured party has acted reasonably in mitigating damages is one of fact." *Sackett v. Spindler*, 248 Cal. App. 2d 220, 239 (1967).  Thus, the question (to the extent that one even exists) as to whether Linden properly acted to mitigate its damages cannot be decided at the pleading stage.

Second, Bragg argues that Linden's "claims are barred" because it "did nothing from <u>at least</u> April 29, 2006 until May 1, 2006 to preclude any additional low priced land auctions following the (at a minimum) several that occurred before Plaintiff bid." (Motion at 36) (emphasis in original).  This argument ignores the allegations in the Counterclaims, that "[u]pon discovering the irregular auction activity, on May 1, 2006 Linden put Bragg's account" on hold.

-17-

(CC, ¶ 68).  That the scheme started on April 29, 2006 is apparently undisputed by Bragg, but that does not mean that Linden was aware of the scheme at that time and did nothing to stop it. To the contrary, Linden alleges that it took remedial action "upon discovering the irregular auction activity."  Thus, Bragg's allegation that Linden knew about the irregular auctions for two days and did nothing misstates the actual allegations in the Counterclaims.

Bragg's cite to *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559 (1996) provides him no help.  In *Thrifty-Tel*, the plaintiff sued the parents of teenagers who used confidential access codes to access a private computerized switching network to make free long-distance telephone calls.  *Id*. at 1563-64.  The teenagers first accessed the network in November 1991, and made approximately 90 telephone calls.  *Id*. at 1564.  "Through its internal security system, Thrifty-Tel learned of the computer hacking almost immediately.  And by late November, the carrier identified the Bezeneks' home as the source."  *Id*.  But Thrifty-Tel did nothing.  *Id*.  Three months later in mid-February 1992, the teenagers again accessed the private network to make telephone calls.  *Id*.  A jury awarded Thrifty-Tel damages for both episodes.  The Court of Appeals overturned the damages award for the second episode in February because Thrifty-Tel did nothing "to prevent a recurrence" of the November incident, even though it knew about the computer hacking in November.  *Id*. at 1568-69.

The facts of *Thrifty-Tel* are not analogous to the present case.  In *Thrifty-Tel*, the company knew about the unauthorized access "almost immediately," including who was responsible, but did nothing to stop the offending behavior for months.  *Id*. at 1564.  In contrast, Linden has alleged that "upon discovering the irregular auction activity," Linden placed Bragg's account on hold, and altered the auction system's code to prevent further use of the exploit.

Thus, unlike the plaintiff in *Thrifty-Tel*, Linden acted when it learned of the wrongdoing. Accordingly, *Thrifty-Tel* is of no help to Bragg.

At bottom, Linden has alleged facts sufficient to state a claim under Penal Code Section 502.

## V.    LINDEN'S FEDERAL COMPUTER FRAUD CLAIM (18 U.S.C. § 1030) IS SUFFICIENTLY PLED

### A.    Legal Standard.

Linden alleges that Bragg violated subsections (a)(2)(C)[13] and (a)(4)[14] of the CFAA, 18 U.S.C § 1030.  The CFAA provides for a civil right of action:  "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive or other equitable relief.  A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."  18 U.S.C § 1030(g).  Thus, the CFAA's private cause of action sets forth a two-part injury requirement for a plaintiff:  (1) damage or loss; and (2) one of the five effects set forth in subsection 1030(a)(5)(B)(i)-(v).  *P.C. of Yonkers, Inc. v. Celebrations! The Party & Seasonal Superstore, L.L.C.*, 2007 WL 708978 *4 (D.N.J. Mar. 5, 2007).

"Congress has . . . continually broadened the scope and coverage of the CFAA since its original enactment in 1984.  And no doubt, as new forms of computer crimes emerge, the CFAA

---

[13] "(a) Whoever . . . (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains-- . . . (C) information from any protected computer if the conduct involved interstate or foreign communication."  18 U.S.C § 1030(a)(2)(C).

[14] "(a) Whoever . . . (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."  18 U.S.C § 1030(a)(4).

will continue its evolution as courts construe and apply particular provisions to the statute." *Pac. Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1195 (E.D. Wash. 2003).[15] Under the liberal pleading requirements of Rule 12(b)(6), a complaint that tracks the language of the CFAA is adequately pled. *Dudick v. Vaccarro*, 2007 WL 1847435 *5 (M.D. Pa. June 25, 2007); *see also P.C. of Yonkers*, 2007 WL 708978 at *7 (holding that the plaintiff adequately alleged a CFAA violation where the complaint mirrored the CFAA's language, and that such "allegations are sufficient to put Defendants on notice of the claims against them, pursuant to Fed.R.Civ.P. 12(b)(6) and 8(a)").

**B.      Linden alleges that it suffered "loss" under the CFAA.**

The bulk of Bragg's opposition to Linden's CFAA claim is that Linden has failed to properly allege "damages." (Motion at 40-49). Bragg is wrong. Linden can maintain a private cause of action against Bragg if it suffered "damage <u>or</u> loss." 18 U.S.C § 1030(g) (emphasis added). The term "loss" is defined under the CFAA as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* at § 1030(e)(11).

For example, in *Dudick*, the court found that the plaintiff had adequately alleged loss based on the allegations that it suffered the following damages: "the time and resources spent and the cost of hiring an expert to research and assess the unauthorized information and assets

---

[15] The court, in *Pacific Aerospace*, detailed the historical background and subsequent revisions to the CFAA. 295 F. Supp. 2d at 1194-95.

transmitted to/from [the plaintiff]'s protected computer and, to the extent possible, remedy the damage done and protect against such damage and loss in the future." 2007 WL 1847435 at *5.

Similarly, in *P.C. Yonkers*, the court found the following "loss" allegations were sufficient to withstand a Rule 12(b)(6) motion: "Plaintiffs 'have suffered and will continue to suffer substantial losses in excess of $5,000.00, including but not limited to losses sustained in responding to defendants' actions, investigating defendants' actions and taking remedial steps to prevent defendants' further actions.'" 2007 WL 708978 at *5. The court noted that the incurred losses alleged in the complaint were "explicitly identified in the CFAA's definition of 'loss.'" *Id.* (citing 18 U.S.C. § 1030(e)(11).

Linden has properly alleged that it has suffered all three losses enumerated in Section 1030(e)(11): (1) responding to Bragg's unlawful conduct via its investigation; (2) conducting a damages assessment; and (3) restoring the system to its condition prior to the offense. (*See, e.g.*, CC, ¶¶ 67-68, 70, and 89). Thus, Linden has pled the exact same losses that the courts in *Dudick* and *P.C. Yonkers* found satisfied the pleading standard for loss under the CFAA—investigation, damage assessment, and remedial expenses.

Further, Linden has also alleged damages and loss of "goodwill" as a result of Bragg's actions violating the CFAA. (CC, ¶¶ 74, 89). Such damages qualify as losses under the CFAA. *See, e.g.. Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004) (holding that "damages for loss of business and business goodwill" are recoverable under the CFAA because they are "economic damages"); *see also In re Am. Online*, 168 F. Supp. 2d 1359, 1380 (S.D. Fla. 2001) (holding that damage to "goodwill and reputation is actionable under the CFAA"); *see also America Online v. LCGM, Inc.*, 46 F. Supp. 2d 444, 451 (E.D. Va. 1998) (granting summary judgment to plaintiff on CFAA claim after finding that the "plaintiff asserts

damages to its computer network, reputation and goodwill in excess of the minimum $5,000 statutory requirement"); *see also Dudick*, 2007 WL 1847435 at *5 (holding that alleged loss of "goodwill" was properly considered a loss under the CFAA).

And, even in the cases cited by Bragg that purport to limit the damages and loss appropriately considered for meeting the $5,000 threshold (*i.e.*, *Nexans Wires S.A. v. Sark-USA, Inc.* and *In re Doubleclick Inc. Privacy Litigation*), the courts simply held that the loss requirements for a CFAA claim are limited to the "cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted." *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004); *see also In re Doubleclick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 524 (S.D.N.Y. 2001) ("Clearly, any economic losses plaintiffs bore in securing or remedying their systems in the wake of Doubleclick's alleged CFAA violations would count towards [the CFAA]'s damage threshold").[16]

Here, Linden has alleged that it undertook an investigation into Bragg's actions, including the effect of his actions on their computer system, and that it suffered economic losses in securing and remedying its system in the wake of Bragg's alleged CFAA. (*See, e.g.*, CC, ¶¶ 67-68). As the cases relied upon by Bragg concede, such losses are appropriately considered for a CFAA claim. Thus, Linden's loss allegations meet the CFAA's requirements even under Bragg's limited definition of "loss."

Bragg argues that Linden has not properly pled damages under the CFAA for four reasons: (1) Linden placed the auction web page on the Internet; (2) damages are limited to

---

[16] Bragg cites *In re Doubleclick* to support his contention that Linden has "not alleged any recoverable loss/damage attributable to Plaintiff." (Motion at 46). This cite is puzzling considering that the court in *In re Doubleclick* specifically held that the CFAA's damage threshold can be met through "economic losses" based on "securing or remedying" a computer system (154 F. Supp. 2d at 524), and the Counterclaim's specific allegations that Linden bore such losses. (CC, ¶¶ 67-68). This distinguishes the present case from *In re Doubleclick*, where the plaintiffs did not allege such damages.

physical damage under the CFAA; (3) the "transient unavailability" of the virtual land cannot support a claim under the CFAA; and (4) Bragg cannot be held liable for Linden's own purported negligence. Each of these arguments is easily dismissed.

First, Bragg argues that because Linden purportedly "placed" the auction web pages "on the internet for the world to see," Linden cannot, as a matter of law, state a CFAA claim against him. (Motion at 40).[17]  Bragg does not cite a single case in support of this proposition, and he is wrong.  In *EF Cultural Travels v. Explorica, Inc.*, 274 F.3d 577, 579-84 (1st Cir. 2001), the Court of Appeals held that a CFAA claim was properly brought where a former employee of the plaintiff used confidential information he obtained as an employee to create a program that enabled his current employer (the defendant) to obtain information from a website that was available to the general public in a more efficient manner.  Thus, while the website was open to the general public, meaning the defendant (and indeed the entire world) was "authorized" to use it, the defendant exceeded his authorization by using confidential information to obtain better access than other members of the public.  *Id.*  Thus, a CFAA claim can still be brought even where the information accessed is available to the general public.

Second, Bragg's argument that claims under the CFAA are limited to those where computers were physically "altered, damaged or destroyed" (Motion at 40) misstates both the language of the CFAA and the case law interpreting such language.[18]  Contrary to Bragg's

---

[17] To be clear, Linden vigorously disputes Bragg's factual contention that the auction detail information for the unlisted "sims" were available to the general public.  Linden specifically alleges in its Counterclaims that the auction detail pages were not published, and not accessible to the general public.  (*See, e.g.*, CC, ¶ 40).

[18] Bragg fails to cite to a single case to support his bald assertion that Linden must allege that he either sent a computer virus, worm, used destructive software, or "altered, damaged or destroyed" Linden's computers in order to properly allege damages or loss under the CFAA.  (Motion at 40).  To the extent that Bragg relies on *L-3 Communications Westwood Corp. v. Robicharux*, 2007 WL 756528 (E.D. La. Mar. 8, 2007) to support his contention that the CFAA requires allegations of "damage to a computer system," that case does not hold that physical damage is required.  And, even if the case could be read that way, the decision contains scant justification
(continued...)

-23-

erroneous assertion, physical damage to a computer or the information contained therein is not required to maintain a private cause of action under the CFAA. *See, e.g., Dudick*, 2007 WL 1847435 at *5 (finding that the plaintiff had adequately pled $5,000 in loss under the CFAA where the plaintiff did not allege that there was any "physical damage or impairment to the integrity of [the plaintiffs]'s computer system").

For example, in *EF Cultural Travels*, the appellants / defendants argued that the plaintiff could not meet the "damage or loss" requirement under the CFAA because they had not alleged that that their actions "caused any physical damage []or placed stress on [the plaintiff]'s website." 274 F.3d at 584. The First Circuit rejected this argument, concluding that "Congress's use of the disjunctive 'damage or loss,' confirms that it anticipated recovery in cases involving other than purely physical damage." *Id.* at 585.[19]

Bragg's third argument is that Linden has not properly pled damages / loss because the "transient unavailability of data" cannot support a claim under the CFAA, relying on *Davies v. Afilias Ltd.*, 293 F. Supp. 2d 1265 (M.D. Fla. 2003) for this proposition. (Motion at 42-44). This argument is puzzling. As explained above, Linden's damages / loss allegations are not based on the "unavailability" of the Taesot "sim." (*See, e.g.,* CC, ¶¶ 67-68). Thus, Bragg's cite to *Davies* is of no importance to the present action. Further, *Davies* is even more irrelevant to the present action since the court's holding was based primarily on the fact that "[t]here is no evidence that [the counterclaim defendant] directly accessed [the counterclaim plaintiff]'s computer system"

_____

(continued...)

for such a holding, which is against the great weight of authority explicitly following the plain language of the CFAA and allowing claims to proceed where the plaintiff alleges "loss" as defined in Section 1030(e)(11).

[19] After *EF Cultural Travels* was decided, Congress amended the CFAA to explicitly define the term "loss," thereby making it even more clear that physical damage to a computer or a computer system is not required to meet CFAA's requirements.

(*id.* at 1273), unlike the present case, where Bragg concedes he directly accessed Linden's computer system. For both of these reasons, *Davies* is irrelevant to this Court's consideration of whether Linden has properly alleged a cognizable loss to support its CFAA claim.

Bragg's fourth argument is that Linden has not pled damages attributable to Bragg because Linden purportedly "mismarked numerous items throughout its store," and thus, Bragg's illegal behavior is excused by Linden's purported negligence.[20] (Motion at 48-49). But the court in *Creative Computing* rejected a similar argument by a defendant that it should not be found liable under the CFAA because the plaintiff's computer system was insecure, thereby allowing the defendant to easily hack into the system: "Getloaded's [the defendant] argument that truckstop.com could have prevented some of the harm by installing the [software] patch is analogous to a thief arguing that 'I would not have been able to steal your television if you had installed deadbolts instead of that silly lock I could open with a credit card.' A causal chain from the thief to the victim is not broken by a vulnerability that the victim negligently leaves open to the thief." 386 F.3d at 935-36 (affirming a jury's award of damages under the CFAA).

At bottom, Linden has properly alleged that it suffered a recognizable "loss" under the CFAA. None of Bragg's arguments compel a different conclusion.

### C.    Linden has properly alleged facts supporting the necessary $5,000 loss threshold under Section 1030(a)(5)(B)(i).

Section 1030(g) requires that a plaintiff bringing a civil claim under the CFAA allege one of the five effects set forth in Section 1030(a)(5)(B). Here, Linden alleges that it meets the first effect—that it has suffered loss to 1 or more persons during any 1-year period aggregating at least $5,000 in value. 18 U.S.C. § 1030(a)(5)(B)(i). As a case cited by Bragg notes, courts have

---

[20] Factually, Bragg's analogy is way off base, since Linden did not mismark anything—the unlisted "sims" were never "for sale" nor were they "in the store." They were not available for sale to the public. (CC, ¶ 59).

recognized the "ease with which a plaintiff may be able to satisfy . . . the $5,000 damages element." *Pacific Aerospace*, 295 F. Supp. 2d at 1197 (denying motion to dismiss CFAA suit). "The damage floor in the Computer Fraud and Abuse Act contains 'no single act' requirement." *Creative Computing*, 386 F.3d at 935 (rejecting cases that required $5,000 damages from a single act or event).

In *P.C. Yonkers*, the court found that the plaintiffs' allegation that they have "suffered and will continue to suffer substantial losses in excess of $5,000.00" were sufficient to withstand a Rule 12(b)(6) motion. 2007 WL 708978 at *5. And, in *Dudick*, the court similarly found that the plaintiff's allegation that it had "suffered damage and loss in excess of $5,000" satisfied the requirements of Section 1030(a)(5)(B)(i). 2007 WL 1847435 at *3-*6. Here, Linden has made the exact same allegations that the court's in *Dudick* and *P.C. Yonkers* found sufficient at the pleading stage: that Linden suffered losses, based on the actions it undertook as described in paragraphs 67 and 68 of the Counterclaim, "in excess of $5,000.00." (CC, ¶ 89). Thus, Bragg's argument that Linden has not pled $5,000 in damages is false.

Further, Linden has also alleged damages and loss of "goodwill" as a result of Bragg's actions. (CC, ¶¶ 74, 89). These losses must also be applied to the $5,000 threshold under the CFAA. *See, e.g., Creative Computing*, 386 F.3d at 935 (holding that "damages for loss of business and business goodwill" are recoverable under the CFAA because they are "economic damages"). Such losses are difficult to monetize at this time, but they also support the allegation that Linden has suffered in excess of $5,000 for its CFAA claim.

Thus, Linden's has properly pled that its losses meet the $5,000 threshold under Section 1030(a)(5)(B)(i).[21]

**D.    Each of Linden's CFAA claims is sufficiently pled.**

   **1.    Linden alleges that Bragg's "access" to Linden's computers was "unauthorized" or "exceeded authorized access" under Sections 1030(a)(2)(C) and 1030(a)(4).**

Bragg argues that the CFAA only outlaws certain types of behavior, such as sending computer viruses, worms, utilizing destructive software, or altering, damaging or destroying a computer.  (Motion at 40).  Not true.  Sections 1030(a)(2)(C) and 1030(a)(4) of the CFAA simply outlaws intentionally accessing a computer "without authorization or exceed[ing] authorized access."  18 U.S.C § 1030(a)(2)(C) and (a)(4).  The term "exceeds authorized access" is defined in the CFAA as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C § 1030(e)(6).[22]

Further, case law has made clear that while the "majority of CFAA cases still involve 'classic' hacking activities," the scope of the CFAA is much broader:  "Congress's 1994 amendment of the CFAA was intended to expand the statute's scope to include civil claims challenging the unauthorized removal of information or programs from a company's computer database."  *Pacific Aerospace*, 295 F. Supp. 2d at 1196 (noting the "ease with which a plaintiff may be able to satisfy the 'unauthorized' element").

---

[21] To the extent that Bragg wishes to challenge such allegations, the correct method by which to do so is through summary judgment, after appropriate discovery, not on a motion to dismiss.

[22] Courts interpreting the CFAA have noted that a claim under the CFAA should be interpreted pursuant to the plain meaning of the statute, and that the "unambiguous meaning" of the CFAA "should be the first and final inquiry."  *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1123-24 (W.D. Wash. 2000).

For example, in *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000), a company brought a CFAA claim against a company that employed one of its former employees, alleging that the employee had accessed the company's computers and the information contained therein without authorization or in "excess of scope of his authorized use" and sent that information to the defendant, his future employer. *Id.* at 1123-24. The defendant moved to dismiss, arguing that the employee's access of the plaintiff's information contained on the plaintiff's computers was not "unauthorized" because he was given access to the plaintiff's information as an employee of the defendant. Thus, the defendant maintained that since the employee had authorized access to the information in question, the plaintiff, as a matter of law, could not maintain an action under CFAA. *Id.* at 1124.

The court rejected this argument, holding that "for the purposes of a Rule 12(b)(6) motion," the defendant lost his "authorization" when he obtained the information and used it in an unauthorized way. *Id.* at 1124-25. Other courts have reached the same conclusion, rejecting attempts by defendants to dismiss CFAA claims under the argument that since they were given access to the plaintiff's computer (and the information contained therein), they could not, as a matter of law, violate the CFAA's prohibition on accessing a computer "without authorization or exceed[ing] authorized access." *See, e.g., United States v. Morris*, 928 F.2d 504, 510 (2d Cir. 1991) (holding that a computer user, with authorized access to a computer and its programs, was without authorization when he used the programs in an unauthorized way); *see also Bro-Tech Corp. v. Thermax, Inc.*, 2006 WL 516767 *1 (E.D. Pa. Feb. 28, 2006) (denying motion to dismiss CFAA claim where the plaintiff alleged that employees had accessed information from computers they had access to by virtue of their employment); *see also Nilfisk v. Advance, Inc. v. Mitchell*, 2006 WL 827073 (W.D. Ark. March. 28, 2006) (denying motion to dismiss CFAA

claim where the defendant had authorization to access the computer (and the information contained therein), finding that the plaintiff had alleged that the defendant had exceeded his authorization).

> **2.    Linden has alleged facts supporting its allegation that Bragg's access and use of Linden's computers to unlawfully bid on unlisted "sims" was "unauthorized" or in "excess of authorized use."**

As previously noted, Bragg's argument that since Linden purportedly "placed" the auction web pages "on the internet for the world to see," Linden cannot state a CFAA claim against him is false. *See, e.g.*, *EF Cultural Travels*, 274 F.3d at 579-84 (1st Cir. 2001) (holding that a CFAA claim was properly brought where information was obtained from a website that was available to the general public in a more efficient manner). Here, Linden alleges that Bragg's access of the auction detail information that Linden had not listed on the main auction page was unauthorized. (*See, e.g.*, CC, ¶¶ 40-42, 63, 87).

Linden also alleges that Bragg's actions were unauthorized because they violated specific portions of Linden's Terms of Service, the contract that existed between Linden and Bragg. (CC, ¶ 30). Courts have found that CFAA claims are properly brought where a party violates a contract that authorizes and governs the use of computers and information and accesses the other party's computers and its system in a way that breaches the contract's terms. For example, in *America Online v. LCGM, Inc.*, 46 F. Supp. 2d 444 (E.D. Va. 1998), AOL sued the defendant who had purchased an AOL account and used it to collect thousands of AOL user e-mail addresses in violation of AOL's Terms of Services. AOL argued that by violating the Terms of Service, the defendant had accessed AOL's website without authorization, and the court agreed, characterizing the defendant's actions as unauthorized since they violated the contractual terms. *Id.* at 448-50.

Thus, Linden has properly alleged that Bragg's access to Linden's computers was without authorization or exceeded authorization.

### a.    Linden's claim under Section 1030(a)(2)(C) is sufficiently pled.

Section 1030(a)(2)(C) makes it a crime to intentionally access a computer without authorization or exceeding authorized access, and obtaining information from any protected computer if the conduct involves interstate or foreign communication.    18 U.S.C § 1030(a)(2)(C).    As already established, Bragg's conduct was without authorization or exceeding authorized access, and Linden's loss and damages exceed $5,000.

Further, Bragg obtained "information" from Linden's protected computer.  While there are no cases interpreting or defining the term "information," the American Heritage Dictionary defines the term "information," as it relates to computers, as "[p]rocessed, stored, or transmitted data." *The American Heritage Dictionary of the English Language, Fourth Edition.* Houghton Mifflin Company, 2004, http://dictionary.reference.com/browse/information (accessed July 24, 2007); *see also Dictionary.com Unabridged (v 1.1)*,    Random House, Inc., http://dictionary.reference.com/browse/information (accessed July 24, 2007) (defining the term "information" as it relates to "Computers" as "data at any stage of processing (input, output, storage, transmission, etc.)").

Here, Linden has alleged that Bragg accessed "stored data" – the "auction detail information . . . for 'sims' that Linden had not yet listed on the main auction page" which are maintained on Linden's computer servers. (*See, e.g.*, CC, ¶¶ 40-63).  Thus, Linden has properly alleged that Bragg obtained "information."  At bottom, Linden has properly alleged that Bragg: (1) intentionally accessed a computer; (2) without authorization or exceeding authorized access; (3) obtained information from Linden's protected computers; and (4) the conduct involves

interstate or foreign communications (*Id.*, ¶¶ 86-87). By tracking the language of the CFAA, and under the liberal pleading requirements of Rule 12(b)(6), Linden has properly pled a claim under Section 1030(a)(2)(C). *Dudick*, 2007 WL 1847435 *5; *see also P.C. of Yonkers*, 2007 WL 708978 at *7.

> **b.    Linden's claim under Section 1030(a)(4) is sufficiently pled.**

Section 1030(a)(4) makes it a crime to knowingly and with intent to defraud, access a protected computer without authorization, or exceeding authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value. 18 U.S.C § 1030(a)(4). As previously discussed, Bragg's conduct was without authorization and / or exceeded authorized access, and Bragg obtained something of value—the virtual land. (CC, ¶¶ 59, 63). Bragg states, without any elaboration, that Linden is required "to plead as a result of his alleged 'fraud,' 'further[ed] the intended fraud and obtain[ed] anything of value." (Motion at 47) (incorrect grammar in original).

However, courts have held that under Section 1030(a)(4), "the CFAA's use of 'fraud' simply means wrongdoing and not proof of common law elements of fraud." *Shurgard*, 119 F. Supp. 2d at 1126. Accordingly, in *Shurgard*, the court found that since "the complaint alleges that the defendant participated in dishonest methods," the plaintiff "has stated a claim upon which relief can be granted under 18 U.S.C. § 1030(a)(4)." *Id.*; *see also P.C. Yonkers*, 2007 WL 708978 at *6-*7 (holding that to state a claim under Section 1030(a)(4), the plaintiff does not need to satisfy Rule 9(b)'s heightened pleading standard for fraud, and that allegations that simply parrot the language of the statute—that the defendant "knowingly and with intent to defraud" satisfy the pleading requirements for a claim under Section 1030(a)(4)).

Similarly, here, Linden has alleged that Bragg "participated in dishonest methods," including engaging in a "scheme" to "surreptitiously and without authorization access[] auction detail information on Linden's computers for 'sims' that Linden had not yet listed on the main auction page of the Second Life site, and before Linden had set the minimum opening bid of U.S. $1,000.00." (CC, ¶ 40). Additionally, Linden alleges details of the scheme, including Bragg's "dishonest methods." (CC, ¶¶ 34-64). Thus, Linden has adequately pled the "fraud" necessary to sustain a claim under Section 1030(a)(4), as well as the other necessary elements for a Section 1030(a)(4) claim.

Linden has alleged that Bragg:  (1) knowingly and with intent to defraud; (2) accessed a protected computer without authorization, or exceeding authorized access; and (3) and by means of such conduct furthered the intended fraud and obtained something of value.  (CC, ¶ 88).  By tracking the language of the CFAA, and under the liberal pleading requirements of Rule 12(b)(6), Linden has properly pled a claim under Section 1030(a)(4).  *Dudick*, 2007 WL 1847435 *5; *see also P.C. of Yonkers*, 2007 WL 708978 at *7.

## VI.    LINDEN'S CALIFORNIA STATUTORY UNFAIR COMPETITION CLAIM (CAL. BUS. & PROF. CODE § 17200) IS PROPER

Section 17200 of the California Business & Professions Code ("Section 17200" or "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994).  Therefore, the UCL establishes three varieties of unfair competition—acts or practices that are unlawful, or unfair, or fraudulent. Whether a business act or practice constitutes unfair competition within Section 17200 is a question of fact, involving "an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *See Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980) (overturning trial court's sustaining demurrer to

-32-

Section 17200 claim, holding that "if that pleading states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story").[23]

### 1. Bragg, as a person, is a proper UCL defendant, and whether his actions are properly termed "business practices" is a question of fact.

Bragg argues, without any legal support, that it is improper for a business to sue an individual under the UCL. (Motion at 49-50). He is wrong. Section 17203 provides that "[a]ny person performing or proposing to perform an act of unfair competition may be enjoined in any court of competent jurisdiction." The term "person" includes "natural persons." UCL, § 17201. As the leading treatise on the UCL states: "These statutes [§ 17200 and § 17500] could hardly be drafted more broadly - - 'any person' can be liable for a § 17200 and § 17500 violation." William L. Stern, *California Business & Professions Code § 17200 Practice*, ¶ 6:2 (2007).

Bragg's second contention, that "Defendant Linden has not (and cannot) allege anything remotely close to a 'business' practice conducted by Plaintiff" (*see* Motion at 50), is also wrong. While Linden is not aware of any case specifically defining the term "business practice," it is clear that that "[w]hether any particular conduct is a business practice within the meaning of section 17200 is a question of fact dependent on the circumstances of each case." *See, e.g., People v. E.W.A.P., Inc.*, 106 Cal. App. 3d 315, 322-23 (1980) (holding allegations of commercial distribution of obscene material sufficient to state a claim under § 17200 and refusing, at the pleading stage, to resolve scope of appropriate injunctive relief); *see also Isuzu*

---

[23] Bragg cites a single case in support of his motion to dismiss Linden's Section 17200 claim: *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224 (2007). Bragg makes no attempt to explain how this case is relevant to the present action, and it is not, as it is an antitrust case. To the extent that any relevance can be found to the present action, it should be noted that the court in *Belton* was asked to consider a Section 17200 claim on a motion for summary judgment, not a motion to dismiss.

*Motors Ltd. v. Consumers Union of United States, Inc.,* 12 F. Supp. 2d 1035, 1048 (C.D. Ca. 1998) (refusing to dismiss Section 17200 claim at the pleading state because determination of whether defendant's defamatory statements about the plaintiff's product were a business practice was "a question of fact dependant on the circumstances of the case").

Here, Linden has alleged that Bragg engaged in a scheme to unlawfully and unfairly acquire "virtual land," which he intended to then resell, at a substantial profit. (CC, ¶¶ 34-66). Actions designed to acquire something of value and then resell it at a higher value would seem to be the essence of a "business practice." At any rate, as case law has made clear, the determination as to whether Bragg's conduct is a "business practice" is "a question of fact dependent on the circumstances of each case."

### 2. Linden has properly pleaded a Section 17200 claim based on Bragg's unlawful business practices.

"The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders,* 27 Cal. App. 4th at 838-39 (1994).[24] Because Section 17200 "borrows" from other law, a plaintiff properly pleads an unfair competition claim if the plaintiff can allege a violation of virtually any other law. *Id.* at 839. Whether a business practice is unlawful is a question of fact. *See id.* at 841 (noting that for Section 17200 claim based on unlawful business practices, "if the pleading states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story"). Linden's Section 17200

---

[24] Bragg's claim that an unlawful business practice must be "grounded in antitrust" (Motion at 50) is wrong. As the court noted in *Saunders,* any practice forbidden by law, regardless of the type of law, can be the basis for an unlawful business practice claim. *See. e.g., Saunders,* 27 Cal. App. 4th at 838-39 (court of appeal held that a state licensing statute governing certified shorthand reporters requiring that they maintain impartiality (Bus. & Prof. C. § 8025) could be the basis for a Section 17200 "unlawful" business practices claim).

claim under the unlawfulness prong is sufficiently pled because, as discussed above, Linden has sufficiently pled claims under the CFAA and California's Statutory Computer Fraud Act.

### 3. Linden had properly pled a claim for unfair business practices by Bragg.

"Unfair" conduct under Section 17200 means "conduct that threatens an incipient violation of an anti-trust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, <u>or otherwise significantly threatens or harms competition</u>." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone*, 20 Cal.4th 163, 187 (1999) (emphasis added).[25]

Here, Linden has sufficiently alleged facts to establish that Bragg's actions otherwise significantly threaten or harm competition: (1) Linden sells rights to "virtual land . . . through auctions that are open to all residents simultaneously" (CC, ¶ 1); (2) Linden conducts auctions of land "so that all users with Premium memberships . . . have an opportunity to bid" on the virtual land (CC, ¶ 18); (3) Bragg unlawfully and unfairly obtained access to "virtual land" that "was scheduled to be auctioned by Linden in the future and thus before it was available to any other users" (CC, ¶ 1, ¶¶ 34-66); and (4) Bragg's actions benefited himself by effectively eliminating competition for bidding on the land he unlawfully and unfairly gained access to (CC, ¶¶ 34-66), and injured the other Premium users by preventing them from getting access to the virtual land Bragg unlawfully and unfairly obtained, as well as by his scheme to resell that land to the other Premium users at a higher price, thereby threatening and harming competition. (CC, ¶¶ 34-66).

---

[25] Again, Bragg misstates the law by arguing that an "unfair" business practice must be based on a violation of antitrust law. (Motion at 50). As courts have noted, "the UCL's prohibition on 'unfair' business practices arguably brings within its radius conduct that might otherwise fall outside the strict confines of antitrust law." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1227 (C.D. Ca. 2003) (denying motion to dismiss Section 17200 claim even though the court granted the motion to dismiss federal and state antitrust claims) (citing *Cel-Tech Communications*, 20 Cal. 4th at 181).

Accepting Linden's alleged facts as true, which the Court must, Linden has properly alleged a cause of action for unfair competition pursuant to Section 17200, since Bragg's conduct threatened and harmed competition for the virtual land he unlawfully and unfairly obtained.

For all the above reasons, Linden has properly pled a Section 17200 claim, and Bragg's Motion must be denied.

## VII. BRAGG'S RULE 12(E) MOTION FOR A MORE DEFINITE STATEMENT SHOULD BE DENIED

Rule 12(e) provides in relevant part:  "If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading."  Fed. R. Civ. P. 12(e).  "A stringent standard accompanies Federal Rule of Civil Procedure 12(e).  With the exception of allegations of fraud and mistake, there is no requirement in the rules that pleading be particular.  The class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small. . . ."  *Sun Co v. Badger Design & Constructors, Inc.*, 939 F. Supp. 365, 374 (E.D. Pa. 1996) (citation and quotation marks omitted).  "The basis for granting such a motion is unintelligibility, not lack of detail.  As long as the defendant is able to respond, even if only with a simple denial, in good faith and without prejudice, the Complaint is deemed sufficient for purposes of Rule 12(e)."  *Wood & Locker, Inc. v. Doran & Assocs.*, 708 F. Supp. 684, 691 (E.D. Pa. 1989) (quotation marks omitted).

Here, Bragg demands that Linden "attach documents that underlie its claims."  (Motion at 51).  This request is properly characterized as a demand for more "detail."  But as this court has already held, "[t]he basis for granting such a motion is unintelligibility, not lack of detail."  *Wood & Locker*, 708 F. Supp. at 691 (denying motion for more definite statement after noting

that if "the pleading satisfies the requirements of Rule 8 and fairly notifies the defendants of the nature of the claims against them, the motion should be denied").  The Counterclaim is not "unintelligible," and Bragg does not argue otherwise.  In fact, Bragg's 54-page Motion underscores the fact that he is able to "frame a responsive pleading" (Fed. R. Civ. P. 12(e)) and "is able to respond." *Wood & Locker*, 708 F. Supp. at 691.  Accordingly, Bragg's Rule 12(e) Motion should be dismissed.

## VIII.  BRAGG'S RULE 12(B)(7) MOTION TO DISMISS FOR LINDEN'S ALLEGED FAILURE TO JOIN NECESSARY PARTIES SHOULD BE DENIED.

Bragg brings a Rule 12(b)(7) motion to dismiss based on Linden's purported failure to join two sets of purportedly necessary parties pursuant to Rule 19—(1) two users who allegedly participated in similar conduct as Bragg did, and (2) Linden's own employees.  (Motion at 52- 54).  Since neither groups meet the legal requirements for a necessary party, the Rule 12(b)(7) motion should be denied.

### A.    Legal Standard for Rule 12(b)(7) Motion and Joinder Under Rule 19.

A defendant can move to dismiss a complaint for failure to join an indispensable party under Rule 12(b)(7).  *Freedom Properties, L.P. v. Lansdale Warehouse Co., Inc.*, 2007 WL 1683850, *2 (E.D. Pa. June 7, 2007).  Rule 19 governs the circumstances under which persons must be joined as parties to an action—where "joinder of persons [is] needed for just adjudication." Fed. R. Civ. P. 19.

Joinder analysis under Rule 19 requires a "bifurcated analysis."  *Freedom Properties*, 2007 WL 1683850 at *2 (denying Rule 12(b)(7) motion).  The court must "first determine whether a party is a necessary party to the dispute" under Rule 19(a).  *Koppers Co., Inc. v. The Aetna Cas. and Sur. Co.*, 158 F.3d 170, 175 (3d Cir. 1998).  "If the absentee is not 'necessary' under subdivision (a), the determinations set forth in subdivision (b) need not be reached."

-37-

*Wood & Locker*, 708 F. Supp. at 689-90 (denying Rule 19 motion to dismiss, noting that since the absent party was "not a necessary party under Rule 19(a), it follows *a fortiori* that it is not indispensable under Rule 19(b) and that the matter of dismissal need not be addressed").

Under Rule 19(a), a party is only necessary in three circumstances, where: (1) complete relief cannot be reached between the present parties (Rule 19(a)(1)); (2) the litigation may affect the absent party's ability to protect its interests (Rule 19(a)(2)(i)); or (3) the absentee has an interest related to the subject matter of the action and the litigation may expose the current parties to multiple judgments or inconsistent obligations because of the potential party's absence. (Rule 19(a)(2)(ii)). "The party raising the defense of failure to join an indispensable party has the burden to show that the person who is not joined is needed for a just adjudication." *Paige v. Philadelphia Housing Authority*, 2002 WL 500677 *8 (E.D. Pa. Mar. 28, 2002).

**B.     Neither of the Two Sets of Parties Are Necessary Parties Under Rule 19.**

**1.     The users identified in the Counterclaim are not necessary parties.**

Bragg argues that "at least four other individuals" are necessary parties and must be joined here because they are "identified . . . in [Linden's] counterclaims alleging violations of computer and business practice statutes," and "at least one of these users are alleged to have participated in the alleged violative conduct **prior to** Plaintiff." (Motion at 53) (emphasis in original). Apparently, it is Bragg's contention that because Linden accuses those specific users of wrongdoing in its Counterclaims, they are necessary parties. He is wrong.

In fact, the United States Court of Appeals for the First Circuit addressed and rejected this exact argument, refusing to find that a non-party accused of wrongdoing was a necessary party under Rule 19(a): "The mere fact, however, that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved improperly does not, by

itself, make C a necessary party." *Pujol v. Shearson/American Express, Inc.*, 877 F.2d 132, 136 (1st Cir. 1989) (cited approvingly in *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 409 (3d Cir. 1993)).

Bragg does not allege that he will not be able to get complete relief absent the users, nor can he; he seeks relief solely from Linden. Thus, Rule 19(a)(1) is not implicated. Nor does Bragg allege that the litigation may affect the absent user's ability to protect their interests. Thus, Rule 19(a)(2)(i) is not implicated. And, Rule 19(a)(2)(ii) is not implicated because Bragg does not (and cannot) argue that the litigation may expose him to multiple judgments or inconsistent obligations where the absent users are not going to sue Bragg. Thus, the users identified in the Counterclaim are not necessary parties.

### 2.      Linden's employees are not necessary parties.

Bragg fails to explain how Linden's employees are "necessary" parties under the appropriate legal standard. They are not necessary under any of the three prongs of Rule 19(a). First, complete relief can be reached between Bragg on the one hand and Linden on the other without joinder of Linden's employees. Bragg can get complete relief from Linden. Thus, Rule 19(a)(1) is not satisfied. While Bragg appears to argue that Linden's own negligence (through the actions of its employees) caused his wrongdoing, even if this were true (which it is not), at best, this is a defense to Linden's counterclaims. It does not make these employees "necessary parties." And, to the extent that Bragg argues that the actions of these employees are at issue in the litigation, he can pursue such evidence through discovery; the employees do not need to be parties for Bragg to access information about their purportedly negligent actions. *See, e.g., Freedom Properties*, 2007 WL 1683850 at *4 (rejecting argument that party was necessary party where "defendants can access . . . information [from the party] by calling [the party] as a witness during discovery or at trial").

Second, there are no allegations that Linden's employees have any interests in this litigation that they must protect, or that they will ever sue Bragg or be sued by Bragg for their conduct. Thus, neither Rule 19(a)(2)(i) or Rule 19(a)(2)(ii) are implicated here. For all of these reasons, Linden's employees are not necessary parties.

## IX.   CONCLUSION

For all of the above reasons, Bragg's Motion should be denied.


Dated: September 13, 2007                    /s/  Laurence Z. Shiekman

                                             Laurence Z. Shiekman (No. 15203)
                                             Thomas T. Watkinson, II (No. 200697)
                                             PEPPER HAMILTON LLP
                                             3000 Two Logan Square
                                             18th & Arch Streets
                                             Philadelphia, PA  19103
                                             (215) 981-4000

                                             Michael G. Rhodes (Cal. 116127)
                                             Benjamin F. Chapman (Cal. 234436)
                                             (*PRO HAC VICE PENDING*)
                                             COOLEY GODWARD KRONISH LLP
                                             4401 Eastgate Mall
                                             San Diego, CA  92121
                                             (858) 550-6000

                                             Attorneys for Defendant and Counterclaim
                                             Plaintiff LINDEN RESEARCH, INC. and
                                             Defendant Philip Rosedale

## CERTIFICATE OF SERVICE

I, Thomas T. Watkinson, II, hereby certify that on this 13th day of September, 2007, the foregoing Defendant/Counterclaim Plaintiff Linden Research, Inc.'s Brief in Opposition to Plaintiff/Counterclaim Defendant Marc Bragg's Motion to Dismiss the Counterclaims Pursuant to Rule 12(b)(6) and Rule 12(b)(7), and motion for more Definite Statement pursuant to Rule 12(e), was served via ECF upon the following counsel:

Jason A. Archinaco
White and Williams LLP
The Frick Building
437 Grant Street, Suite 1001
Pittsburgh, PA 15219-6003

*Attorney for Plaintiff and Counterclaim Defendant Marc Bragg*

/s/   Thomas T. Watkinson, II
Thomas T. Watkinson, II